No. 14-14426

# In the United States Court of Appeals for the Eleventh Circuit

_____

DANA'S RAILROAD SUPPLY; DANA JACKSON; TM JEWELRY LLC;
LEE HARPER; TALLAHASSEE DISCOUNT FURNITURE; DUANA PALMER;
COOK'S SPORTLAND; and ERIC COOK,
*Plaintiffs-Appellants,*

v.

PAMELA JO BONDI,
in her official capacity as Attorney General of the State of Florida,
*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Northern District of Florida

_____

### APPENDIX

_____

Gary B. Friedman
Rebecca Quinn
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

David Frank
FRIEDMAN, FRANK & ABRAHAMSEN
524 E. College Avenue
Tallahassee, FL 32301
(850) 224-4357

Deepak Gupta
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptabeck.com*

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Tab DS**   Docket Sheet .......................................................... A-1

**Tab 1**   Complaint .............................................................. A-8

**Tab 16**   Amended Complaint............................................. A-35

**Tab 18**   Dana Jackson Declaration ................................... A-62

**Tab 19**   Tiffany Ballard Declaration ................................. A-67

**Tab 20**   Duana Palmer Declaration .................................. A-71

**Tab 21**   Eric Cook Declaration ........................................ A-76

**Tab 22**   Deepak Gupta Declaration .................................. A-81

**Tab 22-1**   *Expressions Hair Design v. Schneiderman*...................... A-84

**Tab 22-3**   *New York v. Fulvio* .............................................. A-97

**Tab 22-4**   Michael Parisi Declaration................................. A-105

**Tab 22-5**   Hill and Knowlton Memo Regarding "Consumers Against Penalty Surcharges" .............................. A-115

**Tab 22-6**   Consumers Groups' Opposition to No-Surcharge Law .... A-116

**Tab 22-7**   Senate Staff Analysis and Economic Impact Statement for Florida No-Surcharge Law............................. A-118

**Tab 22-8**   Legislative History of New York No-Surcharge Law ........ A-120

**Tab 22-9**   Legislative History of Connecticut No-Surcharge Law ..... A-137

**Tab 29**   Order Granting Motion to Dismiss ................................... A-141

**Tab 31**   Notice of Appeal ................................................ A-147

**Tab CS**   Certificate of Service ........................................ A-149

# TAB DS

# U.S. District Court
## Northern District of Florida (Tallahassee)
## CIVIL DOCKET FOR CASE #: 4:14-cv-00134-RH-CAS

DANA'S RAILROAD SUPPLY et al v. BONDI
Assigned to: JUDGE ROBERT L HINKLE
Referred to: MAGISTRATE JUDGE CHARLES A
STAMPELOS
Case in other court:  USCA, 14-14426-DD
Cause: 42:1983 Civil Rights Act

Date Filed: 03/05/2014
Date Terminated: 09/02/2014
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**DANA'S RAILROAD SUPPLY**          represented by   **DEEPAK GUPTA**
                                                     GUPTA BECK PLLC - WASHINGTON
                                                     DC
                                                     1625 MASSACHUSETTS AVE NW
                                                     STE 500
                                                     WASHINGTON, DC 20036
                                                     202-888-1741
                                                     Fax: 202-328-7030
                                                     Email: deepak@guptabeck.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **DAVID MICHAEL FRANK**
                                                     DAVID M FRANK PA - TALLAHASSEE
                                                     FL
                                                     1584 METROPOLITAN BLVD
                                                     STE 102
                                                     TALLAHASSEE, FL 32308
                                                     850-894-5729
                                                     Fax: 850-894-5728
                                                     Email: pl.ffalawyers@gmail.com
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DANA JACKSON**                     represented by   **DEEPAK GUPTA**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **DAVID MICHAEL FRANK**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TM JEWELRY LLC**

represented by **DEEPAK GUPTA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID MICHAEL FRANK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LEE HARPER**

represented by **DEEPAK GUPTA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID MICHAEL FRANK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TALLAHASSEE DISCOUNT FURNITURE**

represented by **DEEPAK GUPTA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID MICHAEL FRANK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DUANA PALMER**

represented by **DEEPAK GUPTA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID MICHAEL FRANK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COOK'S SPORTLAND**

represented by **DEEPAK GUPTA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID MICHAEL FRANK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ERIC COOK**

|                        | represented by | **DEEPAK GUPTA**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**DAVID MICHAEL FRANK**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

**PAMELA JO BONDI**

|                        | represented by | **ALLEN C WINSOR**<br>FLORIDA ATTORNEY GENERAL -<br>TALLAHASSEE FL<br>THE CAPITOL PL-01<br>TALLAHASSEE, FL 32399-1050<br>850-414-3688<br>Fax: 850-410-2672<br>Email: allen.winsor@myfloridalegal.com<br>*ATTORNEY TO BE NOTICED*<br><br>**OSVALDO VAZQUEZ**<br>OFFICE OF THE ATTORNEY<br>GENERAL - TALLAHASSEE FL<br>THE CAPITOL STE PL-01<br>400 S MONROE ST<br>TALLAHASSEE, FL 32399<br>202/460-9206<br>Fax: 850-410-2672<br>Email: ovazquez@post.harvard.edu<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 03/05/2014 | 1 | COMPLAINT against PAMELA JO BONDI ( Filing fee $ 400 receipt number 1129-2889349.), filed by DUANA PALMER, ERIC COOK, LEE HARPER, DANA'S RAILROAD SUPPLY, TM JEWELRY LLC, COOK'S SPORTLAND, DANA JACKSON, TALLAHASSEE DISCOUNT FURNITURE. (Attachments: # 1 Summons) (FRANK, DAVID) (Entered: 03/05/2014) |
| 03/05/2014 | 2 | CIVIL COVER SHEET. (FRANK, DAVID) (Entered: 03/05/2014) |
| 03/05/2014 | 3 | Summons Issued as to PAMELA JO BONDI. (jem) (Entered: 03/05/2014) |
| 03/05/2014 | 4 | MOTION to Transfer Case to Tallahassee Division by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (Internal deadline for referral to judge if response not filed earlier: **3/24/2014**). (FRANK, DAVID) (Entered: 03/05/2014) |

| | | |
|---|---|---|
| 03/06/2014 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE RICHARD SMOAK notified that action is needed Re: 4 MOTION to Transfer Case to Tallahassee Division (jem) (Entered: 03/06/2014) |
| 03/11/2014 | 5 | ORDER granting 4 Motion to Transfer Case. The clerk shall transfer and refile this case in the Tallahassee Division for the Northern District of Florida. Signed by JUDGE RICHARD SMOAK on 3/11/2014. (jem) (Entered: 03/11/2014) |
| 03/11/2014 | 6 | Case transferred in from Gainesville Division on 03/11/2014 (Case Number 1:14-cv-25). (jem) (Entered: 03/11/2014) |
| 03/14/2014 | | JUDGE ROBERT L HINKLE and MAGISTRATE JUDGE CHARLES A STAMPELOS added. (tdg) (Entered: 03/14/2014) |
| 03/25/2014 | 7 | Consent MOTION for Extension of Time to File Answer re 1 Complaint, *Unopposed Motion of Defendant For Extension of Time To Respond to Complaint* by PAMELA JO BONDI. (VAZQUEZ, OSVALDO) (Entered: 03/25/2014) |
| 03/26/2014 | 8 | ORDER EXTENDING THE DEADLINE TO RESPOND TO THE COMPLAINT - The defendant's unopposed motion, ECF No. 7 , to extend the deadline to respond to the complaint is GRANTED. (Internal deadline for referral to judge if response not filed earlier: **4/28/2014**). Signed by JUDGE ROBERT L HINKLE on 3/26/2014. (tdl) (Entered: 03/27/2014) |
| 04/28/2014 | 9 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Incorporated Memorandum of Law* by PAMELA JO BONDI. (Attachments: # 1 Exhibit) (VAZQUEZ, OSVALDO) (Entered: 04/28/2014) |
| 04/29/2014 | 10 | INITIAL SCHEDULING ORDER: Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **5/13/2014**. Rule 26 Meeting Report due by **6/12/2014**. Discovery due by **8/27/2014**. Signed by JUDGE ROBERT L HINKLE on 4/29/2014. (tdl) (Entered: 04/30/2014) |
| 05/05/2014 | 11 | Consent MOTION for Extension of Time to File Response/Reply as to 9 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Incorporated Memorandum of Law* by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (FRANK, DAVID) (Entered: 05/05/2014) |
| 05/09/2014 | 12 | ORDER EXTENDING THE DEADLINE TO RESPOND TO THE MOTION TO DISMISS - granting 11 Consent MOTION for Extension of Time to File. (Internal deadline for referral to judge if response not filed earlier: **6/11/2014**.) Signed by JUDGE ROBERT L HINKLE on 5/9/2014. (tdl) (Entered: 05/09/2014) |
| 05/13/2014 | 13 | Corporate Disclosure Statement/Certificate of Interested Persons by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE. (FRANK, DAVID) (Entered: 05/13/2014) |
| 05/30/2014 | 14 | REPORT of Rule 26(f) Planning Meeting. (FRANK, DAVID) (Entered: 05/30/2014) |
| 06/02/2014 | 15 | SCHEDULING ORDER: (Dispositive Motions to be filed by **6/11/2014**.), ( Memorandum in Opposition due by **7/2/2014**., Memorandum in Support of Motion for Summary Judgment due by **6/11/2014**., The moving party may file a reply memorandum due by **7/9/2014**.) Signed by JUDGE ROBERT L HINKLE on 6/2/2014. |

| 06/11/2014 | 16 | FIRST AMENDED COMPLAINT against All Defendants All Defendants., filed by DUANA PALMER, TM JEWELRY LLC, COOK'S SPORTLAND, DANA JACKSON, ERIC COOK, DANA'S RAILROAD SUPPLY, TALLAHASSEE DISCOUNT FURNITURE. (GUPTA, DEEPAK) (Entered: 06/11/2014) |
|---|---|---|
| 06/11/2014 | 17 | MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss* by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (Internal deadline for referral to judge if response not filed earlier: **6/30/2014**). (GUPTA, DEEPAK) (Entered: 06/11/2014) |
| 06/11/2014 | 18 | AFFIDAVIT re 17 MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss , Declaration of Dana Jackson* by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (GUPTA, DEEPAK) (Entered: 06/11/2014) |
| 06/11/2014 | 19 | AFFIDAVIT re 17 MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss , Declaration of Tiffany Ballard* by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (GUPTA, DEEPAK) (Entered: 06/11/2014) |
| 06/11/2014 | 20 | AFFIDAVIT re 17 MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss , Declaration of Duana Palmer* by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (GUPTA, DEEPAK) (Entered: 06/11/2014) |
| 06/11/2014 | 21 | AFFIDAVIT re 17 MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss , Declaration of Eric Cook* by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (GUPTA, DEEPAK) (Entered: 06/11/2014) |
| 06/11/2014 | 22 | AFFIDAVIT in Support re 17 MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss , Declaration of Deepak Gupta* filed by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (GUPTA, DEEPAK) (Entered: 06/11/2014) |
| 06/30/2014 | 23 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *And Incorporated Memorandum of Law* by PAMELA JO BONDI. (VAZQUEZ, OSVALDO) (Entered: 06/30/2014) |
| 07/02/2014 | 24 | MEMORANDUM in Opposition re 17 MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss* filed by PAMELA JO BONDI. (Attachments: # 1 Exhibit Excerpt from Summary Judgment Memorandum) (VAZQUEZ, OSVALDO) (Entered: 07/02/2014) |

| | | |
|---|---|---|
| 07/02/2014 | 25 | AFFIDAVIT in Opposition re 17 MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss* filed by PAMELA JO BONDI. (VAZQUEZ, OSVALDO) (Entered: 07/02/2014) |
| 07/10/2014 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE ROBERT L HINKLE notified that action is needed Re: 15 Scheduling Order - Reply memorandum not filed as to 24 MEMORANDUM in Opposition re 17 MOTION for Summary Judgment. (tdl) (Entered: 07/10/2014) |
| 07/10/2014 | 26 | Consent MOTION to Extend Time *to reply to defendant's response to plaintiffs' motion for summary judgment* by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (FRANK, DAVID) (Entered: 07/10/2014) |
| 07/11/2014 | 27 | ORDER EXTENDING THE DEADLINE TO FILE A REPLY MEMORANDUM IN SUPPORT OF THE SUMMARY-JUDGMENT MOTION - The plaintiffs' unopposed motion, ECF No. 26 , to extend the deadline to file a reply memorandum in support of their summary-judgment motion is GRANTED.(Reply Memorandum due by **7/18/2014**.) Signed by JUDGE ROBERT L HINKLE on 7/11/2014. (tdl) (Entered: 07/11/2014) |
| 07/18/2014 | 28 | REPLY to Response to Motion re 17 MOTION for Summary Judgment *and Memorandum In Opposition to the Attorney General's Motion to Dismiss* filed by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. (GUPTA, DEEPAK) (Entered: 07/18/2014) |
| 09/02/2014 | 29 | ORDER GRANTING 17 SUMMARY JUDGMENT - The defendant's motion to dismiss, ECF No. 23 , is GRANTED. The clerk must enter judgment stating, "The plaintiffs' claims are dismissed with prejudice." The clerk must close the file. Signed by JUDGE ROBERT L HINKLE on 9/2/2014. (tdl) (Entered: 09/02/2014) |
| 09/02/2014 | 30 | CLERK'S JUDGMENT, entered pursuant to 29 Order. (tdl) (Entered: 09/02/2014) |
| 09/30/2014 | 31 | NOTICE OF APPEAL as to 29 Order on Motion to Dismiss for Failure to State a Claim,, Order on Motion for Summary Judgment, 30 Clerk's Judgment by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC. ( Filing fee $505 Receipt Number 1129-3066413.) (FRANK, DAVID) (Entered: 09/30/2014) |
| 09/30/2014 | 32 | Appeal Instructions re: 31 Notice of Appeal: The Transcript Request Form is available on the Internet at http://www.flnd.uscourts.gov/forms/Attorney/ECCA_transcript_form_fillable.pdf **PLEASE NOTE** Separate forms must be filed for each court reporter. Transcript Order Form due by **10/14/2014**. (tdl) (Entered: 09/30/2014) |
| 09/30/2014 | 33 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 31 Notice of Appeal. (tdl) (Entered: 09/30/2014) |
| 09/30/2014 | | Set Deadlines re 31 Notice of Appeal: Clerk to check status of Appeal on **12/30/2014**. Electronic Availability of ROA due by **11/28/2014**. (tdl) (Entered: 09/30/2014) |
| 10/01/2014 | 34 | USCA Case Number 14-14426-DD for 31 NOTICE OF APPEAL. (tdl) (Entered: |

| | | |
|---|---|---|
| | | 10/02/2014) |
| 10/13/2014 | 35 | TRANSCRIPT REQUEST by ERIC COOK, COOK'S SPORTLAND, DANA'S RAILROAD SUPPLY, LEE HARPER, DANA JACKSON, DUANA PALMER, TALLAHASSEE DISCOUNT FURNITURE, TM JEWELRY LLC re 32 Appeal Instructions, Transcript due by **10/14/2014**. (FRANK, DAVID) (Entered: 10/13/2014) |
| 12/01/2014 | 36 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 31 Notice of Appeal,, Appeal No. 14-14426-DD. The entire record on appeal is available electronically. (tdl) (Entered: 12/01/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/01/2014 12:58:45 | | | |
| **PACER Login:** | deepakgupta:3927546:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:14-cv-00134-RH-CAS |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

# TAB 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

|  |  |
|---|---|
| DANA'S RAILROAD SUPPLY, DANA JACKSON, TM JEWELRY LLC, LEE HARPER, TALLAHASSEE DISCOUNT FURNITURE, DUANA PALMER, COOK'S SPORTLAND, and ERIC COOK, | No. _____ |
| *Plaintiffs,* | |
| v. | **COMPLAINT** |
| PAMELA JO BONDI, in her official capacity as Attorney General of the State of Florida, | |
| *Defendants.* | |

## Introduction

Every time a consumer uses a credit card to make a purchase, the merchant incurs a fee—known colloquially as a "swipe fee." These fees are typically passed on to all consumers in the form of higher prices for goods and services. Both state and federal law, however, permit merchants to pass swipe fees on to only those consumers who pay with credit cards. Merchants may do so by charging two different prices depending on how the consumer pays: a higher price for using a credit card, and a lower price for using other payment methods (cash, a personal check, or a debit card). But, in Florida, merchants may engage in dual pricing only if they communicate the difference between the cash price and the credit price using the right *language*: A Florida law allows merchants to offer "discounts" for

using cash or a debit card, yet makes it a criminal offense to impose "surcharges" for using a credit card—even though the conduct in both cases (the use of dual pricing) is the same.

This "virtually incomprehensible distinction between what a vendor can and cannot tell its customers" has already caused one federal court to strike down New York's indistinguishable statute as an impermissible restriction on free speech and as unconstitutionally vague. *Expressions Hair Design v. Schneiderman*, --- F. Supp. 2d ---, No. 13 Civ. 3775, 2013 WL 5477607, *1 (S.D.N.Y. Oct. 3, 2013). And the only other federal court to consider state no-surcharge laws has signaled its agreement, calling the statutes "anti-consumer" and "irrational," and finding "good reason to believe" that the remaining no-surcharge laws will be overturned. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, --- F. Supp. 2d ---, No. 05-MD-1720, 2013 WL 6510737, *19-*20 (E.D.N.Y. Dec. 13, 2013).

Florida's no-surcharge law, Fla. Stat. § 501.0117, is no different. Like New York's, it violates the First Amendment to the U.S. Constitution and is unconstitutionally vague. The plaintiffs are merchants seeking a declaration that the law is unconstitutional and an injunction preventing the State of Florida from enforcing the law against them.

## Jurisdiction

1.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

## Parties

2.     Dana's Railroad Supply is a family-run model railroad and hobby shop in Spring Hill, Florida. Dana's began accepting credit cards when it opened in 2002. As with most small merchants, when Dana's makes a sale on a credit card it incurs a swipe fee of 3% or more per transaction. By contrast, there is no fee for sales made with cash and a significantly lower fee for sales made on debit. For a small business like Dana's, swipe fees are a major cost. To alleviate this burden, Dana's began experimenting with ways to urge customers to pay with cash and debit. One year, Dana's dropped credit cards and accepted only cash. While this avoided merchant fees, it was not a sustainable practice because customers demanded that they be able to pay with credit cards. Another year, Dana's offered customers a 5% discount off the retail price if they chose to pay with cash instead of credit cards. But Dana's eventually gave this up because customers who wanted to pay with credit cards did not react to the discount—they didn't switch to cheaper forms of payment, and Dana's was essentially giving money away to customers who wanted to pay with cash and debit in the first place.

3.     Dana's finally hit upon a solution: The owners posted a sign in the shop stating that Dana's would tack on a small additional fee for transactions paid for with credit cards. But, one day, a customer came into the shop and told the owners that the sign was illegal. After that, Dana's received an official letter from

the Florida Attorney General informing the shop that it was in violation of Florida's no-surcharge law, which makes it illegal to impose a surcharge on a customer electing to use a credit card (even though it is legal to label the identical price difference as a "discount" for cash).  Not wanting to break the law, Dana's took its sign down and stopped describing the price difference as an additional fee.

4.     Dana's understands that it was and is permitted by Florida law to tell customers that it will deduct an amount from the price if they pay with cash or debit—in other words, that customers will pay *less* for cash rather than *more* for credit. In Dana's experience, however, framing the transaction as a discount was not an effective way to generate a reaction from customers. Customers who were already inclined to pay with cash or debit got the discount while credit-card customers just shrugged and continued to pay with credit.  Dana's would like to be able to truthfully tell its customers—either verbally, or by putting its sign back up, or both—that it will add a small fee onto the sale if they choose to pay by credit card, and that there will be no fee if they choose to pay with cash or debit.  Dana's believes it would be much more effective to truthfully describe the price difference as an "extra fee" or "surcharge" for credit rather just than a "discount" for cash. This way, Dana's can disclose the true cost of accepting credit cards and give customers the chance to make an informed choice.

5.     Plaintiff Dana Jackson is the owner of Dana's Railroad Supply, which he operates with his wife.

6.     Plaintiff TM Jewelry LLC is a specialty-jewelry store in Key West, Florida, that designs and makes its own products. The vast majority of its sales are paid for by credit card. For each of those sales, TM Jewelry pays roughly 3% of the total amount in swipe fees—a significant cost for a small business.

7.     A few years ago, TM Jewelry took steps to cut down on that cost and to inform its customers of the high price of credit. It started charging two different prices for its products and services—a lower price to customers paying with cash, check, or debit card and a higher price to customers paying with a credit card. TM Jewelry expressed the difference between these prices as an additional charge (or "surcharge") for credit, which the company made all customers aware of so that they could decide for themselves whether to use a credit card.

8.     By engaging in dual pricing, TM Jewelry increased its prices to account for the cost of credit (which Florida permits) and did so only for those who use credit cards (which Florida also permits). But because TM Jewelry characterized the price difference as an "extra" fee for credit, the Florida Attorney General determined that the company was violating the state's no-surcharge law. In 2013, the Attorney General sent TM Jewelry a letter notifying the company that "surcharges" are unlawful in Florida—even though merchants may provide a "discount" for using cash, check, or debit card. The letter further demanded that TM Jewelry "suspend this practice immediately to avoid the possibility of further action by our office." Not wanting to risk criminal liability, TM Jewelry did just that: It stopped communicating the cost of credit to its customers as a "surcharge."

9.     At that point, the company faced a dilemma. It could continue to engage in dual pricing, while taking pains to communicate the price difference instead as a "discount" for cash or debit. Or it could do away with dual pricing altogether, even though that conduct is lawful in Florida. TM Jewelry chose the latter. It did so because it does not want to describe the difference as a "discount"; it wants to tell its customers that they are paying *more* for credit, not *less* for cash. Only by using its preferred language—that there is a "surcharge" for credit and "no charge" for cash—would TM Jewelry be able to effectively communicate the true cost of credit to its customers. And that is the message it wants to covey: The company knows from experience that customers who are presented with an extra charge for using a credit card are much more likely to respond by using a cheaper payment method. TM Jewelry also decided to abandon dual pricing because it does not fully understand the distinction between a "discount" and a "surcharge," so it is not sure that it could comply with the law in practice. The company would rather play it safe than risk paying a criminal fine or having its owner go to jail.

10.     Plaintiff Lee Harper is the owner of TM Jewelry and is responsible for its day-to-day management.

11.     Plaintiff Tallahassee Discount Furniture (TDF) is a discount furniture store in Tallahassee, Florida. It is in a competitive industry with low profit margins, and swipe fees significantly cut into these margins. Because TDF pays an average of 3% per credit transaction in fees—and because many of its

sales are big-ticket furniture items—TDF pays thousands of dollars in swipe fees each year.

12.     Seeking to reduce these fees, TDF decided to experiment with dual pricing. Like TM Jewelry, it communicated the price difference to its customers as a "surcharge," telling them that—due to the high swipe fees charged by the credit-card industry—they would be charged 2% more for using a credit card. And (again like TM Jewelry), TDF received a letter from the Attorney General telling the company that it was violating Florida law and must "suspend this practice immediately to avoid the possibility of further action by our office."

13.     TDF is concerned about the law's effect on how it communicates it prices to customers. TDF would like to describe its policy as a "surcharge" because it believes that is the most effective way to inform its customers of the true costs of credit. But TDF worries that describing its prices in this way would expose the company to criminal liability. Although TDF understands that it may lawfully communicate the price difference as a "discount" for cash, that is not how it wants to characterize its prices to its customers. When TDF told customers that there was a 2% charge on credit cards, it was effective: The vast majority switched to cash or debit. The word "discount," by contrast, makes it sound like TDF's prices are higher than they are and does not give customers the same incentive to avoid using credit. Moreover, the blurry distinction between "surcharge" and "discount" leaves the company uncertain that it can implement a dual-pricing system in a lawful way.

14.     Plaintiff Duana Palmer is the owner of TDF and is responsible for its day-to-day management.

15.     Plaintiff Cook's Sportland is an outdoor-sporting-goods store in Naples, Florida. For a small family business like Cook's, credit-card swipe fees make an enormous difference. The company pays as much as 3% per credit transaction in fees. Because these transactions make up a significant portion of its sales, Cook's pays thousands of dollars in fees every year—an amount that has steadily increased over time.

16.     A few years ago, Cook's decided to bring swipe fees to the attention of its customers. It began telling customers that they would pay an additional charge if they used a credit card. Cook's did this for about six weeks before it too received a letter from the Florida Attorney General notifying the company that it was violating Florida's no-surcharge law. The letter told Cook's to "suspend this practice immediately to avoid the possibility of further action by our office." Afraid the Attorney General would follow through on its enforcement threat—potentially subjecting the company and its owner to criminal penalties—Cook's stopped telling customers that it would charge extra for credit. This means that swipe fees now get passed on to *all* of its customers, cash and credit users alike, in the form of higher prices. And because swipe fees are kept hidden, customers have no disincentive to use credit—just the opposite, in fact, because of the benefits that most credit cards offer—which raises fees even higher.

17.    The reason Cook's no longer has dual pricing is because of the law's prohibition on speech and also because of its vagueness. As to the former: Cook's would like to communicate the price difference as a "surcharge" for credit—not a "discount" for cash, which would make prices look higher than they are—because the company believes that this would most effectively convey the costs of credit to its customers. Florida's no-surcharge law blocks it from doing so. As to the latter: The law is so vague about what it prohibits that Cook's is afraid to have any dual pricing at all, lest it accidentally subject itself to criminal prosecution.

18.    If it were legal, Cook's would tell its customers that it offers one low base price for each of its products and that there is an additional fee if a customer chooses to pay with a credit card. Cook's believes that this truthful speech is easy to understand and would benefit both the company and its customers by giving customers the information they need to make the best decisions about how to pay for their purchases. But Florida's no-surcharge law makes that speech a crime.

19.    Plaintiff Eric Cook is the owner of Cook's and is responsible for its day-to-day management.

20.    Defendant Pamela Jo Bondi is the Attorney General of Florida and is responsible for enforcing the laws of the state, including the state's no-surcharge law. She is named as a defendant only in her official capacity.

**Factual Background**

21.    Americans pay some of the highest swipe fees in the world—seven or eight times those paid by Europeans, according to estimates by the Merchants

Payments Coalition. The main reason swipe fees are so high is that they are kept hidden from consumers, who decide which payment method to use and thus determine whether a fee will be incurred in the first place. According to one survey, about 41% of American credit-card users are completely unaware that merchants are charged fees to process credit-card transactions. Although merchants are allowed to charge consumers more for using credit than for using cash, merchants cannot effectively communicate that added cost because Florida and other states force them to call it a "discount" for cash rather than a "surcharge" for credit.

22.     Florida's no-surcharge law makes it a criminal offense—punishable by a fine of $500 and jail time—for any "seller or lessor in a sales or lease transaction [to] impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card." Fla. Stat. § 501.0117(1). Florida's no-surcharge law does *not*, however, outlaw dual pricing. The law expressly permits "the offering of a discount for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card, if the discount is offered to all prospective customers." *Id.*

23.     Until 2013, Florida's no-surcharge law was effectively redundant because credit-card companies imposed similar speech prohibitions in their contracts with merchants. But after federal antitrust litigation caused the three dominant credit-card companies (Visa, MasterCard, and American Express) to

agree to change their contracts to remove their no-surcharge rules, Florida's law took on added importance. It is now the only thing keeping the plaintiffs from saying what they would like: that they impose a "surcharge" for using credit because credit costs more.

## I.   Why labels matter: the communicative difference between "surcharges" and "discounts"

24.   A "surcharge" on credit and a "discount" for cash "are different frames for presenting the same price information—a price difference between two things." Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1351-52 (2008). They are identical in every way except one: the *label* that the merchant uses to communicate that price difference.

25.   But labels can matter. "[T]he frame within which information is presented can significantly alter one's perception of that information, especially when one can perceive the information as a gain or a loss," as with the price difference between using cash and using credit. Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence of Market Manipulation*, 112 Harv. L. Rev. 1420, 1441 (1999). This is largely because of a well-known cognitive phenomenon called "loss aversion," which refers to people's tendency to let "changes that make things worse (losses) loom larger than improvements or gains" of an equivalent amount. Daniel Kahneman, Jack L. Knetsch, & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persp. 193, 199 (1991). Put more simply: "people have stronger reactions to losses

and penalties than to gains." Adam J. Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 Berkeley Bus. L.J. 265, 280 (2006).

26.    Because of this, "[c]onsumers react very differently to surcharges and discounts," even though they present the exact same pricing information. *Id.* Consumers are more likely to respond to surcharges (which are perceived as *losses* for using credit) than to discounts (which are perceived as *gains* for not using credit). *Id.* Research shows just how wide this gap is. In one study, 74% of consumers had a negative or strongly negative reaction to credit surcharges, while fewer than half had a negative or strongly negative reaction to cash discounts. That difference—the difference in how the same pricing information is understood by consumers—influences their behavior, making "surcharges" a much more effective way to communicate the costs of credit to consumers.

27.    The effectiveness of surcharges is why the plaintiffs in this case seek to impose them: surcharges inform consumers of the costs of credit, letting consumers decide for themselves whether credit's benefits outweigh its costs. That exchange of information creates meaningful competition, which in turn drives down costs—as demonstrated by price-transparency reforms in Europe and Australia. If consumers are made aware of swipe fees and determine that they are too high, consumers will use a different payment method, and banks and credit-card companies will have to lower their fees to attract more business. Indeed, in Australia, where regulators in 2003 allowed complete transparency of price

information and merchants have responded with surcharges, swipe fees have greatly declined.

28.    But when the government criminalizes framing the added cost of credit as a "surcharge," as Florida has done, merchants lose their most effective means of informing consumers of the high costs of credit. Moreover, because the dividing line between what constitutes a "surcharge" and what constitutes a "discount" is so blurry, many merchants do not even attempt to offer dual pricing, even though the law allows it, to avoid accidentally subjecting themselves to criminal punishment. And many other merchants falsely believe that they may not offer any dual pricing at all. The upshot, then, is that merchants end up passing on swipe fees to *all* consumers by raising the prices of goods and services across the board. This means that consumers are unaware of how much they pay for credit and have no incentive to reduce their credit-card use because they will pay the same price regardless. As a result, swipe fees have soared.

29.    Swipe fees thus function as an invisible tax, channeling vast amounts of money from consumers to some of the nation's largest banks and credit-card companies. Because cash and credit purchasers both pay this tax, swipe fees are also highly regressive: low-income cash purchasers subsidize the cost of credit cards, while enjoying none of their benefits or convenience. According to Federal Reserve economists, "[b]y far, the bulk of [this subsidy] is enjoyed by high-income credit card buyers," who receive an average of $2,188 every year, paid

disproportionately by poor and minority households. The result is a regime in which food-stamp recipients are subsidizing frequent-flier miles.

30.    For these reasons, numerous prominent economists and consumer advocates—from Joseph Stiglitz to Elizabeth Warren—have opined that no-surcharge policies are bad for consumers and hurt competition.

## II.    The credit-card industry's concerted efforts to prevent merchants from communicating the costs of credit as "surcharges"

31.    The invisibility of swipe fees is no accident. It is the product of concerted efforts by the credit-card industry over many decades to ensure that merchants cannot communicate to consumers the added price they pay for using credit. Over the years, the industry has succeeded, both through contractual provisions and legislative measures, to silence merchants' attempts to call consumers' attention to the true costs of credit.

### The industry's early ban on differential pricing ends

32.    In the early days of credit cards, any attempt at differential pricing between credit and non-credit transactions was strictly forbidden by rules imposed on merchants in their contracts with credit-card companies. That changed in 1974 after two important developments. *First*, Consumers Union sued American Express on the ground that its contractual ban on differential pricing was an illegal restraint on trade. Rather than face the prospect that federal courts would mandate full price transparency, American Express almost immediately settled the

suit by agreeing to allow merchants to provide consumers with differential price information.

33.     *Second*, Congress then enacted legislation protecting the right of merchants to have dual-pricing systems. Congress amended the Truth in Lending Act to provide that "a card issuer may not, by contract, or otherwise, prohibit any such seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Pub. L. No. 93, § 495, 88 Stat. 1500 (1974).

**The credit-card industry shifts its strategy to labeling**

34.     The 1974 amendments were initially considered a victory for consumers. But the credit-card industry, seizing on Congress's use of the word "discount," soon shifted its focus to the way merchants could *label* and *describe* such pricing to consumers. Aware that how information is presented to consumers can have a huge impact on their behavior—and that many merchants would avoid dual pricing altogether if "surcharges" were outlawed—the credit-card lobby "insist[ed] that any price difference between cash and credit purchases should be labeled a cash discount rather than a credit card surcharge." Amos Tversky & Daniel Kahneman, *Rational Choice and the Framing of Decisions*, 59 J. Bus. S251, S261 (1986).

### The credit-card industry's labeling strategy achieves short-lived success at the national level

35.    In 1976, after two years of lobbying Congress to impose the credit-card industry's preferred speech code, the industry succeeded in getting Congress to enact a temporary ban on "surcharges," despite the authorization for "discounts." *See* Pub. L. No. 94–222, 90 Stat. 197 ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means."). This controversial measure set the stage for a series of battles over renewal of the ban, culminating in an intense political debate in the mid-1980s that pitted both the Reagan Administration and consumer groups against the credit-card industry.

36.    With the "surcharge" ban set to expire in 1981, the federal government and consumer advocates registered the impact that it had on consumers' and merchants' behavior. The Chairman of the Federal Trade Commission, writing in opposition to extending the law, recognized that the "surcharge" label drives home the true marginal cost of a credit transaction to the consumer. S. Rep. 97-23, at 11-12. Although "a discount and a surcharge are equivalent concepts," he remarked, "one is hidden in the cash price and the other is not," meaning that a ban on "surcharges" prohibited merchants from disclosing to their customers the true cost of credit. *Id.* at 10.

37.    The Federal Reserve Board held a similar view. One member— presenting the Board's unanimous opposition to the surcharge ban's extension—

pointed out "the obvious difficulty in drawing a clear economic distinction between a permitted discount and a prohibited surcharge." *Cash Discount Act, 1981: Hearings on S. 414 Before the Subcomm. On Consumer Affairs of the Senate Comm. On Banking, Housing, & Urban Affairs*, 97th Cong., 1st Sess. 9 (Feb. 18, 1981) (Nancy Teeters, Federal Reserve Board). "If you just change the wording a little bit, one becomes the other." *Id.* at 22. The Board thus proposed "a very simple rule": that both surcharges and discounts be allowed, and "that the availability of the discount or surcharge be disclosed to consumers." *Id.* at 10.

38.   Every major consumer advocacy organization agreed, and urged Congress to let the ban lapse and allow surcharges. One consumer advocate testified that the difference between surcharges and discounts "is merely one of semantics, and not of substance." *Id.* at 98 (Ellen Broadman, Consumers Union). But "the semantic differences are significant," she explained, because "the term 'surcharge' makes credit card customers particularly aware that they are paying an extra charge," whereas "the discount system suggests that consumers are getting a bargain, and downplays the truth." *Id.* Another advocate put it more pithily: "one person's cash discount may be another person's surcharge." *Id.* at 90 (Jim Boyle, Consumer Federal of America). "Removing the ban on surcharges," he explained, "is an important first step" to "disclos[ing] to consumers the full" cost of credit so that they can "make informed judgments." *Id.* at 92.

39.   On the other side of the debate, American Express and MasterCard "wholeheartedly" and "strongly" supported the ban, even though, from a

"mathematical viewpoint," "there is really no difference between a discount for cash and a surcharge for credit card use." *Id.* at 43 (Hugh H. Smith, American Express); *id.* at 55 (Amy Topiel, MasterCard). And the big banks, like the credit-card giants, supported treating "surcharges" and "discounts" differently because a surcharge "makes a negative statement about the card to the consumer." *Id.* at 32 (Peter Hood, American Bankers Association). Surcharges, a banking lobbyist openly explained, "talk against the credit industry." *Id.* at 60. Congress ultimately gave in to industry lobbying and renewed the ban for an additional three years. Pub. L. 97–25, 95 Stat. 144 (1981).

40.     In 1984, the no-surcharge law was again set to expire. Senator William Proxmire of Wisconsin, one of the ban's chief opponents, cut to the chase: "Not one single consumer group supports the proposal to continue the ban on surcharges," he observed. "The nation's giant credit card companies want to perpetuate the myth that credit is free." Irvin Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984, at D12. The credit-card industry, acutely conscious of the threat that merchants' disclosure of credit's true cost posed to its business model, responded by unleashing a massive lobbying campaign to oppose ending the ban. Stephen Engelberg, *Credit Card Surcharge Ban Ends*, N.Y. Times, Feb. 27, 1984, at D1. One senior vice president of Shearson/American Express remarked in 1984 that his company had been opposing ending the ban for eight years. He observed that consumers do not write angry letters to credit-card companies about cash discounts, but do complain about surcharges. *Id.* He

concluded that ending the ban "could potentially hurt the image of" credit cards, revealing that the industry viewed its legislative efforts as playing a key role in dictating the perception of credit cards among consumers. *Id.* This time, the industry's efforts failed, and the ban lapsed in 1984. Levitin, *Priceless?*, 55 UCLA L. Rev. at 1381.

41.     A 1981 report of the Senate Banking Committee, prepared as part of the law's initial renewal, stressed the law's role in regulating how a merchant could frame a dual-pricing system. The Committee observed that "while discounts for cash and surcharges on credit cards may be mathematically the same, their practical effect and the impact they may have on consumers is very different." S. Rep. 97-23, at 3. The no-surcharge law thus effectively set forth a speech code, requiring that merchants label their prices in the way that best hid the costs of credit and most enabled the credit-card companies to take advantage of the framing effect: by advertising the credit price as the "regular" price, and the cash price as a "discount" from that price.

42.     Furthermore, the vague distinction between "discounts" and "surcharges," and the risk of inadvertently describing a dual-pricing system in an unlawful way, led merchants to steer clear of such systems. In an editorial in *The New York Times*, Senator Christopher Dodd of Connecticut, a proponent of allowing surcharges, noted that "many merchants are not sure what the difference between a discount and a surcharge is and thus do not offer different cash and credit prices for fear they will violate the ban on surcharges." Sen. Christopher J.

Dodd, *Credit Card Surcharges: Let the Gouger Beware*, N.Y. Times, Mar. 12, 1984, at A16. *See also* Carol Krucoff, *When Cash Pays Off*, Wash. Post, Sept. 22, 1981 (describing consumer activist who argued that merchants have not offered cash discounts because "the regulations have been so complicated. Smaller business people, who are most likely to offer them, may have been intimidated by the fear it could be viewed as an illegal surcharge."); Engelberg, *Credit Card Surcharge Ban Ends*, at D1 ("A House aide said that one explanation for the relative unpopularity of cash discounts is that retailers, aware that surcharges on credit purchases are illegal, have erroneously assumed that discounts are not permitted.").

### The credit-card industry lobbies the states to enact no-surcharge laws and adopts contractual no-surcharge rules

43.    After the controversial federal ban expired, the credit-card industry briefly turned to the states, convincing fewer than a dozen (including Florida) to enact no-surcharge laws of their own. In an early instance of the phenomenon now known as "astroturfing," American Express and Visa went to great lengths to create the illusion of grassroots support for such laws, even going so far as to create and bankroll a fake consumer group in Florida called "Consumers Against Penalty Surcharges." But the overwhelming majority of the real consumer groups— including Consumers Union and Consumer Federation of America—opposed state no-surcharge laws because they discouraged merchants from making the costs of credit transparent, which resulted in an enormous hidden tax paid by all consumers whenever they made a purchase.

44.     Florida's law took effect in 1987. Fla. Stat. § 501.0117. That same year, a New York court concluded that, under that state's criminal no-surcharge law, "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *People v. Fulvio*, 517 N.Y.S.2d 1008, 1011 (Crim. Ct. N.Y. 1987) (emphasis in original). The court explained: "[W]hat [the law] *permits* is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what [the law] *prohibits* is a price differential, in that so long as that differential is characterized as an additional charge for payment by use of a credit card, it is legally impermissible. . . . [The law] creates a distinction without a difference; it is not the *act* which is outlawed, but the *word* given that act." *Id.* at 1015 (emphasis in original). Similarly, the legislative history of Florida's no-surcharge law recognizes "that from an economic standpoint there is no difference between a cash discount, as permitted by [Florida law], and a credit surcharge, as would be prohibited by this bill." Senate Staff Analysis and Economic Impact Statement (Apr. 17, 1987).

45.     Around the same time that Florida's no-surcharge law was enacted, the major credit-card companies changed their contracts with merchants to include no-surcharge rules. No-surcharge laws in Florida and other states thus function as a legislative extension of the restrictions that credit-card issuers previously imposed more overtly by contract. For instance, American Express's

contracts with merchants included an elaborate speech code. The contracts provided that merchants may not "indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card"; "try to dissuade Cardmembers from using the Card"; "criticize … the Card or any of our services or programs"; or "try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check).

### The Durbin Amendment and the
### recent political controversy over swipe fees

46.     From the mid-1980s until the 2000s the issue of swipe fees remained largely in the shadows. Even in the majority of states without anti-surcharge laws, the contractual no-surcharge rules ensured that consumers were rarely informed of the true costs of credit. Developments in the late 2000s, however, caused swipe fees to reemerge as a volatile political issue.

47.     The global financial crisis of 2007-2008 and the ensuing push for financial-regulation reform resulted in renewed focus on swipe fees. Senator Dick Durbin of Illinois proposed an amendment to the Senate version of the Dodd-Frank Wall Street Reform and Consumer Protection Act that aimed to reduce the fees associated with transactions by both debit and credit cards. Although proposed legislation to regulate *credit-card* swipe fees was defeated, the Durbin Amendment was enacted into law. As enacted, it establishes a procedure by which the Federal Reserve Board now sets the maximum swipe fees for *debit-card* transactions. 15 U.S.C. § 1693o-2(a). It also includes a provision protecting

merchants' rights to offer consumers incentives for using different payment methods: "A payment card network shall not … by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards." *Id.* § 1693o-2(b)(2).

48.     The fight over the Durbin Amendment shone a spotlight on the amount of revenue that banks generate from swipe fees, initiated a frenzy of lobbying by the credit-card industry, and touched off a contentious national political debate. Many merchants sought to convey their opposition to swipe fees directly to their customers—and voters—at the checkout counter. The national convenience store chain 7-Eleven, for example, put up signs asking customers to "STOP UNFAIR CREDIT CARD FEES" and gathered a total of 1.6 million signatures on a petition to support legislation on credit-card fees. 7-Eleven claimed that its petition represented the largest quantity of signatures ever presented to Congress—trumping even the 1.3 million signatures presented to Congress regarding national healthcare reform.

### Visa, MasterCard, & American Express drop their no-surcharge rules

49.     In May 2005, Animal Land Inc., a pet-relocation company based in Atlanta, Georgia, sued Visa for a declaration that its no-surcharge rule violated antitrust laws by preventing Animal Land and other merchants from assessing a discrete, denominated charge upon customers using credit cards, as opposed to

cash, checks, or debit cards. *Animal Land, Inc. v. Visa USA, Inc.*, No. 05-CV-1210 (N.D. Ga.). In the ensuing months, numerous U.S. merchants and trade associations brought claims against the dominant credit-card networks, alleging that they engaged in illegal price-fixing and impermissibly banned merchants from encouraging customers to use less expensive payment methods.

50.    Under the terms of a national class-action settlement, Visa and MasterCard in January 2013 dropped their prohibitions against merchants imposing surcharges on credit-card transactions. And in December 2013—in response to a separate lawsuit—American Express agreed to drop its surcharge ban as well.

51.    As a result, state no-surcharge laws—previously redundant because of contractual no-surcharge rules—have now gained added importance. And as they did in the 1980s, credit-card companies are once again seeking to discourage dual pricing by pushing state legislation that dictates the labels that merchants can use for such systems.

### New York's no-surcharge law is declared unconstitutional

52.    In June 2013, five merchants—supported by several national consumer groups and retailers as amici curiae—brought a constitutional challenge to New York's no-surcharge law in federal district court, claiming that it violated the First Amendment and was unconstitutionally vague. By making liability "turn[] on the language used to describe identical conduct," they argued, the law is a content-based speech restriction that is subject to heightened scrutiny, which it

cannot withstand. They further argued that the law is unconstitutionally vague because it does not define the line between a "surcharge" and a "discount," and "[y]et that line marks the difference between what is criminal and what is not."

53.    The court agreed. In October 2013, it declared the law unconstitutional and granted a preliminary injunction against its enforcement. *See Expressions*, --- F. Supp. 2d ---, 2013 WL 5477607. One month later, final judgment, including a permanent injunction, was entered in favor of the plaintiffs.

## Claims for Relief

### Claim One: Violation of the First Amendment (under 42 U.S.C. § 1983)

54.    Florida's no-surcharge law regulates how the plaintiffs may characterize the price differences they may lawfully charge for credit and cash purchases. The law allows them to tell their customers that they are paying *less* for using cash or other means of payment (a "discount"), but not that they are paying *more* for using credit (a "surcharge"). This state-imposed speech code prevents the plaintiffs from effectively conveying to their customers—who absorb the costs of credit through higher prices for goods and services—that credit cards are a more expensive means of payment.

55.    By prohibiting certain disfavored speech by merchants—and enforcing that prohibition with criminal penalties—Florida's no-surcharge law violates the plaintiffs' First Amendment rights, as applied to the states through the Fourteenth Amendment. Because the no-surcharge law is a content- and speaker-based restriction on speech, it is subject to heightened scrutiny under the First

Amendment. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). Regardless of whether the law is analyzed under a special commercial-speech inquiry, it cannot survive. The prohibited speech concerns lawful activity (engaging in dual pricing) and is not misleading; Florida has no substantial interest in prohibiting the speech; and Florida's no-surcharge law does not directly advance—and is far more extensive than necessary to serve—any interest the state might have. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980).

### Claim Two: Void for vagueness (under 42 U.S.C. § 1983)

56.     Florida's no-surcharge law does not provide guidance about what speech is permitted and invites arbitrary and discriminatory enforcement. Because the law makes criminal liability turn on the blurry difference between two ways of describing the same conduct, the law does not provide a person of ordinary intelligence reasonable opportunity to know what is prohibited. Additionally, the law lacks explicit standards for those charged with its enforcement. It is therefore unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

### Request for Relief

The plaintiffs request that the Court:

A.     Declare that Florida's no-surcharge law is unconstitutional and enjoin its enforcement;

B.     Award the plaintiffs their reasonable costs, expenses, and attorney's fees under 42 U.S.C. § 1988; and

C.      Grant the plaintiffs all other appropriate relief.


March 5, 2013                                    Respectfully submitted,

                                                */s/ Deepak Gupta*
                                                DEEPAK GUPTA
                                                GREGORY A. BECK
                                                JONATHAN E. TAYLOR
                                                GUPTA BECK PLLC
                                                1625 Massachusetts Avenue, NW
                                                Suite 500
                                                Washington, DC 20036
                                                (202) 470-3826

                                                GARY B. FRIEDMAN
                                                TRACEY KITZMAN
                                                REBECCA QUINN
                                                FRIEDMAN LAW GROUP LLP
                                                270 Lafayette Street
                                                New York, NY 10012
                                                (212) 680-5150

                                                DAVID FRANK
                                                FRIEDMAN, FRANK &
                                                ABRAHAMSEN
                                                524 E. College Avenue
                                                Tallahassee, FL 32301
                                                (850) 224-4357

                                                *Counsel for Plaintiffs*

# TAB 16

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

DANA'S RAILROAD SUPPLY, DANA
JACKSON, TM JEWELRY LLC; TIFFANY
BALLARD; TALLAHASSEE DISCOUNT
FURNITURE; DUANA PALMER; COOK'S
SPORTLAND; and ERIC COOK,

> *Plaintiffs,*

> v.

PAMELA JO BONDI, in her official capacity as
Attorney General of the State of Florida,

> *Defendants.*

No. 4:14cv134-RH/CAS

**FIRST AMENDED
COMPLAINT**

### Introduction

Every time a consumer uses a credit card to make a purchase, the merchant

incurs a fee—known colloquially as a "swipe fee." These fees are typically passed

on to all consumers in the form of higher prices for goods and services. Both state

and federal law, however, permit merchants to pass swipe fees on to only those

consumers who pay with credit cards. Merchants may do so by charging two

different prices depending on how the consumer pays: a higher price for using a

credit card, and a lower price for using other payment methods (cash, a personal

check, or a debit card). But, in Florida, merchants may engage in dual pricing only

if they communicate the difference between the cash price and the credit price

using the right *language*: A Florida law allows merchants to offer "discounts" for

using cash or a debit card, yet makes it a criminal offense to impose "surcharges" for using a credit card—even though the conduct in both cases (the use of dual pricing) is the same.

This "virtually incomprehensible distinction between what a vendor can and cannot tell its customers" has already caused one federal court to strike down New York's indistinguishable statute as an impermissible restriction on free speech and as unconstitutionally vague. *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430 (S.D.N.Y. 2013). And the only other federal court to consider state no-surcharge laws has signaled its agreement, calling the statutes "anti-consumer" and "irrational," and finding "good reason to believe" that the remaining no-surcharge laws will be overturned. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, --- F. Supp. 2d ---, 2013 WL 6510737, *19-*20 (E.D.N.Y. Dec. 13, 2013).

Florida's no-surcharge law, Fla. Stat. § 501.0117, is no different. Like New York's, it violates the First Amendment to the U.S. Constitution and is unconstitutionally vague. The plaintiffs are merchants seeking a declaration that the law is unconstitutional and an injunction preventing the State of Florida from enforcing the law against them.

### Jurisdiction

1.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

### Parties

2.     Dana's Railroad Supply is a family-run model railroad and hobby shop in Spring Hill, Florida. Dana's began accepting credit cards when it opened

in 2002. As with most small merchants, when Dana's makes a sale on a credit card it incurs a swipe fee of 3% or more per transaction. By contrast, there is no fee for sales made with cash and a significantly lower fee for sales made on debit. For a small business like Dana's, swipe fees are a major cost. To alleviate this burden, Dana's began experimenting with ways to urge customers to pay with cash and debit—forms of payment that are less expensive for the store to accept. One year, Dana's dropped credit cards and accepted only cash. While this avoided merchant fees, it was not a sustainable practice because customers demanded that they be able to pay with credit cards. Another year, Dana's offered customers a percentage-based discount off the retail price if they chose to pay with cash instead of credit cards. But Dana's eventually gave this up because customers who wanted to pay with credit cards did not react to the discount—they didn't switch to cheaper forms of payment, and Dana's was essentially giving money away to customers who wanted to pay with cash and debit in the first place.

3.      Finally, Dana's hit upon a solution: The owners posted a sign in the shop stating that Dana's would tack on a small additional fee for transactions paid for with credit cards. But, one day, a customer came into the shop and told the owners that the sign was illegal. After that, Dana's received an official letter from the Florida Attorney General informing the shop that it was in violation of Florida's no-surcharge law, which makes it illegal to impose a surcharge on a customer electing to use a credit card (even though it is legal to label the identical

price difference as a "discount" for cash).  Not wanting to break the law, Dana's took its sign down and stopped describing the price difference as an additional fee.

4.  Dana's understands that it was and is permitted by Florida law to tell customers that it will deduct an amount from the price if they pay with cash or debit—in other words, that customers will pay *less* for cash rather than *more* for credit. In Dana's experience, however, framing the transaction as a discount was not an effective way to generate a reaction from customers. Customers who were already inclined to pay with cash or debit got the discount while credit-card customers just shrugged and continued to pay with credit.  Dana's would like to be able to tell its customers—either verbally, or by putting its sign back up, or both— that it will add a small fee onto the sale if they choose to pay by credit card, and that there will be no fee if they choose to pay with cash or debit.  Dana's believes it would be much more effective to say that there is an "extra fee" or "surcharge" for credit rather than a "discount" for cash. This way, Dana's can disclose the true cost of accepting credit cards and give customers the chance to make an informed choice.

5.  Plaintiff Dana Jackson is the owner of Dana's Railroad Supply, which we operates with his wife.

6.  Plaintiff TM Jewelry LLC is a specialty-jewelry store in Key West, Florida, that designs and makes its own products. The vast majority of its sales are paid for by credit card. For each of those sales, TM Jewelry pays roughly 3% of the total amount in swipe fees—a significant cost for a small business.

FIRST AMENDED COMPLAINT | Page 4

7.      A few years ago, TM Jewelry took steps to cut down on that cost and to inform its customers of the high price of credit. It started charging two different prices for its products and services—a lower price to customers paying with cash, check, or debit card and a higher price to customers paying with a credit card. TM Jewelry expressed the difference between these prices as an additional charge (or "surcharge") for credit, which the company made all customers aware of so that they could decide for themselves whether to use a credit card.

8.      By engaging in dual pricing, TM Jewelry increased its prices to account for the cost of credit (which Florida permits) and did so only for those who use credit cards (which Florida also permits). But because TM Jewelry characterized the price difference as an "extra" fee for credit, the Florida Attorney General determined that the company was violating the state's no-surcharge law. In 2013, the Attorney General sent TM Jewelry a letter notifying the company that "surcharges" are unlawful in Florida—even though merchants may provide a "discount" for using cash, check, or debit card. The letter further demanded that TM Jewelry "suspend this practice immediately to avoid the possibility of further action by our office." Not wanting to risk criminal liability, TM Jewelry did just that: It stopped communicating the cost of credit to its customers as a "surcharge."

9.      At that point, the company faced a dilemma. It could continue to engage in dual pricing, while taking pains to communicate the price difference instead as a "discount" for cash or debit. Or it could do away with dual pricing altogether, even though that conduct is lawful in Florida. TM Jewelry chose the

latter. It did so because it does not want to describe the difference as a "discount"; it wants to tell its customers that they are paying *more* for credit, not *less* for cash. Only by using its preferred language—that there is a "surcharge" for credit and "no charge" for cash—would TM Jewelry be able to effectively communicate the true cost of credit to its customers. And that is the message it wants to covey: The company knows from experience that customers who are presented with an extra charge for using a credit card are much more likely to respond by using a cheaper payment method. TM Jewelry also decided to abandon dual pricing because it does not fully understand the distinction between a "discount" and a "surcharge," so it is not sure that it could comply with the law in practice. The company would rather play it safe than risk paying a criminal fine or having its owner go to jail.

10.     Plaintiff Tiffany Ballard is the owner of TM Jewelry and is responsible for its day-to-day management.

11.     Plaintiff Tallahassee Discount Furniture (TDF) is a discount furniture store in Tallahassee, Florida. It is in a competitive industry with low profit margins, and swipe fees significantly cut into these margins. Because TDF pays an average of 3% per credit transaction in fees—and because many of its sales are big-ticket furniture items—TDF pays thousands of dollars in swipe fees each year.

12.     Seeking to reduce these fees, TDF decided to experiment with dual pricing. Like TM Jewelry, it communicated the price difference to its customers as a "surcharge," telling them that—due to the high swipe fees charged by the credit-

card industry—they would be charged 2% more for using a credit card. And (again like TM Jewelry), TDF received a letter from the Attorney General telling the company that it was violating Florida law and must "suspend this practice immediately to avoid the possibility of further action by our office."

13.     TDF is concerned about the law's effect on how it communicates it prices to customers. TDF would like to describe its policy as a "surcharge" because it believes that is the most effective way to inform its customers of the true costs of credit. But TDF worries that describing its prices in this way would expose the company to criminal liability. Although TDF understands that it may lawfully communicate the price difference as a "discount" for cash, that is not how it wants to characterize its prices to its customers. When TDF told customers that there was a 2% charge on credit cards, it was effective: The vast majority switched to cash or debit. The word "discount," by contrast, makes it sound like TDF's prices are higher than they are and does not give customers the same incentive to avoid using credit. Moreover, the blurry distinction between "surcharge" and "discount" leaves the company uncertain that it can implement a dual-pricing system in a lawful way.

14.     Plaintiff Duana Palmer is the owner of TDF and is responsible for its day-to-day management.

15.     Plaintiff Cook's Sportland is an outdoor-sporting-goods store in Venice, Florida. For a small family business like Cook's, credit-card swipe fees make an enormous difference. The company pays as much as 3% per credit

transaction in fees. Because these transactions make up a significant portion of its sales, Cook's pays thousands of dollars in fees every year—an amount that has steadily increased over time.

16.     A few years ago, Cook's decided to bring swipe fees to the attention of its customers. It began telling customers that they would pay an additional charge if they used a credit card. Cook's did this for about six weeks before it too received a letter from the Florida Attorney General notifying the company that it was violating Florida's no-surcharge law. The letter told Cook's to "suspend this practice immediately to avoid the possibility of further action by our office." Afraid the Attorney General would follow through on its enforcement threat—potentially subjecting the company and its owner to criminal penalties—Cook's stopped telling customers that it would charge extra for credit. Instead, it changed its policy and began telling them that it requires a $10-minimum purchase amount to pay with credit. This means that swipe fees now get passed on to *all* of its customers, cash and credit users alike, in the form of higher prices. And because these fees are kept hidden, customers who meet the minimum purchase amount have no disincentive to use credit—just the opposite, in fact, because of the benefits that most credit cards offer—which raises fees even higher.

17.     The reason Cook's no longer has dual pricing is because of the law's prohibition on speech and also because of its vagueness. As to the former: Cook's would like to communicate the price difference as a "surcharge" for credit—not a "discount" for cash, which would make prices look higher than they are—because

the company believes that this would most effectively convey the costs of credit to its customers. Florida's no-surcharge law blocks it from doing so. As to the latter: The law is so vague about what it prohibits that Cook's is afraid to have any dual pricing at all, lest it accidentally subject itself to criminal prosecution.

18.     If it were legal, Cook's would tell its customers that it offers one low base price for each of its products and that there is an additional fee if a customer chooses to pay with a credit card. Cook's believes that this truthful speech is easy to understand and would benefit both the company and its customers by giving customers the information they need to make the best decisions about how to pay for their purchases. But Florida's no-surcharge law makes that speech a crime.

19.     Plaintiff Eric Cook is the owner of Cook's and is responsible for its day-to-day management.

20.     Defendant Pamela Jo Bondi is the Attorney General of Florida and is responsible for enforcing the laws of the state, including the state's no-surcharge law. She is named as a defendant only in her official capacity.

## Factual Background

21.     Americans pay some of the highest swipe fees in the world—seven or eight times those paid by Europeans, according to estimates by the Merchants Payments Coalition. The main reason swipe fees are so high is that they are kept hidden from consumers, who decide which payment method to use and thus determine whether a fee will be incurred in the first place. According to one survey, about 41% of American credit-card users are completely unaware that

FIRST AMENDED COMPLAINT | Page 9

merchants are charged fees to process credit-card transactions. Although merchants are allowed to charge consumers more for using credit than for using cash, merchants cannot effectively communicate that added cost because Florida and other states force them to call it a "discount" for cash rather than a "surcharge" for credit.

22.     Florida's no-surcharge law makes it a criminal offense—punishable by a fine of $500 and jail time—for any "seller or lessor in a sales or lease transaction [to] impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card." Fla. Stat. § 501.0117(1). Florida's no-surcharge law does *not*, however, outlaw dual pricing. The law expressly permits "the offering of a discount for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card, if the discount is offered to all prospective customers." *Id.*

23.     Until 2013, Florida's no-surcharge law was effectively redundant because credit-card companies imposed similar speech prohibitions in their contracts with merchants. But after federal antitrust litigation caused the three dominant credit-card companies (Visa, MasterCard, and American Express) to agree to change their contracts to remove their no-surcharge rules, Florida's law took on added importance. It is now the only thing keeping the plaintiffs from saying what they would like: that they impose a "surcharge" for using credit because credit costs more.

FIRST AMENDED COMPLAINT | Page 10

## I.   Why labels matter: the communicative difference between "surcharges" and "discounts"

24.    A "surcharge" on credit and a "discount" for cash "are different frames for presenting the same price information—a price difference between two things." Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1351-52 (2008). They are identical in every way except one: the *label* that the merchant uses to communicate that price difference.

25.    But labels can matter. "[T]he frame within which information is presented can significantly alter one's perception of that information, especially when one can perceive the information as a gain or a loss," as with the price difference between using cash and using credit. Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence of Market Manipulation*, 112 Harv. L. Rev. 1420, 1441 (1999). This is largely because of a well-known cognitive phenomenon called "loss aversion," which refers to people's tendency to let "changes that make things worse (losses) loom larger than improvements or gains" of an equivalent amount. Daniel Kahneman, Jack L. Knetsch, & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persp. 193, 199 (1991). Put more simply: "people have stronger reactions to losses and penalties than to gains." Adam J. Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 Berkeley Bus. L.J. 265, 280 (2006).

26.     Because of this, "[c]onsumers react very differently to surcharges and discounts," even though they present the exact same pricing information. *Id.* Consumers are more likely to respond to surcharges (which are perceived as *losses* for using credit) than to discounts (which are perceived as *gains* for not using credit). *Id.* Research shows just how wide this gap is. In one study, 74% of consumers had a negative or strongly negative reaction to credit surcharges, while fewer than half had a negative or strongly negative reaction to cash discounts. That difference—the difference in how the same pricing information is understood by consumers—influences their behavior, making "surcharges" a much more effective way to communicate the costs of credit to consumers.

27.     The effectiveness of surcharges is why the plaintiffs in this case seek to impose them: surcharges inform consumers of the costs of credit, letting consumers decide for themselves whether credit's benefits outweigh its costs. That exchange of information creates meaningful competition, which in turn drives down costs—as demonstrated by price-transparency reforms in Europe and Australia. If consumers are made aware of swipe fees and determine that they are too high, consumers will use a different payment method, and banks and credit-card companies will have to lower their fees to attract more business. Indeed, in Australia, where regulators in 2003 allowed complete transparency of price information and merchants have responded with surcharges, swipe fees have greatly declined.

28.     But when the government criminalizes framing the added cost of credit as a "surcharge," as Florida has done, merchants lose their most effective means of informing consumers of the high costs of credit. Moreover, because the dividing line between what constitutes a "surcharge" and what constitutes a "discount" is so blurry, many merchants do not even attempt to offer dual pricing, even though the law allows it, to avoid accidentally subjecting themselves to criminal punishment. And many other merchants falsely believe that they may not offer any dual pricing at all. The upshot, then, is that merchants end up passing on swipe fees to *all* consumers by raising the prices of goods and services across the board. This means that consumers are unaware of how much they pay for credit and have no incentive to reduce their credit-card use because they will pay the same price regardless. As a result, swipe fees have soared.

29.     Swipe fees thus function as an invisible tax, channeling vast amounts of money from consumers to some of the nation's largest banks and credit-card companies. Because cash and credit purchasers both pay this tax, swipe fees are also highly regressive: low-income cash purchasers subsidize the cost of credit cards, while enjoying none of their benefits or convenience. According to Federal Reserve economists, "[b]y far, the bulk of [this subsidy] is enjoyed by high-income credit card buyers," who receive an average of $2,188 every year, paid disproportionately by poor and minority households. The result is a regime in which food-stamp recipients are subsidizing frequent-flier miles.

30.     For these reasons, numerous prominent economists and consumer advocates—from Joseph Stiglitz to Elizabeth Warren—have opined that no-surcharge policies are bad for consumers and hurt competition.

## II.     The credit-card industry's concerted efforts to prevent merchants from communicating the costs of credit as "surcharges"

31.     The invisibility of swipe fees is no accident. It is the product of concerted efforts by the credit-card industry over many decades to ensure that merchants cannot communicate to consumers the added price they pay for using credit. Over the years, the industry has succeeded, both through contractual provisions and legislative measures, to silence merchants' attempts to call consumers' attention to the true costs of credit.

### The industry's early ban on differential pricing ends

32.     In the early days of credit cards, any attempt at differential pricing between credit and non-credit transactions was strictly forbidden by rules imposed on merchants in their contracts with credit-card companies. That changed in 1974 after two important developments. *First*, Consumers Union sued American Express on the ground that its contractual ban on differential pricing was an illegal restraint on trade. Rather than face the prospect that federal courts would mandate full price transparency, American Express almost immediately settled the suit by agreeing to allow merchants to provide consumers with differential price information.

33.   *Second*, Congress then enacted legislation protecting the right of merchants to have dual-pricing systems. Congress amended the Truth in Lending Act to provide that "a card issuer may not, by contract, or otherwise, prohibit any such seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Pub. L. No. 93, § 495, 88 Stat. 1500 (1974).

### The credit-card industry shifts its strategy to labeling

34.   The 1974 amendments were initially considered a victory for consumers. But the credit-card industry, seizing on Congress's use of the word "discount," soon shifted its focus to the way merchants could *label* and *describe* such pricing to consumers. Aware that how information is presented to consumers can have a huge impact on their behavior—and that many merchants would avoid dual pricing altogether if "surcharges" were outlawed—the credit-card lobby "insist[ed] that any price difference between cash and credit purchases should be labeled a cash discount rather than a credit card surcharge." Amos Tversky & Daniel Kahneman, *Rational Choice and the Framing of Decisions*, 59 J. Bus. S251, S261 (1986).

### The credit-card industry's labeling strategy achieves short-lived success at the national level

35.   In 1976, after two years of lobbying Congress to impose the credit-card industry's preferred speech code, the industry succeeded in getting Congress to enact a temporary ban on "surcharges," despite the authorization for

"discounts." *See* Pub. L. No. 94–222, 90 Stat. 197 ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means."). This controversial measure set the stage for a series of battles over renewal of the ban, culminating in an intense political debate in the mid-1980s that pitted both the Reagan Administration and consumer groups against the credit-card industry.

36. With the "surcharge" ban set to expire in 1981, the federal government and consumer advocates registered the impact that it had on consumers' and merchants' behavior. The Chairman of the Federal Trade Commission, writing in opposition to extending the law, recognized that the "surcharge" label drives home the true marginal cost of a credit transaction to the consumer. S. Rep. 97-23, at 11-12. Although "a discount and a surcharge are equivalent concepts," he remarked, "one is hidden in the cash price and the other is not," meaning that a ban on "surcharges" prohibited merchants from disclosing to their customers the true cost of credit. *Id.* at 10.

37. The Federal Reserve Board held a similar view. One member— presenting the Board's unanimous opposition to the surcharge ban's extension— pointed out "the obvious difficulty in drawing a clear economic distinction between a permitted discount and a prohibited surcharge." *Cash Discount Act, 1981: Hearings on S. 414 Before the Subcomm. On Consumer Affairs of the Senate Comm. On Banking, Housing, & Urban Affairs*, 97th Cong., 1st Sess. 9 (Feb. 18, 1981) (Nancy Teeters, Federal Reserve Board). "If you just change the wording a little bit, one

becomes the other." *Id.* at 22. The Board thus proposed "a very simple rule": that both surcharges and discounts be allowed, and "that the availability of the discount or surcharge be disclosed to consumers." *Id.* at 10.

38.     Every major consumer advocacy organization agreed, and urged Congress to let the ban lapse and allow surcharges. One consumer advocate testified that the difference between surcharges and discounts "is merely one of semantics, and not of substance." *Id.* at 98 (Ellen Broadman, Consumers Union). But "the semantic differences are significant," she explained, because "the term 'surcharge' makes credit card customers particularly aware that they are paying an extra charge," whereas "the discount system suggests that consumers are getting a bargain, and downplays the truth." *Id.* Another advocate put it more pithily: "one person's cash discount may be another person's surcharge." *Id.* at 90 (Jim Boyle, Consumer Federal of America). "Removing the ban on surcharges," he explained, "is an important first step" to "disclos[ing] to consumers the full" cost of credit so that they can "make informed judgments." *Id.* at 92.

39.     On the other side of the debate, American Express and MasterCard "wholeheartedly" and "strongly" supported the ban, even though, from a "mathematical viewpoint," "there is really no difference between a discount for cash and a surcharge for credit card use." *Id.* at 43 (Hugh H. Smith, American Express); *id.* at 55 (Amy Topiel, MasterCard). And the big banks, like the credit-card giants, supported treating "surcharges" and "discounts" differently because a surcharge "makes a negative statement about the card to the consumer." *Id.* at 32

(Peter Hood, American Bankers Association). Surcharges, a banking lobbyist openly explained, "talk against the credit industry." *Id.* at 60. Congress ultimately gave in to industry lobbying and renewed the ban for an additional three years. Pub. L. 97–25, 95 Stat. 144 (1981).

40.    In 1984, the no-surcharge law was again set to expire. Senator William Proxmire of Wisconsin, one of the ban's chief opponents, cut to the chase: "Not one single consumer group supports the proposal to continue the ban on surcharges," he observed. "The nation's giant credit card companies want to perpetuate the myth that credit is free." Irvin Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984, at D12. The credit-card industry, acutely conscious of the threat that merchants' disclosure of credit's true cost posed to its business model, responded by unleashing a massive lobbying campaign to oppose ending the ban. Stephen Engelberg, *Credit Card Surcharge Ban Ends*, N.Y. Times, Feb. 27, 1984, at D1. One senior vice president of Shearson/American Express remarked in 1984 that his company had been opposing ending the ban for eight years. He observed that consumers do not write angry letters to credit-card companies about cash discounts, but do complain about surcharges. *Id.* He concluded that ending the ban "could potentially hurt the image of" credit cards, revealing that the industry viewed its legislative efforts as playing a key role in dictating the perception of credit cards among consumers. *Id.* This time, the industry's efforts failed, and the ban lapsed in 1984. Levitin, *Priceless?*, 55 UCLA L. Rev. at 1381.

41.    A 1981 report of the Senate Banking Committee, prepared as part of the law's initial renewal, stressed the law's role in regulating how a merchant could frame a dual-pricing system. The Committee observed that "while discounts for cash and surcharges on credit cards may be mathematically the same, their practical effect and the impact they may have on consumers is very different." S. Rep. 97-23, at 3. The no-surcharge law thus effectively set forth a speech code, requiring that merchants label their prices in the way that best hid the costs of credit and most enabled the credit-card companies to take advantage of the framing effect: by advertising the credit price as the "regular" price, and the cash price as a "discount" from that price.

42.    Furthermore, the vague distinction between "discounts" and "surcharges," and the risk of inadvertently describing a dual-pricing system in an unlawful way, led merchants to steer clear of such systems. In an editorial in *The New York Times*, Senator Christopher Dodd of Connecticut, a proponent of allowing surcharges, noted that "many merchants are not sure what the difference between a discount and a surcharge is and thus do not offer different cash and credit prices for fear they will violate the ban on surcharges." Sen. Christopher J. Dodd, *Credit Card Surcharges: Let the Gouger Beware*, N.Y. Times, Mar. 12, 1984, at A16. *See also* Carol Krucoff, *When Cash Pays Off*, Wash. Post, Sept. 22, 1981 (describing consumer activist who argued that merchants have not offered cash discounts because "the regulations have been so complicated. Smaller business people, who are most likely to offer them, may have been intimidated by the fear it

could be viewed as an illegal surcharge."); Engelberg, *Credit Card Surcharge Ban Ends*, at D1 ("A House aide said that one explanation for the relative unpopularity of cash discounts is that retailers, aware that surcharges on credit purchases are illegal, have erroneously assumed that discounts are not permitted.").

### The credit-card industry lobbies the states to enact no-surcharge laws and adopts contractual no-surcharge rules

43.     After the controversial federal ban expired, the credit-card industry briefly turned to the states, convincing fewer than a dozen (including Florida) to enact no-surcharge laws of their own. In an early instance of the phenomenon now known as "astroturfing," American Express and Visa went to great lengths to create the illusion of grassroots support for such laws, even going so far as to create and bankroll a fake consumer group in Florida called "Consumers Against Penalty Surcharges." But the overwhelming majority of the real consumer groups—including Consumers Union and Consumer Federation of America—opposed state no-surcharge laws because they discouraged merchants from making the costs of credit transparent, which resulted in an enormous hidden tax paid by all consumers whenever they made a purchase.

44.     Florida's law took effect in 1987. Fla. Stat. § 501.0117. That same year, a New York court concluded that, under that state's criminal no-surcharge law, "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the *label* the individual affixes to his economic behavior, without substantive difference."

*People v. Fulvio*, 517 N.Y.S.2d 1008, 1011 (Crim. Ct. N.Y. 1987) (emphasis in original). The court explained: "[W]hat [the law] *permits* is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what [the law] *prohibits* is a price differential, in that so long as that differential is characterized as an additional charge for payment by use of a credit card, it is legally impermissible. . . . [The law] creates a distinction without a difference; it is not the *act* which is outlawed, but the *word* given that act." *Id.* at 1015 (emphasis in original). Similarly, the legislative history of Florida's no-surcharge law recognizes "that from an economic standpoint there is no difference between a cash discount, as permitted by [Florida law], and a credit surcharge, as would be prohibited by this bill." Senate Staff Analysis and Economic Impact Statement (Apr. 17, 1987).

45.    Around the same time that Florida's no-surcharge law was enacted, the major credit-card companies changed their contracts with merchants to include no-surcharge rules. No-surcharge laws in Florida and other states thus function as a legislative extension of the restrictions that credit-card issuers previously imposed more overtly by contract. For instance, American Express's contracts with merchants included an elaborate speech code. The contracts provided that merchants may not "indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card"; "try to dissuade Cardmembers from using the Card"; "criticize … the Card or any of our services

or programs"; or "try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check).

**The Durbin Amendment and the
recent political controversy over swipe fees**

46.     From the mid-1980s until the 2000s the issue of swipe fees remained largely in the shadows. Even in the majority of states without anti-surcharge laws, the contractual no-surcharge rules ensured that consumers were rarely informed of the true costs of credit. Developments in the late 2000s, however, caused swipe fees to reemerge as a volatile political issue.

47.     The global financial crisis of 2007-2008 and the ensuing push for financial-regulation reform resulted in renewed focus on swipe fees. Senator Dick Durbin of Illinois proposed an amendment to the Senate version of the Dodd-Frank Wall Street Reform and Consumer Protection Act that aimed to reduce the fees associated with transactions by both debit and credit cards. Although proposed legislation to regulate *credit-card* swipe fees was defeated, the Durbin Amendment was enacted into law. As enacted, it establishes a procedure by which the Federal Reserve Board now sets the maximum swipe fees for *debit-card* transactions. 15 U.S.C. § 1693o-2(a). It also includes a provision protecting merchants' rights to offer consumers incentives for using different payment methods: "A payment card network shall not … by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a

discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards." *Id.* § 1693o-2(b)(2).

48.    The fight over the Durbin Amendment shone a spotlight on the amount of revenue that banks generate from swipe fees, initiated a frenzy of lobbying by the credit-card industry, and touched off a contentious national political debate. Many merchants sought to convey their opposition to swipe fees directly to their customers—and voters—at the checkout counter. The national convenience store chain 7-Eleven, for example, put up signs asking customers to "STOP UNFAIR CREDIT CARD FEES" and gathered a total of 1.6 million signatures on a petition to support legislation on credit-card fees. 7-Eleven claimed that its petition represented the largest quantity of signatures ever presented to Congress—trumping even the 1.3 million signatures presented to Congress regarding national healthcare reform.

### Visa, MasterCard, & American Express drop their no-surcharge rules

49.    In May 2005, Animal Land Inc., a pet-relocation company based in Atlanta, Georgia, sued Visa for a declaration that its no-surcharge rule violated antitrust laws by preventing Animal Land and other merchants from assessing a discrete, denominated charge upon customers using credit cards, as opposed to cash, checks, or debit cards. *Animal Land, Inc. v. Visa USA, Inc.*, No. 05-CV-1210 (N.D. Ga.). In the ensuing months, numerous U.S. merchants and trade associations brought claims against the dominant credit-card networks, alleging

that they engaged in illegal price-fixing and impermissibly banned merchants from encouraging customers to use less expensive payment methods.

50.    Under the terms of a national class-action settlement, Visa and MasterCard in January 2013 dropped their prohibitions against merchants imposing surcharges on credit-card transactions. And in December 2013—in response to a separate lawsuit—American Express agreed to drop its surcharge ban as well.

51.    As a result, state no-surcharge laws—previously redundant because of contractual no-surcharge rules—have now gained added importance. And as they did in the 1980s, credit-card companies are once again seeking to discourage dual pricing by pushing state legislation that dictates the labels that merchants can use for such systems.

### New York's no-surcharge law is declared unconstitutional

52.    In June 2013, five merchants—supported by several national consumer groups and retailers as amici curiae—brought a constitutional challenge to New York's no-surcharge law in federal district court, claiming that it violated the First Amendment and was unconstitutionally vague. By making liability "turn[] on the language used to describe identical conduct," they argued, the law is a content-based speech restriction that is subject to heightened scrutiny, which it cannot withstand. They further argued that the law is unconstitutionally vague because it does not define the line between a "surcharge" and a "discount," and "[y]et that line marks the difference between what is criminal and what is not."

FIRST AMENDED COMPLAINT | Page 24

53.    The court agreed. In October 2013, it declared the law unconstitutional and granted a preliminary injunction against its enforcement. *See Expressions*, 975 F. Supp. 2d 430. One month later, final judgment, including a permanent injunction, was entered in favor of the plaintiffs.

## Claims for Relief

## Claim One: Violation of the First Amendment (under 42 U.S.C. § 1983)

54.    Florida's no-surcharge law regulates how the plaintiffs may characterize the price differences they may lawfully charge for credit and cash purchases. The law allows them to tell their customers that they are paying *less* for using cash or other means of payment (a "discount"), but not that they are paying *more* for using credit (a "surcharge"). This state-imposed speech code prevents the plaintiffs from effectively conveying to their customers—who absorb the costs of credit through higher prices for goods and services—that credit cards are a more expensive means of payment.

55.    By prohibiting certain disfavored speech by merchants—and enforcing that prohibition with criminal penalties—Florida's no-surcharge law violates the plaintiffs' First Amendment rights, as applied to the states through the Fourteenth Amendment. Because the no-surcharge law is a content- and speaker-based restriction on speech, it is subject to heightened scrutiny under the First Amendment. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). Regardless of whether the law is analyzed under a special commercial-speech inquiry, it cannot survive. The prohibited speech concerns lawful activity (engaging in dual pricing)

and is not misleading; Florida has no substantial interest in prohibiting the speech; and Florida's no-surcharge law does not directly advance—and is far more extensive than necessary to serve—any interest the state might have. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980).

## Claim Two: Void for vagueness (under 42 U.S.C. § 1983)

56.     Florida's no-surcharge law does not provide guidance about what speech is permitted and invites arbitrary and discriminatory enforcement. Because the law makes criminal liability turn on the blurry difference between two ways of describing the same conduct, the law does not provide a person of ordinary intelligence reasonable opportunity to know what is prohibited. Additionally, the law lacks explicit standards for those charged with its enforcement. It is therefore unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

## Request for Relief

The plaintiffs request that the Court:

A.     Declare that Florida's no-surcharge law is unconstitutional and enjoin its enforcement;

B.     Award the plaintiffs their reasonable costs, expenses, and attorney's fees under 42 U.S.C. § 1988; and

C.     Grant the plaintiffs all other appropriate relief.

June 11, 2014

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
GREGORY A. BECK
JONATHAN E. TAYLOR
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

GARY B. FRIEDMAN
TRACEY KITZMAN
REBECCA QUINN
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

DAVID FRANK
FRIEDMAN, FRANK &
ABRAHAMSEN
524 E. College Avenue
Tallahassee, FL 32301
(850) 224-4357

*Counsel for Plaintiffs*

# TAB 18

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

DANA'S RAILROAD SUPPLY, DANA
JACKSON, TM JEWELRY LLC; TIFFANY
BALLARD;TALLAHASSEE DISCOUNT            No. 4:14cv134-RH/CAS
FURNITURE; DUANA PALMER; COOK'S
SPORTLAND; and ERIC COOK,

        *Plaintiffs*,

    v.

PAMELA JO BONDI, in her official capacity as
Attorney General of the State of Florida,

        *Defendants*.

**DECLARATION OF DANA JACKSON**

## DECLARATION OF DANA JACKSON

1.      I am the owner of Dana's Railroad Supply, a railroad model and hobby shop in Spring Hill, Florida.  Dana's Railroad Supply is a small family business that I've been operating with my wife since 2002. We sell and repair a variety of model trains and supplies.

2.      As owner of our business, I am responsible for all of our daily operations including ordering inventory, setting retail prices, making payment acceptance decisions and making sales to customers.

3.      We began accepting credit cards for payment of supplies and repairs since we opened in 2002. We only accept Visa and MasterCard.  When we make a sale on a credit card, we incur a fee known as a merchant fee.  We are charged 3% or more of sales made on credit cards in merchant fees.  There is no fee for sales made on cash and a significantly lower fee for sales made on debit.   This means that 3% or higher of our sale price goes to the credit card companies.  In a year, we feel lucky to make $100,000 in sales.  For a small business like us, merchant fees are a major cost.

4.      To find ways to manage the burden of merchant fees, we began experimenting with ways to urge customers to pay with cash and debit—forms of payment that are less expensive for us to accept.  One year, we dropped credit cards and accepted only cash.  While we avoided merchant fees, this was not a sustainable practice for us because our customers demanded that they be able to pay with credit cards. Another year, we offered customers a percentage-based discount off the retail price if they chose to pay with cash instead of credit cards.  We eventually gave this up because our customers who wanted to pay with credit cards did not react to the discount—they didn't switch to cheaper forms of payment, and we were

1

essentially giving money away to our customers who wanted to pay with cash and debit in the first place.  Finally, we posted a sign in the shop stating that we would tack on a small fee for transactions paid for with credit cards.  A customer came in one day and told us the sign was illegal.  After that, we received a letter from the Florida attorney general telling us that we were in violation of Florida's law making it illegal impose a surcharge on a customer electing to use a credit card.  Not wanting to break the law, we took the sign down and stopped charging the small fee on credit card use.

5.      With no effective way to offset or recoup the merchant fees the credit card companies charge us, we have been forced to raise our prices across the board.  This means all customers, whether paying by credit card or cash and debit, face higher prices.

6.      I understand that we were and are permitted by the law to tell customers that we will deduct an amount from the price if they pay with cash or debit.  In our experience, however, framing the transaction as a discount was not an effective way to generate a reaction from our customers.  Customers who were already inclined to pay with cash or debit got the discount while many credit card customers just shrugged and continued to pay with credit.  We think it is much more effective to say that there is an extra fee for credit rather than a discount for cash. This way, we can disclose the true cost of accepting credit cards and give our customers the chance to make an informed choice.  Our customers will either stick with credit cards, which would allow us to defray the merchant fee, or they will choose to pay with a cheaper form of payment allowing us to avoid the high merchant fee altogether.

7.      We would like to be able to tell our customers, both verbally and through signage, that we will add a small fee onto the sale if they choose to pay by credit card, and that there will

be no fee if they choose to pay with cash or debit.  For any particular transaction, then, there will

be one price for customers who use a credit card, and a lower price for people who do not.  We

would notify customers of our pricing policy both at the entrance to our store and at the register

so that there will be no surprise as to what our prices are for customers who pay with a credit

card.  In fact, it was our practice to notify customers of the fee we added to credit card

transactions before we were told to stop by the Attorney General—and we would like to continue

to keep our customers informed.

I declare under penalty of perjury the foregoing is true and correct.


Dated: _4 June_, 2014
       Spring Hill, Florida

                                                        Dana Jackson


3

A-65

OFFICE OF THE ATTORNEY GENERAL
Citizen Services

**PAM BONDI**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

PL-01, The Capitol
Tallahassee, Florida 32399-1050
Phone: (850) 414-3990      Fax: (850) 410-1630
Website: *http://www.myfloridalegal.com*

March 15, 2013

Dana's Railroad Supply
4042 Deltona Boulevard
Spring Hill, Florida 34606

Dear Sirs:

Florida Attorney General Pam Bondi's Office received a complaint involving your business related to the imposition of a surcharge when customers pay for a transaction using a credit card. This practice may be in violation of Section 501.0117, Florida Statutes. I am providing a copy of the statute for your review.

As you may be aware, Mastercard and Visa previously announced a class-action settlement pertaining to credit-card swipe fees (In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 05-md-01720, U.S. District Court, Eastern District of New York). Please note that regardless of the terms of that settlement, Section 501.0117, Florida Statutes, does not allow a seller or lessor in a sales or lease transaction to impose a surcharge on a buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means.

Consequently, if you are charging a surcharge to customers who pay for a transaction with a credit card, as defined in the statute, please suspend this practice immediately to avoid the possibility of further action by our office.

Sincerely,

Mark S. Hamilton
Bureau Chief - North Florida Region
Consumer Protection Division

Enclosure

# TAB 19

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

DANA'S RAILROAD SUPPLY, DANA
JACKSON, TM JEWELRY LLC; TIFFANY
BALLARD;TALLAHASSEE DISCOUNT
FURNITURE; DUANA PALMER; COOK'S
SPORTLAND; and ERIC COOK,

No. 4:14cv134-RH/CAS

         *Plaintiffs*,

   v.

PAMELA JO BONDI, in her official capacity as
Attorney General of the State of Florida,

         *Defendants*.

## DECLARATION OF TIFFANY BALLARD

## DECLARATION OF TIFFANY BALLARD

TIFFANY BALLARD hereby declares:

1.      I am the owner of TM Jewelry LLC, a specialty jewelry design and retail store in Key West, Florida. As owner I am responsible for the day-to-day management of TM Jewelry, including making payment-acceptance decisions, setting retail pricing, overseeing design and manufacture of our jewelry and making sales to customers.

2.      TM Jewelry designs and sells unique, individually fitted, specialty jewelry.

3.      We have always accepted credit cards at TM Jewelry. We accept Visa, MasterCard, American Express, and Discover. When we first began, we were making lower ticket item sales, and many of our customers paid with cash. Over the years as our business has grown, so has the prevalence of credit cards. Roughly 88% of our sales are on credit. When we make a sale on a credit card, we pay about 3% of the sale in merchant fees. On debit sales, we pay about 1% of the sale in merchant fees. Cash and checks do not carry any merchant fees. These merchant fees are quite considerable, especially on our high-end gold, silver, and diamond rings. Our average ticket price is $140, and we sell some pieces that cost up to $2,200. Paying 3% on our sales, no matter the ticket price, is a big cost to us.

4.      A few years ago, I was in the Miami area and noticed that gas stations there posted both a cash and a credit price, and the credit price was higher. When I got back to our store, I charged a customer more for paying with a credit card and expressed this as an extra charge on top of the regular price. The customer complained to the Attorney General. We got a letter from the Attorney General advising us that we were

- 1 -

violating Florida law and that we must stop or face further action from the state. As we understand it, Florida law permits us to tell customers they will pay less if they pay with cash and debit, but we can't say they will pay more if they pay with credit. We haven't tried to charge different prices for cash and credit again, even though we are allowed to do so, because we don't want to get into trouble with the law based on how we describe the price difference to our customers. I'm not confident that we can communicate this distinction properly in compliance with the law.

5.      My business partner and I have discussed it and what we would like to do is tell customers that there is a "surcharge" if they pay with a credit card and that there is no charge if they pay with a debit card or cash.  We'd tell our customers about the surcharge clearly, so they would not be caught unaware. We'd post signs at the entrance and at the point of sale, and we'd be prepared to explain the surcharge verbally.

6.      I believe that if we were able to tell our customers that there is an extra charge for paying with a credit card, we would be able to express to customers the true cost of accepting credit.  We should have the option to communicate our pricing decisions the way we think is the most effective for us and our customers.

I declare under penalty of perjury the foregoing is true and correct.


Dated: Key West, Florida
       _June 5_ , 2014


                                    Tiffany Ballard



**OFFICE OF THE ATTORNEY GENERAL**

Office of Citizen Services
PL 01, The Capitol
Tallahassee, Florida 32399-1050
Telephone (850) 414-3990
Fax (850) 410-1630
www.myfloridalegal.com

**PAM BONDI**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

July 26, 2013

Purr Fit
P.O. Box 1811
Key West, Florida 33041

Dear Sirs:

Florida Attorney General Pam Bondi's Office received a complaint involving your business related to the imposition of a surcharge when customers pay for a transaction using a credit card. This practice may be in violation of Section 501.0117, Florida Statutes. I am providing a copy of the statute for your review.

As you may be aware, Mastercard and Visa previously announced a class-action settlement pertaining to credit-card swipe fees (In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 05-md-01720, U.S. District Court, Eastern District of New York). Please note that regardless of the terms of that settlement, Section 501.0117, Florida Statutes, does not allow a seller or lessor in a sales or lease transaction to impose a surcharge on a buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means.

Consequently, if you are charging a surcharge to customers who pay for a transaction with a credit card, as defined in the statute, please suspend this practice immediately to avoid the possibility of further action by our office.

Sincerely,

William Armistead
Assistant Attorney General
Consumer Protection Division

Enclosure

# TAB 20

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

DANA'S RAILROAD SUPPLY, DANA
JACKSON, TM JEWELRY LLC; TIFFANY
BALLARD;TALLAHASSEE DISCOUNT
FURNITURE; DUANA PALMER; COOK'S
SPORTLAND; and ERIC COOK,

        *Plaintiffs*,

    v.

PAMELA JO BONDI, in her official capacity as
Attorney General of the State of Florida,

        *Defendants*.

No. 4:14cv134-RH/CAS

**DECLARATION OF DUANA PALMER**

## DECLARATION OF DUANA PALMER

DUANA PALMER hereby declares:

1.      I am the owner of Tallahassee Discount Furniture ("TDF"), a discount furniture store in Tallahassee, Florida. As the owner I am responsible for the day-to-day management of TDF, including making payment-acceptance decisions, setting retail pricing, overseeing inventory, and making sales to customers.

2.      I have owned and operated TDF for about four years. At TDF, I am able to offer the lowest prices possible for furniture by keeping operating costs to a minimum.

3.      I have always accepted credit cards at TDF. I accept Visa and MasterCard. Over the years, I have seen more and more customers wanting to pay with credit. When we make a sale on a credit card, I pay about 3% of the sale in merchant fees. On debit sales, I pay about 1% of the sale in merchant fees. Cash and checks do not carry any merchant fees. Being in the furniture business, many of my sales are in the range of $1,500 to $2,000, and are paid for with credit. This adds up to thousands of dollars a year coming out of my pocket and going to the credit-card companies.

4.      Running a discount store means that I operate on very low margins. It is important that I offer my customers the lowest price, and therefore, I compete heavily with other furniture stores. Any savings I can find, I pass on to my customers in the form of lower prices. To offset some of the costs associated with accepting credit, I have experimented with charging customers two different prices depending on whether they pay with a credit card, which I understand Florida law allows. I expressed the price difference as a "surcharge," telling my customers that they will be charged 2% extra if they paid with a credit card. A few years ago, one customer complained about this to the

Attorney General. I received a letter from the Attorney General telling me I was violating Florida's ban on credit-card "surcharges" and that I would face further action if I didn't stop.

5.    I am in a tough position. I would like to be able to offset the merchant fees and keep my prices low, and yet I am unable to describe my prices to customers in the way that I believe would be most effective—by telling customers that I charge more for credit. I understand that I am permitted to communicate the price difference between paying with credit and cash as a "discount" for cash, rather than telling them I charge more for credit. In my experience, however, calling the difference a "surcharge" allows me to better inform customers of the costs of credit, which is the message that I want to convey. When I told customers that there is an extra charge on credit cards, the vast majority switched to cash or debit. But calling it a "discount" for cash makes it sounds like my prices are higher than they are and does not give customers the same push to use cheaper forms of payment.

6.    Additionally, I am not certain that I understand the proper way to describe a cash discount to comply with Florida's law, and I do not want to accidentally commit a crime. It is confusing to me and my customers that I am permitted to describe my prices as lower for cash, but that I am not permitted to describe my prices as higher for credit.

7.    I would like to tell my customers that I have one low price with a 2% fee attached if the customer chooses to pay with a credit card. It is clear and simple, and it expresses the cost I incur for accepting credit while allowing me to keep my overall prices low. I want to be as transparent as possible with my customers. But I can't

communicate this truthful message, which I believe would benefit both me and my customers, because Florida outlaws it.

8.      In the interest of remaining transparent with my customers, if permitted to surcharge credit card transactions, I would let customers know about the surcharge through clear disclosures. I would notify customers of my pricing and why I surcharge credit card transactions at the entrance to the store and at the register, so my customers understand what they will pay, no matter what method of payment they choose to pay with.

I declare under penalty of perjury the foregoing is true and correct.


Dated: Tallahassee, Florida
       JUNE 6 , 2014


                                        Duana Palmer





**OFFICE OF THE ATTORNEY GENERAL**

**PAM BONDI**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

Office of Citizen Services
PL 01, The Capitol
Tallahassee, Florida 32399-1050
Telephone (850) 414-3990
Fax (850) 410-1630
*www.myfloridalegal.com*

July 8, 2013

Tallahassee Discount Furniture
2415 North Monroe Street, #540
Tallahassee, Florida 32303

Dear Sirs:

Florida Attorney General Pam Bondi's Office received a complaint involving your business related to the imposition of a surcharge when customers pay for a transaction using a credit card. This practice may be in violation of Section 501.0117, Florida Statutes. I am providing a copy of the statute for your review.

As you may be aware, Mastercard and Visa previously announced a class-action settlement pertaining to credit-card swipe fees (In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 05-md-01720, U.S. District Court, Eastern District of New York). Please note that regardless of the terms of that settlement, Section 501.0117, Florida Statutes, does not allow a seller or lessor in a sales or lease transaction to impose a surcharge on a buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means.

Consequently, if you are charging a surcharge to customers who pay for a transaction with a credit card, as defined in the statute, please suspend this practice immediately to avoid the possibility of further action by our office.

Sincerely,

William Armistead
Assistant Attorney General
Consumer Protection Division

Enclosure

A-75

# TAB 21

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

DANA'S RAILROAD SUPPLY, DANA
JACKSON, TM JEWELRY LLC; TIFFANY
BALLARD;TALLAHASSEE DISCOUNT
FURNITURE; DUANA PALMER; COOK'S
SPORTLAND; and ERIC COOK,

No. 4:14cv134-RH/CAS

        *Plaintiffs*,

    v.

PAMELA JO BONDI, in her official capacity as
Attorney General of the State of Florida,

        *Defendants*.

**DECLARATION OF ERIC COOK**

## DECLARATION OF ERIC COOK

ERIC COOK hereby declares:

1.      I am the owner Cook's Sportland, an outdoors sporting goods store in Venice, Florida. As the owner I am responsible for the day-to-day management of Cook's, including making payment-acceptance decisions, setting retail pricing, hiring and training staff, making sales, and interacting with customers.

2.      Cook's is a family business. We started in Michigan in 1954 and moved to Florida in 1968. I currently have six employees helping to sell our camping, fishing and hunting supplies.

3.      We have always accepted credit cards for payment of goods. We accept Visa, MasterCard, American Express and Discover. At first, very few of our customers paid with credit cards, but over the years, more and more people began to use them. Today, we run a lot of volume on credit. Many of our sales are paid for with credit cards. When a customer chooses to pay with a credit card, we pay a merchant fee that can equal roughly 3% of the purchase price, including sales tax. These fees add up to thousands of dollars each year.

4.      A few years ago, we experimented with a way to highlight the high fees we pay to the credit card companies. We began telling customers that they would pay a small extra fee if they paid with a credit card. We did this for about six weeks until we received a letter from the Attorney General informing us that we were violating Florida's law against imposing a "surcharge" on credit-card transactions. We were afraid of facing fines or other penalties from the state, so we stopped telling customers that we would charge more for credit. I contacted the Attorney General to ask about the law and to find

out what options I had. The Attorney General informed me that I could tell customers that we don't accept credit cards for sales below a minimum price. We then instituted a credit-card minimum.

5.     I also understand that the law permits me to tell customers that they will receive a "discount" if they pay with cash or debit.  I do not wish to describe the price difference between cash and credit as a "discount." I am not certain that I can accurately express the difference between offering a discount and adding a fee in accordance with the law, nor that I can ensure that my employees accurately express this difference.

6.     Cook's would like to be able to tell customers that we add a small fee to credit-card sales and that we add no fee to cash and debit sales. I believe that if I were able to tell my customers that there is an extra charge for paying with a credit card, I would be able to express to my customers the true cost of accepting credit. When confronted with a "surcharge" for credit, I believe many customers would choose to use debit, a check or cash instead—forms of payment that are much cheaper for me to accept. If they choose to stick with a credit card and pay the "surcharge," Cook's would be able to offset the high merchant fee. Saving on merchant fees would allow us to keep retail prices down for all of my customers.

7.     It matters to me how I communicate the price difference to my customers, and it matters to customers. I would like our pricing to be transparent and fair to all customers, no matter what form of payment they choose to use. To us, this means we would like the ability to state that we charge a discrete fee for the use of credit cards. If given this ability, we would make sure that our customers are aware of our pricing by posting signs at the entrance to the store and at the register stating that we charge more for credit card

transactions.   We'd make sure our customers they have the opportunity to make an informed choice to pay with credit or a cheaper form of payment.


I declare under penalty of perjury the foregoing is true and correct.


Dated: _June 4_ , 2014

Venice, Florida

_Eric Cook_
Eric Cook



OFFICE OF THE ATTORNEY GENERAL

Office of Citizen Services
PL 01, The Capitol
Tallahassee, Florida 32399-1050
Telephone (850) 414-3990
Fax (850) 410-1630
*www.myfloridalegal.com*

**PAM BONDI**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

September 20, 2012

Cook's Sportland, Inc.
4419 Tamiami Trail South
Venice, Florida 34293

Dear Sirs:

Florida Attorney General Pam Bondi's Office received a complaint involving your business related to the imposition of a surcharge when customers pay for a transaction using a credit card. This practice may be in violation of section 501.0117, Florida Statutes. I am providing a copy of the statute for your review.

If you are charging a surcharge to customers who pay for a transaction with a credit card, as defined in the statute, please suspend this practice immediately to avoid the possibility of further action by our office.

Investigators from the Attorney General's Office may conduct inspections to ensure compliance. If you have any questions concerning this matter please feel free to contact me at the above listed number. Thank you for your cooperation.

Sincerely,

Mark Hamilton
Bureau Chief of Economic Crimes
Economic Crimes Division

Enclosure

cc:  Gerard Lockwood
     Chief of Investigations

# TAB 22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DANA'S RAILROAD SUPPLY, DANA
JACKSON, TM JEWELRY LLC, TIFFANY
BALLARD, TALLAHASSEE DISCOUNT
FURNITURE, DUANA PALMER, COOK'S
SPORTLAND, and ERIC COOK,
*Plaintiffs,*

v.                                                    No. 4:14cv134-RH/CAS

PAMELA JO BONDI, in her official capacity as
Attorney General of the State of Florida,
*Defendants.*

## DECLARATION OF DEEPAK GUPTA

I, Deepak Gupta, declare as follows:

1.      I am a member in good standing of the bar of the District of Columbia and of the
U.S. District Court for the Northern District of Florida and am submitting this declaration in
support of the plaintiffs' motion for summary judgment and in opposition to the Attorney
General's motion to dismiss. The statements in this declaration are based on my personal
knowledge and information obtained in the course of my research for this case.

2.      The document attached as Exhibit A is an authentic copy of Judge Rakoff's
decision, dated October 3, 2013, in the case *Expressions Hair Design, et al. v. Eric T.
Schneiderman, et al.*, 975 F. Supp.2d 430 (S.D.N.Y), concluding that New York's no-surcharge
law, N. Y. Gen. Bus. Law § 518, offends the First Amendment and is unconstitutionally vague, and
enjoining its enforcement.

3.      The document attached as Exhibit B is an authentic copy of Judge Gleeson's order,
dated December 13, 2013, approving the nationwide class-action settlement in *In re Payment Card*

A-81

*Interchange Fee and Merchant Discount Antitrust Litigation*, --- F. Supp. 2d ---, No. 05-MD-1720, 2013 WL 6510737 (E.D.N.Y. 2013).

4.       The document attached as Exhibit C is an authentic copy of the opinion in *People v. Fulvio*, 517 N.Y.S.2d 1008 (N.Y. Crim. Ct. 1987), holding New York's no-surcharge statute unconstitutionally vague as applied to a gas station owner who was criminally prosecuted because his cashier told a customer that it would cost "a nickel more" to pay with credit versus cash, instead of saying that it would cost "a nickel less" to pay with cash versus credit.

5.       The document attached as Exhibit D is an authentic copy of the declaration of Michael Parisi, dated July 23, 2013, submitted in support of the plaintiffs' motion for a preliminary injunction in *Expressions Hair Design et al., v. Eric T. Schneiderman, et al.*

6.       The document attached as Exhibit E is an authentic copy of a memorandum from the public relations firm Hill & Knowlton dated July 24, 1987. The document was obtained from the Legacy Tobacco Documents Library at the University of California, San Francisco, http://legacy.library.ucsf.edu/.

7.       The document attached as Exhibit F is an authentic copy of an excerpt from the official legislative history of California's no-surcharge law, Cal. Civ. Code § 1748.1(a), obtained by Legislative Research and Intent LLC from the California State Law Library in Sacramento, California. The excerpt contains copies of letters submitted by Consumer Federation of California and Consumers Union in opposition to the law, both of which are dated July 5, 1985.

8.       The document attached as Exhibit G is an authentic copy of an excerpt from the official legislative history of Florida's no-surcharge law, Fla. Stat. § 501.0117, obtained from the State Archives of Florida in Tallahassee. The excerpt contains a copy of the "Senate Staff Analysis and Economic Impact Statement," dated April 17, 1987.

8.     The document attached as Exhibit H is an authentic copy of the official legislative history of New York's no-surcharge law, N.Y. Gen. Bus. Law § 518, obtained from the New York State Library in Albany, New York.

9.     The document attached as Exhibit I is an authentic copy of an excerpt from the official legislative history of Connecticut's no-surcharge law, Conn. Gen. Stat. § 42-133ff, obtained from the Connecticut State Library in Hartford, Connecticut. The excerpt is from the "Transcripts from the Joint Standing Committee Public Hearing(s) and/or Senate and House of Representatives Proceedings."

10.     The document attached as Exhibit J is an authentic copy of the brief of Consumer Action, National Association of Consumer Advocates, The National Consumers League, and U.S. Public Interest Research Group as *Amici Curiae* submitted in support of plaintiffs' motion for a preliminary injunction in *Expressions Hair Design et al., v. Eric T. Schneiderman, et al.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Deepak Gupta*
_____
Deepak Gupta

Dated: June 11, 2014

# TAB 22-1

Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)

975 F.Supp.2d 430
United States District Court,
S.D. New York.

EXPRESSIONS HAIR DESIGN, Linda Fiacco, The
Brooklyn Farmacy & Soda Fountain, Inc., Peter
Freeman, Bunda Starr Corp., Donna Pabst, Five
Points Academy, Steve Milles, Patio.com LLC, and
David Ross, Plaintiffs,
v.
Eric T. SCHNEIDERMAN, in his official capacity
as Attorney General of the State of New York,
Cyrus R. Vance, Jr., in his official Capacity as
District Attorney of New York County, Charles J.
Hynes, in his official capacity as District Attorney
of Kings County, and Gerald F. Mollen, in his
official capacity as District Attorney for Broome
County, Defendants.

No. 13 Civ. 3775(JSR). | Oct. 3, 2013.

**Synopsis**
**Background:** Five retailers and their principals brought
action against New York Attorney General and district
attorneys of three counties, challenging on constitutional
grounds a state statute prohibiting sellers in sales
transactions from imposing a surcharge or swipe fee on
customers who elected to pay with a credit card, based on
allegations that statute prohibited retailers from informing
their customers that fees that retailers paid to credit card
companies and then passed on to customers were in
nature of surcharges or swipe fees. Plaintiffs filed motion
for preliminary injunction, and defendants filed cross-
motion to dismiss the complaint.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

[1]  statute did not directly advance any interest in
protecting consumers from deception, as factor weighing
in favor of finding a violation of First Amendment
protection of commercial speech;

[2]  statute was far broader than necessary to serve any
asserted anti-fraud purpose, as factor weighing in favor of
finding a violation of First Amendment protection of
commercial speech;

[3]  statute was void for vagueness under Due Process
Clause; and

[4]  plaintiffs stated a claim for preemption by Sherman
Act.

Plaintiffs' motion granted; defendants' motion denied.

**West Codenotes**

**Held Unconstitutional**
N.Y.McKinney's General Business Law § 518

**Attorneys and Law Firms**

**\*435** Deepak Gupta, Gupta Beck PLLC, Washington,
DC, Gary B. Friedman, Scott H. Levy, Tracey Kitzman,
Friedman Law Group, New York, NY, Mark A. Wendorf,
Reinhardt, Wendorf & Blanchfield, St. Paul, MN, for
Plaintiff.

Garrett Joseph Coyle, Sheryl Rebecca Neufeld, Sharon
Nicole Scher, New York City Law Department, New
York, NY, for Defendants.

**Opinion**

*PRELIMINARY INJUNCTION, OPINION, AND
ORDER*

JED S. RAKOFF, District Judge.

*Alice in Wonderland* has nothing on section 518 of the
New York General Business Law. Under the most
plausible interpretation of that section, if a vendor is
willing to sell a product for $100 cash but **\*436** charges
$102 when the purchaser pays with a credit card, the
vendor risks prosecution if it tells the purchaser that the
vendor is adding a 2% surcharge because the credit card
companies charge the vendor a 2% "swipe fee." But if,
instead, the vendor tells the purchaser that its regular price
for the product is $102, but that it is willing to give the
purchaser a $2 discount if the purchaser pays cash,
compliance with section 518 is achieved. As discussed
below, this virtually incomprehensible distinction

Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)

between what a vendor can and cannot tell its customers offends the First Amendment and renders section 518 unconstitutional.

The instant action is brought by five retailers and their principals against the Attorney General of the State of New York and the District Attorneys of New York, Kings, and Broome Counties challenging the constitutionality of section 518 of the New York General Business Law. That statute prohibits a seller from imposing a "surcharge" on customers who elect to pay with a credit card, rather than by cash, check, or other similar means, *see* N.Y. Gen. Bus. Law § 518, and has been applied so as to prohibit retailers from informing their customers that the fees they pay to credit card companies and then pass on to their customers are in the nature of surcharges above the price they would otherwise charge. Plaintiffs wish to impose surcharges on credit-card transactions and to so inform their customers, but are constrained from doing so by section 518, which they assert violates the First Amendment, is unconstitutionally vague, and also is preempted by the Sherman Antitrust Act. Pending before the Court are plaintiffs' motion for a preliminary injunction based on the First Amendment and vagueness challenges and defendants' cross-motion to dismiss the complaint in its entirety. For the reasons that follow, plaintiffs' motion is granted, and defendants' motion is denied.

Section 518 provides: "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." *Id.* Violations of this prohibition carry criminal penalties: "any seller who violates [section 518] shall be guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars or a term of imprisonment up to one year, or both." *Id.* Criminal prosecutions under section 518 are brought by the appropriate county District Attorney. *See* N.Y. County Law §§ 700, 927. In addition, the New York Attorney General is authorized to bring civil enforcement actions to enjoin "continuous" violations of the statute, N.Y. Gen. Bus. Law § 513, and to seek restitution, damages, and cancellation of business licenses against "repeat [ ]" or "persistent" offenders, N.Y. Exec. Law § 63(12).

Section 518 by its terms only prohibits credit-card "surcharge[s]," and all parties here agree that the statute does not bar sellers from offering an equivalent "discount" to consumers who use cash.[1] In terms of their immediate economic consequences, surcharges and

discounts are merely different labels for the same thing—a price difference between cash and credit. A number of studies have indicated, however, that consumers perceive credit-card surcharges negatively as a kind of loss or penalty, while cash discounts are perceived positively as a kind of gain or bonus. *See generally* Daniel Kahneman, Jack L. Knetch & Richard H. Thaler, Anomalies: The Endowment Effect, Loss **\*437** Aversion, and Status Quo Bias, 5 J. Econ. Persp. 193, 199 (1991); Adam Levitan, The Antitrust Super Bowl: America's Payment Systems, No–Surcharge rules, and the Hidden Costs of Credit, 3 Berkeley Bus. L.J. 265, 280–81 (2006); *see also* S.Rep. No. 97–23, at 3 ("The [U.S. Senate Banking] Committee recognizes that while discounts for cash and surcharges on credit cards may be mathematically the same, their practical effect and the impact they may have on consumers is very different.").

1    For convenience, and following the parties' usage, the Court hereinafter refers to all non-credit forms of payment as "cash."

The parties draw very different conclusions about the impact these varying consumer reactions have on the financial relations between buyers, sellers, and third-party credit providers. Plaintiffs claim that framing the incremental cost of credit-card usage as a "surcharge" is an accurate and effective way to convey to consumers that paying with credit is actually more expensive than paying with cash. Absent surcharges, consumers may be unaware that when they use a credit card, the relevant credit card company charges the retailer a fee, usually around two to three percent of the sales price. *See, e.g.,* Decl. of Linda Fiacco ("Fiacco Decl.") ¶ 3; FAC ¶ 7. Such fees, known as "swipe fees," are among greatest and fastest growing operating expenses for merchants in some industries. *See* Adam J. Levitin, Priceless? The Economic Costs of Credit Card Merchant Restraints, 55 UCLA L.Rev. 1321, 1345 (2008); FAC ¶ 28. Plaintiffs accordingly want to impose credit card surcharges, rather than give cash discounts, and to so inform their customers, precisely because consumers are more likely then to notice the fees, dislike them, and switch to cash in order to avoid them. Over time, this behavior will place downward pressure on swipe fees, which credit card companies will be forced to reduce in order to prevent more and more consumers from switching to cash. *See* Levitan, The Antitrust Super Bowl, *supra,* at 313 (noting that after surcharges were permitted in Australia and customers were notified of same, swipe

A-85

fees there declined significantly); FAC ¶ 27.

Plaintiffs also argue that, in the absence of being able to impose surcharges and label them as such, some retailers cannot effectively call consumers' attention to the price differences between cash and credit, and therefore must charge higher headline prices for everyone. Surcharge bans like section 518 thus in effect force cash users (who are said to be disproportionately poor and minority persons), to subsidize the retail purchases of credit card users. *See* Adam J. Levitin, Priceless? The Social Costs of Credit Card Merchant Restraints, 45 Harv. J. on Legis. 1, 35 (2008); FAC ¶¶ 28–29. This hidden, regressive subsidy for credit card usage is not insubstantial. *See* Scott Schuh, Oz Shy, & Joanna Stavins, Who Gains and Who Loses from Credit Card Payments? at 21 (Fed. Reserve Bank of Boston, Public Policy Discussion Paper No. 10–03, 2010) ("The average cash-paying household transfers $149 ... annually to card users," each of whom on average "receives a subsidy of $1,333 ... annually from cash users.").

Defendants, however, contend that, in enacting section 518, the New York legislature effectively concluded that a surcharge ban would actually protect consumers from unfair surprise and deception. Defendants note that consumers tend to plan and anchor their expectations around the advertised sticker price of a given item they intend to purchase. If a consumer later learns that she can earn a discount from that price for using cash, she is not harmed. But if the consumer later learns that there is an additional charge, above the sticker price, if she chooses to pay by credit card, her expectations may be frustrated.

**\*438** Whatever its purported purpose, section 518 is the product of a decades-long battle between credit card companies on the one hand and retailers and consumer advocates on the other. In the early days of credit cards, credit card companies included clauses in their contracts with retailers that strictly forbade those retailers from charging different prices for cash and credit transactions. *See* Edmund W. Kitch, The Framing Hypothesis: Is It Supported by Credit Card Issuer Opposition to a Surcharge on a Cash Price?, 6 J.L. Econ. & Org. 217, 219–20 & n. 4 (1990); FAC ¶ 32. That practice ended in 1974 when Congress amended the Truth in Lending Act to provide that a "card issuer may not, by contract or otherwise, prohibit any ... seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Fair Credit Billing Act, Pub. L. No. 93–495, tit. III, § 306, 88

Stat. 1500, 1515 (1974) (codified at 15 U.S.C. § 1666f(a)).

Thereafter, the battleground moved from whether merchants could charge different prices for cash and credit to how merchants could communicate those different prices to consumers. In 1976, at the urging of the credit card industry, Congress passed another amendment to the Truth in Lending Act, providing, as section 518 now provides, that "[n]o seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means." Act of Feb. 27, 1976, Pub. L. No. 94–222, § 3(c), 90 Stat. 197, 197 (codified at 15 U.S.C. § 1666f(a) (1980)). In this 1976 amendment, Congress defined the terms "discount" (as used in the preexisting version of the Act) and "surcharge" (as used in the amendment) as follows:

> The term "discount" ... means a reduction made from the regular price. The term "discount" ... shall not mean a surcharge.

> ... The term "surcharge" ... means any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means.

*Id.* § 3(a) (codified at 15 U.S.C. § 1602 (1980)).

The 1976 amendment placed a three-year time limit on the no surcharge provision, but in 1978, Congress extended the provision for an additional two years. *See* Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95–630, § 1501, 92 Stat. 3641, 3713. In 1981, with the support of the credit card industry and over the opposition of federal regulators, Congress again extended the sunset for another three years. *See* Cash Discount Act, Pub. L. No. 97–25, § 201, 95 Stat. 144, 144; S.Rep. No. 97–23, at 8–10 (additional views of Sen. Proxmire) (describing the positions of credit card companies and federal regulators). In addition, supplementing the provisions that had defined "discount" and "surcharge" in terms of the retailer's "regular price," the 1981 renewal added a provision defining "regular price" as follows:

> the term "regular price" means the tag or posted price charged for the property or service if a single price is tagged or posted, or the price

charged for the property or service when payment is made by use of ... a credit card if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by use of ... a credit card and the other when payment is made by use of cash, check, or similar means.

Cash Discount Act § 102. This definition was intended to clarify that the no-surcharge provision "permits merchants to have two-tier pricing systems and to offer **\*439** a differential between the credit price and the cash price" as long as merchants ensure that "when prices are tagged or posted, the consumers will be exposed to the highest price when they see a tagged or posted price." S.Rep. No. 97–23, at 4.

In 1984, however, Congress allowed the no-surcharge provision to lapse. In response, the credit card industry began lobbying for state-level no-surcharge laws, which were eventually enacted in ten states, including New York. *See* N.Y. Bus. Law § 518.[2] New York's no-surcharge provision, section 518, copied the operative text of the then-lapsed federal provision prohibiting surcharges, but did not include the federal definitions, or any other definitions, of "discount," "surcharge," or "regular price."

[2]       *See also* Cal. Civ.Code § 1748.1(a); Colo.Rev.Stat. § 5–2–212(1); Conn. Gen.Stat. § 42–133ff(a); Fla. Stat. § 501.0117; Kan Stat. Ann. § 16a–2–403; Me.Rev.Stat. 9–A, § 8–303(2) (repealed Sept. 27, 2011); Mass Gen. Laws ch. 140D, § 28A(a); Okla. Stat. tit. 14a, § 2–211(A); Tex. Fin.Code § 339.001.

Contemporaneously, credit card companies also began including contractual no-surcharge provisions in their agreements with retailers. *See* Amos Tversky & Daniel Kahneman, Rational Choice and the Framing of Decisions, 59 J. Bus. S251, S261 (1986); FAC ¶¶ 34, 43. In January 2013, however, two major credit card issuers, Visa and MasterCard, agreed to drop their contractual prohibitions against surcharges as part of a larger antitrust settlement. *See* Jessica Silver–Greenberg, Visa and MasterCard Settle Claims of Antitrust, N.Y. Times, July 14, 2012, at B1; FAC ¶ 48. As a result, state no-surcharge laws, previously redundant of retailers' contractual

obligations, have now taken on renewed importance.

The ten plaintiffs in this case consist of five New York retail businesses and their principals. All of these businesses pay swipe fees of around two-to-three percent per credit transaction, and accordingly would like to charge higher prices for credit transactions than for cash. They do not want to frame this price difference as a cash discount, however, because, *inter alia,* discounts "would make advertised prices look higher than they are, without making it transparent that the higher price would be due solely to credit card transaction costs—precisely the information [they] wish to convey to [their] consumers." Decl. of Peter Freeman Decl. ("Freeman Decl.") ¶ 8; Decl. of Donna Pabst ("Pabst Decl.") ¶ 5 (similar); Decl. of David Ross ("Ross Decl.") ¶¶ 8–9 (similar); Fiacco Decl. ¶¶ 5–8; Decl. of Stephen Milles ("Milles Decl.") ¶¶ 5–6; FAC ¶¶ 2–4, 7, 10, 13, 16. Given section 518, however, plaintiffs fear that they may be sued or even prosecuted if they frame any price difference as imposing a "surcharge" or otherwise convey to their customers that they will be charged *more* for paying with credit rather than *less* for paying with cash. *See* Freeman Decl. ¶ 9; Pabst Decl. ¶ 6; Ross Decl. ¶ 10; Fiacco Decl. ¶¶ 8–9; Milles Decl. ¶¶ 6–7; FAC ¶¶ 4–5, 8, 11, 13, 16.

Because of these fears, moreover, four of the five plaintiff businesses simply charge the same price for all transactions, even though they would like to charge more for credit. *See* Freeman Decl. ¶ 6; Pabst Decl. ¶ 5; Ross Decl. ¶ 7; Milles Decl. ¶ 4; FAC ¶¶ 7, 11, 13, 16. The remaining business, Expressions Hair Design ("Expressions"), a unisex hair salon in Vestal, New York, does charge different prices for cash and credit, but section 518 effectively restricts how it describes those prices to its customers. According to the salon's co-owner plaintiff Linda Fiacco, "[u]ntil 2012, Expressions posted a sign at **\*440** our counter informing all customers that, due to the high swipe fees charged by the credit-card industry, we would charge them 3% more for using a credit card to purchase services." Fiacco Decl. ¶ 6; *see* FAC ¶ 3. However, after a customer who is a lawyer informed the salon of New York's no-surcharge law, Expressions removed the sign. Fiacco Decl. ¶ 6 FAC ¶ 3. Expressions still charges a higher price for credit, but because of section 518, the salon's managers and employees "try to be as careful as we can to avoid characterizing that price difference as a 'surcharge' or an 'extra' charge for paying with a credit card," as opposed to a discount for cash. Fiacco Decl. ¶ 7 *see* FAC ¶ 5. Fiacco states that Expressions would like to return to its former policy of

prominently advertising a surcharge on all credit transactions, but cannot because of fears of being prosecuted or sued for violation of section 518. Fiacco Decl. ¶ 8; FAC ¶ 4.

Against this background, the Court turns to plaintiffs' motion for a preliminary injunction on its First Amendment and void-for-vagueness claims and defendants' cross-motion to dismiss the complaint in its entirety.[3]

[3]    In their initial complaint, plaintiffs named only the Attorney General as a defendant, but later amended their complaint to name the three District Attorneys as well. *See generally* Compl.; FAC. Before plaintiffs filed their amended complaint, however, the Attorney General moved to dismiss the initial complaint. On consent of the parties, the Court later deemed the motion to dismiss to be directed against the First Amended Complaint. *See* Order of July 31, 2013. Also on consent of the parties, the Court deemed plaintiffs' motion for a preliminary injunction to be directed not only against the Attorney General, but also against the District Attorneys. *See* Order of August 14, 2013. The District Attorneys joined in the Attorney General's motion to dismiss, as well as his opposition to the motion for a preliminary injunction.

[1]  [2]  Regarding plaintiffs' motion, a plaintiff seeking a preliminary injunction must ordinarily show "1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of New York,* 615 F.3d 152, 156 (2d Cir.2010) (internal quotation marks and citations omitted). However, "[w]hen, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Id.*

As for defendants' motion, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal

quotation marks omitted). A court considering a motion to dismiss must "accept[ ] as true all factual claims in the complaint and draw[ ] all reasonable inferences in the plaintiff's favor." *Fink v. Time Warner Cable,* 714 F.3d 739, 740–41 (2d Cir.2013).

[3]  Before applying these standards to the motions at hand, the Court must first address defendants' threshold argument that certain plaintiffs lack Article III standing and that plaintiffs' entire pre-enforcement challenge to section 518 is not ripe for adjudication. As to standing, Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies," and "[o]ne element of the case-or-controversy requirement is that plaintiffs **\*441** must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA,* —— U.S. ——, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013) (internal quotation marks omitted). This constitutional requirement demands that

> (1) the plaintiff have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) the injury be fairly traceable to the challenged action of the defendant, and (3) it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Hedges v. Obama,* 724 F.3d 170, 188 (2d Cir.2013) (internal quotation marks omitted).

[4]  [5]  The closely related doctrine of ripeness has both constitutional and prudential aspects. "To the extent that issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' a conclusion that the complaining party will sustain immediate injury and that such injury would be redressed by the relief requested would appear to satisfy this constitutional requirement." *Simmonds v. I.N.S.,* 326 F.3d 351, 358 (2d Cir.2003) (internal quotation marks and alterations omitted). As a prudential matter, courts also consider "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Id.* at 359.

[6] [7]  That said, courts "assess pre-enforcement First Amendment claims ... under somewhat relaxed standing and ripeness rules." *Nat'l Org. for Marriage, Inc. v. Walsh,* 714 F.3d 682, 689 (2d Cir.2013). Void-for-vagueness claims grounded in First Amendment concerns receive similar treatment. *See Dickerson v. Napolitano,* 604 F.3d 732, 742 (2d Cir.2010). As the Second Circuit has explained, "plaintiffs contesting statutes or regulations on First Amendment grounds face an unattractive set of options if they are barred from bringing a facial challenge: refrain[ ] from activity they believe the First Amendment protects, or risk civil or criminal penalties for violating the challenged law." *Nat'l Org. for Marriage,* 714 F.3d at 689 (internal quotation marks omitted). Accordingly, in order to satisfy the requirements of standing and ripeness, "[a] plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it." *Id.* (internal quotation marks omitted).

[8]  Taking the issue of ripeness first, this well-settled standard disposes of defendants' contention that plaintiffs' claims are unripe. Defendants argue that this suit is premature because no plaintiff has yet been the subject of civil or criminal enforcement for violating section 518, and plaintiffs supposedly would suffer no hardship from postponing review. But that argument simply ignores the gravamen of this suit, which claims that section 518 presently burdens and chills plaintiffs' fundamental right of free speech. That is a cognizable injury plaintiffs would continue to suffer on an ongoing basis if review were withheld. This suit is clearly ripe.

As to standing, defendants recognize the governing principles and concede that four of the ten plaintiffs in this action legitimately fear enforcement and therefore have standing. *See* Defs.' Reply Mem. of Law in Further Supp. of Mot. To Dismiss at 8–9. While this concession alone is sufficient to allow this suit to continue, the Court must resolve each plaintiff's standing in order to determine the scope of any **\*442** injunction in this case— i.e., precisely which parties the defendants would be formally prevented from suing or prosecuting under section 518. In addition, it is useful to discuss defendants' challenge to the remaining six plaintiffs' standing because it casts light on the proper interpretation of section 518.

As an initial matter, plaintiffs argue that they all have standing because, as they read it, section 518 draws the

line between permissible discounts and impermissible surcharges based solely on the words and labels a seller uses to describe its prices. Here, each plaintiff avers that but for section 518, they would charge different prices for cash and credit and would frame that price difference as a credit-card surcharge. Plaintiffs therefore claim that they all legitimately fear enforcement and therefore have standing.

Defendants, however, contend that section 518 "is an anti-fraud statute prohibiting sellers from charging credit card users an additional hidden fee not displayed as prominently as the cash price." Mem. of Law in Supp. of Defs.' Mot. To Dismiss and in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Mem.") at 21. On defendants' reading, a "surcharge" is any increase over a seller's regular price, and a seller's "regular" price, in turn, is the price, in dollars and cents, that is most prominently displayed or communicated to consumers. Hence, if a seller's credit-card price is displayed, in dollars and cents, at least as conspicuously as the cash price, then the credit-card price is the "regular price," and there can be no impermissible surcharge.

[9]  According to defendants, six of the plaintiffs here— The Brooklyn Farmacy & Soda Fountain, Inc., its co-owner Peter Freeman, Bunda Starr Corp., its president Donna Pabst, Patio.com LLC, and its founder and president David Ross—do not propose to advertise their credit-card prices any less prominently than their cash prices. *See generally* Freeman Decl.; Pabst Decl.; Ross Decl.[4] Defendants thus argue that these plaintiffs have not proposed to do anything that would violate section 518, and therefore lack standing. The remaining four plaintiffs, however—Expressions, Fiacco, Five Points Academy, and its vice-president Stephen Milles—assertedly want to advertise and their credit-card surcharges only as a percentage fee added on top of their cash prices. *See* Suppl. Decl. of Linda Fiacco; Suppl. Decl. of Stephen Milles. Because these plaintiffs propose not to disclose their credit-card prices in dollars and cents at all (i.e., not as a "sticker price"), their proposals would violate defendants' reading of the statute. Defendants accordingly concede that these four plaintiffs have standing.

4  To be precise, defendants contend that it is unclear whether Patio.com intends to display the credit card surcharge prominently or only as a line than on the customer's receipt. *See* Defs.' Mem. at 34–35. Fairly read, however, the Ross Declaration indicates that

Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)

Patio.com wants to include a line item on its receipt in addition to other means of prominently advertising the surcharge. The Ross Declaration states that Patio.com wants "to charge a different price for credit card usage" and "call that price a 'surcharge' " in order to "provide a meaningful incentive to many customers to switch to paying with a debit card, cash or check." Ross Decl. ¶ 8.

But defendants' rather convoluted interpretation of the statute runs into several difficulties. The most obvious is the plain text of section 518 itself, which, as previously stated, reads: "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." N.Y. Bus. Law § 518. The statute simply bans "surcharge[s]." This, on **443 its face, chills any retailer from characterizing its prices as including a surcharge; conversely it says nothing, and provides no warning or guidance, about how prominently prices must be displayed or whether swipe fees must be disclosed in dollars and cents or as a percentage.

Defendants' interpretation also produces absurd results. Consider, for example, a seller who advertises two prices with equal prominence: "$100 per widget" and "$103 per widget with 3% credit-card surcharge." It strains credulity to suggest that a seller using the latter language could not legitimately fear prosecution under section 518.

The actual history of prosecution under section 518 also belies defendants' interpretation. In 1987, just a few years after section 518 was enacted, the District Attorney for Bronx County prosecuted and convicted a gas-station owner, Eugene Fulvio, for imposing an unlawful credit-card fee of five cents per gallon, which was advertised as such. After trial, the Bronx County Criminal Court granted Fulvio's motion to dismiss the charge under section 518 on the ground that, as applied, section 518 was impermissibly vague. *See People v. Fulvio* ("*Fulvio II* "), 136 Misc.2d 334, 517 N.Y.S.2d 1008, 1009–10 (N.Y.Crim.Ct.1987).[5] In the course of its ruling, the court concluded that, based on "the facts developed in this case," "the pertinent legislative history," and "the position of the People," "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *Id.* at 1011 (emphasis original). Although Fulvio had testified that "the signs in

his station clearly stated the 'cash price' and the 'credit price' for his gasoline," *id.* at 1010, the court found it "clear that conviction may be had under the literal terms of GBL § 518 regardless of sign displays," *id.* at 1011. In the court's view, " § 518 creates a distinction without a difference; it is not the act which is outlawed, but the *word* given that act." *Id.* at 1015 (emphasis original).

[5]   In an earlier decision in the same case, the court rejected Fulvio's argument that section 518 was impermissibly vague on its face. *See People v. Fulvio* ("*Fulvio I*"), 135 Misc.2d 93, 514 N.Y.S.2d 594, 596–97 (N.Y.Crim.Ct.1987).

Although *Fulvio* is one of the few reported cases involving prosecution under section 518, defendants attempt to dismiss it as a kind of aberration and to find support for their interpretation of section 518 in the definitions of the terms "surcharge," "discount," and "regular price" that existed under the now-lapsed federal statute. But in enacting section 518 the New York legislature chose not to enact those definitional provisions. And even if it had, the federal definitions, like section 518 itself, make no mention of how prominently a seller's credit-card price must be disclosed or whether it may be expressed in dollars and cents or a percentage.

Nor can defendants point to any case law or official pronouncement that would limit section 518's scope to match the lapsed federal definitions. To the contrary, the Attorney General's most recent enforcement actions under section 518 are inconsistent with the federal definitions. As the federal legislative history shows, the federal definitions were designed to "permit [ ] merchants to have two-tier pricing systems," provided that "*when prices are tagged or posted,* the consumers will be exposed to the highest price *when they see a tagged or posted price.*" S.Rep. No. 97–23, at 4 (emphasis added).[6] In a series of **444 sweeps in 2008 and 2009, however, then-Attorney General Andrew Cuomo enforced section 518 against sellers that had no tagged or posted prices, but had only announced their prices orally.[7] These recent enforcement actions are fatal to defendants' reliance on the federal definitions. Contrary to defendants' contention, sellers have every reason to fear, based on recent history, that section 518 will be enforced beyond the bounds of its federal precursor.

[6]   *See also* Cash Discount Act § 102 (defining "regular

Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)

price" as (1) the "tag or posted price" for an item if a single price is tagged or posted, or (2) the credit-card price if (a) no price is tagged or posted, or (b) two different prices are tagged or posted, one for cash and one for credit).

[7]    In a representative case, an investigator called a small home heating oil company "pretending to be a customer ordering oil," and an employee "quoted the price of oil and said that [the company] charge[s] a fee on top of that price for using a credit card." Decl. of Michael Parisi ¶ 6. The Attorney General took the position that that constituted the imposition of an unlawful surcharge under section 518. The company ultimately entered into an Assurance of Discontinuance, which included an agreement to refund "all previously imposed surcharges" over a specified period. *Id.,* ex. A, ¶ 9. The Attorney General took the same position in numerous other cases around the same time. *See* Decl. of John Conover ¶¶ 3–5; Decl. of Donna Zasowski ¶¶ 3–6; Second Decl. of Deepak Gupta ("Second Gupta Decl."), exs. F, H (press releases announcing settlements with numerous other heating-oil companies).

For all of these reasons, the Court rejects defendants' reading of the statute, and concludes that all of the plaintiffs here legitimately fear that section 518 may be enforced against them. All of the plaintiffs accordingly have standing.

**[10]  [11]  [12]**  The Court therefore turns to the merits of plaintiffs' First Amendment claim. It is axiomatic that "[t]he First Amendment protects against government regulation and suppression of speech on account of its content." *United States v. Caronia,* 703 F.3d 149, 162–63 (2d Cir.2012). Content-based restrictions on speech "require[ ] heightened scrutiny" and are "presumptively invalid." *Sorrell v. IMS Health Inc.,* ―― U.S. ――, 131 S.Ct. 2653, 2664, 2667, 180 L.Ed.2d 544 (2011). These general principles apply "whenever" the government restricts speech based on the message it conveys, and "[c]ommercial speech is no exception," *id.* at 2664. "Criminal regulatory schemes, moreover, warrant even more careful scrutiny." *Caronia,* 703 F.3d at 163.

**[13]**  Plaintiffs claim that section 518 is unconstitutional under these principles because it is an unsupportable content-based restriction on disfavored speech—specifically, speech that describes an extra charge for

credit-card usage as a credit-card "surcharge." Defendants, however, contend that section 518 on its face regulates non-expressive conduct—"impos[ing] a surcharge"—not speech. In the alternative, to the extent the statute can be read to regulate speech, defendants contend that it merely imposes a disclosure requirement, a type of regulation subject only to rational basis review. *See Connecticut Bar Ass'n v. United States,* 620 F.3d 81, 95 (2d Cir.2010).

Defendants' arguments are unpersuasive. For all the reasons already stated, section 518 draws the line between prohibited "surcharges" and permissible "discounts" based on words and labels, rather than economic realities. So read, the statute clearly regulates speech, not conduct, and does so by banning disfavored expression.

It bears noting, however, that even if section 518 somehow could be construed as defendants propose, it would still violate the First Amendment. To begin with, **\*445** even as defendants read it, section 518 plainly regulates speech. Indeed, defendants' suggestion to the contrary turns the speech-conduct distinction on its head. Defendants argue that while "[i]t is true that if sellers want to use dual pricing, § 518 affects *how* they may communicate it," the statute "does not dictate the *content* of that communication at all," because "sellers are free to set the credit card price at whatever level they wish." Defs.' Mem. at 37. Thus, in defendants' view, setting prices (which section 518 does not regulate) is speech, but communicating those prices to customers (which the statute, on defendants' own analysis, does regulate) is conduct. That is precisely backwards. Pricing is a routine subject of economic regulation, but the manner in which price information is conveyed to buyers is quintessentially expressive, and therefore protected by the First Amendment.

Defendants' argument that their reading of section 518 does nothing more than impose a disclosure requirement fares no better. To be sure, the Supreme Court has held that the government may constitutionally require commercial speakers to disclose truthful factual information as long as it is "reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio,* 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). But section 518 on defendants' reading does not merely impose a disclosure requirement, because disclosure alone is not sufficient for compliance. Rather, on defendants' reading, the statute also prohibits sellers

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    8

Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)

from advertising their cash price in a way that causes consumers to perceive it as the regular, baseline price against which all other prices are measured.

It is instructive in this regard to compare defendants' interpretation of section 518 with Minnesota's surcharge law. Minnesota's law provides:

> A seller of goods or services may impose a surcharge on a purchaser who elects to use a credit card in lieu of payment by cash, check, or similar means, *provided (1) the seller informs the purchaser of the surcharge both orally at the time of sale and by a sign conspicuously posted on the seller's premises....*

Minn.Stat. § 325G.051(1)(a) (emphasis added). A seller who fully complied with Minnesota's disclosure requirement would still violate defendants' reading of section 518 if it displayed its cash price one iota more prominently than the credit card price. In this sense, defendants interpret section 518 as an *anti*-disclosure statute, as they read the statute to bar a seller from disclosing its cash price even marginally more conspicuously than its credit-card price.

[14] [15] Because even on defendants' interpretation, section 518 contains not just a disclosure requirement but also an "outright prohibition [ ] on speech," *id.* at 650, 105 S.Ct. 2265, *Zauderer's* lenient standard of review is inapplicable, and the statute must be subjected to "heightened judicial scrutiny." *Sorrell,* 131 S.Ct. at 2664. In particular, commercial speech has traditionally been subject to intermediate scrutiny, which directs courts to consider (1) whether the regulated speech "concern[s] lawful activity and [is] not ... misleading," (2) "whether the asserted governmental interest" justifying the regulation "is substantial," (3) "whether the regulation directly advances the governmental interest asserted," and (4) whether the regulation "is not more extensive than necessary to serve the governmental interest." *Central Hudson Gas & Electric Corp. v. Public Service Commission of* *446 New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Section 518, however it is interpreted, cannot pass muster under this standard, for three reasons.[8]

fails intermediate scrutiny, it need not resolve plaintiffs' argument that the statute sweeps up both commercial and noncommercial speech, subjecting the law to strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,* 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Brown v. Entm't Merchants Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011). The Court notes, however, that commercial speech generally includes speech that "does no more than propose a commercial transaction," *United States v. United Foods, Inc.,* 533 U.S. 405, 409, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001), or is "related solely to the economic interests of the speaker and its audience." *Cent. Hudson,* 447 U.S. at 561, 100 S.Ct. 2343. In this case, while price information no doubt proposes a transaction and relates to economic interests, "what is going on here is more than just a debate about how best to sell toothpaste." *BellSouth Telecommunications, Inc. v. Farris,* 542 F.3d 499, 505 (6th Cir.2008). Plaintiffs want to convey not only the terms of a transaction, but also *why* prices are what they are and *who* is responsible. Given current debates over swipe fees and financial regulation more generally, those questions have a powerful noncommercial valence. *See id.* at 504–05 (discussing a regulation prohibiting a seller from including a line item on an invoice separately detailing the cost of a particular tax); *Bloom v. O'Brien,* 841 F.Supp. 277, 280–81 (D.Minn.1993) (similar).

[16] [17] First, the speech restricted by section 518 concerns lawful conduct and is non-misleading. The regulated speech pertains solely to dual pricing, which all parties agree is lawful in itself. And while defendants make much of the fact that credit-card surcharges may be misleading if they are hidden or inadequately disclosed, "the States may not place an absolute prohibition on certain types of potentially misleading information ... if the information also may be presented in a way that is not deceptive." *In re R.M.J.,* 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). The Court finds nothing "inherently misleading" about a seller describing a price difference as a credit-card "surcharge" or displaying its credit-card price with marginally less prominence than the cash price. *Id.* Indeed, by truthfully and effectively conveying the true costs of using credit cards, surcharges can actually make consumers more informed rather than less, thus furthering rather than impeding the purposes of the First Amendment. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 765, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

8    Because the Court easily concludes that section 518

A-92

Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)

[18] Second, section 518 does not "directly advance[ ]" any interest in protecting consumers from deception. *Cent. Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. To the contrary, insofar as it prohibits credit-card surcharges that are not misleadingly presented, the statute actually perpetuates consumer confusion by preventing sellers from using the most effective means at their disposal to educate consumers about the true costs of credit-card usage. It would be perverse to conclude that a statute that keeps consumers in the dark about avoidable additional costs somehow "directly advances" the goal of preventing consumer deception.

Moreover, even to the extent it can be said to prevent misleading speech, section 518 is riddled with numerous "exemptions and inconsistencies [that] bring into question the purpose" of the statute. *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 489, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). While defendants express concern for consumers who may be lured into a transaction they cannot complete without incurring additional unannounced charges, section 518 applies to only one particular type of additional **\*447** charge: credit-card surcharges. The statute thus does not actually ensure that the most prominently displayed price consumers encounter will reflect the highest price they will have to pay, since handling charges, shipping costs, service fees, processing fees, "suggested tips," and any number of other types of additional charges—which consumers may or may not be able to take steps to avoid—may still be added on top.

Furthermore, even with respect to credit-card surcharges, New York has created numerous exceptions to section 518 for the state itself and certain favored utilities.[9] Defendants offer no explanation for why credit-card surcharges are somehow less deceptive when imposed by the Water Board, for example, than when imposed by ordinary commercial retailers like the plaintiffs. *See Greater New Orleans Broad. Ass'n, Inc. v. United States,* 527 U.S. 173, 191, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) ("[T]he Government presents no convincing reason for pegging its speech ban to the identity of the owners or operators of the [speaker].")[10]

9  *See* N.Y.Crim. Proc. Law § 420.05 (authorizing York courts to impose "a reasonable administrative fee" on individuals who pay court-imposed fines or fees "by credit card or similar device"); N.Y.Crim. Proc. Law § 520.10(1)(i) ("[A]ny person posting bail by credit card or similar device ... may be required to pay a reasonable

administrative fee."); N.Y. Pub. Auth. Law § 1045–j(4–a)(b) (allowing the Water Board to "accept credit cards as a means of payment of fees, rates, rent or other charges," and to impose "a reasonable administrative service fee not to exceed the costs incurred by the water board in connection with such credit card transaction."); N.Y. Pub. Serv. Law § 92–c(9) (allowing telecommunications providers to collect a "premises or location surcharge" for calls originating in the state that are charged to a credit card).

10  As one commentator has observed, these kinds of exceptions make little sense "unless one sees them as an implicit acknowledgement that when the government plays the role of a merchant, it too does not want to be stuck with any of the transaction costs of credit." Levitan, The Antitrust Super Bowl, *supra,* at 285 n. 92.

[19] Finally, section 518 is far broader than necessary to serve any asserted anti-fraud purpose. New York easily could have limited its regulation to surcharges that are deceptive or misleading. Alternatively, it could have passed a provision similar to Minnesota's surcharge law, which permits credit-card surcharges so long as the seller "informs the purchaser of the surcharge both orally at the time of sale and by a sign conspicuously posted on the seller's premises." Minn.Stat. § 325G.051(1)(a)(1). And even in the absence of any statute specifically regulating surcharges, New York already has laws on the books prohibiting false advertising and deceptive acts and practices. *See* N.Y. Gen. Bus. Law §§ 349–350–a. For all these reasons, section 518 is plainly overbroad.

The Court accordingly concludes that section 518, however interpreted, violates the First Amendment.

[20] [21] [22] [23] The Court now moves on to plaintiffs' claim that section 518 is impermissibly vague. "As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *VIP of Berlin, LLC v. Town of Berlin,* 593 F.3d 179, 186 (2d Cir.2010) (internal quotation marks omitted). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary

A-93

Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)

intelligence a reasonable **448 opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). "The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *VIP of Berlin,* 593 F.3d at 186 (internal quotation marks omitted). Here, section 518 is subject to the strictest vagueness scrutiny, as it both chills First Amendment rights and imposes criminal penalties. In addition, the statute also contains no "scienter requirement," thus potentially setting "a trap for those who act in good faith." *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (internal quotation marks omitted).

[24] With these standards in mind, the Court has little difficulty concluding that, to the extent liability under section 518 turns on the labels that sellers use to describe their prices, the statute is impermissibly vague. Indeed, defendants make no attempt to defend the statute so interpreted, conceding that it is "untenable." Defs.' Mem. at 32. That concession is well taken. In the words of the court in *Fulvio II:*

> [it] is intolerable ... that the gasoline station operator careful enough or sophisticated enough to always characterize the lower of [his] prices as a "discount for cash" may enter his automobile at the end of his business day and drive home a free man; however, if the same individual, or his colleague operating the station down the street, *or* his *employee* is careless enough to describe the higher price in terms which amount to the "credit price" having been derived from *adding* a charge to the lower price, he faces the prospect of criminal conviction and possible imprisonment.

517 N.Y.S.2d at 1015 (emphases in original).

Defendants' reading of section 518, whereby the statute simply requires sellers to display their credit-card prices

at least as prominently as their cash prices, would present a closer question under the Due Process Clause. But as explained above, defendants' narrowing interpretation strays markedly from the ordinary plain meaning of the statute's text, and therefore cannot save it. *See, Vt. Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 386 (2d Cir.2000) (holding that federal courts may narrowly construe a state statute to avoid constitutional problems only if the statute is "readily susceptible to the limitation" (internal quotation marks omitted)).

The Court accordingly concludes that section 518 is also void for vagueness.

[25] [26] [27] The Court now addresses plaintiffs' claim that section 518 is preempted by the federal Sherman Antitrust Act. While plaintiffs have not moved for a preliminary injunction on this claim, defendants have moved to dismiss it. In general, federal law preempts state law if the federal law does so expressly, if the federal law occupies the entire regulatory field, or if the state law conflicts with federal law such that "compliance with both federal and state regulations is a physical impossibility" or the state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Arizona v. United States,* ––– U.S. ––––, 132 S.Ct. 2492, 2500–01, 183 L.Ed.2d 351 (2012) (internal quotation marks omitted). In the antitrust context, the Supreme Court has held that the Sherman Act preempts state law only if the **449 state law necessarily mandates, authorizes, or causes an antitrust violation. *See Fisher v. City of Berkeley, Cal.,* 475 U.S. 260, 265, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). Applying that standard, the Second Circuit has held that a state or local law can be preempted if it has unreasonable "anticompetitive effects." *Hertz Corp. v. City of New York,* 1 F.3d 121, 127 (2d Cir.1993).

Here, the complaint alleges that by preventing retailers from effectively communicating the costs of credit-card usage to consumers, section 518 "insulates credit card companies from competition, causes the costs of credit to skyrocket, and frustrates the purposes of federal antitrust law—just as Visa and MasterCard's no-surcharge rules did." FAC ¶ 52. According to plaintiffs, because those contractual rules "constituted an antitrust violation, the no-surcharge law that now carries them out does so as well." *Id.* Defendants, however, argue that plaintiffs' preemption claim fails, because, properly interpreted, the statute "is *pro*-competitive: By requiring sellers to prominently disclose the credit card price, § 518 [enables] consumers to make an informed decision whether the

A-94

Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)

higher credit card price is worth paying at an early moment in the transaction when they can feasibly switch cash." Defs.' Mem. at 42 (emphasis original).

[28] Defendants' argument that section 518 fosters rather than impedes competition presents a factual question that cannot be resolved on a motion to dismiss. Because plaintiffs do not allege or argue that section 518 constitutes a *per se* unlawful restraint of trade, the statute must be subjected to a fact-intensive analysis under "rule of reason." That standard directs "the factfinder [to] weigh[ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 885, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (internal quotation marks omitted).

[29] Plaintiffs have more than plausibly alleged that section 518 violates the rule of reason. To begin with, the statute imposes a surcharge ban indistinguishable from the bans that Visa and MasterCard recently dropped from their retailer contracts as part of an antitrust settlement. In addition, state and federal nosurcharge laws like section 518 were enacted in the name of consumer protection at the behest of the credit-card industry over the objection of consumer advocates. And furthermore, as explained above with respect to plaintiffs' First Amendment claim, the "fit" between the statute's asserted purpose of protecting consumers and its actual scope and effect is dubious at best. Defendants may be able to produce evidence to undercut or rebut these considerations when this claim is fully adjudicated, but the claim cannot be dismissed at this stage of the case.

Having addressed the merits of each of plaintiffs' three claims for relief, the Court turns finally to the remaining factors relevant to the issuance of a preliminary injunction.

[30] First, it is plain that plaintiffs will suffer irreparable harm in the absence of an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The Court has already explained why all plaintiffs reasonably fear that section 518 will be enforced against them, and the plaintiffs' sworn declarations detail how that fear burdens and chills the exercise of their right to free speech.

[31] [32] Defendants assert that plaintiffs' injury is actually monetary in nature, since plaintiffs desire to impose surcharges in order to recoup and reduce the costs of *450 swipe fees. Monetary harms are usually not irreparable. *See, e.g., Dexter 345 Inc. v. Cuomo,* 663 F.3d 59, 63 (2d Cir.2011). But free expression is no less protected merely because it has an economic impact or motive. *See Sorrell,* 131 S.Ct. at 2665. And section 518 does not merely cause a monetary injury that then incidentally burdens plaintiffs' free speech rights; instead, it directly prohibits and penalizes free expression. *See Int'l Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 72 (2d Cir.1996) (drawing this distinction). That injury is cognizable and irreparable.

[33] [34] Defendants also argue that plaintiffs' delay in bringing this action belies their claim of irreparable harm. To be sure, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights," and delay thus "tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985). But any delay in this case was not unreasonable. As noted, the controversy over section 518 only became "live" after Visa and MasterCard dropped their contractual bans on surcharges in January of this year as part of an antitrust settlement. In May, Visa and MasterCard were still working to give retailers the technical ability to impose surcharges over the relevant networks. *See* Decl. of Gary B. Friedman ¶¶ 1–5. This suit was then filed on June 4, 2013. Furthermore, as of the date of this Opinion, the antitrust settlement still has not been finally approved. *See In re Payment Card Interchange Fee Merchant Discount Antitrust Litig.,* No. 05–MD–01720 (JG)(JO) (E.D.N.Y. fairness hearing held Sept. 12, 2013). Plaintiffs have not sat on their rights, and have more than adequately shown irreparable harm.

[35] As to the public interest, the public has an undeniable interest in having access to full and accurate information. As the Supreme Court has explained, even in the context of purely commercial information, "[t]he listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue." *Bates v. State Bar of Arizona,* 433 U.S. 350, 364, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). "Advertising," moreover, "though entirely commercial, may often carry information of import to significant issues of the day." *Id.* These values are well exemplified by plaintiffs' desired speech. Consumers make decisions about methods of payment millions of times every day, and credit-card surcharges

A-95

**Expressions Hair Design v. Schneiderman, 975 F.Supp.2d 430 (2013)**

convey information that is critical to those decisions. The information conveyed by surcharges also is relevant to current debates over swipe fee regulation, as well as financial regulation more broadly. And even beyond the informational content of surcharges, sellers' inability to effectively inform consumers of the true costs of credit has the effect of artificially subsidizing credit at the expense of cash, increasing overall credit-card usage and consumer debt.

Accordingly, for the foregoing reasons, the Court hereby preliminarily enjoins the defendants from enforcing section 518 of the New York General Business Law

during the pendency of this case, and denies defendants' motion to dismiss in full. In addition, the stay of proceedings imposed on August 14, 2013 is hereby lifted. The parties are directed, within one week of the date of this Order, to jointly telephone Chambers to schedule further proceedings in this case. The Clerk of the Court is directed to close documents numbered 26 and 49 on the docket of this case.

SO ORDERED.

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

A-96

# TAB 22-3

People v. Fulvio, 136 Misc.2d 334 (1987)

517 N.Y.S.2d 1008

136 Misc.2d 334
Criminal Court, City of New York,
Bronx County, Part JP 9.

The PEOPLE of the State of New York
v.
Eugene FULVIO, Defendant.

June 22, 1987.

Defendant was found not guilty of criminal mischief in the fourth degree and guilty of attempt to violate credit card surcharge statute. Motions by defendant were treated as motions to set aside the verdict and to dismiss the charge. The Criminal Court, Bronx County, Donati, J., held that statute prohibiting vendor from charging surcharge for credit card use but which would not interfere with that same vendor establishing higher price for credit sales and then allowing comparable discount for cash purchases, is invalid on due process grounds.

Motion to dismiss granted; conviction set aside and dismissed; defendant discharged.

**West Codenotes**

**Unconstitutional as Applied**
McKinney's General Business Law § 518

**Attorneys and Law Firms**

**\*\*1009 \*334** Mario Merola, Dist. Atty., Sp. Dist. Atty. Eric A. Seiff, for the people.

Murray Richman, New York City, for defendant.

**Opinion**

DONATI, Judge:

Following a five day trial without a jury on a two-count Information, this court found the defendant not guilty on the charge of violation of Penal Law § 145.00 (Criminal mischief in the fourth degree) and guilty of an attempt to violate General Business Law § 518 (Credit card surcharge prohibited). Prior to **\*335** the rendering of that verdict defendant orally moved, and after summations in the case supplemented his motions with papers, to dismiss the GBL § 518 charge on the grounds that (1) GBL § 518 is an unclassified misdemeanor and there exists no basis in law permitting a charge of *attempt* to commit an unclassified misdemeanor and, in effect, (2) that GBL § 518 violated defendant's due process rights in that, among other things, the section is impermissibly vague as well as arbitrary and capricious. The court reserved decision on those motions and, in view of the court's conviction of defendant on the charge of attempt to violate GBL § 518, treats the motions as motions to set aside the verdict and to dismiss the charge.

[1] (1) As to the motion addressed to the charge of attempt to violate GBL § 518, on the ground that no basis in law

People v. Fulvio, 136 Misc.2d 334 (1987)

517 N.Y.S.2d 1008

exists for a charge of attempt to commit an unclassified misdemeanor, Penal Law Section 110.00 prohibits an attempt to commit "a crime" and thus to the extent applicable to misdemeanors the provision refers to all misdemeanors, without distinction between those classified and unclassified. Accordingly, the court finds no substance to defendant's position in that regard and that motion to set aside and to dismiss is denied; (2) as to the motion addressed to the constitutionality of GBL § 518, the court finds that conviction of the crime charged thereunder would constitute a denial of substantive due process of law as applied in this case and, accordingly, that motion is granted, the conviction is set aside and that charge is dismissed.

Prior to the commencement of trial herein, defendant moved to dismiss the PL § 110.00 and GBL § 518 charge pursuant to the Constitutions of the United States and of the State of New York on the grounds, *inter alia,* of vagueness and selective enforcement. The motions were denied, essentially on the grounds, respectively, that the statute appeared clear and unambiguous *on its face* and that no *facts* were shown to demonstrate selective prosecution; however, both questions were impliedly left open for further consideration if and when pertinent facts were established (McGann, J. opinion dated January 16, 1987, 135 Misc.2d 93, 94, 96, 514 N.Y.S.2d 594). As is apparent, this court's decision on the issue of the constitutionality of this statute is predicated upon the effect of GBL § 518 *as applied,* at least in this case, based upon the facts proved at trial and thus the factual situation before Judge McGann and **336** the factual situation developed at this trial are clearly different.

Based upon the evidence adduced at trial, this court found the following facts beyond a reasonable doubt.

On January 22, 1986 the complaining witness, Mr. Barry Gedan, drove his automobile into the Amoco Gasoline service station located at 2918 Boston Road in the Bronx, which was leased from Amoco and operated by defendant Eugene Fulvio, having been attracted by the price displayed on signs at the station.

**1010** Mr. Gedan chose to use his credit card for his purchase and, in accordance with his understanding of appropriate procedure, presented his credit card to the woman in the cashier's window who, after verifying that the card was valid, indicated the gasoline pumps Mr. Gedan was to use and activated the mechanism to enable him to pump the gasoline into his automobile. As the pump meter registered the gasoline being pumped, Mr. Gedan noticed that the price being registered was five cents per gallon higher than the price on the sign on the top of the pump for that grade of gasoline. Upon completing his pumping of gas, Mr. Gedan reported to the cashier's window with his credit card to pay for his purchase and complained to the cashier that the pump was registering five cents more per gallon than the price on the sign posted on the top of the pump. A dispute then arose between the two as to which price Mr. Gedan was required to pay. Defendant appeared and an argument ensued between defendant and Mr. Gedan on the same subject.

The testimony of both defense and prosecution witnesses, other than defendant, was consistent as to the assertion that the five cent per gallon additional charge demanded of Mr. Gedan by defendant and his cashier was based upon the customer's use of his credit card to pay for his purchase, and the court so found. For example, Mr. Gedan stated, and the court found, that defendant told him the price was five cents higher because the credit card price is higher and that he (defendant) charged five cents more (per gallon) for his credit card price. Ms. Diaz, the cashier, stated, and the court found, that defendant had instructed her as to the method for charging customers who used a credit card, that she told Mr. Gedan, after he pumped his gas and complained, there was a five cent difference in the price because Mr. Gedan used his credit card and that defendant Fulvio had told her to tell credit card customers that it would cost an "extra nickel," or five cents **337** "extra," to use a credit card. She further told Mr. Gedan and Ms. Miro (a witness who was present at the time of the incident) that night that there was a five cent difference between the cash price and the credit card price. Police Sergeant Collins stated, and the court found, that defendant Fulvio, at the incident, told him a customer must pay a higher price if using a credit card.

People v. Fulvio, 136 Misc.2d 334 (1987)

517 N.Y.S.2d 1008

Ms. Miro stated, and I find, that the cashier had informed her that she (the cashier) had told Mr. Gedan that there was a five cent per gallon additional charge for use of a credit card.

Defendant testified that he was a participant in Amoco's cash discount program, that the signs in his station clearly stated the "cash price" and the "credit price" for his gasoline, that the price differential represented a discount for cash, that his employees were instructed to tell customers that the differential was a discount for cash and that he never instructed his employees to tell customers it would cost more for a credit card purchase. After hearing defendant's testimony, and evaluating it together with the testimony and findings above stated, I find that defendant's instructions to his employees as to what to tell customers concerning the station's prices, were both, that is, in effect, the lower price was a discount for payment by cash but that the higher price would be charged to a customer who used a credit card, for the reason that the customer was paying by that means.

Upon the arrival of the police, Mr. Gedan told them he was willing to pay the cash price for his purchase but not the higher price; defendant told the police the higher price had already been registered in his machine as due and that was the price he insisted that Mr. Gedan pay. However, defendant was persuaded by the police to accept the lower, cash, payment, gave Mr. Gedan a receipt and the police left.

Later that evening Mr. Gedan arrived at the police station and swore out a complaint charging defendant with the two offenses which were the subject of this trial. The two policemen who had earlier responded to the scene thereupon, acting upon the complaint, returned to the gasoline station and arrested defendant.

**1011 [2] General Business Law § 518 provides:

"§ 518. Credit card surcharge prohibited

No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means.

*338 Any seller who violates the provisions of this section shall be guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars or a term of imprisonment up to one year, or both."

After long and careful deliberation on the issue of constitutionality presented here, the court feels compelled to conclude that the very distinction made by the People in this case, namely, that GBL § 518 "prohibits a vendor from charging a surcharge for credit card usage, but ... would not interfere with that same vendor establishing the higher price for credit card sales and then allowing a comparable discount for cash purchases" (Special District Attorney's Post-Trial Memorandum, p 1), requires that this statute be invalidated on due process grounds, at least as applied in this case. The distinction made by the People is correctly based upon the legislative history of GBL § 518, as well as on the federal statute which served as the model for GBL § 518 and that federal statute's legislative history.

In reaching its conclusion the court is deeply mindful of the principle that a strong presumption of constitutionality underlies legislative enactment (*People v. Pagnotta,* 25 N.Y.2d 333, 337, 305 N.Y.S.2d 484, 253 N.E.2d 202 [1969] ), and that in order to declare a law unconstitutional the invalidity of the law must be demonstrated beyond a reasonable doubt (*Matter of Van Berkel v. Power,* 16 N.Y.2d 37, 40, 261 N.Y.S.2d 876, 209 N.E.2d 539 [1965] ). It is, however, also a fundamental tenet of our system of justice that penal laws are to be strictly construed and, particularly, that constitutional limitations on penal statutes are to be scrupulously adhered to not only in accordance with the provisions of the Constitution of the United States but also with the sometimes

517 N.Y.S.2d 1008

even stricter standards of the Constitution of the State of New York. (*See People v. P. J. Video,* 68 N.Y.2d 296, 303, 308, 508 N.Y.S.2d 907, 501 N.E.2d 556 [1986].)

It appears, from the facts developed in this case and the application of this statute based upon the pertinent legislative history and the position of the People as set forth above, that precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the *label* the individual affixes to his economic behavior, without substantive difference.

Observe the instance in which a merchant sets $105 as his price for the sale of a suit, but sells it to a customer for $100 because the customer pays cash. The customer then tells a friend the price of his purchase and the friend, admiring the **\*339** suit, enters the merchant's establishment to purchase the same with a credit card, having the customer's $100 price in mind. Upon the second customer's presentation of his credit card he is advised the price of the suit is $105. In the undoubtedly ensuing discussion, should the merchant advise the customer that the $100 price is available only as a discounted price for cash, he has engaged in legally permissible behavior. Should the merchant advise that the additional $5 is required because this customer is using a credit card for his purchase, the merchant would be subject to conviction for the offense charged in the instant case, namely, attempt to violate GBL § 518, or, indeed, violating that statute's prohibition if the customer acceded to paying the $105.

Nor would the result necessarily be different if the $105 price was actually on a placard placed on the suit. Much was made at the trial of this case as to the matter of what signs were displayed at defendant's gasoline station, when they were placed there, whether they clearly set forth "credit" prices and "cash" prices, and other factors relating to the contents, placement and timing of the sign displays. But it is clear that conviction may be had under the literal terms of GBL § 518 regardless of sign displays (although the **\*\*1012** signs may be relevant on the question of what the merchant in fact said where his words are in issue). Thus, however relevant the evidence as to sign placement and content may be on issues such as misrepresentation, fraud, consumer affairs, or other issues of *what* price differential is or is not projected to the public, it is not determinative on the issue here, namely, of *why* the differential was imposed, the crucial question on a charge of this offense.

The trap set for the unwary or unsophisticated, by the mode of application of the statute here involved, as specified by the People throughout the trial and in its Post-Trial Memorandum, is grounded in the federal legislation (the Cash Discount Act, amending the Truth-in-Lending Act) which provided the model for GBL § 518. The memorandum in support of Assembly Bill 10189 (Senate 836) of 1984 which enacted GBL § 518 notes that its purpose was to fill the gap created by the expiration of the federal ban on surcharges on credit card users and that the provision permitting a merchant to offer a discount for cash would still be permitted. In the May 30, 1984 letter of the Assembly sponsor of the bill (Mr. Goldstein) to the Governor, recommending **\*340** approval of that legislation, Mr. Goldstein notes that the concepts in the bill were identical to those contained in the federal Truth-in-Lending Act (Title 15, U.S.C. § 1601 *et seq.*).

In the legislative history of the federal counterpart of GBL § 518 it is pointed out that the

"bill permits merchants to have two-tier pricing systems and to offer a differential between the credit price and the cash price....

"Merchants can utilize two-tier pricing systems and thereby price cash purchases lower than credit purchases, if they choose to do so". (S.Rep. No. 97–23, 97th Cong., pp. 3–4, *reprinted in* 1981 U.S. Code Cong. and Ad. News, 74–80, at pp. 76–77.)

People v. Fulvio, 136 Misc.2d 334 (1987)

517 N.Y.S.2d 1008

General Business Law § 518 would not have the deficiency described in this opinion if it simply prohibited the imposition of a surcharge upon a credit card user. But however laudatory the cash discount objectives of the framers of this legislation, the two-tier price system created and permitted here results in a mode of application of the statute so vague, uncertain and arbitrary of enforcement as to be fatally defective when the principles of the authorities discussed hereinafter are applied to that mode of application.

The People contend that "[t]he statute in question is clearly drafted...." (Post-Trial Memorandum, *supra,* p 6) and that the term "surcharge" is a commonly used and usually understood word. However, in *Lanzetta v. State of New Jersey,* 306 U.S. 451, 458, 59 S.Ct. 618, 621, 83 L.Ed. 888 (1939), the Court reversed the conviction below on the ground of vagueness, indefiniteness and uncertainty in violation of the due process clause of the Fourteenth Amendment, despite the fact that the offending term used in the statute there involved was the commonly used and understood word "gangster." On the issue of vagueness crucial here, the facts proved at trial and the two-tier pricing system raise the sometimes subtle but definite distinction between the occasion where the statute is unconstitutionally vague, *on its face,* because "no standard of conduct is specified at all" and that where it is unconstitutionally vague *as applied,* because "it requires a person to conform his conduct to an *imprecise but comprehensible* normative standard...." (*Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 [1971] [emphasis added]; and *see People v. Velazquez,* 77 Misc.2d 749, 760, 354 N.Y.S.2d 975 [Crim.Ct., N.Y. County, 1974] ).

New York authorities adhere to the same principles. "A statute which fails to distinguish between innocent conduct and action which is calculated to cause harm may not be **\*341** sustained" (*People v. Pagnotta,* 25 N.Y.2d at 337, 305 N.Y.S.2d 484, 253 N.E.2d 202; *People v. Diaz,* 4 N.Y.2d 469, 471, 176 N.Y.S.2d 313, 151 N.E.2d 871 [1958] ).

In *People v. Diaz,* the court struck down an ordinance making it a crime to "loiter" on the two grounds that the prohibitory **\*\*1013** language was too vague, indefinite and uncertain to define a crime as well as failing to provide any standards or criteria by which the prohibited conduct may be tested. The court reached its conclusion despite its finding that

"While the term 'loiter' or 'loitering' has by long usage acquired a common and accepted meaning ... it does not follow that by itself, and without more, such term is enough to inform a citizen of its criminal implications and, by the same token, leave it open to arbitrary enforcement. These fatal defects are best illustrated by the very facts of this case." (4 N.Y.2d at 470, 176 N.Y.S.2d 313, 151 N.E.2d 871.)

The same can be said for the term "surcharge" as used in GBL § 518. Indeed, if that word were substituted for the word "loiter" in *Diaz,* or the word "gangster" in *Lanzetta,* taken together with the permissibility of the two-tier pricing system, "the very facts of this case" illustrate that a precise fit would occur and thus the same result must follow as in *Diaz* and *Lanzetta,* that is, the (impermissible) fact that precisely the same conduct may be labelled as lawful or unlawful on the basis of semantics only. (*See also, People v. Berck,* 32 N.Y.2d 567, 569–70, 347 N.Y.S.2d 33, 300 N.E.2d 411 [1973]; *People v. Clark,* 135 Misc.2d 22, 515 N.Y.S.2d 382 [App Term, N.Y. County]; *People v. Velazquez,* 77 Misc.2d at 760, 354 N.Y.S.2d 975.)

In *People v. Velazquez,* the court also pointed to another crucial factor to be considered in the type of situation presented by the instant case, a factor which, indeed, transgresses the issues of vagueness and of selective enforcement (77 Misc.2d at 752, 354 N.Y.S.2d 975):

"Although the void-for-vagueness doctrine has traditionally been viewed as concerned principally with the problem of fair notice to the potential criminal actor, 'perhaps the most meaningful aspect of the vagueness

People v. Fulvio, 136 Misc.2d 334 (1987)

517 N.Y.S.2d 1008

doctrine is not actual notice but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' (*Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605.) A vague statute violates due process by permitting and encouraging arbitrary and erratic arrests and convictions. It 'places virtually unfettered discretion in the hands of the police and thereby encourages arbitrary and discriminatory enforcement.' (*People v. Berck,* 32 N.Y.2d 567, 571, 347 N.Y.S.2d 33, 300 N.E.2d 411.)"

The fatal deficiency in GBL § 518 and in **\*342** the People's attempt to substantiate its validity is starkly illustrated by the testimony of crucial witnesses in this case. As above noted, defendant testified as to his instructions to his employees which, if understood and carried out by them as described by defendant, would have avoided a conflict with this statute since those instructions characterized the price differential involved as the legally permissible discount for cash rather than the legally impermissible additional, or "extra", charge for use of a credit card. It was this court's clear impression of the testimony of defendant's cashier, Ms. Diaz, that she felt she was truthfully testifying as to her recollection of her employer's instructions and that she believed she was assisting him with her testimony because the situation merely involved the customer (witness Gedan) insisting on paying cash for his purchase, and the cash discount simply did not apply when the customer used a credit card. And if Ms. Diaz had so testified, her testimony indeed would have supported her employer's contention in this case. It was also the court's clear impression of this witness and her testimony that she believed that her various explanations to the customer, as specified above, were *equally interchangeable.* But they were not. Her explanation that the price per gallon was five cents "extra" because of his use of a credit card amounted to conduct in violation of the statute. Her explanation that the "nickel less" applied only as a discount in a cash transaction was legally permissible behavior. Her further explanation that there was a five cent "difference" between the cash price and the credit price was a statement legally neutral, at worst, for this defendant, under **\*\*1014** this statute. Thus, whether this witness' testimony accurately supported the case for the prosecution or for the defense clearly turned on the witness' understanding, or *lack* of grasp, of the subtle semantic distinction involved in the People's case as to what is lawful or unlawful under GBL § 518.

Similarly, the testimony heretofore noted by other witnesses—most particularly Mr. Gedan and Sergeant Collins, who testified as to the phraseology used by the defendant—would support either the prosecution or the defense, depending upon the subtle difference of phraseology used by the person speaking to the witness or, indeed, perhaps only the recollection by the witness of the nuance used by the speaker to the witness.

Indeed, the lack of clarity of the law here apparently ensnarled even those versed in the law. Witness the Special District Attorney's argument in the instant case urging that **\*343** *defense counsel's statement,* in the latter's previously submitted "Memorandum of Fact and Law" (p 3), that a "credit card surcharge is a policy that has been used nationwide by all of the oil companies", be considered by the court as an informal judicial admission by defendant (see *People v. Rivera,* 45 N.Y.2d 989, 413 N.Y.S.2d 146, 385 N.E.2d 1073 [1978] ). In support of this contention the prosecutor in his Post-Trial Memorandum (p 3), states "that misrepresents oil company practice.... Cash discounts are allowed, credit card surcharges are impermissible. It was the credit card surcharge that defendant criminally attempted to impose".

Indeed, if the People's position in this regard were to prevail, defense counsel compounded that "admission" with similar others, stating in the aforesaid Memorandum (at pp. 1, 2), that defendant's service station "maintains a differential in surcharges with relation to credit cards" and that "the policy of a surcharge" does not violate GBL § 518. But those statements of counsel indirectly make the court's very point as to the fatal defect in GBL § 518: if counsel learned in the law can confuse the two sides of the coin to which the People point here ("cash discounts are allowed, credit card surcharges are impermissible"), how much more so is the individual without legal training

People v. Fulvio, 136 Misc.2d 334 (1987)

517 N.Y.S.2d 1008

subject to criminal prosecution by reason of that ease of confusion, that lack of clarity of the requirements of the criminal offense here involved. How much more of a danger does it present to the ordinary individual businessman in his everyday affairs and to his often less sophisticated employees.

A penal statute will be struck down which "admit(s) of such a double meaning that a citizen may act upon one conception of its requirements and the courts upon another (*People v. Brill*, 255 App.Div. 452, 454, 7 N.Y.S.2d 949; *United States v. Capital Traction Co.*, 34 App.Cas. [D.C.] 592)". (*People v. Dioguardi*, 8 A.D.2d 426, 434, 188 N.Y.S.2d 84 [1st Dept 1959], *revd. on other grounds*, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 [1960].)

It is true, of course, that some criminal offenses are distinguished from innocent behavior on the ground of the *intent* with which the individual acts.[*] That, however, is not the distinction which could save from conviction under this section **344** the businessman who falls victim to the confusion engendered by, or the lack of clarity of, the requirements of GBL § 518. In the example of the sale of the suit, if the merchant involved fully intended that the $105 price be charged because of the use of the credit card (and even so *acknowledged*, in general terms for example, apart from the specific transaction involved) but in each specific transaction was careful to state and document the difference as a discount for **1015** cash, no violation of GBL § 518 would occur.

[*]   The Special District Attorney's faulty analogy of the situation here to a hypothetical case involving payments by a businessman to a public official being lawful in a certain instance but unlawful in another (Special District Attorney's Post-Trial Memorandum dated April 2, 1987, p 7) is clearly distinguishable on the basis of the differences of elements and facts in the two instances. Indeed, as the prosecutor points out, in his hypothetical case, "in *most* important respects the acts are identical" (emphasis added). In the instant case *all* of the acts are identical in the criminal instance and in the innocent instance; only the label is different.

Thus, even with established *intent* to charge a credit cardholder more than others for his product, the merchant in the suit example would comply with the statute here involved simply, for example, by marking the suit with the figure of $105 as his "regular price" (T. 15, U.S.C. § 1602[x] ) and also marking the suit with the $100 figure as his discount price for payment by cash. Under those circumstances the intended purpose of GBL § 518 is not achieved, indeed, its purpose is violated, yet the merchant does not violate GBL § 518 because at no time has he *labelled* his $105 price as a higher price by reason of payment by means of credit card.

On the other hand, the same merchant could fully *intend* that the $5 differential in the price of the suit be given as a *cash discount*, but if he or his employee carelessly phrases the matter to a creditcard holder, the merchant could be convicted of the crime described in GBL § 518.

Nor, as the People here contend, is the statute saved by the semantic gyration of claiming that it contemplates the establishment of a "regular price" for a product, that a "discount for cash" from that "regular price" is permitted and that it is only the "surcharge", or additional charge, for use of a credit card, which is prohibited. The fact of the matter is that, at least for this product, there is at the "gas" pump, a legally permissible "cash price" and a legally permissible "credit price"—that fact is amply established by the position taken by the People and the evidence in this case, as well as by the authorities above cited. What is intolerable is that the gasoline station operator careful enough or sophisticated enough to always characterize the lower of these prices as a "discount for cash" may enter his automobile at the end of his business **345** day and drive home a free man; however, if the same individual, or his colleague operating the station down the street, *or his employee* is careless enough to

**People v. Fulvio, 136 Misc.2d 334 (1987)**

517 N.Y.S.2d 1008

describe the higher price in terms which amount to the "credit price" having been derived from *adding* a charge to the lower price, he faces the prospect of criminal conviction and possible imprisonment.

Thus, what GBL § 518 *permits* is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what GBL § 518 *prohibits* is a price differential, in that so long as that differential is characterized as an additional charge for payment by use of a credit card, it is legally impermissible. In each case the innocent and the criminal conduct is based upon the same factual configuration. General Business Law § 518 creates a distinction without a difference; it is not the *act* which is outlawed, but the *word* given that act. The Bard had the phrase (of course) for the defendant's best defense to the surcharge offense alleged here: "Oh, be some other name! What's in a name? That which we call a Rose/By any other name would smell as sweet;" (*Romeo and Juliet* [2.2:42–44] ) or, in this case, as bad.

The motion to dismiss the charge of attempting to violate General Business Law § 518 is granted, the conviction thereon is set aside and dismissed and the defendant is discharged.

**Parallel Citations**

136 Misc.2d 334, 517 N.Y.S.2d 1008

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 22-4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| EXPRESSIONS HAIR DESIGN, LINDA FIACCO, THE BROOKLYN FARMACY & SODA FOUNTAIN, INC., PETER FREEMAN, BUNDA STARR CORP., DONNA PABST, FIVE POINTS ACADEMY, STEVE MILLES, PATIO.COM LLC, and DAVID ROSS, | No. 13-CIV-3775 (JSR) |
| *Plaintiffs*, | |
| v. | |
| ERIC T. SCHNEIDERMAN, in his official capacity as Attorney General of the State of New York, | |
| *Defendant*. | |

**DECLARATION OF MICHAEL PARISI**

## DECLARATION OF MICHAEL PARISI

Michael Parisi declares as follows:

1.     I am the owner of Parkside Fuel Oil Delivery & Service, a family-owned-and-operated heating-and-cooling company in Mount Sinai, New York. I am responsible for Parkside's day-to-day operations, which include the sale, installation, and servicing of home boilers, oil tanks, water heaters, and air-conditioning units.

2.     Parkside has been in business since 2001 and has steadily grown through excellent service and customer loyalty. We pride ourselves on providing prompt deliveries and expert service, and the satisfaction of our customers has been our primary goal since day one.

3.     Parkside allows customers to pay with a credit card. When a customer uses a credit card to make a purchase, we pay between 2% and 3% of the price in swipe fees. For a small business like ours, these fees make an enormous difference.

4.     Several years ago, we decided to start imposing a small surcharge on credit-card purchases to help recover some of the cost of accepting credit cards. We did this because we did not want to raise our prices to make all customers pay these costs, which we thought was unfair to those who paid in cash.

5.     We notified our customers of this surcharge on the phone, at the same time that we informed them of our prices, before they made a purchase. We would tell them the price of fuel (for example, $3.45/gallon) and then explain that there was a surcharge on top of that price for paying with a credit card (for example, $.05/gallon). Every customer who paid a surcharge was therefore made aware of the charge before doing so,

meaning that each one could have made a decision to use cash to avoid paying the charge.

6.    In 2009, the New York Attorney General's Office called our business pretending to be a customer ordering oil. We quoted the price of oil and said that we charge a fee on top of that price for using a credit card. The Attorney General took the position that we were imposing a credit-card "surcharge" in violation of General Business Law § 518.

7.    Because we did not want any trouble, and because we are not lawyers and have no legal training, we did not contest the charges, and instead complied with the Attorney General's demand that we stop imposing surcharges on credit-card purchases and also provide credits to customers who had paid surcharges from September 2008 to May 2009. The Assurance of Discontinuance that I signed is attached to this declaration.

8.    In a telephone conversation with a lawyer named Alan Berkowitz from the Attorney General's Office, I asked how I could lawfully pass on the cost of credit to customers under the No-Surcharge Law. He told me that I could do so by characterizing the difference between paying with cash and paying with credit as a cash "discount," not a credit "surcharge," and then gave me a script of what I could tell customers when talking to them over the phone. He said that I could quote the price as $3.50/gallon, for example, and then explain to customers that they would receive a $.05/gallon "discount" for paying with cash, but that I could not quote the price as $3.45/gallon while explaining that they would have to pay a $.05/gallon "surcharge" to use a credit card.

9.    For a little while, we tried doing what he had said. We offered "discounts" to those who paid in cash. But our customers found that to be very confusing, and it made

us look unscrupulous because Suffolk County charges a sales tax of 2.5% on home heating fuel (which is similar to the amount of the cash discount that we offered), and some customers mistakenly thought that we would not pay the tax if they paid in cash, which is not the message that we meant to convey. As a result, we stopped offering discounts and now charge only one price to all of our customers regardless of whether they use cash or credit.

10.     We have been told that the Attorney General is now claiming that the state's No-Surcharge Law is just a false-advertising law. That does not square with our experience. The Attorney General's Office never told us that we could impose a surcharge on our credit-card-paying customers if only we disclosed the charge to them ahead of time. In fact, the Assurance of Discontinuance clearly says that we "shall not charge consumers a surcharge for payment by credit card," period, regardless of how it is disclosed.

11.     Based on our experience, New York's No-Surcharge Law is all about semantics. The Attorney General always told us that we could not say that we charge more for using a credit card, but that we could say that we charge less for using cash. We were targeted because we didn't realize that we had to tell our customers about the price difference between cash and credit in a specific way.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  Mount Sinai, New York

July 23, 2013

_Michael Parisi_
Michael Parisi

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ANDREW M. CUOMO
ATTORNEY GENERAL

DIVISION OF REGIONAL OFFICES
SUFFOLK REGIONAL OFFICE

June 29, 2009

Parkside Fuel, Inc
1054 Route 25A
Mt. Siani, New York    11766

To Whom It May Concern:

Attached please find the Assurance of Discontinuance that you have entered into with the Attorney General.

Very truly yours,

ALAN B. BERKOWITZ
Assistant Attorney General

ABB/lm

THE ATTORNEY GENERAL OF THE STATE OF NEW YORK

--------------------------------------------------------------------------------X

In the Matter of                                                    AOD # O9 - 105
PARKSIDE FUEL, INC.

--------------------------------------------------------------------------------X

### ASSURANCE OF DISCONTINUANCE
### PURSUANT TO EXECUTIVE LAW § 63(15)

Pursuant to the provisions of Article 22-A of the General Business Law and §63(12) of the Executive Law, ANDREW M. CUOMO, Attorney General of the State of New York caused an inquiry to be made into the business practices of PARKSIDE FUEL, INC. ("PARKSIDE"), and based upon that inquiry makes the following findings:

### FINDINGS

1.     PARKSIDE is a New York corporation located at 1054 Route 25A, Mt. Sinai, NY, 11766.   PARKSIDE is engaged in the business of providing home heating oil and services in the State of New York.

2.     PARKSIDE has been providing home heating oil and services for a number of years.

3.     In conducting its home heating business, PARKSIDE uses various types of contracts. The Attorney General's inquiry relates to the home heating oil delivery for the 2008-2009 season.   In setting its price for fuel oil, PARKSIDE regularly imposed a surcharge on consumers who chose to use a credit card as opposed to paying by cash or check.

4.     Under General Business Law §518, no seller in any sales transaction may impose a surcharge on a purchaser who elects to use a credit card in lieu of payment by cash, check, or similar means.  An investigation by the Office of the Attorney General reveals that consumers were regularly and routinely charged these illegal surcharges by PARKSIDE.

A-110

5.  By reason of the foregoing, the Attorney General asserts that PARKSIDE has engaged in conduct which violates General Business Law §518.

## ASSURANCE

6.  IT NOW APPEARS that PARKSIDE desires to settle and resolve the investigation.  Accordingly, the Attorney General and PARKSIDE hereby enter into this Assurance of Discontinuance.

7.  IT IS HEREBY UNDERSTOOD AND AGREED by PARKSIDE, its officers, directors, agents, employees and assignees, and any individual or entity through which PARKSIDE may now or hereafter act, as follows:

8.  PARKSIDE shall not enforce provisions of any contract or any contract that includes a credit card surcharge in violation of General Business Law §518.  Furthermore, PARKSIDE shall not charge consumers a surcharge for payment by credit card.

9.  Subsequent to its initial meeting with the Office of the Attorney General, PARKSIDE ceased imposing a credit card surcharge on its customers, and has agreed to provide a refund to its customers of all previously imposed surcharges for the period of September 2008 to present within thirty days of the execution of this assurance.  These refunds will be made as a credit to the customers' home heating oil account and documentation of these refunds has been provided to the Office of the Attorney General.

10.  PARKSIDE shall maintain, and upon request, make available to the Office of the Attorney General, for one year after the execution of this Assurance, copies of all contracts that will demonstrate compliance with the requirements of this Assurance.

11.    This Assurance concludes the investigation, and precludes any action that the Office of the Attorney General could commence against PARKSIDE and its affiliates for the acts, omissions and practices which are stated in this Assurance, except nothing contained herein precludes the Office of the Attorney General from bringing an action and/or proceeding to enforce PARKSIDE's obligations arising out of or relating to this Assurance.

## COMPLIANCE REPORT TO THE ATTORNEY GENERAL

12.    IT IS FURTHER AGREED that PARKSIDE shall file with the Office of the Attorney General, no later than sixty days after executing this Assurance, an affidavit, sworn to by a knowledgeable employee of PARKSIDE, attesting that all required refunds have been made and demonstrating that it is in full compliance with the terms of this Assurance.

## MISCELLANEOUS

13.    Nothing contained herein shall be construed so as to deprive any person of any private right under the law.

14.    Pursuant to Executive Law §63(15), evidence of a violation of this Assurance of Discontinuance shall constitute *prima facie* proof of a violation of the applicable statutes in any civil proceeding thereafter commenced by the Attorney General.

**WHEREFORE,** the following signatures affixed hereto this 25 day of June, 2009.

PARKSIDE FUEL, INC.

**By:** _____
Mike Parisi
President

CONSENTED TO:

**ANDREW M. CUOMO**
Attorney General of the State of New York

By: _____
Alan B. Berkowitz
Assistant Attorney General

A-113

Parkside Fuel, Inc
1054 Route 25A
Mt. Siani, New York     11766

State of New York
Office of the Attorney General
300 Motor Parkway - Suite 205
Hauppauge, New York 11788

# TAB 22-5

HILL AND KNOWLTON

Hill and Knowlton
Public Affairs Worldwide Co.
Washington Harbour
901 31st Street, N.W.
Washington, D.C. 20007-3838
202-333-7400
Telecopy 202-333-1638
Telex 440143 HKDC

*Memorandum*

| | |
|---|---|
| **Memo to:** | Susan Stuntz, Jeff Ross |
| **From:** | Kate Krell |
| **Subject:** | New Troops |
| **Date:** | July 24, 1987 |
| **Copies:** | S. Johnson, J. Finney, T. Doke, C. Crawford |

Beginning Monday, June 27, Steve Johnson will work on The Tobacco Institute activities. The other team member will be Judy Finney. Judy has already been working with me on Institute activity and is very familiar with your issues.

Steve Johnson is a senior vice president with Hill experience and journalism experience. Steve served as director of communications at the National Association of Manufactureres before getting into the agency business four years ago.

Steve has worked on some of our most complex and challenging accounts, including several that have involved nationwide grass-roots coalition building. He helped put together "Consumers Against Penalty Surcharges" for a coalition of credit card companies and "Americans for Constitutional Freedom" for a coalition of book and magazine publishers, wholesalers and retailers. Steve will bring savvy, smarts and hands-on experience to the table. You and the other consultants should enjoy working with him.

Judy has had extensive experience dealing with state and local transportation and tax issues through her work on The Road Information Program (TRIP) account at both Carl Byoir and Hill & Knowlton for the past seven years.

TRIP's specific program in grassroots education and coalition building works to influence and inform the general public, legislators and other state leaders about their transportation needs. She has been involved in these state programs in all areas of implementation, from initial strategic planning and coalition building, to media placement plans, acting as spokesperson at news conferences, preparing testimony, follow-up and evaluation work.

Judy is on vacation the last week of July, but Steve and I will be joining you for lunch, Monday after the excise tax meeting.

A Division of Hill and Knowlton, Inc.

TI51382052

# TAB 22-6

# *Consumer Federation of California*

### P.O. Box 27066, Los Feliz Station, Los Angeles, California 90027

July 5, 1985

**President**
Mary Solow
827 Tigertail Road
Los Angeles, Calif. 90049
472-5884

**LEGISLATIVE ADVOCATE**
Harry Snyder
1535 Mission Street
San Francisco, Calif. 94103
(415) 431-6747

**Secretary**
Dora "Mitzi" Rodriguez

Senator Bill Lockyer
State Capitol
Sacramento, CA  95814

**Treasurer**
Kathleen Kinnick

Re: Opposition to S.B. 848 (Rosenthal)

**Vice Presidents**
Albin J. Gruhn
Regene Mitchell
Gerald Rubin

Dear Senator Lockyer:

**Policy Board**
Gregorio Aguilar
Jacob Andresen
Joe Belardi
Judith Bell
Jan Borunda
Majorie Caldwell
William Demers
Treesa Drury
Susan Giesberg
Shirley Goldinger
C. Annelle Grajeda
Ruth Harmer
Mattie Jackson
Ruth Jernigan
Roy Kiesling
Max Mont
Jim Patton
James Quillin
Anthony Ramos
Belva Roberts
Harry Snyder
George C. Soares
Richard Spohn
Evelyn Stein
Geri Stone
Dan Swinton
Jeane Thom
Jerry Vercruse
Jackie Walsh
Susan Woods

The Consumer Federation of California representing
150 organizations and millions of California consumers,
urges you to oppose S.B. 848 (Rosenthal) when it is heard
by the Senate Judiciary Committee on July 9th.

A federal law which prohibited retailers from
charging for credit card use expired in January and
efforts to renew it were unsuccessful.  S.B. 848
(Rosenthal)  would enact a similar prohibition into
California law.

Retailers are charged a fee for credit card receipts.
Yet S.B. 848 (Rosenthal) would make it impossible for a
retailer to directly pass these costs on to credit card
users.  Instead, the bill would mandate the continuation
of an invisible subsidy where cash customers must share
the costs associated with credit card use through higher
retail prices.  This system is particularly inequitable for
low income consumers since most of them do not have credit
cards.

We urge you to oppose this bill to allow the
marketplace to operate more effectively.

Sincerely,

Harry M. Snyder
Legislative Advocate
Consumer Federation of California

cc:  Senator Herschel Rosenthal
Roger Dickinson
Mary Solow

A-116

**Provided by Legislative Research & Intent LLC (800) 530-7613**

Consumers Union
Publisher of Consumer Reports

July 5, 1985

Senator Bill Lockyer
State Capitol
Sacramento, CA  95814

Re: Opposition to S.B. 848 (Rosenthal)

Dear Senator Lockyer:

Consumers Union, nonprofit publishers of Consumer Reports magazine urges you to oppose S.B. 848 (Rosenthal) when it is heard by the Senate Judiciary Committee on July 9th.  This bill would prohibit retailers from charging a fee to their credit card customers.

Retailers pay a fee for all credit card purchases.  (The fee is usually a percentage of volume sales.  Fees for bankcards range from 2-5% while fees for private cards are generally higher with companies such as American Express charging as much as 6%.)  However, this bill would prohibit retailers from passing this cost on to their credit card customers.  It would continue an invisible subsidy in the marketplace whereby cash customers subsidize credit card customers through higher retail prices.  This system is particularly inequitable to low income consumers since most of them do not have credit cards.  (Less than 25% of those making $20,000 or less have a Visa or Mastercard; only 3.2% of this group has an American Express card.)

Until this year federal law prohibited retailers from charging a fee to their credit card customers.  That federal law expired in 1984 and efforts to renew it failed.  Now the credit card companies are trying to pass a similar prohibition in the California legislature with S.B. 848 (Rosenthal).

We urge you to oppose this bill so that all consumers will not have to continue to subsidize those who chose to pay for their purchases with a credit card.

Sincerely,

Harry M. Snyder, Director
West Coast Regional Office
Consumers Union of U.S., Inc.

cc: Senator Herschel Rosenthal

A-117

1535 Mission Street, San Francisco, Ca. 94103

# TAB 22-7

SENATE STAFF ANALYSIS AND ECONOMIC IMPACT STATEMENT

| ANALYST | STAFF DIRECTOR | | REFERENCE | ACTION |
|---------|----------------|---|-----------|--------|
| 1. Jones | Fort | 1. | COM | |
| 2. _____ | _____ | 2. | _____ | _____ |
| 3. _____ | _____ | 3. | _____ | _____ |
| 4. _____ | _____ | 4. | _____ | _____ |

COPY

reproduced by
FLORIDA STATE ARCHIVES
DEPARTMENT OF STATE
R.A. GRAY BUILDING
Tallahassee, Florida 32399-0250
Series _____ Carton _____
File Folder _____

SUBJECT:

Credit Card Transactions

BILL NO. AND SPONSOR:

SB 509 by
Senator D.C. Childers

I.   SUMMARY:

A.   Present Situation:

The regulation of credit cards is primarily a question of
federal jurisdiction. Basically, the federal legislation
regulating credit cards is contained in Regulation Z of the
Federal Reserve Board, which implements the Truth-In-Lending
and Fair Credit Billing Acts, 15 U.S.C. 1601, et seq. These
provisions are generally designed to provide disclosures to
consumers and a method for settling billing disputes.

Federal provisions do not address the cost of credit cards such
as finance charges or interest limits other than by requiring
proper disclosure of these terms. The authority to regulate
the cost of using credit cards is left to the states. In
Florida, s. 520.35, F.S., and s. 658.50, F.S., provide for a
1.5 percent charge per month for retail and bank issued credit
cards. This is equivalent to an 18 percent annual percentage
rate (APR).

Prior to 1984, federal provisions prohibited surcharges on
cardholders who chose to use a credit card instead of paying in
cash. 15 U.S.C. 1666f (a)(2). Applicable federal staff
opinions did allow certain cash discounts for a retail purchase
of gasoline where the price for a credit card purchase was at
the "regular price" and a lower price was offered for a cash
transaction. Similar federal surcharge prohibitions also
applied to lease transactions. These surcharge provisions
expired on February 27, 1984.

In the absence of federal preemption, state laws may apply to
certain credit card transactions. Various provisions of
Florida law govern the use of credit cards, particularly the
consumer protection aspects and credit card fraud provisions.

Subsection 526.121(2), F.S., currently provides that, "This
section shall not be construed to prohibit a price differential
between a cash sale and a credit sale..." of the same gasoline.
This provision impliedly allows a cash discount for gasoline
where the "regular" price is the charge price.

Section 626.9541(1)(o)2, F.S., as a part of the Florida
Insurance Code, allows a licensed insurance agent to charge and
collect the amount of any discount or other fee imposed because
of the use of a credit card. This amount is in addition to the
policy premium and is designed to cover the actual costs
incurred by the insurance agent relating to the use of a credit
card in the insurance sales transaction.

B.   Effect of Proposed Changes:

This bill would prohibit credit card surcharges where the cost
for purchasing by credit card would be greater than the amount
charged if paid by cash.

The bill would define "surcharge" as any additional amount
charged that would increase the cost of the purchase for the
privilege of using a credit card to make payment.  The bill
specifies that an approved state or federal tariff would not be
considered a surcharge for purposes of the bill.  The bill
specifies that a "credit card" includes those cards for which
unpaid balances are payable upon demand.

The bill specifies that the prohibition would not apply to the
offer of discounts for the purpose of inducing payment by cash.
However, the discount would have to be offered to all
prospective customers.

The bill also specifies a penalty of a misdemeanor of the
second degree for violations.

II.   ECONOMIC IMPACT AND FISCAL NOTE:

A.   Public:

The provisions of the bill would benefit a credit card customer
because the price of a purchase, or payment for lease, could
not be greater solely for using a credit card for payment.
Merchants or lessors who choose to impose a surcharge on credit
card transactions would be prohibited from increasing the sales
price solely because the purchase was made by credit card.

B.   Government:

No substantial economic impact is anticipated.

III.   COMMENTS:

It should be noted that from an economic standpoint there is no
difference between a cash discount, as permitted by s. 526.121(2),
F.S., and a credit surcharge, as would be prohibited by this bill.
Thus, in certain contexts the bill could be circumvented by using a
cash discount instead of a credit surcharge.

IV.   AMENDMENTS:

None.

A-119

# TAB 22-8

CHAPTER _*160*_

LAWS OF 19 _*84*_

SENATE BILL _*8367*_          ASSEMBLY BILL _____

S. 8367                                    A. 10189

# SENATE—ASSEMBLY

March 14, 1984

IN SENATE -- Introduced by Sens. LACK, CALANDRA, DALY, FLYNN, JOHNSON, KNORR, LAVALLE, LEVY, MARINO, SCHERMERHORN, TRUNZO, TULLY, VOLKER -- read twice and ordered printed, and when printed to be committed to the Committee on Consumer Protection

IN ASSEMBLY -- Introduced by M. of A. GOLDSTEIN, WERTZ -- read once and referred to the Committee on Consumer Affairs and Protection

AN ACT to amend the general business law, in relation to prohibiting the imposition of a surcharge on persons purchasing goods or services using a credit card

IN THE ASSEMBLY BY: *GOLDSTEIN, WERTZ*
*A. 10189*

**001**

| Bill compared by _____ | DATE RECEIVED BY GOVERNOR: |
| _____ | _____*5/24*_____ |
| _____ | ACTION MUST BE TAKEN BY: |
| _____ | _____*6/5*_____ |
| _____ | GOVERNOR'S ACTION: |
| _____ | DATE _____*6/5/84*_____ |

Memorandum No. _____

002

SENATE VOTE **52** Y   **7** N          **HOME RULE MESSAGE** ___ Y ___ N

Date **5/18/84**                        **Bill is disapproved**

ASSEMBLY VOTE **147** Y  **0** N

Date **5/21/84**                        Counsel to Governor



SENATE JOURNAL
MAY 8 - 1984
PAGE 65

**1984**

# SENATE

The Senate Bill
by Mr. **LACK** _____ Calendar No. **717** _____   Senate No. **8367** _____
Entitled: "   Assem. Rept. No. _____

> 8367          LACK
> An act to amend the general business law, in
> relation to prohibiting the imposition of a
> surcharge on persons purchasing goods or
> services using a credit card

" was read the third time

The President put the question whether the Senate would agree to the final passage of said bill, the same having been printed and upon the desks of the members in its final form at least three calendar legislative days, and it was decided in the affirmative, a majority of all the Senators elected voting in favor thereof and three-fifths being present, as follows:

| AYE | Dist. | | NAY | AYE | Dist. | | NAY |
|---|---|---|---|---|---|---|---|
| | 51 | Mr. Anderson | | | 8 | Mr. Levy | |
| | 48 | Mr. Auer | ▬▬▬ | | 49 | Mr. Lombardi | |
| | 17 | Mr. Babbush | | | 24 | Mr. Marchi | |
| | 46 | Mr. Barclay | | | 5 | Mr. Marino | |
| | 20 | Mr. Bartosiewicz | | | 21 | Mr. Markowitz | |
| | 9 | Mrs. Berman | | | 58 | Mr. Masiello | |
| | 33 | Mr. Bernstein | | | 30 | Mrs. Mendez | |
| | 29 | Mr. Bogues | | | 23 | Mr. Montalto | |
| | 43 | Mr. Bruno | | | 42 | Mr. Nolan | |
| | 34 | Mr. Calandra | | | 27 | Mr. Ohrenstein | |
| | 25 | Mr. Connor | | | 14 | Mr. Onorato | |
| | 40 | Mr. Cook | ▬▬▬ | | 11 | Mr. Padavan | |
| | 61 | Mr. Daly | | | 54 | Mr. Perry | ▬▬▬ |
| | 47 | Mr. Donovan | | | 36 | Mr. Pisani | **EXCUSED** |
| | 6 | Mr. Dunne | | | 56 | Mr. Present | |
| | 44 | Mr. Farley | ▬▬▬ | | 50 | Mr. Riford | |
| | 60 | Mr. Floss | ▬▬▬ | | 41 | Mr. Rolison | |
| | 35 | Mr. Flynn | | | 32 | Mr. Ruiz | |
| | 31 | Mr. Galiber | | | 39 | Mr. Schermerhorn | |
| | 13 | Mr. Gold | | | 52 | Mr. Smith | |
| | 37 | Mrs. Goodhue | | | 19 | Mr. Solomon | |
| | 26 | Mr. Goodman | | | 57 | Mr. Stachowski | |
| | 18 | Mr. Halperin | | | 45 | Mr. Stafford | |
| | 22 | Ms. Jefferson | | | 12 | Mr. Stavisky | |
| | 10 | Mr. Jenkins | ▬▬▬ | | 55 | Mr. Steinfeldt | |
| | 4 | Mr. Johnson | | | 3 | Mr. Trunzo | |
| | 53 | Mr. Kehoe | ▬▬▬ | | 7 | Mr. Tully | |
| | 15 | Mr. Knorr | | | 59 | Mr. Volker | |
| | 2 | Mr. Lack | | | 16 | Mr. Weinstein | |
| | 1 | Mr. LaValle | | | 38 | Mrs. Winikow | |
| | 28 | Mr. Leichter | **EXCUSED** | | | | |

003

AYES ___ **52**
NAYS ___ **7**

Ordered, that the Secretary deliver said bill to the Assembly and request its concurrence therein.

REPRINT NO: 001                                              DATE: 05/21/1934
DATE: 05/21/34                                               TIME: 03:37:0? P

BILL: S8367(A10189)              R.R. NO: 195   SPONSOR: LACK--


        AN ACT TO AMEND THE GENERAL BUSINESS LAW, IN RELATION TO PROHIBITING THE
IMPOSITION OF A SURCHARGE ON PERSONS PURCHASING GOODS OR SERVICES USING A CREDIT
CARD

| | | | | | |
|---|---|---|---|---|---|
| Y | ABRAMSON,E | Y | Hannon,K | Y | PASSANNANTE,WF |
| Y | BARBARO,FJ | Y | HARENBERG,PE | Y | PATTON,BA |
| Y | Barnett,HN | Y | Harris,GH | Y | Paxon,LH |
| Y | Barraga,TF | Y | HARRISON,J | Y | Perone,JM |
| Y | Becker,GR | Y | Hawley,RS | Y | PILLITTERE,JT |
| Y | Behan,JL | Y | Healey,PB | Y | PORDUM,FJ |
| Y | BENNETT,LE | Y | HEVESI,AG | Y | PROUD,G |
| Y | BIANCHI,IW | Y | HIKIND,D | Y | Rappleyea,CD |
| Y | BOYLAND,WF | Y | HINCHEY,MD | Y | Rettaliata,AP |
| Y | BRAGMAN,MJ | Y | Hoblock,MJ | Y | RIVERA,J |
| Y | BRODSKY,RL | ABS | HOCHBRUECKNER,GJ | Y | ROBACH,RJ |
| Y | Burrows,GW | Y | HOYT,HB | Y | ROBLES,VL |
| Y | Bush,WE | Y | JACOBS,RS | Y | RUGGIERO,RS |
| Y | BUTLER,DJ | Y | JENKINS,C | Y | Ryan,AW |
| Y | Casale,AJ | Y | KEANE,RJ | Y | RYAN,WJ |
| Y | CATAPANO,TF | Y | Kelleher,NW | Y | Saland,SM |
| Y | Chesbro,RT | Y | KOPPELL,GO | Y | SANDERS,S |
| Y | Cochrane,JC | Y | KREMER,AJ | Y | Sawicki,J |
| Y | CONNELLY,EA | Y | Kuhl,JR | Y | SCHIMMINGER,RL |
| Y | CONNERS,RJ | Y | LAFAYETTE,IC | Y | SCHMIDT,FD |
| Y | CONNOR,RJ | Y | Lane,CD | Y | Sears,WR |
| Y | Cooke,AT | Y | Larkin,WJ | Y | SEMINERIO,AS |
| Y | Coombe,RI | Y | LASHER,HL | Y | SERRANO,JE |
| Y | DAmato,AP | Y | Leibell,VL | Y | Sheffer,JB |
| Y | DAndrea,RA | Y | LENTOL,JR | Y | SIEGEL,MA |
| Y | DANIELS,GL | Y | Levy,E | Y | SILVER,S |
| Y | DAVIS,G | Y | LIPSCHUTZ,GE | Y | SLAUGHTER,LM |
| Y | DEARIE,JC | Y | MacNeil,HS | Y | Spano,NA |
| Y | DEL TORO,A | Y | Madison,GH | Y | Straniere,RA |
| Y | DIAZ,HL | Y | MARCHISELLI,VA | Y | SULLIVAN,EC |
| Y | DUANE,JF | Y | MARSHALL,HM | Y | Sullivan,PM |
| Y | DUGAN,EC | Y | MAYERSOHN,N | Y | TALLON,JR |
| Y | ENGEL,EL | Y | MCCABE,JW | Y | Talomie,FG |
| Y | EVE,AO | Y | McCann,JW | Y | Tedisco,J |
| Y | FARRELL,HD | Y | MCNULTY,MR | Y | TONKO,PD |
| Y | FELDMAN,D | Y | MCPHILLIPS,MM | Y | VANN,A |
| Y | FERRIS,J | Y | Miller,HM | Y | VITALIANO,EN |
| Y | Flanagan,JJ | Y | MILLER,MH | Y | WALDON,AR |
| Y | FREDA,L | Y | MURPHY,MJ | Y | HALSH,DB |
| Y | FRIEDMAN,G | Y | MURTAUGH,JB | Y | Warren,GE |
| Y | GANTT,DF | Y | NADLER,J | Y | WEINSTEIN,HE |
| Y | GOLDSTEIN,R | Y | Nagle,JF | Y | WEPRIN,S |
| Y | GORSKI,DT | Y | NEWBURGER,MW | Y | Hertz,RC |
| Y | GOTTFRIED,RN | Y | NORMAN,C | Y | Wesley,RC |
| Y | GRABER,VJ | Y | Nortz,HR | Y | WILSON,CE |
| Y | GRANNIS,A | Y | Nozzolio,MF | Y | Winner,GH |
| EOR | GREEN,RL | Y | ONeil,JG | Y | YEVOLI,LJ |
| Y | GREENE,A | Y | ORAZIO,AF | Y | YOUNG,GP |
| Y | GRIFFITH,E | Y | PARMENT,WL | Y | ZIMMER,MN |
| Y | HALPIN,PG | Y | Parola,FE | | MR. SPEAKER |

                    YEAS:   147                         NAYS:     0



                                004

CONTROL: 20G38082                              CERTIFICATION:_____

LEGEND: Y=YES,NAY=NO,NV=ABSTAIN,ABS=ABSENT,
        ELB=EXCUSED FOR LEGISLATIVE BUSINESS,EOR=EXCUSED FOR OTHER REASONS.

MEMORANDUM

Senate Bill                          Introduced by Senator James J. Lack

Assembly Bill **10189**              Introduced by Assy. Ralph Goldstein


AN ACT to amend the general business
law, in relation to prohibiting the imposition
of a surcharge on persons purchasing goods or
services using a credit card

*10189*
*Consumer*

SUMMARY:

This bill would enjoin any merchant from levying a surcharge on sales or
services charged to a credit card.

The bill would provide that any merchant who breaches the provisions of
this bill would be guilty of a misdemeanor, liable for a fine of not more
than $500, or one year in prison, or both.

A merchant would be able to offer a discount for cash if they so desire.
The only procedure that would be prohibited is a surcharge for credit in
keeping with the provisions of the Federal ban that recently expired.

JUSTIFICATION:

The expiration of a Federal ban on surcharges on credit card purchases
places credit card users at an unfair disadvantage.  While merchants are
permitted to offer cash discounts, they would attempt to offset the 3%
fee charged (to them) by banks or card corporations for credit services
by increasing the price of a good or service purchased on a credit card.

In effect, two price scales would exist for the merchant who would adver-
tise a certain price and, at the time of the sale, raise or lower the
price according to the method of payment.  Consequently, the consumer
would be subject to dubious marketing practices and variable purchase
prices.

FISCAL IMPLICATIONS:

None

EFFECTIVE DATE:

Immediately upon enactment


005

A-124

Case 4:14-cv-00184-RH-CAS Document 22-8 Filed 06/11/14 Page 6 of 17
Case 3:11-cv-... Document Filed 10/9/2014 Page 142 of 170

MEMORANDUM

Senate Bill                          Introduced by Senator James J. Lack

Assembly Bill                        Introduced by Assy. Ralph Goldstein


AN ACT to amend the general business
law, in relation to prohibiting the imposition
of a surcharge on persons purchasing goods or
services using a credit card


SUMMARY:

This bill would enjoin any merchant from levying a surcharge on sales or
services charged to a credit card.

The bill would provide that any merchant who breaches the provisions of
this bill would be guilty of a misdemeanor, liable for a fine of not more
than $500, or one year in prison, or both.

A merchant would be able to offer a discount for cash if they so desire.
The only procedure that would be prohibited is a surcharge for credit in
keeping with the provisions of the Federal ban that recently expired.

JUSTIFICATION:

The expiration of a Federal ban on surcharges on credit card purchases
places credit card users at an unfair disadvantage.  While merchants are
permitted to offer cash discounts, they would attempt to offset the 3%
fee charged (to them) by banks or card corporations for credit services
by increasing the price of a good or service purchased on a credit card.

In effect, two price scales would exist for the merchant who would adver-
tise a certain price and, at the time of the sale, raise or lower the
price according to the method of payment.  Consequently, the consumer
would be subject to dubious marketing practices and variable purchase
prices.

FISCAL IMPLICATIONS:

None

EFFECTIVE DATE:

Immedately upon enactment

006



THE SENATE
STATE OF NEW YORK
ALBANY 12247



IF INDICATED, PLEASE RESPOND TO
DISTRICT OFFICE
1 1 3842 NEW YORK STATE OFFICE BUILDING
VETERANS MEMORIAL HIGHWAY
HAUPPAUGE, NEW YORK 11788

MAIN OFFICE & SMITHTOWN:
(516) 360-6623

TIE LINES:
BROOKHAVEN 467-2523
HUNTINGTON 421-3737

JAMES J. LACK
2ND DISTRICT
CHAIRMAN
COMMITTEE ON ELECTIONS
ALBANY:
(518) 455-2071

MAY 30 REC'D

May 29, 1984

TO:     The Hon. Gerald C. Crotty
        Counsel to the Governor

FROM:   Senator James J. Lack

RE:     Senate Bill 8367

   Thank you for giving me the opportunity to write to you in favor of
the above bill which would amend the General Business Law by adding a
new section which would prohibit merchants and vendors from adding a
"surcharge" to purchases made with a credit card.

   Until February 28, of this year, there was in place by Federal law,
a restriction on merchants and other commercial vendors from imposing
any surcharge on consumers who paid for goods or services by way of a
credit card, in lieu of payments by cash, check or similar direct remittance.
This Federal legislation has lapsed and it does not appear imminent that
the separate houses of Congress will be able to agree upon a unified
resolution of the "surcharge" ban that has been in place for so many years.

   The consumers of New York State must not be required to forego this
essential protection in the market place because Congress cannot agree on
whether the ban should be permanent or temporary, or otherwise resolve
the somewhat technical points which appear to be hindering the passage of
this worthwhile protection for the entire nation.

   I urge the Governor, on behalf of all of the consumers of New York State,
to sign the proposed legislation into law. A very successful and balanaced
effort has been pursued in New York to protect the rights of consumers and
yet allow the merchants and commerical enterprises in New York State to
prosper with a minimum of direct government regulation. This bill would
continue that careful balance.

007



# THE ASSEMBLY
## STATE OF NEW YORK
### ALBANY

RALPH GOLDSTEIN
ASSEMBLYMAN 30th DISTRICT
97-45 QUEENS BLVD. ROOM 612
REGO PARK, NEW YORK 11374
PHONE (212) 459-2400

CHAIRMAN
COMMITTEE ON CONSUMER AFFAIRS
AND PROTECTION

LEGISLATIVE OFFICE BLDG.
ROOM 845
ALBANY, NEW YORK 12248
(518) 455-4755

JUN 0 1 1984

May 30, 1984

Hon. Gerald C. Crotty
Executive Chamber
State Capitol
Albany, NY  12224

Dear Mr. Crotty:

The attached legislation (A.10189, S.8367) prohibits sellers
from placing any surcharge on a consumer who pays by credit
card rather than cash or check.  A "surcharge" here is under-
stood to mean any means of increasing the regular price to a
cardholder which is not imposed upon customers paying by cash,
check or a similar means.  This is identical to the definition
contained in § 103 (q) of the federal Truth-in-Lending Act.

Since the February 27th expiration of the federal ban on such
surcharges, five states have acted to continue to prohibit
credit surcharges, and Connecticut and Pennsylvania are ex-
pected to soon follow.  It is important that New York do so
as well.  Credit cards are a way of life in our country; New
Yorkers have become accustomed to their use, and to allow im-
position of a surcharge now will only result in a windfall for
some retailers with no concomitant benefit for consumers.

It is important to note that this bill does nothing to pre-
vent a seller from offering a discount to consumers who pay by
cash or check.  This was always permitted under truth-in-lending
and continues to be allowed under the proposed bill.

I urge you to recommend that the Governor approve this legislation.

Sincerely yours,

RALPH GOLDSTEIN
Member of the Assembly

RG:eg
Enc.

A-127

Case 4:14-cv-00134-RH-CAS   Document 22-8   Filed 06/11/14   Page 9 of 17
Case: 14-14426   Date Filed: 12/08/2014   Page: 145 of 170

S-8367
JUN 07 1984

*Memorandum*



NEW YORK STATE POLICE

June 6, 1984

| SENATE | ASSEMBLY | INTRODUCED BY |
|--------|----------|---------------|
| 8367 | | Sens. Lack, Calandra, Daly, Flynn, Johnson, Knorr, Lavalle, Levy, Marino, Schermerhorn, Trunzo, Tully, Volker |

RECOMMENDATION:     APPROVAL

STATUTE INVOLVED:     GENERAL BUSINESS LAW

EFFECTIVE DATE:     IMMEDIATELY

PURPOSE:

    This bill amends the General Business Law by adding a new Section 518.  This section would prohibit sellers in any sales transaction from imposing a surcharge for the use of a credit card.  Violation of this provision is a misdemeanor and subjects violators to a fine not to exceed $500.00 and/or a term of imprisonment not to exceed one year.  The Division of State Police recommends approval of this legislation.

Donald O. Chesworth

Superintendent

cc:  Lawrence T. Kurlander
     Director of Criminal Justice
     Executive Chamber
     State Capitol
     Albany, NY 12224

009

PB

S-8367

*Memorandum*

June 1, 1984



To: Gerald C. Crotty,
   Counsel to the Governor

From: Mollie Lampi, Associate Counsel
   State Consumer Protection Board

Re: S.8367 (Lack)/A.10189 (Goldstein)

     X      The Consumer Protection Board
             supports this bill.

             The Consumer Protection Board
             has no position on this bill.

             The Consumer Protection Board
             opposes this bill.

Comments:

 The Consumer Protection Board supports S.8367/A.10189 to permanently ban credit card surcharges.  Credit card surcharges were illegal until very recently when the federal prohibition on their use expired.  As of this date, no new federal ban has been enacted.  Merchants, however, may continue to offer discounts to those customers purchasing in cash.

 Surcharges, even if only psychologically, impose penalties on purchasers and may actually dampen retail sales.  A cash discount, on the other hand, operates as an incentive and encourages desired behavior.

 One of the most important efforts of the consumer movement has been to insure that customers can depend on advertised claims and prices.  Allowing credit card surcharges may defeat this effort however, by permitting unannounced price increases at the point of sale.

 For these reasons, the Consumer Protection Board recommends approval of this bill.

010

*PB*

# M E M O R A N D U M



May 25, 1984

**STATE OF NEW YORK**
**DIVISION OF CRIMINAL JUSTICE SERVICES**

**MAY 29 REC'D**

        TO: Matthew Crosson

      FROM: Jay M. Cohen

    SUBJECT: A. 2611, A. 5314C, A. 8029 & A. 10189/S. 8367

-----------------------------------------------------------------------

        We have no comments on the subject bills.


    js

                                                                011



STATE OF NEW YORK
## OFFICE OF THE STATE COMPTROLLER
ALBANY, NEW YORK
12236

**EDWARD V. REGAN**
**STATE COMPTROLLER**

May 23, 1984

The Honorable Gerald C. Crotty
Counsel to the Governor
Executive Chamber
State Capitol
Albany, New York  12224

Dear Mr. Crotty:

Thank you for requesting our comments regarding the bills
listed below.  Since these bills are not within an area of
direct responsibility or interest of the Office of the State
Comptroller we will offer no opinion in relation to their enactment.

| SENATE | ASSEMBLY |
|--------|----------|
| 6705-C | 4525-A |
| 7417 | 10310 |
| 8193-A | |
| ✓ 8367 | |
| 8398 | |
| 8531 | |

Very truly yours,

John F. Black
Assistant Counsel

JFB:jd

MAY 2 5 1984

012

WILLIAM J. DONOHUE
COMMISSIONER

STATE OF NEW YORK
DEPARTMENT OF COMMERCE
ONE COMMERCE PLAZA
ALBANY, NEW YORK 12245

COUNSEL'S OFFICE
(518) 474-4102

## TEN-DAY BILL MEMORANDUM

June 4, 1984

TO:              GERALD C. CROTTY
                 COUNSEL TO THE GOVERNOR

FROM:            Thea Hoeth, First Assistant Counsel
                 Department of Commerce

SUBJECT:         S. 8367 (Lack, et al.)

RECOMMENDATION:  No Objection

     The Department of Commerce has no objection to this bill, which would amend the General Business Law to prohibit sellers from imposing a surcharge on sales charged to a credit card.  Violations would be punishable by a fine of $500 and/or one year in prison.

     This bill was proposed to maintain the status quo while extension of the Federal surcharge ban, which expired in February, is debated by Congress.  In the absence of State or Federal action, merchants may increase the cost of goods paid for by credit card although the Department suspects the pressures of the marketplace would discourage such practice.  Finally, the Department understands that the Retail Council of New York State is not opposing the measure.

T.H.

TH:sw

013

A-132



TO COUNSEL TO THE GOVERNOR

*MAY 30 REC'D*


RE:   SENATE   *8 367*

ASSEMBLY


Inasmuch as this bill does not appear to relate to the functions of the Department of Law, I am not commenting thereon, at this time.  However, if there is a particular aspect of the bill upon which you wish comment, please advise me.


ROBERT ABRAMS
Attorney General


Dated: *5-24-84*                    011

A-133

# NY COM

Executive Committee

**Mayor Ronald J. Canestrari**
President, Cohoes

**Mayor Philip E. Zegarelli**
1st Vice President
North Tarrytown

**Mayor Steven B. Carlson**
2nd Vice President
Jamestown

**Mayor Thomas M. Whalen, III**
Treasurer, Albany

**Mayor Ida Frankel**
Immediate Past President
Liberty

**Mayor James F. Lettis**
Oneonta

**Mayor Kenneth J. Herman**
Angola

**Mayor Thomas P. Ryan, Jr.**
Rochester

**Mayor Robert S. Thompson**
Massapequa Park

**Mayor Louis C. Mancuso**
Fredonia

**Mayor George Tomlinson**
Beacon

**Mayor Robert G. Gardner**

**Mayor Robert J. Peacock**

Staff

**John G. Lauber**
Executive Director

**Donald A. Walsh**
General Counsel

**Donald F. Larson**
Counsel

**John H. Galligan**
Employee Relations

**Esther A. Strachman**
Publication Services

**Ross E. Muth**
Educational Services

**William V. Karson, Jr.**
Special Projects

**Charles E. Fitz-Gerald**
Public Administration

May 23, 1984

Hon. Gerald C. Crotty, Counsel
Executive Chamber
State Capitol
Albany, NY 12224

                    Re:  S. 8367

Dear Mr. Crotty:

The Conference of Mayors writes this memorandum at your request. We wish to advise the Governor that we do not believe that the subject matter of this bill relates to the operation of local government. Hence, we will make no recommendation relating to this bill.

Sincerely,

*Donald A. Walsh*

DONALD A. WALSH
General Counsel


DAW/sh


015

# RETAIL COUNCIL
## of NEW YORK STATE

May 25, 1984

MAY 29 REC'D

MEMORANDUM

S. 8367 (Lack et al.) - Senate Consumer Protection Committee
A. 10189 (Goldstein, Wertz) - Assembly Consumer Affairs and Protection Committee

AN ACT to amend the general business law, in relation to prohibiting the imposition of a surcharge on persons purchasing goods or services using a credit card.

This bill would prohibit any merchant from imposing a surcharge on sales or services charged to a credit card, regardless of the cost the merchant must absorb to process that credit transaction.

A merchant must pay a percentage of each credit sale to the credit card company, and, as a rule, this business expense is recovered through the retail price on all merchandise for sale. In essence, cash customers and those who cannot qualify for credit cards are subsidizing credit customers since everyone must pay more to cover the inherent costs of processing credit transactions. Without the option of imposing a surcharge on credit purchases, a merchant has no choice but to raise the price of all goods accordingly, or face the prospect of going out of business.

We feel if merchants are allowed to recover their credit costs directly through a surcharge, the level of competition between retailers could be heightened, resulting in a variety of new credit terms and options for discriminating shoppers. If a surcharge on credit sales is authorized, some merchants would then have the latitude to consider such attractive consumer options as lower interest rates on proprietary (store) credit cards, or reduced retail prices on all goods.

Federal legislation to authorize surcharges on credit card purchases is being supported by the Consumer Federation of America, Consumers Union, Federal Reserve Board and the Federal Trade Commission. The Retail Council adds its support, emphasizing that this issue should be resolved on the federal, not the state, level.

Respectfully submitted,

James A. Quaremba, President and
Chief Executive Officer

016

Peter H. Zimmerman, Vice President and
Director of Governmental Affairs

ps

# New York State
# Association
# of COUNTIES

150 STATE STREET  ALBANY, NEW YORK 12207  (518) 465-1473

**PRESIDENT**
Laure C. Nolan
Suffolk

**EXECUTIVE DIRECTOR
AND ASSOCIATE COUNSEL**
Edwin L. Crawford

**COUNSEL**
Herman S. Geist

**VICE PRESIDENTS**
John T. Grant
Rockland

John Kelly
Essex

Edward J. Rutkowski
Erie

**TREASURER**
Edward T. Stack
Albany

**DIRECTORS**
Bennett Abrams
St. Lawrence

Edmund Armstrong
Greene

George Arney
Wayne

David D. Bruen
Putnam

Henry W. Dwyer
Nassau

Albert J. Evans
Chenango

Carolyn Rush
Oswego

James J. Snyder
Cattaraugus

John Stanwix
Monroe

Claudia Wagner
New York City

May 29, 1984

Honorable Gerald Crotty
Counsel to the Governor
The Executive Chamber
The Capitol
Albany, NY  12224

RE:  S.8367/A.10189

Dear Gerry:

    This letter is in response to your recent inquiry concerning the above-mentioned legislation recently passed by both houses of the Legislature and now before the Governor for executive action.

    The New York State Association of Counties has no position on this legislation.

    Please call on our office if we can be of any further assistance.

Yours very truly,

Edwin L. Crawford
Executive Director

ELC/RST/pm

017

8th ANNUAL LEGISLATIVE CONFERENCE  •  March 4-6, 1984 Albany Hilton Hotel, Albany, NY

60th ANNUAL FALL SEMINAR  •  September 16-19, 1984 Grossinger's Hotel, Grossinger, NY

A-136

# TAB 22-9

Legislative History for Connecticut Act

HB 5961          PA 222  . FAX     1986

House   2419-2421                    (3)

Senate   2558-2569                   (12)

Banks   48-49, 79-80                 (4)

Total 19ρ

Transcripts from the Joint Standing Committee Public Hearing(s) and/or Senate
and House of Representatives Proceedings

Connecticut State Library
Compiled 2012

JOINT
STANDING
COMMITTEE
HEARINGS

BANKS
1-210

1986
INDEX

A-138

Case 4:14-cv-00134-RH-CAS  Document 22-9  Filed 06/11/14  Page 3 of 4
Case: 14-14426      Date Filed: 12/08/2014      Page: 157 of 170

48

REP. PATTON:  Could I ask you a question about that?

MR. DUFFY:  Yes.

REP. PATTON:  Based on -- you are quite right about the
tougher enforcement -- two weekends ago, I went to a
retail store to purchase some goods, and at the cashier's
station they told me that every single of their checks is
bonded, that they go to an insurance company (inaudible)
on that check against it being bad?

MR. DUFFY:  Yes.

REP. PATTON:  They also took the credit card for
identification, they used that number to verify
credibility, I guess.  I don't know quite how that relates
to the check, but what costs are involved with that and
(inaudible).

MR. DUFFY:  Yes, there are retailers who basically get
insurance for checks they accept, and they pay a premium
on that.  I'm not sure what the cost of that is, but I
will provide you with some information prior to your final
consideration of this bill about those costs.  As a
condition of that insurance, rigorous identification
processes are required by the retailers, and they
communicate this to the clerks and clerks are required
through this check identification process which is
generally in some instances in the one you described a
condition of this insurance.  Absence insurance, it is a
retailers have established because they know
identification is the major problem.

REP. PATTON:  So it is purely for identification purposes.
They didn't somehow link my credit card to the payment
process, for identification.

MR. DUFFY:  Yeah, except there also is a process by which
retailers can identify, not through your credit card, but
through your check the credibility of the check, but in
most instances the requirements for credit cards have to
do with the identification process.

On HB 5961, the credit card surcharge bill, I don't have
any strenuous objections to this although conceptually, I
would like somebody to someday explain to me the

Case 4:14-cv-00134-RH-CAS  Document 22-9  Filed 06/11/14  Page 4 of 4
Case: 14-14426    Date Filed: 12/08/2014    Page: 158 of 170

F_  49

49
kok                    BANKS                    March 11, 1986

MR. DUFFY:  (continued)
     difference between a surcharge and a discount.  I also
     don't know of anyone who really makes wide use of it.  I
     have a couple of suggestions that I think would be
     important to clarify.  First of all, I would want it to be
     clear that retailers, and particularly restaurants, would
     still be free to establish a minimum charge level at which
     they would accept a credit card.  I think that is an
     important, it's a condition of the bank's acceptance of
     that account, and it affects the rate the merchant
     discount rate that the retailer pays to the bank for the
     ability to accept those credit cards, and so I would
     suggest, and I hope that while it may not be necessary,
     language be inserted in that bill to -- similar to the
     language in Section B, which shall nothing in the section
     shall prohibit any seller from requiring a minimum charge
     level.

     Secondly, in part C, and again I am not an attorney, but I
     would suggest that rather than saying any seller who --
     and I don't have any question about the substance of this
     section of what it is trying to do, but I just suggest
     that it might say instead of having language that would
     say any seller shall honor a bank credit card bearing such
     trade name that might say, "no seller can refuse to accept
     a bank credit card bearing such trade name simply because
     of the identity of the card issuer."  So perhaps a minor
     point but one that you might consider.

     In general I don't have any real questions with that
     aspect of -- orproblems with that aspect of that bill.

     Lastly, on HB 5978, again, I would express on behalf of
     our membership some strong concern with Section 5 of the
     bill, and points of clarification, perhaps.  If this
     requirement means that every installment sales contract an
     additional piece of paper has to flow from the lender to
     the consumer, it adds significantly to the costs of these
     kinds of loans.

     Section 5, a creditor shall mail to a consumer debtor a
     written notice of the imposition of any delinquency
     charge, late fee, or similar assessment, and any financial
     charge accured as a result of a late payment on a note,
     mortgage or installment sales contract.  I would be
     concerned that in addition, if an installment sales

# TAB 29

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

DANA'S RAILROAD SUPPLY et al.,

       Plaintiffs,

v.                               CASE NO.  4:14cv134-RH/CAS

PAMELA JO BONDI,

       Defendant.

_____/

## ORDER GRANTING SUMMARY JUDGMENT

This is a constitutional challenge to a Florida statute governing cash and credit-card sales.  This order holds the statute constitutional.

Florida law allows a merchant to exact a higher price from a customer who pays with a credit card than from a customer who pays with cash.  A merchant's decision to do this may make economic sense: the merchant must pay a fee to a credit-card issuer and thus, to net the same amount, must obtain a higher price from a customer who pays with a credit card.

Florida Statutes § 501.0117 restricts the manner in which a merchant may achieve this result.  The merchant may give a discount for paying with cash, but the merchant may not exact a surcharge for paying with a credit card.  This is the law even though the difference between a cash discount and a credit-card surcharge makes no difference in the price a customer must pay when using either cash or a card; it is a matter of semantics, not economics.

In this case the plaintiffs assert that § 501.0117 is unconstitutional.  The plaintiffs are four merchants and their individual owners: Dana's Railroad Supply and owner Dana Jackson; TM Jewelry LCC and owner Tiffany Ballard; Tallahassee Discount Furniture and owner Duana Palmer; and Cook's Sportland and owner Eric Cook.  The sole defendant is the Florida Attorney General in her official capacity.  The plaintiffs have moved for summary judgment.  The Attorney General has moved to dismiss.  Because the statute is within the Florida Legislature's broad discretion in regulating economic affairs, this order holds the statute constitutional.

The challenged statute provides in relevant part:

A seller or lessor in a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card. A surcharge is any additional amount imposed at the time of a sale or lease transaction by the seller or lessor

that increases the charge to the buyer or lessee for the privilege of
using a credit card to make payment.

Fla. Stat. § 501.0117 (2013).  There are exceptions—not at issue here—for

amounts payable under tariffs, for certain tuition and similar payments by students,

and for payments to state agencies.  *Id*.

The effect of the statute can be illustrated with a hypothetical example.  If a

merchant decides to net $95 from the sale of a product and must pay a 5% fee

when a customer pays with a credit card, the merchant will charge $100 to a

customer who pays with a credit card but will charge $95 to a customer who pays

with cash.  Under § 501.0117, the merchant must list the price as $100, and the

merchant can simultaneously note the 5% discount for cash.  The merchant cannot

list the price as $95, with a $5 surcharge for paying with a credit card.

A statute of this kind will withstand constitutional challenge if the statute

has a rational basis, that is, if the statute is rationally related to a legitimate state

interest.  *See, e.g.*, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  It is

not a court's function "to judge the wisdom, fairness, or logic of legislative

choices."  *Id*.  Here the challenged statute has a rational basis.

First, the prohibited practice of initially communicating only the lower

price—the cash price—entails at least a small measure of bait and switch.  A

consumer who decides to buy a product for $95 may be reluctant to change course

upon learning that, because the customer will pay with a credit card, the actual price will be $100.  This is hardly fraud; with diligence, the customer can figure it out from the start, and in any event the customer will know the facts before consummating the transaction.  But ensuring that the customer knows the facts before initially deciding to make the purchase is a legitimate legislative goal.

Second, even if not coerced or unduly influenced, a customer who is told the price is $95 may be displeased to learn that the price is actually $100.  Preventing unpleasant surprises is a legitimate legislative goal, both because it makes for happier customers—a legitimate end in itself—and because happier customers help drive a stronger economy.  The effect is surely not large, but a reasonable legislator could believe it worth the effort.

Third, even without this statute, an honest merchant concerned with the best interests of its customers might choose, as a matter of fairness and full disclosure, to list the higher price, exactly as the statute requires.  A reasonable legislator could decide that the honest merchant ought not be at a competitive disadvantage to a different merchant who elects to list the lower price.  Requiring prices to be listed in the same way, thus allowing consumers to make quicker and more accurate comparisons, is a legitimate legislative purpose.

Case No.  4:14cv134-RH/CAS

None of these assertions is compelling.  They might not even be persuasive. But the question whether they are persuasive is for the legislature, not the courts. The assertions are sufficient to render § 501.0117 constitutional.

In reaching this conclusion, I have not overlooked the plaintiffs' effort to make this a First Amendment case.  Restrictions on pricing are economic measures subject only to rational-basis scrutiny.  *See, e.g.*, *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 477 (1997) ("[W]hat we are reviewing is a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress.").  This statute is no more a First Amendment violation than are the Truth-in-Lending Act, which restricts how a lender can pitch its interest rates, and the Fair Debt Collection Practices Act, which restricts how a creditor can present its claim for repayment.  A whole host of statutes impose similar restrictions on the relationships between businesses and their customers, and many implicate communications.  Under the applicable standard of review—the rational-basis test—this statute is constitutional.  And if this were viewed as a restriction on commercial speech, the outcome would be the same; this statute passes muster under the commercial-speech standards imposed in cases like *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).

Case No.  4:14cv134-RH/CAS

Nor have I overlooked the plaintiffs' assertion that the statute is

impermissibly vague.  It is not.  The core of the statute is clear, and it clearly

applies to the plaintiffs' pricing of their products.

For these reasons,

IT IS ORDERED:

1.      The plaintiffs' summary-judgment motion, ECF No. 17, is DENIED.

2.      The defendant's motion to dismiss, ECF No. 23, is GRANTED.

3.      The clerk must enter judgment stating, "The plaintiffs' claims are

dismissed with prejudice."

4.      The clerk must close the file.

SO ORDERED on September 2, 2014.

s/Robert L. Hinkle
United States District Judge

# TAB 31

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

Dana's Railroad Supply; Dana Jackson;
TM Jewelry LLC; Lee Harper; Tallahassee
Discount Furniture; Duana Palmer; Cook's
Sportland, and Eric Cook,
        Plaintiffs,

v.                              Case No: 4:14-cv-00134-RH-CAS

Pamela Jo Bondi, in her official capacity as
Attorney General of the State of Florida,
        Defendant.
_____/

### PLAINTIFFS' NOTICE OF APPEAL

Plaintiffs Dana's Railroad Supply, Dana Jackson, TM Jewelry LLC, Lee Harper,

Tallahassee Discount Furniture; Duana Palmer; Cook's Sportland, and Eric Cook hereby appeal

to the U.S. Court of Appeals for the Eleventh Circuit from the final order of September 2, 2014

(Doc. 29), which granted the defendant's motion to dismiss (and is erroneously titled "Order

Granting Summary Judgment"), as well as the accompanying judgment (Doc. 30), issued that

same day. Both the order and accompanying judgment are attached.

Dated this 30th of September, 2014.

                                  Respectfully submitted,

                                  *s/ David M. Frank*
                                  David M. Frank
                                  Florida Bar No. 997854
                                  Friedman, Frank & Abrahamsen
                                  524 E. College Avenue
                                  Tallahassee, FL 323301
                                  850-224-4357
                                  850-201-6972 (fax)
                                  davidfrank65@gmail.com

1

Deepak Gupta
Washington, D.C. Bar No. 495451
Gupta Beck PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
(202) 888-1792 (fax)
deepak@guptabeck.com

Gary B. Friedman
Friedman Law Group LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

### CERTIFICATE OF SERVICE

I hereby certify that a copy hereof has been served by Notice of Electronic Filing upon all counsel of record this 30th day of September, 2014.

*s/ David M. Frank*
David M. Frank

2

# TAB CS

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2014, I electronically filed the foregoing Appendix with the Clerk of the Court of the U.S. Court of Appeals for the Eleventh Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta