No. 14-14426

# In the United States Court of Appeals for the Eleventh Circuit

─────────────────────────

DANA'S RAILROAD SUPPLY; DANA JACKSON; TM JEWELRY LLC;
TIFFANY BALLARD; TALLAHASSEE DISCOUNT FURNITURE; DUANA PALMER;
COOK'S SPORTLAND; and ERIC COOK,
*Plaintiffs-Appellants,*

v.

PAMELA JO BONDI,
in her official capacity as Attorney General of the State of Florida,
*Defendant-Appellee.*

─────────────────────────

On Appeal from the United States District Court
for the Northern District of Florida

─────────────────────────

## PLAINTIFFS-APPELLANTS' OPENING BRIEF
─────────────────────────

Gary B. Friedman
Rebecca Quinn
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

David Frank
FRIEDMAN, FRANK & ABRAHAMSEN
524 E. College Avenue
Tallahassee, FL 32301
(850) 224-4357

Deepak Gupta
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptabeck.com*

*Attorneys for Plaintiffs-Appellants Dana's Railroad Supply, et al.*

14-14426
*Dana's Railroad Supply v. Bondi*
C-i of ii

## CERTIFICATE OF INTERESTED PERSONS

Counsel hereby certify that the following persons and entities have a known

interest in the outcome of this appeal:

1. Pamela Bondi, Florida Attorney General, Defendant-Appellee

2. Tiffany Ballard, Plaintiff-Appellant

3. Eric Cook, Plaintiff-Appellant

4. Cook's Sportland, Plaintiff-Appellant

5. Dana's Railroad Supply, Plaintiff-Appellant

6. David Michael Frank, Counsel for Plaintiffs-Appellants

7. Gary Friedman, Counsel for Plaintiffs-Appellants

8. Deepak Gupta, Counsel for Plaintiffs-Appellants

9. Robert L. Hinkle, U.S. District Court Judge

10. Dana Jackson, Plaintiff-Appellant

11. Tracey Kitzman, Counsel for Plaintiffs-Appellants

12. Duana Palmer, Plaintiff-Appellant

13. Rebecca Quinn, Counsel for Plaintiffs-Appellants

14. Charles A. Stempelos, U.S. Magistrate Judge

15. Tallahassee Discount Furniture, Plaintiff-Appellant

16. Jonathan E. Taylor, Counsel for Plaintiffs-Appellants

14-14426
*Dana's Railroad Supply v. Bondi*
C-ii of ii

17.    TM Jewelry LLC, Plaintiff-Appellant

18.    Osvaldo Vazquez, Counsel for Defendant-Appellee

19.    Allen C. Winsor, Florida Solicitor General, Counsel for Defendant-
       Appellee

## CORPORATE DISCLOSURE STATEMENT

No publicly held corporation owns 10% or more of any Plaintiff-Appellants'

stock. Nor is any Plaintiff-Appellant a subsidiary of any parent company.

*/s/ Deepak Gupta*
Deepak Gupta
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Table of Authorities ................................................................................ v

Introduction ........................................................................................... 1

Jurisdictional Statement ........................................................................... 6

Statement of the Issues ............................................................................ 7

Statement of the Case and of the Facts ....................................................... 7

    I.    Why Labels Matter: The Communicative Difference Between
          "Surcharges" and "Discounts" ..................................................... 9

    II.   How We Got Here: The Credit-Card Industry's Concerted Efforts
          to Prevent Merchants from Communicating the Costs of Credit as
          "Surcharges" .......................................................................... 10

          A.    The industry's early ban on dual pricing and its demise ........... 10

          B.    The credit-card industry shifts its strategy to labels ................... 11

          C.    The industry's labeling strategy achieves short-lived
                 success at the federal level ........................................................... 12

          D.    The credit-card industry lobbies states to enact no-
                 surcharge laws and adopts contractual no-surcharge rules........ 14

          E.    Visa, MasterCard, and American Express Drop Their
                 No-Surcharge Rules................................................................... 16

          F.    New York's no-surcharge law is declared unconstitutional ....... 17

    III.  This Litigation ....................................................................... 20

          A.    The Plaintiffs ........................................................................... 20

          B.    The District Court's Decision ................................................... 26

Standard of Review ............................................................................... 28

Summary of Argument .......................................................................... 28

Argument ..................................................................................... 31

    I.    Florida's No-Surcharge Law Violates the First Amendment. ................ 31

        A.    Because liability turns only on semantics, the statute is a content-based speech restriction subject to heightened First Amendment scrutiny—not rational-basis review. ............. 31

        B.    The no-surcharge law cannot survive intermediate scrutiny. ...................................................................... 42

            1.    Dual pricing is legal, and calling the price difference a credit-card "surcharge" is not inherently misleading. .................................................. 43

            2.    The state has no legitimate interest in obscuring the cost of credit-card transactions from consumers. ................................................................. 44

            3.    The no-surcharge law does not directly advance any legitimate state interest. ........................................ 45

            4.    The no-surcharge law is far more extensive than necessary to serve any legitimate state interest. ........... 48

    II.    Florida's No-Surcharge Law Is Impermissibly Vague. ........................... 50

Conclusion .................................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996) ............................................................... 4, 41, 42

*AIDS Action Committee of Massachusetts, Inc. v. Massachusetts Bay
  Transportation Authority,*
  42 F.3d 1 (1st Cir. 1994) .................................................................. 39

*Allstate Insurance Co. v. Abbott,*
  495 F.3d 151 (5th Cir. 2007)........................................................... 42

*BellSouth v. Farris,*
  542 F.3d 499 (6th Cir. 2008).................................................. 43, 45, 49

*Booksellers Association, Inc. v. Hudnut,*
  771 F.2d 323 (7th Cir. 1985)........................................................... 40

*Brown v. Entertainment Merchants Assocation,*
  131 S. Ct. 2729 (2011) .................................................................... 54

*Capital Leasing of Ohio, Inc. v. Columbus Municipal Airport Authority,*
  13 F. Supp. 2d 640 (S.D. Ohio 1998) ............................................. 48

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,*
  447 U.S. 557 (1980) .................................................................*passim*

*City of Cincinnati v. Discovery Network, Inc.,*
  507 U.S. 410 (1993) ........................................................................ 48

*Colautti v. Franklin,*
  439 U.S. 379 (1979) ........................................................................ 50

*Destination Ventures, Ltd. v. FCC,*
  46 F.3d 54 (9th Cir. 1995)............................................................... 34

*Edenfield v. Fane,*
  507 U.S. 761 (1993) .............................................................. 42, 44, 45

*Expressions Hair Design v. Schneiderman,*
  975 F. Supp. 2d 430 (S.D.N.Y. 2013)......................................*passim*

*FCC v. Beach Communications, Inc.,*
  508 U.S. 307 (1993) ................................................... 27, 33

*FEC v. Mass. Citizens for Life, Inc.,*
  479 U.S. 238 (1986) ........................................................ 32

*First National Bank of Boston v. Bellotti,*
  435 U.S. 765 (1978) ........................................................ 41

*Glickman v. Wileman Brothers & Elliott, Inc.,*
  521 U.S. 457 (1997) ................................................... 27, 33

*Greater New Orleans Broad. Association, Inc. v. United States,*
  527 U.S. 173 (1999) ........................................................ 47

*Hill v. Colorado,*
  530 U.S. 703 (2000). ....................................................... 50

*Ibanez v. Florida Department of Business & Professional Regulation,*
  512 U.S. 136 (1994) ........................................................ 45

*In re R.M.J.,*
  455 U.S. 191 (1982) ................................................... 43, 49

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ........................................................ 53

*Mark v. Christensen,*
  2009 WL 2407700 (D. Minn. 2009) .................................. 34

*Mason v. Florida Bar,*
  208 F.3d 952 (11th Cir. 2000)..................................... 28, 33

*Motor Vehicle Manufacturers Assocation of the United States v. Abrams,*
  684 F. Supp. 804 (S.D.N.Y. 1988)................................ 43, 49

*NAACP v. Button,*
  371 U.S. 415 (1963) ........................................................ 51

*National Electrical Manufacturers Association v. Sorrell,*
  272 F.3d 104 (2d Cir. 2001)............................................. 49

*Pagan v. Fruchey*,
   492 F.3d 766 (6th Cir. 2007).............................................................. 39

*Peel v. Attorney Registration & Disciplinary Commission of Illinois*,
   496 U.S. 91 (1990) ........................................................................... 50

*People v. Fulvio*,
   517 N.Y.S.2d 1008 (N.Y. Crim. Ct. 1987) ...................................*passim*

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997) ......................................................................... 55

*Rubin v. Coors Brewing Co.*,
   514 U.S. 476 (1995) ......................................................................... 47

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011) ..................................................................*passim*

*Thompson v. Western States Medical Center*,
   535 U.S. 357 (2002) ......................................................................... 41

*United States v. Amirnazmi*,
   645 F.3d 564 (3d Cir. 2011).............................................................. 54

*United States v. Caronia*,
   703 F.3d 149 (2d Cir. 2012).......................................................... 32, 37

*United States v. Cent. Adjustment Bureau, Inc.*,
   823 F.2d 880 (5th Cir. 1987)............................................................. 35

*United States v. Di Pietro*,
   615 F.3d 1369 (11th Cir. 2010).......................................................... 50

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001) ......................................................................... 34

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ......................................................................*passim*

## Legislative Materials

28 U.S.C. § 1291....................................................................................... 6

28 U.S.C. § 1331....................................................................................... 6

28 U.S.C. § 1343 ............................................................... 6

42 U.S.C. § 1983 ............................................................... 6

*Cash Discount Act, 1981: Hearings on S. 414 Before the Senate Banking Comm.*,
    97th Cong., 1st Sess. 9 (Feb. 18, 1981) ...................... 12, 13

*Cash Discount Act, 1981: Hearings on S. 414*, ......................... 39

Fla. Stat. § 215.322 .......................................................... 47

Fla. Stat. § 501.0117 .................................................. 1, 8, 15

Minn. Stat. § 325G.051 ................................................. 5, 46

N.Y. Gen. Bus. Law § 518 .............................................. 14

Pub. L. No. 93, § 495, 88 Stat. 1500 (1974) ...................... 11

Pub. L. No. 94-222, 90 Stat. 197 (1976) ........................... 12

Pub. L. No. 97-25, 95 Stat. 144 (1981) ............................. 13

S. Rep. No. 97-23 ............................................................. 39

## Books and Articles

Jon Hanson & Douglas Kysar, *Taking Behavioralism Seriously: Some
    Evidence Of Market Manipulation*, 112 Harv. L. Rev. 1420 (1999) ............ 9

Andrew Johnson, *American Express to Pay $75 Million in Card Surcharge
    Settlement*, Wall St. J., Dec. 19, 2013 ................................. 17

Daniel Kahneman, Jack Knetsch, & Richard Thaler, *Anomalies: The
    Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persp.
    193 (1991) .................................................................... 9

Edmund Kitch, *The Framing Hypothesis: Is It Supported by Credit Card Issuer
    Opposition to a Surcharge on a Cash Price?*, 6 J.L. Econ. & Org. 217
    (1991) .......................................................................... 11

Adam Levitin, *Priceless? The Economic Costs of Credit Card Merchant
    Restraints*, 55 UCLA L. Rev. 1321 (2008) ..................... 9, 14, 40

Adam Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 Berkeley Bus. L.J. 265 (2006).................................................................................. 9

Irvin Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984 ................................................................................... 14

Scott Schuh, Oz Shy, & Joanna Stavins, *Who Gains and Who Loses from Credit Card Payments?*, Federal Reserve Bank of Boston (2010)............................ 8

J. Craig Sherman, *Credit Card Surcharge 'Propaganda' Leads to State Legislation*, Washington Retail Insight, Feb. 1, 2013........................................... 17

Jessica Silver-Greenberg, *Visa and MasterCard Settle Claims of Antitrust*, N.Y. Times, July 14, 2012 ............................................... 17

Richard Thaler, *Toward a Positive Theory of Consumer Choice*, 1 J. Econ. Behavior & Org. 39 (1980)................................................. 11

Amos Tversky & Daniel Kahneman, *Rational Choice and the Framing of Decisions*, 59 J. Bus. S251 (1986) ........................................ 11

## INTRODUCTION

Each time a consumer pays with a credit card, a merchant incurs a "swipe fee." These fees are typically passed on to all consumers through higher prices. But, if a merchant chooses, it may instead pass the cost on to only those customers who pay with credit cards. It may accomplish this by charging two prices: a higher price for those who pay with credit and a lower one for those who pay in cash.

In Florida, as in all states, it is legal for merchants to engage in such dual pricing. But a Florida statute enacted at the behest of the credit-card lobby, Fla. Stat. § 501.0117 (2013), seeks to control how merchants may *communicate* the price difference: It allows merchants to offer "discounts" to those who pay in cash but makes it a crime to impose equivalent "surcharges" on those who pay with credit.

A "surcharge" and a "discount" are just two ways of framing the same price information—like calling a glass half full instead of half empty. But consumers react very differently to the two labels, perceiving a "surcharge" as a penalty for using a credit card. Precisely because the "surcharge" label is far more effective at communicating the true cost of credit cards and discouraging their use, the credit-card industry has long insisted that it be suppressed. Florida's no-surcharge law in effect says to merchants: If you use dual pricing, you may tell your customers only that they are paying $2 less to pay without credit (a "discount"), not that they are paying $2 more to pay with credit (a "surcharge")—even though they *are* paying $2

1

more for credit. Liability thus turns on the words used to describe identical conduct—nothing else. A merchant who uses the wrong words is guilty of a crime.

An example illustrates how the law works. Suppose a merchant charges two different prices for widgets depending on how the customer pays—$100 for cash; $102 for credit. If the merchant says that the widget costs $102 and there's a $2 "discount" for paying in cash, the merchant has complied with Florida law. But if the merchant instead says that the widget costs $100 and there's a $2 "surcharge" for using credit to account for the swipe fee, the merchant has violated the law. In both scenarios, the merchant charges the customer the same amounts ($100 for cash or $102 for credit). The only difference is how the merchant communicates that information to customers—that is, the content of the merchant's speech.

The plaintiffs here are Florida merchants who want to employ dual pricing and truthfully and prominently inform their customers that they will in fact pay *more* for using credit cards, not just *less* for using cash. For instance, the husband-and-wife owners of plaintiff Dana's Railroad Supply, a model-railroad hobby shop in Spring Hill, put up a sign informing customers that they would pay an extra cost if they used a credit card. But after receiving a cease-and-desist letter from the Florida Attorney General, they were forced to take down the sign. They would like to put their sign back up without fearing criminal prosecution. They seek a

declaration that Florida's law violates their right to free speech and is void for vagueness, as well as an injunction barring the law's enforcement against them.

Only one other state, New York, has adopted a criminal no-surcharge statute. That statute—indistinguishable from Florida's—was recently struck down as in violation of the First Amendment and as unconstitutionally vague. Because Florida's law, like New York's, "draws the line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities," it "clearly regulates speech, not conduct, and does so by banning disfavored expression." *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430, 444 (S.D.N.Y. 2013) (Rakoff, J.). It therefore cannot withstand constitutional scrutiny.

Like all other courts to examine these laws, the district court below correctly concluded that liability under Florida's no-surcharge law turns on speech rather than conduct—that, in the district court's words, it "is a matter of semantics, not economics." A-142. "[T]he difference between a cash discount and a credit-card surcharge," the court recognized, "makes no difference in the price a customer must pay when using either cash or a card"—the only difference is the label. *Id.*

But unlike the other courts, the district court below failed to appreciate the constitutional consequences of this fact. Where the "practical effect" of a statute is to outlaw one disfavored way of truthfully describing lawful conduct, the Supreme Court has made clear, it is a content-based speech restriction—subject to

"heightened scrutiny" and "presumptively invalid." *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2667 (2011). Without addressing any of the applicable First Amendment jurisprudence (or even the recent decision striking down New York's indistinguishable statute), the district court inexplicably concluded that the statute need survive only "rational-basis scrutiny" because it "is within the [state's] broad discretion in regulating *economic* affairs"—even though the court had just concluded the statute regulates "semantics, *not economics*." A-142-45 (emphasis added). That was error. No existing law supports that idiosyncratic approach.

Next, the district court, acting on its own initiative, theorized three possible rationales for Florida's law: (1) "ensuring that the consumer knows the facts before initially deciding to make the purchase," (2) avoiding "unpleasant surprises" and making customers "happier," and (3) "[r]equiring prices to be listed in the same way." A-143-44. The court candidly found "[n]one" of these possible justifications "compelling" or even "persuasive," A-145, but nonetheless upheld that statute. That is not nearly enough to survive "under the commercial-speech standards imposed in cases like *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980)," as the district court erroneously concluded in an unexplained alternative holding. *Id*. To the contrary, the state's burden under *Central Hudson* is "heavy," requiring actual evidence rather than speculation, and courts "must review the [state's law] with 'special care." *44 Liquormart, Inc. v. Rhode*

*Island*, 517 U.S. 484, 504, 516 (1996). Florida can put forth no legitimate interest in suppressing merchants' efforts to convey the true cost of credit-card transactions to consumers, much less evidence that the law advances a legitimate interest. And the law is far more extensive than necessary to address any danger of undisclosed surcharges, which are independently prohibited by false advertising law and which, in any event, could be easily addressed by a simple disclosure requirement. *See, e.g.*, Minn. Stat. § 325G.051 (allowing merchants to "impose a surcharge" for credit-card use and requiring that surcharges or discounts be "conspicuously" disclosed).

Finally, the district court erred by concluding that the statute is not impermissibly vague. Here was the court's explanation, in its entirety: "the statute is clear, and it clearly applies to the plaintiffs' pricing of their products." A-146. But, as the other courts have properly understood, the purely semantic distinction between a prohibited "surcharge" and a permitted (but mathematically equivalent) "discount" is anything but clear, and yet that fuzzy line marks the difference between what is criminal and what is not. Indeed, the earliest reported prosecution under a no-surcharge law targeted a gas station owner whose cashier made the mistake of truthfully telling a customer that it would cost "five cents 'extra'" to pay with a credit card instead of saying it would cost a "nickel less" to use cash. *People v. Fulvio*, 517 N.Y.S.2d 1008, 1010, 1014 (N.Y. Crim. Ct. 1987) (reproduced at A-97-104). That conviction was set aside only because the court found it constitutionally

"intolerable" that "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior, depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *Fulvio*, 517 N.Y.S.2d at 1011, 1015. As with Florida's no-surcharge law, "it is not the *act* which is outlawed, but the *word* given that act." *Id.* Merchants in Florida, just like the targeted cashier, must either operate in constant fear of inadvertently describing a dual-pricing policy in a criminal way or else refrain from dual pricing altogether (as the plaintiffs here have done).

Because Florida's no-surcharge law violates the First Amendment and is unconstitutionally vague, the state should be enjoined from enforcing it. The district court's decision should be reversed in its entirety.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) over the plaintiffs' claims under 42 U.S.C. § 1983, alleging violations of the First Amendment and unconstitutional vagueness. The district court entered its final judgment dismissing plaintiffs' claims on September 2, 2014. The plaintiffs timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on September 30, 2014. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**1. Level of First Amendment Scrutiny.** The district court correctly concluded that liability under Florida's no-surcharge law "is a matter of semantics, not economics." A-142. The U.S. Supreme Court has held that such content-based speech restrictions, including restrictions on commercial speech, are subject to "heightened scrutiny" under the First Amendment and are "presumptively invalid." *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2667 (2011). Was the district court nevertheless correct to subject the statute to only rational-basis review?

**2. Application of Intermediate Scrutiny.** Did the district court correctly hold, in the alternative, that Florida's no-surcharge law withstands the demanding intermediate scrutiny applied to restrictions on commercial speech under *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980), even though it found "none" of the possible justifications for the statute's restriction of speech to be "compelling" or even "persuasive," A-145?

**3. Void for Vagueness.** Did the district court correctly conclude that Florida's no-surcharge law is not unconstitutionally vague?

## STATEMENT OF THE CASE AND OF THE FACTS

"What most consumers do not know is that their decision to pay by credit card involves merchant fees, retail price increases, a nontrivial transfer of income from cash to card payers, and consequently a transfer from low-income to high-

7

income consumers." Schuh, et al., *Who Gains and Who Loses from Credit Card Payments?*, Federal Reserve Bank of Boston, at 1 (2010). Although merchants are allowed to charge consumers more for using a credit card, they cannot effectively communicate that added cost because credit-card companies have succeeded in insisting that any price difference be labeled as a "discount" for cash rather than a "surcharge" for credit.

This industry-friendly speech code has long been imposed through both private contract and state legislation. But nationwide settlements in two major antitrust class actions have caused the credit-card companies to remove their contractual no-surcharge rules in 2014. So state laws like Florida's have now assumed sudden importance: They are the only thing stopping merchants from truthfully saying they impose a "surcharge" for credit because credit costs more.

Florida's no-surcharge law makes it a crime, punishable by a civil fine or up to sixty days in prison, for any "seller or lessor in any sales or lease transaction [to] impose a surcharge on a buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means." Fla. Stat. § 501.0117 (2013). The law does not, however, outlaw dual pricing; to the contrary, the prohibition expressly "does not apply to the offering of a *discount* for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card, if the discount is offered to all prospective customers." *Id.* (emphasis added).

8

## I.    Why Labels Matter: The Communicative Difference Between "Surcharges" and "Discounts"

A "surcharge" for paying with credit and a "discount" for paying without credit "are different frames for presenting the same price information—a price difference between two things." Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1330, 1351 (2008). They are equivalent in every way except one: the *label* that the merchant uses to communicate that price difference.

But labels matter. "[T]he frame within which information is presented can significantly alter one's perception of that information, especially when one can perceive the information as a gain or a loss." Hanson & Kysar, *Taking Behavioralism Seriously: Some Evidence Of Market Manipulation*, 112 Harv. L. Rev. 1420, 1441 (1999). This difference in perception occurs because of people's tendency to let "changes that make things worse (losses) loom larger than improvements or gains" of an equivalent amount. Kahneman et al., *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persp. 193, 199 (1991).

"Consumers react very differently to surcharges and discounts." Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 Berkeley Bus. L.J. 265, 280 (2006). Consumers are more likely to respond to surcharges (which are perceived as *losses* for using credit) than to discounts (which are perceived as *gains* for not using credit). *Id.* Research shows just how wide

9

this gap is. In one study, 74% of consumers had a negative or strongly negative reaction to surcharges, while fewer than half had a similar reaction to equivalent cash discounts. *Id.* at 280-81. The district court acknowledged this effect. A-144.

The effectiveness of surcharges is why the plaintiffs here seek to impose them: Surcharges inform consumers of the cost of credit and thus create meaningful competition, which in turn drives down that cost. If swipe fees are too high, consumers will use a different payment method, and banks and credit-card companies will have to lower their fees to attract more business.

## II.    How We Got Here: The Credit-Card Industry's Concerted Efforts to Prevent Merchants from Communicating the Costs of Credit as "Surcharges"

The invisibility of swipe fees is no accident. It is the product of concerted efforts by the credit-card industry over many decades to ensure that merchants cannot communicate to consumers the added price they pay for using credit. Over the years, the industry has succeeded, both through contractual provisions and legislation, in silencing merchants' attempts to call consumers' attention to the true costs of credit.

### A.    The industry's early ban on dual pricing and its demise

In the early days of credit cards, any attempt at differential pricing between credit and non-credit transactions was forbidden by rules imposed on merchants in credit-card-company contracts. Kitch, *The Framing Hypothesis: Is It Supported by Credit*

10

*Card Issuer Opposition to a Surcharge on a Cash Price?*, 6 J.L. Econ. & Org. 217, 219-20 (1991). That changed in 1974 after Congress enacted legislation protecting the right of merchants to have dual-pricing systems, providing that "a card issuer may not, by contract, or otherwise, prohibit any such seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Pub. L. No. 93, § 495, 88 Stat. 1500 (1974) (codified at 15 U.S.C. § 1666f(a)).

### B.    The credit-card industry shifts its strategy to labels

The 1974 amendment was initially considered a victory for consumer advocates. But the credit-card industry, seizing on Congress's use of the word "discount," soon shifted its focus to the way merchants could *describe* credit pricing to consumers. Aware that how information is presented to consumers can have a huge impact on their behavior—and that many merchants would avoid dual pricing if "surcharges" were outlawed—the credit-card lobby "insist[ed] that any price difference between cash and credit purchases should be labeled a cash discount rather than a credit card surcharge." Tversky & Kahneman, *Rational Choice and the Framing of Decisions*, 59 J. Bus. S251, S261 (1986); *see also* Thaler, *Toward a Positive Theory of Consumer Choice*, 1 J. Econ. Behavior & Org. 39, 45 (1980) ("[T]he credit card lobby turned its attention to form rather than substance.

11

Specifically, it preferred that any difference between cash and credit card customers take the form of a cash discount rather than a credit card surcharge.").

### C.    The industry's labeling strategy achieves short-lived success at the federal level

In 1976, after two years of lobbying Congress to impose its preferred speech code, the credit-card industry succeeded in getting Congress to enact a temporary ban on "surcharges," despite the authorization for "discounts." Pub. L. No. 94-222, 90 Stat. 197 ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means."). This set the stage for a series of battles over renewal of the ban, culminating in an intense political debate in the mid-1980s that pitted both the Reagan Administration and consumer groups against the credit-card industry.

***1981: Opposition to federal surcharge ban mounts.*** Explaining the Federal Reserve Board's unanimous opposition, one member pointed out "the obvious difficulty in drawing a clear economic distinction between a permitted discount and a prohibited surcharge." *Cash Discount Act, 1981: Hearings on S. 414 Before the Senate Banking Comm.*, 97th Cong., 1st Sess. 9 (Feb. 18, 1981). "If you just change the wording a little bit, one becomes the other." *Id.* at 22. The Board thus proposed "a very simple rule": that both surcharges and discounts be allowed and "the availability of the discount or surcharge be disclosed to consumers." *Id.* at 10.

12

Every major consumer-advocacy organization agreed. One advocate testified that the difference between surcharges and discounts "is merely one of semantics, and not of substance." *Id.* at 98. But "the semantic differences are significant," she explained, because "the term 'surcharge' makes credit card customers particularly aware that they are paying an extra charge," whereas "the discount system suggests that consumers are getting a bargain, and downplays the truth." *Id.* Another advocate put it more pithily: "one person's cash discount may be another person's surcharge." *Id.* at 90. "Removing the ban on surcharges," he explained, "is an important first step" to "disclos[ing] to consumers the full" cost of credit so they can "make informed judgments." *Id.* at 92.

On the other side of the debate, American Express and MasterCard "wholeheartedly" and "strongly" supported the ban, even though they understood that, from a "mathematical viewpoint," "there is really no difference between a discount for cash and a surcharge for credit card use." *Id.* at 43, 55. And the big banks, like the credit-card giants, supported treating "surcharges" and "discounts" differently because a surcharge "makes a negative statement about the card to the consumer." *Id.* at 32. Surcharges, a banking lobbyist explained, "talk against the credit industry." *Id.* at 60.

Congress ultimately gave in to industry lobbying and renewed the ban for an additional three years. Pub. L. No. 97-25, 95 Stat. 144 (1981).

***1984: Congress lets federal surcharge ban lapse.*** Over the next few years, consumer opposition to the ban only intensified. In 1984, when it was again set to expire, Senator William Proxmire cut to the chase: "Not one single consumer group supports the proposal to continue the ban on surcharges," he observed. "The nation's giant credit card companies want to perpetuate the myth that credit is free." Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984, at D12. Ultimately, despite a massive lobbying campaign, the industry's efforts failed, and the ban lapsed in 1984. Levitin, *Priceless?*, 55 UCLA L. Rev. at 1381.

### D. The credit-card industry lobbies states to enact no-surcharge laws and adopts contractual no-surcharge rules

After the national ban expired, the credit-card industry briefly turned to the states, convincing ten states to enact no-surcharge laws of their own. Only two states—New York and Florida—adopted criminal statutes. New York's took effect in 1984, just after the federal ban's expiration. N.Y. Gen. Bus. Law § 518. American Express and Visa went to great lengths to create the illusion of grassroots support for these laws, even going so far as to create and bankroll a fake consumer group called "Consumers Against Penalty Surcharges"—an early instance of the phenomenon now known as "astroturfing." A-115 (internal memo from Hill & Knowlton public-relations firm, describing its work in creating the group). But the real consumer groups, including Consumers Union and Consumer Federation of America, opposed state no-surcharge laws because they inhibit transparency,

14

thereby increasing costs and masking an enormous "invisible subsidy" from low-income cash consumers to high-income credit consumers. A-116-17.

Florida's law took effect in 1987, after expiration of the federal ban. Fla. Stat. § 501.0117. That same year, a New York court concluded that, under that state's indistinguishable criminal no-surcharge law, "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *Fulvio*, 517 N.Y.S.2d at 1011 (emphasis in original). The court explained: "[W]hat [the law] *permits* is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what [the law] *prohibits* is a price differential, in that so long as that differential is characterized as an additional charge for payment by use of a credit card, it is legally impermissible. . . . [The law] creates a distinction without a difference; it is not the *act* which is outlawed, but the *word* given that act." *Id.* at 1015 (emphasis in original).

Similarly, the legislative history of Florida's no-surcharge law recognizes "that from an economic standpoint there is no difference between a cash discount, as permitted by [Florida law], and a credit surcharge, as would be prohibited by this bill." A-119 (Senate Staff Analysis and Economic Impact Statement (Apr. 17, 1987)).

Around the same time that Florida's no-surcharge law was enacted, the major credit-card companies changed their contracts with merchants to include no-surcharge rules. No-surcharge laws in Florida and other states thus function as a legislative extension of the restrictions that credit-card issuers previously imposed more overtly by contract. For instance, American Express's contracts with merchants included an elaborate speech code. The contracts provided that merchants may not "indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card"; "try to dissuade Cardmembers from using the Card"; "criticize . . . the Card or any of our services or programs"; or "try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (*e.g.*, payment by check)." American Express, *Merchant Reference Guide–U.S.*, at 16 (Oct. 2013), *available at* http://amex.co/1iwWJ5j.

### E.    Visa, MasterCard, and American Express Drop Their No-Surcharge Rules

Meanwhile, the issue of swipe fees remained largely in the shadows. Even in the majority of states without no-surcharge laws, contractual no-surcharge rules ensured that consumers were rarely informed of the true cost of credit. In 2005, however, merchants and trade associations began bringing antitrust claims challenging those contractual rules. These claims culminated in a nationwide class-action settlement under which Visa and MasterCard in January 2013 dropped their contractual prohibitions against merchants imposing surcharges on credit

transactions. Silver-Greenberg, *Visa and MasterCard Settle Claims of Antitrust*, N.Y. Times, July 14, 2012, at B1. And in December 2013 American Express agreed to do the same as part of a separate national class-action settlement. Johnson, *American Express to Pay $75 Million in Card Surcharge Settlement*, Wall St. J., Dec. 19, 2013.

As a result, state no-surcharge laws—previously largely irrelevant because of parallel contractual rules—have now gained added importance. And as they did in the 1980s, credit-card companies are once again seeking to discourage dual pricing by pushing state legislation that dictates the labels that merchants may use for such systems. Sherman, *Credit Card Surcharge 'Propaganda' Leads to State Legislation*, Washington Retail Insight, Feb. 1, 2013, *available at* http://bit.ly/1kSpgAR.

### F.    New York's no-surcharge law is declared unconstitutional

In June 2013, five merchants—supported by several national consumer groups and retailers as amici curiae—brought a constitutional challenge to New York's no-surcharge law, claiming that it violated the First Amendment and was unconstitutionally vague. By making liability "turn[] on the language used to describe identical conduct," they argued, the law is a content-based speech restriction that is subject to heightened scrutiny, which it cannot withstand. They further argued that the law is unconstitutionally vague because it does not define the line between a "surcharge" and a "discount," and "[y]et that line marks the difference between what is criminal and what is not."

The court (Rakoff, *J.*) agreed. In October 2013, the court declared the law unconstitutional and granted a preliminary injunction against its enforcement. *Expressions*, 975 F. Supp. 2d at 430. One month later, the parties stipulated to a final judgment, including a permanent injunction.

The court began its analysis by recognizing that liability under New York's no-surcharge law turns on a "virtually incomprehensible distinction between what a vendor can and cannot tell its customers," a distinction that ultimately rendered the statute unconstitutional. *Expressions*, 975 F. Supp. 2d at 436. The statute, the court reasoned, "plainly regulates speech"—not conduct—because it "draws the line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities." *Id.* at 444. The state's "suggestion to the contrary"—that the law regulates conduct because it only "'affects *how* [merchants] may communicate'" their dual-pricing schemes, while leaving them "'free to set the credit card price at whatever level they wish'"—"turn[ed] the speech-conduct distinction on its head." *Id.* at 445 (quoting state's brief). The court explained the problem with the state's logic:

> [I]n defendants' view, setting prices (which [the no-surcharge law] does not regulate) is speech, but communicating those prices to consumers (which the statute, on defendants' own analysis, does regulate) is conduct. That is precisely backwards. Pricing is a routine subject of economic regulation, but the manner in which price information is conveyed to buyers is quintessentially expressive, and therefore protected by the First Amendment.

18

*Id.*

Applying the traditional *Central Hudson* commercial-speech framework, the court found that the law failed intermediate scrutiny: "the speech restricted by [the no-surcharge law] concerns lawful conduct and is non-misleading"; the law "does not 'directly advance' any interest in protecting consumers"; and the law "is far broader than necessary to serve any asserted anti-fraud purpose." *Id.* at 445-48. "It would be perverse," the court reasoned, "to conclude that a statute that keeps consumers in the dark about avoidable additional costs somehow 'directly advances' the goal of preventing consumer deception." *Id.* at 446.

Finally, the court had "little difficulty concluding" that the law was unconstitutionally vague as well. *Id.* at 448. The court quoted the New York trial judge who had reached the same conclusion a quarter-century earlier:

> [it] is intolerable ... that the gasoline station operator careful enough or sophisticated enough to always characterize the lower of [his] prices as a "discount for cash" may enter his automobile at the end of his business day and drive home a free man; however, if the same individual, or his colleague operating the station down the street, or his employee is careless enough to describe the higher price in terms which amount to the "credit price" having been derived from adding a charge to the lower price, he faces the prospect of criminal conviction and possible imprisonment.

*Id.* at 448 (quoting *Fulvio*, 517 N.Y.S.2d at 1015).

## III.  This Litigation

In March, after the *Expressions* decision struck down New York's no-surcharge law and not long after Visa and MasterCard changed their contracts, four Florida merchants and their principals brought this lawsuit. Each merchant has recently received a letter from the Florida Attorney General's office threatening prosecution under Florida's no-surcharge law. A-66; A-70; A-75; A-80. And each wants the same thing: to take advantage of the recent antitrust settlements and truthfully tell their customers that paying by credit card costs *more* than paying by cash (not merely that cash costs *less* than credit). But Florida's no-surcharge law makes using that language a crime.

### A.  The Plaintiffs

***1. Dana's Railroad Supply.*** Dana's Railroad Supply is a family-run model-railroad-and-hobby shop in Spring Hill. A-63. As with most small merchants, when Dana's makes a sale on a credit card it incurs a swipe fee of 3% or more per transaction. *Id.* By contrast, there is no fee for sales made with cash. *Id.* For a small business like Dana's, swipe fees are a major cost. *Id.* Dana's has experimented with ways to alleviate this burden. A-63-64. One year, Dana's dropped credit cards and accepted only cash. *Id.* While this avoided fees, it was not a sustainable practice because some customers demanded the ability to use credit. *Id.* Another year, Dana's offered customers a discount for cash. *Id.* But Dana's gave

20

this up too because customers who wanted to use credit did not react to the discount by switching payment methods, and so Dana's was essentially giving money away to customers who wanted to pay with cash in the first place. *Id.*

Dana's finally hit upon a solution: The husband-and-wife owners posted a sign in the shop explaining that Dana's would tack on a small additional fee for transactions paid for with credit cards. *Id.* In other words, Dana's made clear to customers that they would be paying *more* for using a credit card—not just *less* for using cash. This solution worked for a while, but one day a customer came into the shop and told the owners that the sign was illegal under Florida law. *Id.* After that, Dana's received an official letter from the Florida Attorney General informing the shop that it was in violation of Florida's no-surcharge law, which makes it illegal to impose a surcharge on a customer electing to use a credit card (even though it is legal to label the identical price difference as a "discount" for cash). *Id.*

Not wanting to face prosecution, Dana's took its sign down and stopped describing the price difference as an additional fee. *Id.* Dana's would like to put its sign back up. A-64-65.

The store understands that it was and is permitted by Florida law to tell customers that they will pay less for cash rather than more for credit. A-64. In Dana's experience, however, framing the transaction as a discount was not an effective way to generate a reaction from customers. *Id.* Dana's believes it would be

much more effective to truthfully tell its customers that it will pay *more* for credit. A-64-65. This way, Dana's can disclose the true cost of accepting credit cards and give customers the chance to make an informed choice. *Id.*

**2. TM Jewelry.** TM Jewelry LLC is a store in Key West that designs and makes its own jewelry. A-68. The vast majority of its sales are paid for by credit card. For each of its sales, TM Jewelry pays roughly 3% of the total amount in swipe fees—a significant cost for a small business. *Id.*

A few years ago, TM Jewelry took steps to cut down on that cost and to inform its customers of the high price of credit. It started charging two different prices for its products and services—a lower price to customers paying in cash and a higher price to customers paying with a credit card. A-68-69. TM Jewelry expressed the difference between these prices as an additional charge (or "surcharge") for credit, which the company made all customers aware of so that they could decide for themselves whether to use a credit card. *Id.*

By engaging in dual pricing, TM Jewelry increased its prices to account for the cost of credit (which Florida permits) and did so only for those who use credit cards (which Florida also permits). *Id.* But because TM Jewelry characterized the price difference as an "extra" fee for credit, the Florida Attorney General determined that the company was violating the state's no-surcharge law. In 2013, the Attorney General sent TM Jewelry a letter notifying the company that

22

"surcharges" are unlawful in Florida—even though merchants may provide a "discount" for using cash. *Id.* The letter further demanded that TM Jewelry "suspend this practice immediately to avoid the possibility of further action by our office." Not wanting to risk criminal liability, TM Jewelry did just that: It stopped communicating the cost of credit to its customers as a "surcharge." *Id.*

At that point, the company faced a dilemma. It could continue to engage in dual pricing, while taking pains to communicate the price difference instead as a "discount" for cash or debit. Or it could do away with dual pricing altogether, even though that conduct is lawful in Florida. TM Jewelry chose the latter. It did so because it does not want to describe the difference as a "discount"; it wants to tell its customers that they are paying *more* for credit, not *less* for cash. *Id.* Only by using its preferred language—that there is a "surcharge" for credit and "no charge" for cash—would TM Jewelry be able to effectively communicate the true cost of credit to its customers. TM Jewelry also decided to abandon dual pricing because it does not fully understand the distinction between a "discount" and a "surcharge," so it is not sure that it could comply with the law in practice. *Id.* The company would rather play it safe than risk paying a criminal fine or having its owner go to jail. *Id.*

**3. *Tallahassee Discount Furniture.*** Tallahassee Discount Furniture (TDF) is a discount furniture store in Tallahassee. A-72. Seeking to reduce the thousands of dollars it pays each year in swipe fees, TDF decided to experiment

with dual pricing. A-72-73. Like TM Jewelry, it communicated the price difference to its customers as a "surcharge," telling them that—due to the high swipe fees charged by the credit-card industry—they would be charged 2% more for using a credit card. *Id.*

Like TM Jewelry, TDF received a letter from the Attorney General telling the company that it was violating Florida law and must "suspend this practice immediately to avoid the possibility of further action by our office." *Id.* TDF is concerned about the law's effect on how it communicates its prices to customers. TDF would like to describe its policy as a "surcharge" because it believes that is the most effective way to inform its customers of the true costs of credit. *Id.* But TDF worries that describing its prices in this way would expose the company to criminal liability. *Id.* Although TDF understands that it may lawfully communicate the price difference as a "discount" for cash, that is not how it wants to characterize its prices to its customers. A-73.  When TDF told customers that there was a 2% charge on credit cards, it was effective: The vast majority switched to cash or debit. *Id.* The word "discount," by contrast, makes it sound like TDF's prices are higher than they are and does not give customers the same incentive to avoid using credit. *Id.* Moreover, the blurry distinction between "surcharge" and "discount" leaves the company uncertain that it can implement a dual-pricing system in a lawful way.

**4. Cook's Sportland.** Cook's Sportland is an outdoor-sporting-goods store in Venice. A few years ago, Cook's decided to bring swipe fees to the attention of its customers. A-77-78. It began telling customers that they would pay an additional charge if they used a credit card. *Id.* Cook's did this for about six weeks before it too received a letter from the Florida Attorney General notifying the company that it was violating Florida's no-surcharge law and could be prosecuted. *Id.*

Afraid the Attorney General would follow through on its enforcement threat—potentially subjecting the company and its owner to criminal penalties—Cook's stopped telling customers that it would charge extra for credit and also abandoned dual pricing altogether. *Id.* This means that swipe fees now get passed on to all of its customers, cash and credit users alike, in the form of higher prices. And because swipe fees are kept hidden, customers have no disincentive to use credit—just the opposite, in fact, because of the benefits that most credit cards offer—which raises fees even higher.

The reason Cook's no longer has dual pricing is because of the law's prohibition on speech and also because of its vagueness. As to the former: Cook's would like to communicate the price difference as a "surcharge" for credit—not a "discount" for cash, which would make prices look higher than they are—because the company believes that this would most effectively convey the costs of credit to

its customers. A-78-79.  Florida's no-surcharge law blocks it from doing so. As to the latter: The law is so vague about what it prohibits that Cook's is afraid to have any dual pricing at all, lest it accidentally subject itself to criminal prosecution. *Id*.

If it were legal, Cook's would tell its customers that it offers one low base price for each of its products and that there is an additional fee if a customer chooses to pay with a credit card. *Id*. Cook's believes that this truthful speech is easy to understand and would benefit both the company and its customers by giving them the information they need to make the best decisions about how to pay for their purchases. *Id*.  But Florida's no-surcharge law makes that speech a crime.

## B.    The District Court's Decision

Shortly after the plaintiffs filed their complaint, the parties exchanged dispositive motions. The Attorney General moved to dismiss the case for failure to state a claim and the plaintiffs moved for summary judgment. In a six-page opinion, the district court dismissed the case in its entirety. A-141-46. The court began by observing that "Florida law allows a merchant to exact a higher price from a customer who pays with a credit card than from a customer who pays with cash." A-141. The law restricts only the way the price difference is labeled, not dual pricing itself—a $5 "surcharge" for paying with a credit card is prohibited, but a $5 "discount" for paying without a credit card is permitted, even though in both cases

the consumer pays the same price. A-142-43. As the district court put it, the difference "is a matter of semantics, not economics." *Id.*

Nevertheless, the district court concluded that the appropriate level of scrutiny under which to assess the plaintiffs' constitutional challenge was rational-basis review: "A statute of this kind," the court held, "will withstand constitutional challenge if the statute has a rational basis, that is, if the statute is rationally related to a legitimate state interest." A-143. In support of this holding, the district court cited just two cases—*FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993), which considered only an equal-protection challenge, and *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469 (1997), which involved "no restraint on the freedom of any producer to communicate any message to any audience." The court also reasoned that Florida's no-surcharge law "is no more a First Amendment violation" than other statutes that regulate commercial "communications," suggesting that all such statutes are subject to only rational-basis review. A-145.

Applying this analysis to the facts, the court found that the statute barely survived rational-basis review. The court took it upon itself to propose three potential justifications for the speech restriction—"ensuring that the customer knows the facts," "preventing unpleasant surprises," and "requiring prices to be listed in the same way." A-144. Concluding that "[n]one of these assertions is

compelling" and that they "might not even be persuasive," the court nevertheless found that the law survives rational-basis review. A-145.

In the alternative, the court held without explanation that the no-surcharge law "passes muster under the commercial-speech standards imposed in cases like *Central Hudson.*" *Id*. The court did not explain how, given its rational-basis analysis, it could possibly conclude that Florida had put forth evidence to show that its law directly advances a legitimate interest and is no more extensive than necessary to address any such interest—the bare minimum that *Central Hudson* requires.

Finally, the district court rejected the plaintiffs' claim that the no-surcharge law is impermissibly vague. The court held that "[i]t is not. The core of the statute is clear, and it clearly applies to plaintiffs' pricing of their products." A-146. The court, again, did not elaborate.

## STANDARD OF REVIEW

"This court reviews de novo the question of whether state restrictions on commercial speech are constitutional." *Mason v. Florida Bar*, 208 F.3d 952, 955 (11th Cir. 2000). "The determination of whether a statute is unconstitutionally vague is also subject to de novo review in this court." *Id.*

## SUMMARY OF ARGUMENT

**I.** The district court correctly recognized that Florida's no-surcharge law turns entirely on semantics—that is, that it regulates no more than the content of

merchants' speech—but erroneously concluded that the statute could nevertheless survive constitutional scrutiny under mere rational-basis review. Nothing in the existing First Amendment jurisprudence of the U.S. Supreme Court or this Court supports that conclusion.

To the contrary, the Supreme Court has recently made clear that any law whose "purpose and practical effect" are "to suppress speech" based on content requires "heightened scrutiny" under the First Amendment. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663-64 (2011). The no-surcharge statute is such a law. It does not regulate what merchants may *do*: They may charge different prices for cash and credit. The law regulates only what merchants may *say*: Calling the price difference a cash "discount" is favored; calling it a credit "surcharge" is illegal. The district court got this much right: "the difference between a cash discount and a credit-card surcharge makes no difference in the price a customer must pay when using either cash or a card; it is a matter of semantics, not economics." A-142. The law's practical effect, in other words, is to suppress speech. That was also its purpose: It was enacted at the behest of the credit-card lobby (which worried that surcharges "talk against" the industry) and was openly justified based on the surcharge label's ability, "even if only psychologically," to "encourage[] desired behavior."

It is no answer to say, as the district court did, that the law is just a "[r]estriction[] on pricing." A-145. "Pricing is a routine subject of economic

29

regulation, but the manner in which price information is conveyed to buyers is quintessentially expressive." *Expressions*, 975 F. Supp. 2d at 445. The district court correctly understood that the no-surcharge law regulates only the manner in which price information is conveyed, but failed to appreciate the proper constitutional consequences of that recognition.

The district court also wrongly concluded, in the alternative, that Florida's no-surcharge law can withstand scrutiny under *Central Hudson*—despite the district court recognition that "[n]one" of the possible justifications for the statute is "compelling" or even "persuasive," A-145, and the state's complete failure to put forward any evidence to support its justifications. This comes nowhere near what *Central Hudson*'s demanding inquiry requires: The statute does not directly advance any interest in preventing consumer deception or promoting consumer welfare, is riddled with exceptions that undermine the legitimacy of those aims, and is far broader than necessary to address any risk of deception, which is prohibited by false-advertising laws anyway and could be easily addressed by a simple disclosure requirement.

**II.** Finally, the no-surcharge law is also unconstitutionally vague. It does not clearly define the line between a permissible "discount" and a mathematically equivalent but criminal "surcharge." As a result, merchants must operate in

30

constant fear of inadvertently describing a dual-pricing policy in a criminal way or refrain from dual pricing altogether.

## ARGUMENT

## I.    Florida's No-Surcharge Law Violates the First Amendment.

### A.    Because liability turns only on semantics, the statute is a content-based speech restriction subject to heightened First Amendment scrutiny—not rational-basis review.

The district court was partly right and partly wrong. What the court got right is that liability under Florida's no-surcharge law is entirely "a matter semantics," A-142—it regulates nothing more than the content of merchants' speech. What the court got wrong was its conclusion that the statute could nonetheless withstand constitutional scrutiny, under mere rational-basis review, because it concerns speech on economic affairs. Nothing in existing First Amendment law justifies that conclusion.

Far from it. The Supreme Court, to the contrary, has increasingly insisted that the First Amendment "requires heightened scrutiny" whenever the government creates restrictions that turn on the content of a speaker's words. *Sorrell*, 131 S. Ct. at 2663-64. This scrutiny applies to any law whose "purpose and practical effect" are "to suppress speech" based on its content, even if the law "on its face appear[s] neutral." *Id.* Thus, "[t]he fact that [a] statute's practical effect may be to discourage protected speech is sufficient to characterize [it] as an

infringement on First Amendment activities." *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255 (1986). Content-based speech restrictions are "presumptively invalid," so often "it is all but dispositive to conclude that a law is content-based"—especially if it carries criminal penalties. *Sorrell*, 131 S. Ct. at 2667; *United States v. Caronia*, 703 F.3d 149, 162-63 (2d Cir. 2012), 703 F.3d at 163 ("Criminal regulatory schemes . . . warrant even more careful scrutiny.").

"Commercial speech is no exception." *Sorrell*, 131 S. Ct. at 2664. The Supreme Court has long held that this speech—including speech conveying "price information" to consumers—is "protected by the First Amendment." *Va. Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976). So if a law's "purpose and practical effect" are to restrict commercial speech based on its content, as the Florida law does, then the law must withstand heightened scrutiny to satisfy the First Amendment. *Sorrell*, 131 S. Ct. at 2663.

**1.** Without addressing any of this authority, the district court concluded that Florida's no-surcharge law, despite its regulation of the content of merchants' speech, is an "economic measure[] subject only to rational-basis scrutiny." A-145. The statute, the court believed, could therefore "withstand constitutional challenge if the statute has a rational basis, that is, if the statute is rationally related to a legitimate state interest." A-143. It is difficult to square that holding with the settled view that "[c]ommercial speech"—that is, "expression inextricably related to the

32

economic interests of the speaker and audience"—"is undeniably entitled to substantial protection" under the First Amendment. *Mason v. Florida Bar*, 208 F.3d 952, 955 (11th Cir. 2000).

The district court cited just two cases in support of its rational-basis holding—*FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993), and *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469 (1997). Neither helps explain the district court's odd turn. *Beach* did not decide a First Amendment challenge at all, so it is hard to see how it could support the notion that content-based restrictions may be subject to only rational-basis review. And the *Beach* Court expressly "confin[ed]" itself to the question presented there (whether the statute at issue was "rationally related to a legitimate government purpose under the Due Process Clause") and declined to reach the challengers' speech arguments because the court below hadn't addressed them. *Id.* at 314 n. 6 ("In these circumstances, respondents' arguments for heightened scrutiny [under the First Amendment] are best left open for consideration by the Court of Appeals on remand.").

The second case, *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469 (1997), was a 5-4 decision upholding federal regulations requiring fruit growers to pay for generic agricultural marketing. The Court did not subject the regulations to rational-basis review. Rather, it rejected a compelled-speech challenge because the regulations, unlike Florida's no-surcharge law, imposed "no restraint on the

33

freedom of any producer to communicate any message to any audience." *Id.* at 469. (Four years later, moreover, the Court all but overruled itself in *United States v. United Foods, Inc.*, 533 U.S. 405 (2001).)

Aside from these inapposite cases, the district court justified its rational-basis holding on the ground that "[a] whole host of statutes" also "implicate communications" and impose "similar restrictions on the relationships between businesses and their customers"—for example, the Truth-in-Lending Act and the Fair Debt Collection Practices Act. A-145. Florida's no-surcharge law, the court reasoned, "is no more a First Amendment violation" than these other statutes, suggesting that they too would be subject to rational-basis review. *Id.*

But the sort of consumer-protection laws invoked by the district court, to the extent that they regulate commercial speech, are constitutional because they *survive* intermediate scrutiny under *Central Hudson*—not because they somehow escape such scrutiny altogether. *See, e.g., Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 57 (9th Cir. 1995) (holding that the Telephone Consumer Protection Act's "ban on unsolicited fax advertisements meets the *Central Hudson* … test for restrictions on commercial speech"); *Mark v. Christensen*, 2009 WL 2407700 (D. Minn. 2009) (holding that a provision of the Fair Debt Collection Practices Act requiring a debt collector to identify itself in telephone answering machine message survives *Central Hudson* scrutiny); *see also United States v. Cent. Adjustment Bureau, Inc.*, 823 F.2d 880,

881 (5th Cir. 1987) (rejecting a First Amendment challenge to Fair Debt Collection Practices Act prohibitions on misleading collection practices because "[d]eceptive commercial speech does not merit first amendment protection" under *Central Hudson*).

Finally, it is no justification to suggest, as the district court did, that Florida's law may escape heightened scrutiny because it is a "[r]estriction[] on pricing." A-145. That ignores the distinction that gave birth to the commercial-speech doctrine in the first place. *See Va. Bd. of Pharmacy*, 425 U.S. at 770 (striking down law regulating "price information"). The court that struck down New York's identical no-surcharge law explained it well: "Pricing is a routine subject of economic regulation, but the manner in which price information is conveyed to buyers is quintessentially expressive." *Expressions*, 975 F. Supp. 2d at 445. The district court correctly understood that the no-surcharge law regulates only the "manner" in which price information is conveyed, but it failed to appreciate the proper constitutional consequences of that recognition.

**2.** Once the district court's mistaken rational-basis theory is set aside, it becomes clear that Florida's no-surcharge law is a content-based (and speaker-based) restriction on speech subject to heightened First Amendment scrutiny. That is so because the law's "purpose and practical effect"—as every court to examine

35

no-surcharge laws has understood—are to restrict commercial speech based on its content. *Sorrell*, 131 S. Ct. at 2663.

***Practical effect.*** The district court correctly found that "the difference between a cash discount and a credit-card surcharge makes no difference in the price a customer must pay when using either cash or a card; *it is a matter of semantics, not economics.*" A-142 (emphasis added). To say that liability under a statute is "a matter of semantics" is just another way of saying that liability turns on speech.

By drawing a distinction between two mathematically equivalent terms, Florida's law does not in any way regulate what merchants may *do*: They are allowed to charge different prices depending on whether a customer pays with cash or credit, and to set those prices as they wish. What the law regulates—all that it regulates—is what merchants may *say*: Characterizing the price difference as a cash "discount" is favored; characterizing it as a credit "surcharge" is a crime. The law thus prohibits a certain class of speakers (merchants) from communicating a certain disfavored message (identifying the added cost of credit as a surcharge) and does so to discourage consumers from acting on that message (by deciding not to use a credit card).

A hypothetical illustrates the point. Imagine a merchant who charges two different prices for the same product—$100 for cash and $102 for credit. If she tells her customers that the product costs $102 and that there is a $2 "discount" for cash,

the merchant has no problem under Florida law. But if she instead wants to truthfully say that the product costs $100 and that she is really charging $2 "more" for credit, to account for the swipe fee, then the merchant has committed a crime. Either way, the merchant charges the same customer the same amounts ($100 for cash and $102 for credit). The only difference is the content of the merchant's speech.

One need not think hypothetically, however, to see that the no-surcharge law operates as a content-based speech restriction. Take the first reported prosecution under the statute. A gas-station owner was arrested, prosecuted, and convicted because his cashier truthfully informed a customer that it cost "five cents 'extra'" to use credit rather than saying that it was a "nickel less" to use cash. *Fulvio*, 517 N.Y.S.2d at 1010. "[T]he government clearly prosecuted [the merchant] for his words—for his speech." *Caronia*, 703 F.3d at 161. His conviction was set aside, but only because the court found it constitutionally "intolerable" that "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior, depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *Fulvio*, 517 N.Y.S.2d at 1011, 1015. The court explained:

> [W]hat [the no-surcharge law] *permits* is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what [the no-surcharge law] *prohibits* is a price differential, in that so long as that differential is characterized as

an additional charge for payment by use of a credit card, it is legally impermissible. . . . [The no-surcharge law] creates a distinction without a difference; **it is not the *act* which is outlawed, but the *word* given that act.**

*Id.* at 1015 (bold added).

Or take a more recent enforcement action. A few years back, a New York merchant "quoted the price of oil" to someone over the phone and said that there is "a fee on top of that price for using a credit card." A-107 (Declaration of Michael Parisi, filed in *Expressions*). Under New York's identical no-surcharge law, using that speech made the merchant a criminal. A New York Assistant Attorney General later told the merchant that he could continue to charge the exact same amounts—with the exact same difference between the cash and credit prices—but that he had to "characteriz[e] the difference" in the state's preferred way: "as a cash 'discount,' not a credit 'surcharge.'" *Id.* ¶ 8. The Assistant Attorney General gave the merchant "a script of what [he] could tell customers when talking to them over the phone," saying that he "could quote the price as $3.50/gallon, for example, and then explain to customers that they would receive a $.05/gallon 'discount' for paying with cash," but he "could not quote the price as $3.45/gallon while explaining that they would have to pay a $.05/gallon 'surcharge' to use a credit card." *Id.* The merchant's mistake was that he used the wrong words.

Each of these examples (both hypothetical and real) shows that the law operates as a content-based speech restriction. Any law "that requires reference to

38

the content of speech to determine its applicability is inherently content-based." *Pagan v. Fruchey*, 492 F.3d 766, 779 (6th Cir. 2007). So too is a law that "permits an idea to be expressed but disallows the use of certain words in expressing that idea." *AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*, 42 F.3d 1, 8 (1st Cir. 1994). That is precisely what Florida's no-surcharge law does: Merchants may avoid liability under the law by changing what they say rather than what they charge.

**Purpose.** The reason the law does so is that this was its purpose. When Florida enacted the law, it sought to fill the gap left by the federal ban's expiration. That ban had lasted for several years thanks to intense lobbying by credit-card companies, which objected to allowing the surcharge label because it would "talk against the credit industry." *Cash Discount Act, 1981: Hearings on S. 414*, at 32, 60. Those who opposed the ban, like the Federal Reserve Board and the major national consumer groups, also understood that it was aimed at "wording" and "semantics, and not . . . substance." *Id.* at 22, 98.

Florida did too. Just as Congress knew that credit surcharges and cash discounts, although "mathematically the same," are "very different" in terms of their "practical effect and impact . . . on consumers," Florida understood the same. S. Rep. No. 97-23, at 3. Indeed, the legislative history of Florida's no-surcharge law recognizes "that from an economic standpoint there is no difference between a

cash discount, as permitted by [Florida law], and a credit surcharge, as would be prohibited by this bill." A-119.

Thus, the legislature understood that what it was really regulating was the different effects of the "surcharge" and "discount" labels on consumers' perceptions of credit cards. As a memorandum prepared in support of New York's identical law put it: "Surcharges, *even if only psychologically*, impose penalties on purchasers. . . A cash discount, on the other hand, operates as an incentive and *encourages desired behavior*." A-129 (emphasis added).

But a behavioral effect that "depend[s] on mental intermediation," like the effect of one label versus another, just "demonstrates the power" of speech. *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 329 (7th Cir. 1985). The law affects consumer spending "only through the reactions it is assumed people will have to the free flow of [credit-card] price information." *Va. Bd. of Pharmacy*, 425 U.S. at 769. In the context of credit cards, this assumption is well placed: "Because of the framing effect, surcharges are far more effective than discounts at signaling to consumers the relative costs of a payment system." Levitin, *Priceless?*, 55 UCLA L. Rev. at 1352.

States, however, may not pass laws that seek to "diminish the effectiveness" of communication because the state has determined that certain speech is too powerful. *Sorrell*, 131 S. Ct. at 2663. "Those who seek to censor or burden free

40

expression often assert that disfavored speech has adverse effects," *id.* at 2670, so courts must "be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good," *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996). Fear that "the public will respond 'irrationally' to the truth" or "would make bad decisions if given truthful information," is no justification for banning speech. *Id.*; *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002). Rather than decree such a "highly paternalistic approach," states must "assume that [accurate pricing] information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Va. Bd. of Pharmacy*, 425 U.S. at 770.

But "preventing [the] unpleasant surprise[]"of the true cost of credit cards is exactly the justification upon which the district court relied. A-144. That holding doesn't even have paternalism on its side. Rather, Florida's no-surcharge law is "giv[ing] one side"—the credit-card industry—"an advantage" by muzzling merchants. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785 (1978). A law that "has the effect of preventing" merchants "from communicating with [consumers] in an effective and informative manner," thus hamstringing their "ability to influence [consumer] decisions," is one that "impose[s] a specific, content-based burden on protected speech." *Sorrell*, 131 S. Ct. at 2663-64, 2670. "Attempting to

41

control the outcome of . . . consumer decisions" by restricting truthful speech is just what the First Amendment prohibits the state from doing. *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 167 (5th Cir. 2007).

### B. The no-surcharge law cannot survive intermediate scrutiny.

In recent years, the Supreme Court has left open the question of what form of "heightened scrutiny" applies to commercial speech. *Sorrell*, 131 S. Ct. 2667. At a minimum, however, commercial-speech restrictions must satisfy intermediate scrutiny under the *Central Hudson* test, *id.*, which asks four questions: (1) whether the speech "concern[s] lawful activity and [is] not . . . misleading"; (2) "whether the asserted governmental interest" justifying the regulation "is substantial"; (3) "whether the regulation directly advances the governmental interest asserted"; and (4) whether the challenged law "is not more extensive than is necessary to serve that interest." 447 U.S. at 566.

Courts "must review the [state's law] with 'special care,' mindful that speech prohibitions of this type rarely survive constitutional review." *44 Liquormart*, 517 U.S. at 504. The state's burden is "heavy," *id.* at 516, requiring actual evidence, not speculation and conjecture, that each *Central Hudson* factor is satisfied. *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). Florida cannot meet its burden here.

### 1.  Dual pricing is legal, and calling the price difference a credit-card "surcharge" is not inherently misleading.

Dual pricing based on whether consumers pay with cash or credit is legal in Florida. As the district court acknowledged, "Florida law allows a merchant to exact a higher price from a customer who pays with a credit card." A-141. Because the underlying economic conduct is authorized, "speech about the reasons for these price increases does not advance an illegal transaction." *BellSouth*, 542 F.3d at 506; *see also Motor Vehicle Mfrs. Ass'n of the U.S. v. Abrams*, 684 F. Supp. 804, 806 (S.D.N.Y. 1988) (because it is "entirely lawful" for an automobile manufacturer to pass along "the costs of compliance with the Lemon Law," a clearly marked Lemon-Law surcharge "relates to lawful activity").

Nor is it "inherently misleading" for the merchant to label the difference between the cash price and the credit price a "surcharge." *In re R.M.J.*, 455 U.S. 191, 203 (1982); *see BellSouth*, 542 F.3d at 506 ("[T]ruthfully telling customers why a company has raised prices simply by listing a new tax on a bill . . . is not the kind of false, inherently misleading speech that the First Amendment does not protect."). When a merchant has a dual-pricing system, customers pay more to use a credit card. The merchant does not mislead its customers when it informs them of this fact by truthfully describing the price difference as a credit "surcharge."

43

### 2. *The state has no legitimate interest in obscuring the cost of credit-card transactions from consumers.*

Because Florida has no legitimate interest in keeping consumers in the dark about the cost of credit, the state cannot satisfy the second *Central Hudson* prong. "Unlike rational-basis review, the *Central Hudson* standard does not permit [courts] to supplant the precise interests put forward by the State with other suppositions," or to "turn away if it appears that the stated interests are not the actual interests served by the restriction." *Edenfeld*, 507 U.S. at 768. The Court's analysis, therefore, must be confined to interests actually offered by the state.

Indeed, in the district court, the Attorney General relied on little more than a vague and unsubstantiated appeal to "consumer protection," without explaining (or demonstrating with evidence) how the no-surcharge law might actually further any legitimate consumer-protection interest.[1] The district court speculated that consumers might suffer from a "bait-and-switch" when charged a price that incorporates credit-card swipe fees. A-144. The court also speculated on other potentially legitimate state interests such as "[p]reventing unpleasant surprises" and promoting "happier customers." A-144. Each of these proposed rationales, of course, is about speech—not conduct. *See Bell South v. Farris*, 542 F.3d 499, 510 (6th

---

[1] The legislative history relies most heavily on "Consumers Against Penalty Surcharges"—a group surreptitiously created by a Washington public-relations firm paid by the credit-card industry and designed to appear like a legitimate "grassroots" consumer organization. A-115.

Cir. 2008) (explaining that something "cannot simultaneously be non-communicative" and yet "pose the risk of *communicating* a misleading message"). And the court itself admitted that "[n]one of these assertions is compelling," and these asserted legislative goals are—to put it generously—hypothetical. A-145.

Such purely hypothetical justifications are insufficient under *Central Hudson*. The state's burden cannot be "satisfied by mere speculation or conjecture; rather, a government body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Edenfield*, 507 at 770-71; *see also Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994) ("[R]ote invocation of the words 'potentially misleading' does not relieve the state's burden to demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."). Here, Florida has offered nothing.

### 3.    *The no-surcharge law does not directly advance any legitimate state interest.*

The third prong requires the state to show that the law directly advances the state's asserted interest—that is, that the government's means and ends align. *Edenfield*, 507 U.S. at 771. This prong "seeks to ferret out whether a law ostensibly premised on legitimate public policy objectives in truth serves those objectives." *BellSouth*, 542 F.3d at 507. Here, too, Florida's law comes up short. It does not

45

directly advance either the state's asserted bait-and-switch rationale or the court's "happy customers" rationale.

If Florida were really concerned about preventing hidden costs then it could allow merchants to highlight the extra cost of credit by labeling it a "surcharge" and insist that it be prominently disclosed to consumers, much like Minnesota does. *See* Minn. Stat. § 325G.051(1)(a). Instead, the state requires merchants to label the additional cost in the way that best conceals it. By doing so, the no-surcharge law "actually *perpetuates* consumer confusion," as Judge Rakoff noted, "by preventing sellers from using the most effective means at their disposal to educate consumers about the true costs of credit-card usage." *Expressions*, 975 F. Supp. 2d at 446 (emphasis added).

In this way, the no-surcharge law undermines the very interests that the commercial-speech doctrine is designed to protect: the "public interest" in the "free flow of commercial information" to foster "intelligent and well informed" economic decisions by consumers. *Va. Bd. of Pharmacy*, 425 U.S. at 765. When a merchant uses a dual-pricing system, a consumer can reduce the final price paid by paying in cash. Yet the no-surcharge law prohibits the merchant from telling consumers that they will incur an added cost for using credit. "It would be perverse to conclude that a statute that keeps consumers in the dark about avoidable

additional costs somehow 'directly advances' the goal of preventing consumer deception." *Expressions*, 975 F. Supp. 2d at 446.

The law is also riddled with "exemptions and inconsistencies [that] bring into question the purpose of the labeling ban." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995). The district court failed to grapple with the fact that the State of Florida exempts *itself* from the no-surcharge law—and yet doesn't always require that the surcharges it imposes be prominently disclosed to consumers ahead of time. *See* Fla. Stat. § 215.322(3)(b) (permitting state's Chief Financial Officer to adopt "[p]rocedures which permit an agency or officer accepting payment by credit card, charge card, or debit card to impose a convenience fee upon the person making the payment"); *id.* § 215.322(5) (permitting local governmental units to surcharge "an amount sufficient to pay the service fee charges by the financial institution, vending service company, or credit card company for such services").

The state's self-serving exemptions defeat any interest that it might claim in preventing consumer deception. Florida can "present[] no convincing reason for pegging its speech ban to the identity" of the entity imposing the credit-card surcharge, allowing certain favored entities to use the "surcharge" label while banning its use by others. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 191 (1999). It is difficult to understand why a consumer confused by

surcharges as opposed to discounts would be less confused when paying a bill to a state-run enterprise.

### 4. The no-surcharge law is far more extensive than necessary to serve any legitimate state interest.

The state's biggest problem, however, is that the no-surcharge law is far more extensive than necessary to achieve the state's purported goals, thus failing the final *Central Hudson* prong. "[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993). Here, "the prohibition against the use of words which could be used to present the information about the surcharge in an accurate and non-misleading manner [is] broader than necessary to prevent the description from being potentially misleading." *Capital Leasing of Ohio, Inc. v. Columbus Mun. Airport Auth.*, 13 F. Supp. 2d 640, 669 (S.D. Ohio 1998).

To be clear, we agree that merchants should not impose an undisclosed surcharge or surprise consumers by waiting until the point of sale to inform them of a surcharge. But it is equally clear that the state did not need to enact a new law to prevent that sort of deception. The State of Florida "already has laws on the books prohibiting false advertising and deceptive acts and practices." *Expressions*, 975 F. Supp. 2d at 447; *see* Flor. Stat. § 501.201 *et seq.* Because the state could address any

48

legitimate concern about consumer deception simply by enforcing its own existing laws, the no-surcharge law is unnecessary. *See BellSouth*, 542 F.3d at 508 ("Even granting the Commonwealth's assumption that [consumer deception] was a potential problem, . . . why not first enforce existing state law on the point?").

Even if those laws were not already on the books, the no-surcharge law would still sweep too broadly. The statute pointedly "does not limit itself to a prohibition on false or misleading statements as to the charges imposed." *Abrams*, 684 F. Supp. at 807. It regulates all speech framed as a surcharge, no matter how truthful. "States may not place an absolute prohibition" on information that is merely "potentially misleading . . . if the information also may be presented in a way that is not deceptive." *R.M.J.*, 455 U.S. at 203. If the state were truly worried about consumers being misled by undisclosed surcharges, it could solve that problem by requiring clear disclosure of dual pricing, as Minnesota does. *See* Minn. Stat. § 325G.051(1)(a). That would accomplish the state's purported objective without "offend[ing] the core First Amendment values of promoting efficient exchange of information." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-14 (2d Cir. 2001). Or the state "could have limited its regulation to surcharges that are deceptive and misleading." *Expressions*, 975 F. Supp. 2d at 447. But what it cannot do is what Florida did here: ban an entire category of speech because some of it has

49

the potential to mislead. *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 109 (1990).

## II. Florida's No-Surcharge Law Is Impermissibly Vague.

Given the lack of any legitimate state interest in prohibiting merchants from describing dual pricing as a "surcharge," Florida's law would violate the Constitution even if it were limited to restricting that single word. But the law has been enforced much more broadly—restricting any speech that impermissibly depicts the cost of credit as an added cost above the "regular" price. Application of the law thus turns on a "subtle semantic distinction" between slightly different ways of describing otherwise indistinguishable economic conduct. *Fulvio*, 517 N.Y.S.2d at 1014. As a result, the law both "fails to provide people of ordinary intelligence a reasonable opportunity to know what conduct it prohibits" and allows for "arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). That violates due process.

The no-surcharge law is subject to the "heightened vagueness standard applicable to criminal statutes implicating First Amendment liberties." *United States v. Di Pietro*, 615 F.3d 1369, 1371 (11th Cir. 2010). *First*, the law carries criminal penalties of imprisonment and a civil fine. Because those penalties come in the "absence of a scienter requirement," the law sets up "a trap for those who act in good faith." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). Nor is it possible to cure

this problem by reading a *mens rea* requirement into the law. All that separates an illegal "surcharge" from a permissible cash "discount" are the words themselves, so an implied intent requirement would mean that merchants would violate the law merely by *thinking* about the difference between the cash price and the credit price as a "surcharge." Transforming a word ban into a thought ban is no way to address the law's constitutional infirmities.

*Second*, because it turns on the words merchants use to describe otherwise valid dual-pricing systems, the no-surcharge law threatens to destroy the "breathing space" that First Amendment freedoms need to survive. *NAACP v. Button*, 371 U.S. 415, 433 (1963). The plaintiffs' declarations show how much Florida's labeling restriction chills speech. For instance, although TM Jewelry previously engaged in dual pricing, it no longer does so because it doesn't "want to get into trouble with the law based on how [it] describe[s] the price difference" to customers, and it is "not confident that [it] can communicate this distinction properly in compliance with the law." A-69. *Fulvio* shows these fears to be well founded: The merchant there posted a sign that clearly displayed both the cash and credit prices for gas and instructed his employees to tell customers only that he offered a cash discount. 517 N.Y.S.2d at 1010, 1013. Yet he was prosecuted by the state because his cashier told a customer that it was "five cents 'extra'" to use credit rather than a "nickel less" to use cash. *Id.*

When liability turns on semantics, it can be difficult to find the line between what is legal and what is not. But the whole point of vagueness doctrine is to ensure that this line is reasonably clear, particularly when First Amendment rights and criminal liability are at stake, so that people can conform their activity to the law. So here is a simple question for the state: A merchant wants to charge two different prices for a product depending on how the customer pays: $100 for cash, $102 for credit. How is the merchant supposed to comply with the no-surcharge law?

Or return to TM Jewelry's predicament. The company was engaging in dual pricing, expressing the cost of credit as "an extra charge on top of the regular price," and then it got a letter from the Attorney General saying that this violates the no-surcharge law. A-68-69. At that point, TM Jewelry faced many difficult questions if it wanted to continue dual pricing. Consider just a few from the company's perspective: If one of your customers asks you whether you charge more for paying with a credit card, what do you do? Do you ignore or dodge the question? Are you required to answer falsely? Or should you say something like the following: "State law does not allow us to tell you that you are paying more for using a credit card, but we can tell you that you are paying less for not using a credit card"?

Or what if a consumer asks you why you impose an "added cost" or "surcharge" for credit? Can you answer honestly, or does the law require that you

contest the customer's characterization, insisting that the price difference represents a "discount" for cash rather than an "added cost" or "surcharge" for credit?

Would your otherwise lawful dual pricing become criminal if you posted a sign (like those reproduced below) protesting swipe fees, and added a line stating that "unfair swipe fees are the reason we charge a 'credit price' that is 3% more than the 'cash price.'" (Recall that, until the Attorney General's letter forced them to take it down, the husband-and-wife owners of Dana's Railroad Supply posted just such a sign.)

 

That none of these questions can be answered with certainty demonstrates the no-surcharge law's failure to provide "actual notice" of what is prohibited. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). Although the law clearly bars a merchant from labeling any price difference between cash and credit a "surcharge," beyond that its meaning is nebulous. As soon as a customer asks about the merchant's pricing scheme, the merchant finds itself entangled in a semantic briar patch. It "is intolerable" that a merchant "careful enough or sophisticated enough

to always characterize the lower . . . prices as a 'discount for cash' may enter his automobile at the end of his business day and drive home a free man; however, if the same individual, or his colleague operating the station down the street, *or* his *employee* is careless enough to describe the higher price in terms which amount to the 'credit price' having been derived from *adding* a charge to the lower price, he faces the prospect of criminal conviction and possible imprisonment." *Fulvio*, 517 N.Y.S.2d at 1015. And the law's inscrutability arouses especially grave concerns because it "sweep[s] within [its] coverage the everyday acts of average citizens"— merchants and employees, carrying out transactions in corner shops and other businesses throughout the state—rather than only "govern[ing] the activities of relatively sophisticated individuals who are deliberately engaged in" some highly technical field. *United States v. Amirnazmi*, 645 F.3d 564, 589 n.34 (3d Cir. 2011) (internal quotation marks omitted).

As a result of the law's uncertainty, the plaintiffs have been forced to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2743 (2011) (ellipsis and internal quotation marks omitted). Dana's Railroad, TM Jewelry, Tallahassee Discount Furniture, and Cook's Sportland would all like to employ dual pricing, which is perfectly legal in Florida. But the no-surcharge law has instilled an extreme "chilling effect," prompting them to abandon both disfavored

speech and legal conduct. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997). Fear of slipping across the thin and largely indiscernible semantic line separating a lawful pricing system from a criminal one has prompted these plaintiffs to avoid dual pricing entirely, even though they would otherwise prefer it. This chilling effect also injures consumers, who are deprived of the option of patronizing a merchant with a dual-pricing system.

Those charged with enforcing the no-surcharge law are no better able to pin down its meaning than those charged with compliance. As the judge in *Fulvio* noted when defense counsel accidentally referred to the gas station's otherwise lawful pricing system as a "surcharge" policy, even "counsel learned in the law can confuse the two sides of the coin . . . ('cash discounts are allowed, credit card surcharges are impermissible')." 517 N.Y.S.2d at 1014. And even legislators who have enacted no-surcharge laws seem to have struggled to understand the distinction. During consideration of a similar no-surcharge law in Connecticut, one participant remarked: "[C]onceptually, I would like somebody to someday explain to me the difference between a surcharge and discount." A-139-40. Because the Florida Attorney General hasn't provided an explanation either, the no-surcharge law is void for vagueness.

**CONCLUSION**

The district court's judgment should be reversed in its entirety.

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

Gary B. Friedman
Rebecca Quinn
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

David Frank
FRIEDMAN, FRANK & ABRAHAMSEN
524 E. College Avenue
Tallahassee, FL 32301
(850) 224-4357

December 10, 2014                    *Counsel for Plaintiffs-Appellants Dana's*
                                      *Railroad Supply, et al.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that my word processing program, Microsoft Word, counted 13,206 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

/s/ Deepak Gupta

December 10, 2014                    Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2014, I electronically filed the foregoing Brief for Plaintiffs-Appellants with the Clerk of the Court of the U.S. Court of Appeals for the Eleventh Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta