# DOCKET NO. 14-14426

# United States Court of Appeals

### *for the*

# Eleventh Circuit

———

DANA'S RAILROAD SUPPLY; DANA JACKSON; TM JEWELRY
LLC; TIFFANY BALLARD; TALLAHASSEE DISCOUNT
FURNITURE; DUANA PALMER; COOK'S SPORTLAND;
and ERIC COOK,

*Plaintiffs/Appellants,*

*v.*

PAMELA JO BONDI,
in her official capacity as Attorney General of the State of Florida,

*Defendant/Appellee.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA (TALLAHASSEE)
IN CIVIL DOCKET FOR CASE #: 4:14-cv-00134-RH-CAS

(Hon. ROBERT L. HINKLE)

## BRIEF OF *AMICI CURIAE* THE KROGER CO., WALGREEN CO., PUBLIX SUPER MARKETS, INC., AND SPIRIT AIRLINES, INC. IN SUPPORT OF THE PLAINTIFFS-APPELLANTS AND THE REVERSAL OF THE ORDER ENTERED BELOW

RICHARD ALAN ARNOLD, ESQUIRE
WILLIAM J. BLECHMAN, ESQUIRE
JAMES ALMON, ESQUIRE
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard
Suite 1100
Miami, Florida  33131
(305) 373-1000

JOSEPH M. VANEK, ESQUIRE
DAVID P. GERMAINE, ESQUIRE
VANEK, VICKERS & MASINI, P.C.
55 West Monroe Street, Suite 3500
Chicago Illinois  60603
(312) 224-1500

*Attorneys for Amici Curiae (continued on inside cover)*

PAUL E. SLATER, ESQUIRE
SPERLING & SLATER
55 West Monroe Street
Suite 3200
Chicago, Illinois  60603
(312) 641-3200

DANA'S RAILROAD SUPPLY, ET AL. v. PAMELA JO BONDI, No. 14-14426

## CERTIFICATE OF INTERESTED PERSONS

Counsel hereby certify that in addition to the individuals and entities listed in the Plaintiff-Appellant's opening brief, the following individuals and entities have a known interest in the outcome of this appeal:

1.    Amicus Curiae The Kroger Co. (NYSE: KR)

2.    Amicus Curiae Walgreen Co. (NYSE: WAG)

3.    Amicus Curiae Publix Super Markets, Inc. (Not publicly traded)

4.    Amicus Curiae Spirit Airlines, Inc. (NASDAQ: SAVE)

5.    Richard Alan Arnold, Counsel for *Amici Curiae*

6.    William J. Blechman, Counsel for *Amici Curiae*

7.    James Almon, Counsel for *Amici Curiae*

8.    Paul E. Slater, Counsel for *Amici Curiae*

9.    Joseph M. Vanek, Counsel for *Amici Curiae*

10.    David P. Germaine, Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel certifies that:

1.    *Amicus Curiae* The Kroger Co. is a publicly-held corporation with no parent corporation, and no publicly held company owns 10% or more of its stock.

DANA'S RAILROAD SUPPLY, ET AL. v. PAMELA JO BONDI, No. 14-14426

2.    *Amicus Curiae* Walgreen Co. is a publicly-held corporation with no parent corporation, and no publicly held company owns 10% or more of its stock.

3.    *Amicus Curiae* Publix Super Markets, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

4.    *Amicus Curiae* Spirit Airlines, Inc. is a publicly-held corporation with no parent corporation, and no publicly held company owns 10% or more of its stock.

/s/ James Almon
James Almon
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF *AMICI CURIAE* INTERESTS ....................................................1

STATEMENT OF THE ISSUES...................................................................4

SUMMARY OF ARGUMENT ....................................................................4

ARGUMENT ....................................................................................6

    1.    Merchant Discount Fees and the Lack of Price
            Competition................................................................6

    2.    The Persuasive Effect of Framing Price Differences as
            Surcharges Rather than Discounts ........................................9

    3.    It Furthers the Public's Interest in Competition to Allow
            Merchants to Describe a Price Difference as a Surcharge...................12

    4.    The Florida Statute Unconstitutionally Restricts Freedom
            of Speech................................................................13

CONCLUSION ................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Bates v. State Bar of Ariz.*,
    433 U.S. 350 (1977) ...................................................................12

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
    447 U.S. 557 (1980) ...................................................................13

*Cooper v. Dillon*,
    403 F.3d 1208 (11th Cir. 2005) .................................................14

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) ...................................................................12

*Pruett v. Harris Cty. Bail Bond Bd.*,
    499 F.3d 403 (5th Cir. 2007) .....................................................15

*Thompson v. Western States Medical Center*,
    535 U.S. 357 (2002) ...................................................................17

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) ...................................................... 13, 15, 16, 17

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985) ...................................................................15

**Statutes**

Fla. Stat. § 501.0117 ...........................................................................1

**Other Authorities**

E. Vis & J. Toth, *The Abolition of the No-Discount Rule*, European
    Commission Working Paper Project No. R231, 11-12 (March 2000).................11

Edmund W. Kitch, *The Framing Hypothesis: Is It Supported by Credit
    Card Issuer Opposition to a Surcharge on a Cash Price*, 6 J. L. Econ.
    & Org. 217 (1990) ....................................................................11

Elizabeth Warren, *Antitrust Issues in Credit Card Merchant Restraint Rules*, Tobin Project Risk Policy Working Group Discussion Paper, 2 (May 6, 2007) ................................................................................................7

Fumiko Hayashi, *Public Authority Involvement in Payment Card Markets: Various Countries, August 2012 Update*, Payment Systems Research Department, Federal Reserve Bank of Kansas City, 9-10 ....................................7

Reserve Bank of Australia, *A Variation of the Surcharging Standards: Final Reforms and Regulation Impact Statement*, 3 (June 2012) ..................................10

Reserve Bank of Australia, *Payments Data* (last accessed December 16, 2014) ......8

Reserve Bank of Australia, *Reform of Australia's Payment Systems: Preliminary Conclusions of the 2007/08 Review*, 18 (April 2008) ......................10

Richard H. Thaler and Shlomo Bernartzi, *Save More Tomorrow™: Using Behavioral Economics to Increase Employee Saving*, 112 J. Pol. Econ. S164 (2004) ........................................................................................10

Stuart E. Weiner & Julian Wright, *Interchange Fees in Various Countries: Developments and Determinants*, Federal Reserve Bank of Kansas City, Working Paper 05-01, 14 (September 6, 2005) ....................................................7

## STATEMENT OF *AMICI CURIAE* INTERESTS

This brief is filed on behalf of The Kroger Co., Walgreen Co., Publix Super Markets, Inc., and Spirit Airlines, Inc. (the "Amici").[1]  Each of the Amici accepts all major credit card brands and each of them pays millions of dollars per year in so-called merchant discount fees.  These are per-transaction fees paid by the merchants to the credit card companies.  These fees significantly increase the Amici's costs of operations.  That cost increase must be recaptured by merchants, such as the Amici, in the form of higher prices charged to consumers.  The Amici believe that, if they could clearly and effectively express to consumers the existence and amount of the credit card fees they pay by unbundling the pricing and charge for the cost of accepting a credit card, consumers would switch to lower-cost alternative payment forms and retail prices would go down.

The Florida statute challenged in this action, Fla. Stat. § 501.0117,[2] prevents the Amici and all other merchants from expressing in a particular way the

---

[1]    In compliance with FRAP 29(c)(5), Amici state: (A) this brief was authored entirely by counsel for the Amici and was not authored in any part by counsel for any party; (B) neither a party nor counsel for a party contributed any money intended to fund the preparation or submission of this brief; (C) no person or entity, other than the Amici and their counsel, contributed any money intended to fund the preparation or submission of this brief.

[2]    Fla. Stat. § 501.0117 provides in relevant part:  "A seller or lessor in a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card.  A surcharge is any additional

existence of a price difference between the use of credit cards and the use of other payment forms, such as cash, check or debit card. Thus, a Florida merchant is allowed to tell a consumer that he or she will pay a lower price if he or she pays with cash, but the identical pricing behavior is a crime if the merchant tells the consumer that he or she will pay a commensurately higher price if the consumer pays with a credit card.

The difference between these alternative descriptions of the same pricing behavior is enormously important. A fundamental precept of behavioral economics is the concept of "loss aversion." Loss aversion holds that an individual's response to a threatened loss (*i.e.*, a surcharge) is far stronger than his or her response to a commensurate benefit (*i.e.*, a discount). In other words, if a merchant frames the difference between the price for using cash and the price for using a credit card as a "surcharge" on the use of a credit card rather than as a "discount" of the same magnitude for the use of cash, then the message is far more persuasive and will result in more people switching from high-cost credit cards to alternative payment forms. The label used – discount or surcharge – should not legally matter as either is a price. Discounting or surcharging is merely

amount imposed at the time of a sale or lease transaction by the seller or lessor that increases the charge to the buyer or lessee for the privilege of using a credit card to make a payment . . . . This section does not apply to the offering of a discount for the purpose of inducing payment by cash, check or other means not involving the use of a credit card, if the discount is offered to all prospective customers."

unbundling the lower price or higher price, respectively, or accepting lower or higher cost payment means.  The Florida statute does not prevent merchants from telling consumers that there is a price difference between the use of a credit card and cash.  It only prevents the merchant from expressing that message in its most persuasive form.

The merchants want the opportunity to express to consumers a difference in price between the use of credit cards and the use of alternative payment forms in the most persuasive and effective manner possible.  The Florida statute bans that expression.  It does not prohibit conduct.

Indeed, some of the Amici have been at the forefront of the litigation challenging no-surcharge restrictions.  They understand the impact that expressing a price difference as a surcharge has played in reducing retailers' costs and consumers' prices in other countries.  They have expertise in the benefits and persuasiveness of framing or unbundling prices as "surcharges" rather than "discounts," and they can speak directly to why merchants should not be foreclosed from using the language of "surcharge" to express their pricing decisions to Florida consumers.

The Amici file this brief with the consent of all parties to this appeal.

## STATEMENT OF THE ISSUES

The Amici agree with the statement of the issues in the Plaintiff-Appellants' opening brief.

## SUMMARY OF ARGUMENT

The Florida "no-surcharge" statute, Fla. Stat. § 501.0117, constrains the ability of merchants like the Amici to communicate with their customers about the high costs associated with accepting credit cards. The per-transaction fees associated with accepting credit cards are substantial. Each year, merchants across the United States pay more than $50 million in so-called "discount fees" to credit card companies. For merchants like the Amici, credit card fees are among their largest expenses.

Under the Florida statute, a merchant may charge a different price to a customer who uses a credit card in order to reflect the higher cost to the merchant of accepting that form of payment. A merchant may also tell that customer that he or she would be charged a lower price for using a lower-cost payment form, like cash or a debit card. What the merchant cannot say, however, is that the customer would be charged a higher price, or a surcharge, for using a high-cost credit card. What the merchant can and cannot say about the price differential has a material effect on the merchant's ability to persuade customers to use less costly payment forms.

4

A price difference communicated to the customer as a surcharge will be significantly more effective in persuading the customer to use a lower-cost payment form.  Behavioral economics explains this concept through the doctrine of "loss aversion," which refers to the empirically demonstrated tendency of people to react more strongly to losses more strongly than gains.  In other words, an economic transaction framed as the loss of a dollar has a much greater motivating effect than a transaction that is framed as gaining a dollar.  Applying the concept of loss aversion to credit cards, a price difference framed as a 2% surcharge for using a credit card (*i.e.*, a 2% loss) is a far more effective motivating price signal than a 2% discount (*i.e.*, a 2% gain) on the use of alternative payment forms such as cash or debit cards.  The results predicted by the behavioral economics have been confirmed in jurisdictions such as Australia and the Netherlands, where surcharging of credit cards is permitted.

The effectiveness of framing a price differential as a surcharge also has a real impact on merchants' ability to foster competition among the major credit card networks.  If merchants had the ability to communicate price differentials as surcharges, credit card networks would have to reduce their merchant fees or risk losing volume to lower-cost payment forms.  Evidence from Australia confirms that when merchants are allowed to describe a price differential as a surcharge, credit card networks will lower their prices in response to competition from less

5

costly payment forms. The Florida statute interferes with this basic competitive dynamic that should exist between credit cards and other lower-cost forms of payment.

By prohibiting merchants from using the clearest, most effective price signal to communicate transparently with customers about the different costs of accepting different forms of payment, the Florida statute ensures that information about credit card fees stays hidden from consumers. Consequently, beyond restraining the free speech of the Amici and other Florida merchants, the statute impermissibly infringes the First Amendment rights of consumers from receiving clear price signals to help them make informed choices about what form of payment to use.

## ARGUMENT

### 1.    Merchant Discount Fees and the Lack of Price Competition

Like virtually all retail chains, the Amici must accept all major credit cards. Non-acceptance of those credit card brands is not a viable commercial option. The threat of lost sales from customers who prefer to use those credit cards is too great.

Merchants incur "discount fees" on transactions paid for with a payment card. Each year, U.S. merchants pay more than $50 billion dollars in fees to the major credit card networks. The typical merchant-discount fee on a credit card transaction in the U.S. is between 2% and 3% of the transaction amount. Fees on premium or reward cards are even higher. This means that if a sales ticket totals

$100 and a customer pays with a credit card, the average amount received by the merchant is only between $97 and $98.

In many industries, including those in which the Amici participate, merchant discount fees are among the highest line-item expenses incurred by a merchant. Over the years, these fees have increased dramatically. From 2000 to 2006, the average cost of accepting credit cards in the United States rose 123%.[3] During approximately the same time period, merchant discount fees declined outside of the United States.[4] In countries where merchants have the ability to frame a price increase as a discrete surcharge imposed only on consumers who present high-cost payment cards, the merchant discount fees are significantly less than they are in the U.S.[5] For example, in the decade since the Reserve Bank of Australia removed the

---

[3] Elizabeth Warren, *Antitrust Issues in Credit Card Merchant Restraint Rules*, Tobin Project Risk Policy Working Group Discussion Paper, 2 (May 6, 2007), *available at* http://www.docstoc.com/docs/26252409/Antitrust-Issues-in-Credit-CardMerchant-Restraint-Rules.

[4] Stuart E. Weiner & Julian Wright, *Interchange Fees in Various Countries: Developments and Determinants*, Federal Reserve Bank of Kansas City, Working Paper 05-01, 14 (September 6, 2005), *available at* http://www.newyorkfed.org/research/conference/2005/antitrust/WeinerWright.pdf.

[5] In no fewer than twenty countries including Australia, Spain, and the United Kingdom, public authorities have taken legal or administrative action to ensure that merchants have the right to surcharge credit card transactions. Fumiko Hayashi, *Public Authority Involvement in Payment Card Markets: Various Countries, August 2012 Update*, Payment Systems Research Department, Federal Reserve Bank of Kansas City, 9-10, *available at*

ban on merchants surcharging credit card use, unregulated credit card discount fees on average dropped from approximately 2.5% to roughly 1.75%.[6]  U.S. rates, however, did not drop over the same period of time.

Until recently, U.S. merchants were denied the tools needed to incentivize MasterCard and Visa to compete against each other on price and reduce their merchant discount rates.  More specifically, the MasterCard and Visa "no surcharge" rules precluded merchants from using ordinary price signals to direct customers to lower-cost payment forms.  Some of the Amici and other U.S. merchants fought long and hard to have those rules rescinded as illegal restraints on price competition.  The merchants argued that if they could impose a surcharge on high-cost credit cards, consumers would switch to lower-cost alternative payment forms.  The credit card companies would then have to become more competitive with lower cost alternative payment forms or face the loss of transactional volume that would result from their comparatively high prices.

---

http://www.kansascityfed.org/publicat/psr/dataset/regulator-dev-interchange-fees.pdf.

[6]    Reserve Bank of Australia, *Payments Data* (last accessed December 16, 2014), *available at* http://www.rba.gov.au/payments-system/resources/statistics/index.html (file "C3: Average Merchant Fees for Debit, Credit and Charge Card" showing decrease in American Express average merchant fees, which are not subject to regulation in Australia).

In early 2013, after eight years of litigation, MasterCard and Visa agreed to eliminate their no-surcharge rules. However, for Florida merchants, the no-surcharge statute may still preclude them from using the simplest and most efficacious price signal – a surcharge – to direct purchasers to lower-cost payment forms.

The Florida no-surcharge law thus steps into the shoes of the now abandoned anticompetitive rules of Visa and MasterCard. This no-surcharge law prohibits merchants from communicating transparent and informative surcharge price signals to consumers in order to persuade them to switch from credit cards to less expensive payment forms, like cash or debit cards. The law thereby shields credit card companies from having to engage in the horizontal price competition that would result from the use of such price signals.

**2.    The Persuasive Effect of Framing Price Differences as Surcharges Rather than Discounts**

Under the Florida no-surcharge statute, the speech by which a merchant can communicate a price difference between the use of high-cost credit cards and lower-cost alternative payment forms, such as cash or debit cards, is constrained. The merchant is allowed to express the difference as a discount given for using the lower-cost payment form, but is not allowed to express the price difference as a surcharge imposed on the higher-cost credit card.

9

There can be no credible debate about the strength and persuasiveness of the messaging when a price difference is communicated as a surcharge rather than a discount.  When consumers face even a small surcharge for using a credit card, they shift to a different, non-surcharged payment product.  The shift is dramatic and immediate.  Empirical evidence from Australia, where credit card surcharging is permissible, shows that a majority of consumers faced with a small surcharge will switch to a non-surcharged product.[7]

Behavioral economics explains the power of a price difference denominated as a surcharge through the doctrine of "loss aversion" – which is "the empirically demonstrated tendency for people to weigh losses significantly more heavily than gains."[8]  In other words, an economic transaction that is framed as the loss of one dollar has a far greater motivating effect than a transaction that is framed as the

---

[7]    Reserve Bank of Australia, *A Variation of the Surcharging Standards: Final Reforms and Regulation Impact Statement*, 3 (June 2012), *available at* http://www.rba.gov.au/payments-system/reforms/cards/201206-var-surcharging-stnds-fin-ref-ris/pdf/201206-var-surcharging-stnds-fin-ref-ris.pdf; *see also* Reserve Bank of Australia, *Reform of Australia's Payment Systems: Preliminary Conclusions of the 2007/08 Review*, 18 (April 2008), *available at* http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/review-0708-pre-conclusions.pdf ("[W]hen surcharges are imposed on a particular type of card, use of that card declines substantially").

[8]    Richard H. Thaler and Shlomo Bernartzi, *Save More Tomorrow™: Using Behavioral Economics to Increase Employee Saving*, 112 J. Pol. Econ. S164, S169 (2004).

gain of one dollar.[9]   As a result, a discount given to a consumer for using an alternative payment form must be of significantly greater magnitude than a surcharge imposed on the use of a credit card in order to achieve an equivalent shift in purchaser behavior.[10]   Due to the operation of loss aversion, a price difference framed as a 2% surcharge (*i.e.*, a loss) on the use of credit cards is a far more persuasive and motivating price signal than a price difference that is framed as a 2% discount (*i.e.*, a gain) on the use of alternative payment forms such as cash or debit cards.

A useful example of loss aversion was described in the research of Dutch economists on consumers' attitudes toward credit card surcharges and cash discounts.  The research found that 74% of the consumers surveyed had a negative or strongly negative association with credit card surcharges while only 22% of the sample had a positive or strongly positive view of a cash discount.[11]

---

[9]     *See*, *e.g.*, Edmund W. Kitch, *The Framing Hypothesis: Is It Supported by Credit Card Issuer Opposition to a Surcharge on a Cash Price*, 6 J. L. Econ. & Org. 217, 218, n.2 (1990).

[10]     E. Vis & J. Toth, *The Abolition of the No-Discount Rule*, European Commission Working Paper Project No. R231, 11-12 (March 2000), *available at* http://www.creditslips.org/files/netherlands-no-discrimination-rule-study.pdf.

[11]     *Id.* at 15.

### 3.    It Furthers the Public's Interest in Competition to Allow Merchants to Describe a Price Difference as a Surcharge

The restriction on the Amici's ability to use the language of surcharging to describe a price difference is contrary to both the First Amendment and the public interest in price competition.  The Supreme Court has recognized that commercial speech is critically important not only to speakers and listeners, but also to the functioning of a free economy.  *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977) (commercial speech "performs an indispensible role in the allocation of resources in a free enterprise system").  Clearly, the "heart of our national economy long has been faith in the value of competition."  *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).  This is because "competition will produce not only lower prices, but also better goods and services."  *Id.*

Here, the prohibition on the use of the term "surcharge" prevents merchants from using the more powerful and effective price signal to incentivize consumers to switch to lower-cost alternative payment services.  If the providers of high-cost credit card services lose transactional volume due to their high merchant discount fees and resulting surcharges on the use of credit cards, they will have to compete with the alternative payment forms on price or face the competitive consequences of their failure to do so.  Specifically, the credit card providers will have to lower their merchant discount fees or lose sales volume to lower-priced alternatives.  It is

in the public interest to allow merchants to use the strongest tools available to maximize this price competition so as to minimize price and maximize quality.

In addition, the Florida statute fundamentally interferes with price transparency and the efficient functioning of the market.  In an efficient market, prices convey information to the consumer as to the value and cost of goods and services.  The no-surcharge law thwarts that function.  It prevents merchants from using price to inform customers of the relative cost to the merchant of their chosen means of payment.  The elimination of such pricing information all but guarantees an inefficient allocation of resources.  The market's 'invisible hand' cannot function when buyers are not provided with appropriate information and incentives to guide their decisions.

**4.    The Florida Statute Unconstitutionally Restricts Freedom of Speech**

The Supreme Court has recognized that the dissemination of price signals is an essential form of commercial speech.  *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 764-65 (1976) (commercial speech including the dissemination of "price information" to consumers "is protected by the First Amendment"); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 580 (1980) (Stevens, J., concurring) (commercial speech includes "a manufacturer's publication of a price list").  A rule that bans the use of price signals bans the use of speech.  The First Amendment also prohibits

content-based restrictions of speech. *Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir. 2005). As explained below, the Florida statute does not regulate conduct. It regulates only the content of the speech and the words that are used to describe the pricing conduct in question. More specifically, the Florida statute does not restrict the prices charged by a merchant. It restricts what the merchant says about those prices and whether the merchant describes a price difference, equal in amount, as a surcharge or a discount.

Assume, for example, that a widget is being sold for the stated price of $1.00. If the merchant grants a two-cent discount only to cash customers, those customers pay $0.98 and credit card customers pay $1.00. Now assume that the merchant expresses his price as $0.98 and imposes a two-cent surcharge on credit card customers. The economic transaction and the pricing behavior are identical. In both cases, the cash customer pays $0.98 and the credit card customer pays $1.00. The only difference is the manner in which the transaction is described. In one case the transaction is described as a two-cent discount to cash customers. In the other case, the transaction is described as a two-cent surcharge on credit cards. In making the surcharge description a criminal offense, the Florida statute does not punish the pricing conduct or the transaction. It punishes only the manner in which the transaction is described. It punishes pure speech. This impropriety is compounded by the fact that the speech that is punished (*i.e.*, surcharging) is the

14

most effective and persuasive form of price signaling because of the doctrine of loss aversion.  To draw an analogy, if the Florida statute addressed political speech, it would allow campaign statements that are relatively ineffective, but ban campaign statements that cause voters to change the way they vote.

The Florida no-surcharge law also ensures that high merchant discount fees are hidden from consumers.  Amici have a strong interest in providing their customers with accurate information regarding the cost to the merchant of various payment products, and the most powerful way to convey that information is via a price signal that shows a higher charge for the higher-cost payment form. Armed with accurate price signals, consumers can make appropriate choices. Indeed, the right of consumers to receive accurate information is a core value in the Supreme Court's commercial speech jurisprudence: "[T]he extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides . . . ." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *Virginia Bd. of Pharmacy*, 425 U.S. at 757 (just as advertisers have a First Amendment right to distribute advertising, consumers have a "reciprocal right to receive the advertising"); *Pruett v. Harris Cty. Bail Bond Bd.*, 499 F.3d 403, 415 n.35 (5th Cir. 2007) ("The benefits attending commercial speech flow not just to the speaker, for increased consumer knowledge about any product aids consumer choice and increases competition.")

15

Moreover, as the Court noted in *Virginia Board of Pharmacy,* consumers' interest in receiving commercial information "may be as keen, if not keener by far, than his interest in the day's most urgent political debate." 425 U.S. at 763. By prohibiting merchants from using the speech of surcharging, the Florida statute impermissibly prevents the consumers from receiving clear, concise and persuasive price signals.

## CONCLUSION

Florida allows merchants to charge a different and lower price when consumers use a lower-cost payment form such as cash or a debit card – so long as the merchant does not call the price difference a surcharge. Merchants should be able to speak transparently and openly with their customers and communicate clearly and effectively that they are increasing the price when a consumer uses a high-cost credit card. Free speech requires no less, and the augmentation of price competition is an added benefit.

When the dominant credit card networks banned surcharging they had a discernible (if not admitted) objective: to insulate themselves from competitive forces and allow themselves to set merchant fees at rates that would be unthinkable in much of the world. The objective of the Florida legislature, however, is less clear. Perhaps, the legislature was concerned that consumers would make bad decisions if they received accurate price signals. The Supreme Court, however, has rejected restrictions on commercial speech based on the "fear that people

16

would make bad decisions if given truthful information," *Thompson v. Western States Medical Center*, 535 U.S. 357, 374 (2002); *Virginia Bd. of Pharmacy*, 425 U.S. at 765 ("people will perceive their own best interests, if only they are well enough informed, and . . . the best means to that end is to open the channels of communication rather than to close them.  It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us.")

For all the foregoing reasons, and those set forth in the Plaintiffs-Appellants' Brief, Amici respectfully submit that the Court should reverse the order granting the State's motion for summary judgment.

Respectfully submitted,

*/s/ James Almon*
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
James Almon, Esquire
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard
Suite 1100
Miami, Florida  33131-4327
(305) 373-1000

17

Joseph M. Vanek, Esquire
David P. Germaine, Esquire
VANEK, VICKERS & MASINI, P.C.
55 West Monroe Street
Suite 3500
Chicago, Illinois  60603
(312) 224-1500

Paul E. Slater, Esquire
SPERLING & SLATER
55 West Monroe Street
Suite 3200
Chicago, Illinois  60603
(312) 641-3200

Dated:  December 17, 2014        ***Attorneys for Amici Curiae***

## <u>CERTIFICATE OF COMPLIANCE WITH</u>
## <u>FEDERAL RULE OF APPELLATE PROCEDURE 32(a)</u>

1.      This brief contains 4,042 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  The length of this brief complies with the 7,000 word maximum limit for amicus briefs prescribed by this Court.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(67) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated:  December 17, 2014                          */s/ James Almon*
                                                                         James Almon

19

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2014, I electronically filed the foregoing Brief for Amici Curiae with the Clerk of the Court of the U.S. Court of Appeals for the Eleventh Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

/s/ James Almon
James Almon

20