DOCKET NO. 14-14426

# United States Court of Appeals

*for the*

# Eleventh Circuit

DANA'S RAILROAD SUPPLY; DANA JACKSON; TM JEWELRY LLC; TIFFANY BALLARD; TALLAHASSEE DISCOUNT FURNITURE; DUANA PALMER; COOK'S SPORTLAND; and ERIC COOK,

*Plaintiffs/Appellants,*

*v.*

PAMELA JO BONDI, in her official capacity as Attorney General of the State of Florida,

*Defendant/Appellee.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
CASE NO: 4:14-cv-00134-RH-CAS

## BRIEF OF AMICUS CURIAE CREDIT UNION NATIONAL ASSOCIATION IN SUPPORT OF THE APPELLEE AND OF AFFIRMANCE

RICHARD R. COOK
CREDIT UNION NATIONAL ASSOCIATION
601 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 508-6734
rcook@cuna.coop

*Counsel for Amicus Curiae Credit Union National Association*

Dana's Railroad Supply, et al. v. Attorney General, State of Florida
11th Circuit No. 14-14426

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 16.1 of the Federal Rules of Appellate Procedure, the

Credit Union National Association, by and through its undersigned counsel, hereby

certifies that it has no parent corporation and that no publicly held corporation

owns 10% or more of its stock.


1. Almon, James (Counsel for Amici Curiae)

2. Arnold, Richard Alan (Counsel for Amici Curiae)

3. Ballard, Tiffany (Plaintiff)

4. Blechman, William J. (Counsel for Amici Curiae)

5. Bondi, Pamela Jo, Florida Attorney General (Defendant-Appellee)

6. Cook, Eric (Plaintiff-Appellant)

7. Cook, Richard R. (Counsel for Amicus Curiae)

8. Consumer Action (Amicus Curiae)

9. Cook's Sportland (Plaintiff-Appellant)

10.  Credit Union National Association (Amicus Curiae)

11. Dana's Railroad Supply (Plaintiff-Appellant)

12. Florida Public Interest Research Group (Amicus Curiae)

13. Frank, David Michael (Counsel for Plaintiffs-Appellants)

14. Friedman, Gary (Counsel for Plaintiffs-Appellants)

Dana's Railroad Supply, et al. v. Attorney General, State of Florida
11th Circuit No. 14-14426

15. Germaine, David P. (Counsel for Amici Curiae)

16. Gupta, Deepak (Counsel for Plaintiffs-Appellants)

17. Harper, Lee (Plaintiff, Dismissed 6.11.2014)

18. Hinkle, Hon. Robert L. (U.S. District Court Judge)

19. Jackson, Dana (Plaintiff-Appellant)

20. Kitzman, Tracey (Counsel for Plaintiffs-Appellants)

21. Martin, Diana L. (Counsel for Amici Curiae)

22. National Association of Consumer Advocates (Amicus Curiae)

23. National Consumers League (Amicus Curiae)

24. Palmer, Duana (Plaintiff-Appellant)

25. Publix Super Markets, Inc. (not publicly traded) (Amicus Curiae)

26. Quinn, Rebecca (Counsel for Plaintiffs-Appellants)

27. Slater, Paul E. (Counsel for Amici Curiae)

28. Spirit Airlines, Inc. (NASDAQ: SAVE) (Amicus Curiae)

29. Stampelos, Hon. Charles A. (U.S. Magistrate Judge)

30. Tallahassee Discount Furniture (Plaintiff-Appellant)

31. The Kroger Co (NYSE: KR) (Amicus Curiae)

32. TM Jewelry LLC (Amicus Curiae)

33. Taylor, Jonathan E. (Counsel for Plaintiffs-Appellants)

34. U.S. Public Interest Research Group (Amicus Curiae)

Dana's Railroad Supply, et al. v. Attorney General, State of Florida
11th Circuit No. 14-14426

35. Vanek, Joseph M. (Counsel for Amici Curiae)

36. Vazquez, Osvaldo, Deputy Solicitor General, Office of the Attorney General of Florida (Counsel for Defendant-Appellee)

37. Walgreen Co (NYSE: WAG) (Amicus Curiae)

38. Winsor, Allen C., Solicitor General, Office of the Attorney General of Florida (Counsel for Defendant-Appellee)

## **TABLE OF CONTENTS**

Certificate of Interested Persons .......................................................... C-1

Statement of *Amicus Curiae* Interests...................................................... 1

Statement of the Issues........................................................................ 3

Summary of Argument ........................................................................ 3

      Background: The Electronic Payment System ............................................. 7

Argument............................................................................................ 8

    I.     Merchant Credit Card Fees are No Different than Other Costs of Doing Business, and Should Not Be Directly Passed on to Consumers ........................................................................ 10

          a.     Merchants that Choose to Accept Credit Cards Derive Tremendous Value from the Privilege..................................... 10

          b.     Consumers, Especially Low-Income Cash Consumers, Benefit from Credit Card Transaction Fees............................. 16

    II.    The Surcharge Ban is a Lawful Exercise in the Legislature's Interest in Protecting Florida Consumers........................................... 20

    III.    Allowing Surcharging is Unlikely to Produce Lower Prices or Other Benefits for Consumers, as Confirmed by Recent Experience in the United States and Australia................................... 26

Conclusion ....................................................................................... 31

Certificate of Compliance ..................................................................... 32

Certificate of Service .......................................................................... 33

i

# TABLE OF AUTHORITIES

**Cases**

*Expressions Hair Design v. Schneiderman*,
　　No. 13-4533, 13-4537 (2d. Cir.)................................................................. 23

*FCC v. Beach Comm'n*,
　　508 U.S. 307 (1993)...................................................................................... 6

*Giboney v. Empire Storage & Ice Co.*,
　　336 U.S. 490 (1949)...................................................................................... 9

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
　　No. 12-4671 Dkt. #102 (2d. Cir. June 16, 2014)........................................ 25

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
　　No. 12-4671 Dkt. #157 (2d. Cir. Oct. 15, 2014) ................................... 15, 27

*Italian Colors Resturant et al. v. Harris*,
　　14-cv-00604 (E.D. Cal.) ............................................................................. 23

*Nat'l Ass'n of Tobacco Outlets v. City of Providence*,
　　731 F.3d 71 (1st Cir. 2013)......................................................................... 26

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
　　435 U.S. 679 (1978)..................................................................................... 26

*Nebbia v. New York*,
　　291 U.S. 502 (1934)..................................................................................... 26

*Rowell et al. v. Pettijohn*,
　　No. 14-cv-190 Dkt. #55 (W.D. Tex. Feb. 4, 2015) ............................... 22, 23

**Rules and Statutes**

15 U.S.C. § 1643(a) ........................................................................ 12

15 U.S.C. § 1666f(a)(2) ................................................................... 22

15 U.S.C. § 1666i............................................................................ 13

Cal. Civ. Code § 1748.1(a) (2014)................................................. 22

Colo. Rev. Stat. § 5-2-212 (2013)................................................. 22

Conn. Gen. Stat. § 42-133ff (2013) ............................................... 22

Credit Union Membership Access Act, P.L. 105-219, 112 Stat. 913 (Aug. 7, 1998) .............................................................................................. 1

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §1075, 124 Stat. 1375, 2068-2074 (2010)............................... 19

Fla. Stat. § 501.0117 ............................................................ *passim*

FRAP 29(c)(5).................................................................................. 1

Kan. Stat. Ann. § 16a-2-403 (2013)............................................... 22

Mass. Gen. Laws ch. 140D, § 28A(a)(1)-(2) (2013) ............................. 22

Me. Rev. Stat. 9-A, § 8-509 (2013) ............................................... 22

N.Y. Gen. Bus. Law § 518............................................................. 22

Okla. Stat. tit. 14A, § 2-211 (2013) .............................................. 22

P.R. Code Ann. tit. 10, §11 ........................................................... 22

Utah Code § 13-38-302) (2014)...................................................... 22

**Constitutional Amendments**

First Amendment.............................................................................. *passim*

**Other Authorities**

Consumers Federation of Australia, *Airlines Still Demand Mark Ups of Over 500% on Credit Card Surcharges* (Jan. 9, 2014), *available at* http://bit.ly/1Eis08a............................................................................... 29

John Dagge, *Excess Fees on Cards to Go*, Sunday Mail (Brisbane), July 8, 2012 .................................................................................................... 30

Richard A. Epstein, *The Regulation of Interchange Fees: Australian Fine-Tuning Gone Awry*, 2005 Colum. Bus. L. Rev. 551, 567 (2005) ............... 11, 13, 16

Fed. Deposit Ins. Corp., *Ten Things You Should Know About Debit, Credit, or Prepaid Cards*, *available at* http://1.usa.gov/1zV7zHM ................................... 12

Federal Reserve System, *Strategies for Improving the U.S. Payment System* 40-42 (2015) *available at* http://bit.ly/1BPupRk .................................................... 18

Federal Reserve System, *The 2010 Federal Reserve Payments Study* 9 (2011), *available at* http://bit.ly/1zV7ofA.............................................................. 12

Fla. H. Comm. on Commerce, HB 448 (1987) Staff Analysis (June 18, 1987) ...................................................................................................... 6, 21, 23

Adam J. Levitin, *Interchange Regulation: Implications for Credit Unions*, Filene Research Inst., at 39 (Nov. 2010), *available at* http://bit.ly/1Kdtkgb ... 17, 18

Timothy J. Muris, *Payment Card Regulation and the (Mis)Application of the Economics of Two-Sided Markets*, 2005 Colum. Bus. L. Rev. 515, 527 (2005) .................................................................................................... 18

Nat'l Conference of State Legislatures, *Credit or Debit Card Interest, Surcharges and Fees 2013 Legislation*, *available at* http://bit.ly/1wIRa6H .......... 22

New South Wales Office of Fair Trading, *Choice Report: Credit Card Surcharging in Australia*, 4, 14 *available at* http://bit.ly/1ACjSYt ................. 28, 29

iv

Reserve Bank of Australia, *A Variation to the Surcharging Standards: Final Reforms and Regulation Impact Statement* 1-3 (June 2012), *available at* http://bit.ly/1EeyO56 ................................................................................ 28

Allen Rosenfeld, *Point-of-Purchase Bank Card Surcharges: The Economic Impact on Consumers*, New Am. Found. 3 (May 2010), available at http://bit.ly/1K5a97Z .......................................................................... 14, 24

Marc Rysman & Julian Wright, *The Economics of Payment Cards* 13 (Nov. 29, 2012), *available at* http://bit.ly/1vYuKEw ...................................................... 28

Steven Semeraro, *The Antitrust Economics (and Law) of Surcharging Credit Card Transactions*, 14 Stan. J.L. Bus. & Fin. 343, 365 (2009) .............................. 25

Steven Semeraro, *The Economic Benefits of Credit Card Merchant Restraints: A Response to Adam Levitin*, 56 UCLA L. Rev. Disc. 25, 31 (2009) ....................................................................................................... 20

S. Rep. 97-23, at 4 (1981), *reprinted in* 1981 U.S.C.C.A.N. 74, 77 ..................... 24

Richard J. Sullivan, *Can Smart Cards Reduce Payments Fraud and Identity Theft?*, at 38 (2008), *available at* http://bit.ly/1vPIEcc .......................................... 12

U.S. Gov't Accountability Off., *Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* 6-7 (2009), *available at* http://1.usa.gov/1wQTiKS .................................................. 7, 16

Todd J. Zywicki et al., *Price Controls on Payment Card Interchange Fees: The U.S. Experience* 5 (George Mason Law and Econ. Working Paper No. 14-18) (2014), *available at* http://bit.ly/1DPw3pC ......................................... 19, 27

## STATEMENT OF *AMICUS CURIAE* INTERESTS

The Credit Union National Association ("CUNA")[1] is the largest organization representing America's credit unions.[2] CUNA advocates for credit unions before Congress, federal agencies, and the courts. In partnership with state associations like Florida's League of Southeastern Credit Unions, CUNA also provides support on state issues and sponsors training and education programs for credit union volunteers and staff.

Credit unions are not-for-profit financial cooperatives with the statutory mission of meeting the credit and savings needs of consumers, often in low-income, rural, or underserved populations. *See, e.g.*, Credit Union Membership Access Act, P.L. 105-219, 112 Stat. 913 (Aug. 7, 1998). "Credit unions, unlike many other participants in the financial services market, are exempt from Federal and most State taxes because they are member-owned, democratically operated, not-for-profit organizations generally managed by volunteer boards of directors and because they have the specified mission of meeting the credit and savings

---

[1] Counsel for CUNA has obtained consent from all parties to submit this *Amicus Curiae* brief in support of Appellee and Affirmance.

[2] In compliance with FRAP 29(c)(5), CUNA states: (A) this brief was authored entirely by counsel for CUNA and was not authored in any part by counsel for any party; (B) neither a party nor counsel for a party contributed any money intended to fund the preparation or submission of this brief; (C) no person or entity, other than CUNA, contributed any money intended to fund the preparation or submission of this brief.

1

needs of consumers, especially persons of modest means." *Id*. Credit unions reinvest their earnings in the consumers they serve in the form of better interest rates, lower minimum deposits, and lower fees.

Although there are approximately 4.9 million credit union memberships in Florida (and more than 102 million nationwide), credit unions are generally small and often struggle to compete with larger players in a fiercely competitive consumer financial services marketplace. The median size for a U.S. credit union is roughly $24 million in assets. By comparison, JPMorgan Chase had approximately $2.4 trillion in assets at the end of 2013.

To meet consumer expectations, credit unions offer many of the same financial products as commercial banks, including credit cards. Based on an analysis of credit union regulatory reports, as of September 2014, 126 of Florida's 156 credit unions have issued a total of nearly 1 million credit cards to their members. Consumer friendly and cost-effective card programs allow credit unions to compete with the largest financial institutions, and are vital for a credit union's ability to attract, serve, and retain members.

When a credit union member makes a purchase with a credit card, the merchant is paid almost immediately, and the credit union that issued the card, underwrote the loan for the purchase, guarantees the merchant payment, and is responsible for collecting from the borrower is compensated with a small

2

percentage of the transaction.  The fees constitute a merchant's share of the substantial costs associated with this convenient payment system, and as described in Section I(b), *infra*, help the credit union address the costs of maintaining a card program.  Credit cards also help support other programs that benefit consumers, including free checking accounts.  *See id*.

The outcome of this case could have negative consequences for CUNA-member credit unions.  If merchants are correct in their prediction that credit card transaction volume will decline if Florida's ban on surcharging is found unconstitutional, this will have a significant effect on the bottom-line for credit card issuing Florida credit unions.  As described below, the member-owners of Florida credit unions would suffer harm, both as consumers in the general marketplace and as owners of their credit unions.

## STATEMENT OF THE ISSUES

CUNA agrees with the statement of the issues in the Appellee's Answer Brief.

## SUMMARY OF ARGUMENT

Florida's law prohibiting merchants from "impos[ing] a surcharge," meaning "increas[ing] the charge to the buyer . . . for the privilege of using a credit card to make payment" is constitutional.  Fla. Stat. § 501.0117 (the "Florida Statute").

To support First Amendment and void for vagueness theories, Appellants and their *amici* make a variety of inventive arguments that attempt to tie the fees merchants pay for accepting credit cards to a supposed "speech code," perpetuated by the subject statute. As described below, these arguments are wrong in their policy conclusions, but critically, they do not advance the First Amendment and void for vagueness theories that are before this court.

Indeed, merchants' arguments actually highlight that the Florida Statute regulates *conduct*, not *speech*. Nothing about the Florida Statute prohibits merchants from doing anything at the point-of-sale (or anywhere else) in an attempt to persuade consumers to use cash instead of a credit card. If merchants were to offer consumers cash discounts, the statute does not restrict a merchant from posting a sign saying that credit card users will pay more. The Florida Statute also does not preclude merchants from asking Congress or the Florida Legislature to cap the fees merchants pay for credit card acceptance. In fact, merchants have repeatedly done exactly that in recent years, and have now developed this colorful theory in an effort to accomplish part of what they could not achieve in Washington and Tallahassee.

Merchants are wrong in their policy conclusions and the facts that surround them. Their arguments paint merchant acceptance of credit cards as something other than what it is: a voluntary decision to accept a private service that brings

4

tremendous value to a merchant. Credit cards provide the consumer a safe, efficient, convenient, seamless transaction that redounds to the benefit of merchants—the easier for a consumer to access funds at the point-of-sale, the more likely the consumer will spend more on the goods or services the merchant is offering. Credit cards open up new channels of distribution, like e-commerce, and lower employee costs through more efficient checkout. Meanwhile, card issuers like credit unions assume all of the risk and guarantee the merchant will receive payment immediately. The interchange component of the merchant discount fee is how issuers are appropriately compensated for providing this service.

Consumers, and society as a whole, benefit tremendously from these fees and the payment system they support. "Swipe fees" cover real costs for credit unions, making it possible to offer credit cards in the first place. Moreover, and critically, the maligned fees also allow credit unions and banks to bring more consumers at all income levels into the financial system through free checking and other programs. Data show it is cash customers who are outside the financial system who stand to lose the most from surcharging, far from the "wealth transfer" merchants contend is perpetuated by the Florida Statute.

Merchants also mischaracterize the Statute. The legislative history shows no desire by Florida lawmakers to curtail speech; rather, it demonstrates a Legislature focused on protecting consumers from "inflationary, discriminatory" practices that

5

"undermine Truth in Lending Laws, raise usury law issues, create confusion, and impede electronic payment systems." *See* Supplemental App. at 9, Fla. H. Comm. on Commerce, HB 448 (1987) Staff Analysis (June 18, 1987) ("House Staff Analysis").  Numerous laws that credit unions follow each day, like the Truth in Lending Act, Fair Debt Collection Practices Act, and antitrust laws, regulate similar commercial conduct without raising constitutional questions.  This law is no different.

Merchants also address experiences with surcharging elsewhere, focusing on Australia in particular.  However, merchants tell only part of the story, ignoring how the Australian government had to stop merchants from surcharging well above card acceptance costs, turning surcharges into a profit center.  And while merchants have promised that "retail prices would go down" with surcharging, Br. *Amici* Merchants 1, this is no certainty, as merchants have admitted elsewhere. The more likely outcome is that merchant profits would go up at the expense of consumers.

Florida's Statute has nothing to do with speech.  Appellants and their *amici* may believe that the law does not further consumer protection—but, of course, this is irrelevant for purposes of the rational basis standard before this court.  *See* Florida Br. 9; *see also*, *e.g.*, *FCC v. Beach Comm'n*, 508 U.S. 307, 313-314 (1993) ("The Constitution presumes that . . . even improvident decisions will eventually

6

be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."). Merchants' arguments are erroneous, but they illustrate that the Florida Statute regulates *conduct*, not *speech*. In any event, their arguments belong in Tallahassee, not here.

## BACKGROUND: THE ELECTRONIC PAYMENTS SYSTEM

The process of connecting a consumer's credit card with a merchant's bank involves a complicated web that has developed since the 1950s. Credit unions offer credit cards as part of contractual relationships with either Visa or MasterCard. In each transaction, there are a total of five parties: (1) the consumer; (2) the merchant; (3) the merchant's agent for processing credit card transactions (called the "acquirer"); (4) the consumer's financial institution (called the "issuer"); and (5) the network itself, Visa or MasterCard. Credit unions and other financial institutions that participate in the consumer financial services marketplace serve as issuers. *See* U.S. Gov't Accountability Off., *Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* 6-7 (2009), *available at* http://1.usa.gov/1wQTiKS.

A typical transaction works as follows. When a credit union member applies for a credit card, the credit union is responsible for underwriting the loan—that is, assessing the applicant's ability to repay credit card debt based on the member's

employment status, debt-to-income ratio, and payment history. Once issued a card, the logo tells the clerk which network will process the transaction. Once the card is swiped, a signal is sent to the merchant's acquirer. The acquirer signals the credit union that the member wants to make a credit card purchase. The credit union approves the transaction, assuming the purchase does not exceed the member's line of credit, and signals the merchant to consummate the sale. All of this happens in the span of seconds. *Id*. at 6-9.

Once the purchase is complete, the merchant sends a payment request to the acquirer, which again signals the credit union. The acquirer will forward to the merchant the purchase price for the goods or services less a discount fee. The discount fee typically includes a "switching" fee paid to the card network for processing the transaction, a payment to the acquirer, and an interchange fee to the credit union. The credit union's default interchange fee is generally established by the network. The total discount fee typically ranges from 1% to 3.5% of the purchase price. *Id*.

Although the merchant is paid almost immediately, credit cards generally have an interest-free grace period between the purchase of an item and the payment date. On or before the payment due date, the cardholder can decide to pay the charges in full, or extend all or a portion of the loan by paying an amount less than the full charge. *Id*. at 4.

As discussed below, this arrangement provides many benefits to merchants, including guarantees of timely payment, fraud protection, and the potential of increased sales volume.

## **ARGUMENT**

Because the Florida Statute regulates *conduct*—whether a merchant is permitted to "impose" an "additional amount . . . at the time of a sale or lease transaction"—this is not a free speech case at all.  Fla. Stat. § 501.0117; *See* Florida Br. 12-22.  "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct is in part initiated, evidenced, or carried out by means of language." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).  Rather, in holding that "the statute is within the Florida Legislature's broad discretion in regulating economic affairs," A-142 (D. Ct. Op. at 2), the District Court correctly found that the Florida Statute is rationally tailored to advance the interests of consumers.

Appellants and their *amici* spend substantial portions of their briefs describing the policy implications of the conduct the Florida Legislature has prohibited.  These arguments are inapposite, but in any event, also highlight that the Florida Statute regulates conduct, not speech, and is therefore constitutional.

9

## I. Merchant Credit Card Fees are No Different than Other Costs of Doing Business, and Should Not Be Directly Passed on to Consumers

Card acceptance fees represent the allocation of financial responsibility for the electronic payments system, a private market merchants have voluntarily decided to enter. Appellants and their *amici* like to describe these expenses as a "tax" on all consumers that supports only a few (Br. *Amici* Consumers 13), but this misses the point. These are costs of doing business. The situation here is no different than a grocer who pays for shopping carts only some customers might use, but passes along the expenses of the carts to all. A state would be within its right to pass a law prohibiting shopping cart rental fees. In any event, both merchants and consumers—all consumers—benefit in tangible ways from the decision by a merchant to accept credit cards.

### a. Merchants that Choose to Accept Credit Cards Derive Tremendous Value from the Privilege

The reasons merchants elect to accept credit cards are conveniently overlooked by Appellants and their *amici*, but they are numerous and much more closely tied with the day-to-day operation of the merchants' businesses—and their profits—than simply demand from consumers to pay with plastic. "[A]ll credit transactions fall within the domain of win-win transactions, where the only quarrel is over the size of the gain for each party. Nor could it be otherwise . . . any merchant could effortlessly decide to accept only cash, checks, or debit cards and

10

eliminate the other options." Richard A. Epstein, *The Regulation of Interchange Fees: Australian Fine-Tuning Gone Awry*, 2005 Colum. Bus. L. Rev. 551, 567 (2005). Because of lowered expenses and increased sales, it is easy to understand how merchants would conclude they are better off with credit cards than without.

With credit cards, online commerce is possible. Kiosks and unattended locations can accept payment, increasing distribution channels, lowering personnel costs, and allowing merchants to make things like gas pumps available late at night. Checkout lines are shorter because consumers do not need to hunt for cash, and cashiers do not need to make change. In our fast-paced society, this ensures customers do not walk out a merchant's door to avoid a wait, and ensures staff time can be focused on answering questions and providing customer service on the sales floor.

Cash carries with it risks and expenses that do not exist with credit cards. Things like armored cars and reconciling register drawers to prevent employee theft are not necessary with credit cards. Employee safety is improved by reducing a merchant's attractiveness for a robbery. Even cash itself isn't free; commercial banks frequently charge merchants fees for processing cash deposits.

Credit payment also offers merchants a guarantee against insufficient funds, providing merchants a particularly compelling value relative to checks. With credit cards, merchants receive guaranteed and almost immediate payment for all

authorized purchases, no matter whether the consumer ultimately pays the bill. Merchants also do not generally bear the risk of fraud. With checks, merchants retain those risks themselves. In 2009 the total value returned of checks was a staggering *$127 billion*. Federal Reserve System, *The 2010 Federal Reserve Payments Study* 9 (2011), *available at* http://bit.ly/1zV7ofA. Check fraud also costs merchants approximately $10 billion annually, as of 2006. Richard J. Sullivan, *Can Smart Cards Reduce Payments Fraud and Identity Theft?*, at 38 (2008), *available at* http://bit.ly/1vPIEcc. Avoiding these risks is possible for merchants because the card-issuing credit union assumes the credit risk for the transaction.

Merchants also benefit by making the entire transaction more secure, and thus more comfortable, for consumers. Issuer interchange fees support substantial theft, fraud, and loss protection tools, including chargeback and dispute resolution procedures that, by law, limit consumer liability to $50 (and for many issuers, $0). 15 U.S.C. § 1643(a). This is a particular benefit for consumers over debit cards, where after two business days, consumer liability rules vary from institution to institution. *See* Fed. Deposit Ins. Corp., *Ten Things You Should Know About Debit, Credit, or Prepaid Cards*, *available at* http://1.usa.gov/1zV7zHM. Even if a consumer is ultimately reimbursed for fraudulent transactions, using a debit card causes funds to be immediately withdrawn, meaning consumers could face a

completely depleted account—and overdraft fees—while the financial institution sorts out a fraudulent situation. *Id.* With many consumers keeping relatively large sums of money in linked savings accounts, it is not an exaggeration to say that a debit card in the wrong hands can put someone's life savings at stake. And these problems pale in comparison to the personal safety issues that come with carrying cash, where "what is gone is gone; there is simply no way to stop payment on this ultimate negotiable instrument." Epstein, 2005 Colum. Bus. L. Rev. at 572.

Credit cards also provide merchants additional protections from some consumer disputes. For example, under the Fair Credit Billing Act, a consumer has the right to sue an *issuer* in a dispute about the quality of the *merchant's* goods or services received, so long as the consumer has first attempted to resolve the dispute with the merchant. 15 U.S.C. § 1666i.

Merchants also benefit because credit cards—by definition—extend credit to consumers. Since bills and purchases can rarely be timed relative to payroll cycles, credit cards provide unsecured credit to allow consumers to prudently manage cash, and buy goods in stores, over time. Because of the "grace period" most issuers provide, credit card customers can avoid interest payments if their account is paid in full before the next billing cycle. This amounts to an interest-free loan that can last for more than a month, depending on the issuer and when purchases fall in relation to a consumer's billing statement. Issuers like credit unions face a

cost of funds to pay the merchant immediately and provide this grace period to consumers; in the aggregate, this can represent a substantial allocation of resources for the institution.

These myriad benefits are why so many merchants voluntarily accept credit cards, and pay the price of discount fees. Allowing merchants to surcharge would shift the cost of electronic payments, and the substantial benefits merchants receive, to consumers. Thus, economists argue that the problem with surcharging is that it does not reflect the realities of a transaction. Although it is taken as a given that merchants must increase prices because of card acceptance fees, when reduced labor and cash processing expenses, increased sales, and other efficiencies are taken into account, credit cards may be *cheaper* than other alternatives. Indeed, economists have indicated cards do not impose higher costs on merchants than cash when all benefits are considered. *See* Allen Rosenfeld, *Point-of-Purchase Bank Card Surcharges: The Economic Impact on Consumers*, New Am. Found. 3 (May 2010), *available at* http://bit.ly/1K5a97Z. "[T]he variable fees of card use are less than the variable costs of handling cash . . . empirical evidence shows [that] electronic payments are more cost-efficient than paper payments." *Id*. Thus, for many merchants in competitive markets, "the credit card price should be *less than, not higher than,* the cash price," even with acceptance fees. *Id*. "This would contradict the assumption that bank card use leads to higher retail prices,

14

thereby undermining the claims of retailers advocating for the right to add surcharge fees to posted retail prices." *Id.*

It is easy to imagine that surcharging could become an unearned profit center for merchants. As described in Part III, *infra*, sellers in places that permit credit-card surcharges have frequently recouped more than the cost of credit card acceptance. In fact, merchants' class counsel in another litigation hinted that increasing profit through surcharging is the ultimate objective, boasting to the Second Circuit that merchants could look forward to "increased revenues from the surcharges," but admitting that lowered posted retail prices are no guarantee—they "*may*" come "[i]n the long run." *See* Br. for Plaintiffs-Appellees 62, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 12-4671 Dkt. #157 (2d. Cir. Oct. 15, 2014).

Merchants have made clear they believe card acceptance fees are too high, but they have an absolute right to vote with their feet. Sellers always have a choice whether to accept credit cards. The reason why many merchants allow their customers to pay with credit is one of basic economics: they receive more benefit from accepting credit cards than the cost of acceptance. Thus, far from free speech, "[a] far simpler, albeit more cynical, interpretation of" the key issue here "is that merchants like to use credit cards, but, like the rest of humanity, would rather pay less for something from which they already derive net benefits."

15

Epstein, 2005 Colum. Bus. L. Rev. at 565. Without more, the desire to pay less for something does not give rise to an actionable First Amendment claim.

### b. Consumers, Especially Low-Income Cash Consumers, Benefit from Credit Card Transaction Fees

The payment system benefits more than just merchants. All consumers, even those who pay with cash, receive direct and indirect benefits from merchant credit card acceptance. But just as merchants will not participate in the payment system if their costs are too high, card issuers will not participate if they cannot cover their costs and receive a reasonable rate of return on their investment. It is that return, as described below, which generates benefits for consumers.

Maintaining and supporting the credit-payments system is not free. Write-offs for credit losses from delinquent or defaulting cardholders are the sole responsibility of the issuer. The bulk of fraud losses, and costs to resolve merchant data breaches, fall on the issuer as well. Each time a credit card is swiped, issuers also incur incremental costs for authorizing, clearing, and settling the transaction. Technology costs like hardware, software, cyber security, patent licensing, network processing fees, labor, and fraud detection software are also substantial expenses. Even seemingly simple things like card production, billing, and collection are necessary—and expensive—efforts. *See* U.S. Gov't Accountability Office, *supra*, at 27.

Of critical importance to small institutions like credit unions, "[p]ayment card issuance (particularly for credit) has economies of scale," involving "substantial fixed costs that are feasible only when defrayed over large account and transaction volumes."  Adam J. Levitin, *Interchange Regulation: Implications for Credit Unions*, Filene Research Inst., at 39 (Nov. 2010), *available at* http://bit.ly/1Kdtkgb.  Given credit unions do not have a large pool of consumers from which to develop scale, getting credit union members to use their cards, and use them often, is the way to make a credit card program financially viable. *Id.*

If forced to accept the lower transaction volume that merchants suggest would occur from surcharging (*see* Appellant Br. 9-10; Br. *Amici* Merchants 1), many credit unions and other smaller institutions would re-evaluate their credit offerings, and possibly exit the market. This would result in consumers having fewer credit cards from which to choose, forcing them to rely on only a handful of large issuers for credit cards.  In other words, the market would become *less*, not *more*, competitive—exactly the opposite result merchants promise this court.

This would harm consumers in a variety of ways.  Competition among issuers often lowers the costs consumers face to secure a credit card, for example, through no-annual fee cards.  It encourages issuers to make more cards available to more consumers which, as former FTC Chairman Tim Muris notes, keeps "fewer consumers who cannot obtain unsecured credit through credit cards" from having

17

"to rely on pawn shops and payday lenders."  Timothy J. Muris, *Payment Card Regulation and the (Mis)Application of the Economics of Two-Sided Markets*, 2005 Colum. Bus. L. Rev. 515, 527 (2005).  Competition at the issuer level helps merchants, too, since as more credit cards are available to more consumers, the easier it is for merchants to enjoy the benefits described above.  And as technology continues to develop, competition promotes innovation which has the potential to make credit cards obsolete in the not-so-distant future.  *See, e.g.*, Federal Reserve System, *Strategies for Improving the U.S. Payment System* 40-42 (2015) (discussing potential advantages and concerns of four possible design options for faster, real-time payments), *available at* http://bit.ly/1BPupRk.

Less obvious, but more important to society, interchange is used to make basic financial services possible for millions of consumers, particularly those at the lowest income levels.   For basic consumer financial products "to work economically, it requires that the revenue-generating parts of the bundle"—especially interchange—"subsidize the other parts of the bundle," like checking and savings accounts.  Levitin, *supra*, at 36.  As interchange income drops, bank and credit union supervisors will expect institutions to replace the lost revenue. With limited opportunities to generate income, especially in today's low-rate environment, financial institutions must look to higher fees, higher minimum account levels, and reduced services for consumers to close the gap.  *Id*. at 35-37.

18

This limits access to traditional financial services for those that need it most. Thus, far from an "invisible subsidy from low-income cash consumers to high-income credit consumers," Appellant Br. 15, "swipe fees" actually *accomplish the reverse*: more low-income consumers can have access to basic financial services due to credit cards.

Recent data support this conclusion. After the full implementation of the "Durbin Amendment," which capped debit interchange fees for larger financial institutions and which merchants successfully persuaded Congress to include in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §1075, 124 Stat. 1375, 2068-2074 (2010), annual revenues from interchange fees dropped by between $6.6 billion and $8 billion. Todd J. Zywicki et al., *Price Controls on Payment Card Interchange Fees: The U.S. Experience* 5 (George Mason Law and Econ. Working Paper No. 14-18) (2014), *available at* http://bit.ly/1DPw3pC. In turn, the total number of banks offering free checking accounts *fell by 50%* between 2009 and 2013, and the minimum monthly balance for a free account increased from around $250 to over $750. *Id*. at 7, 10. Monthly fees for non-free accounts *doubled* between 2009 and 2013, from around $6 to more than $12. *Id*. at 6. Fee increases and loss of access to free checking have, according to economists, contributed to an increase in the unbanked population by approximately *1 million people*, mostly low-income families. *Id*. at 14-15 & n.42.

19

On the other hand, over the same period, no-fee banking actually increased at smaller institutions able to maintain consistent interchange income because they are not subject to the capped fees. *Id*. at 11.

All of this may raise more public policy questions than answers, such as: "Would social welfare increase if consumers substituted other forms of consumer lending, such as pay-day loans, for credit card lending? Would currently unbanked consumers benefit more from (1) the lower retail prices that might follow reduced card acceptance fees, or (2) an entree into the banking system and credit cards of their own?" Steven Semeraro, *The Economic Benefits of Credit Card Merchant Restraints: A Response to Adam Levitin*, 56 UCLA L. Rev. Disc. 25, 31 (2009). Appellants and their *amici* may not see eye-to-eye with credit unions on the answers to those questions, but their mere existence demonstrates this is an area for the Legislature, not the courts.

## II. The Surcharge Ban is a Lawful Exercise in the Legislature's Interest in Protecting Florida Consumers

As much as merchants insist that the Statute imposes a "speech code," (Appellant Br. 8, 12, 16; Br. *Amici* Consumers 2), the Statute regulates only how merchants may price the goods or services they sell. That is conduct regulation in its purest form. Thus, in holding that "the statute is within the Florida Legislature's broad discretion in regulating economic affairs," A-142 (D. Ct. Op. at 2), the District Court correctly found that the Florida Statute is rationally tailored

to advance the interests of consumers and is an appropriate exercise of the Legislature's power to regulate commerce.

An examination of the statute and its legislative history confirms this conclusion.  When debated in the Legislature, consumer advocates and other proponents argued a surcharge ban would protect consumers from "inflationary, discriminatory" practices that "undermine Truth in Lending Laws, raise usury law issues, create confusion, and impede electronic payment systems."  *See* Supp. Appendix at 8 (House Staff Analysis, quoting Florida Consumers Federation).  The House Staff Analysis notes that the Surcharge Ban was enacted at a time *after* merchants were already authorized to offer unlimited discounts to cash customers, a practice which began in Florida in 1981.  *Id*. at 6.  Thus, the legislature was well aware of the way in which it was regulating pricing: "The 'regular' or advertised price would be the amount in which persons electing to use credit cards would pay." *Id*.

Then, as now, the retail industry was "opposed to the legislation."  *Id*. at 8. Offering arguments that sound of one of the merchant briefs in this case, retailers told Florida lawmakers a surcharge ban "is both unnecessary and contrary to the best interests of consumers," that "cash customers will have to subsidize purchasers who utilize credit cards," and that a surcharge ban  would only "benefit[] a few large out-of-state credit card issuers."  *Id*. at 8-9.  The Legislature

21

disagreed; the Florida Senate passed the bill unanimously, and the bill was approved in the House by a vote of 67-49.  *Id.* at 9.

Florida is hardly an outlier; its law tracks a twice-approved section of a federal consumer protection statute, the Truth in Lending Act, which prohibited merchants from surcharging credit transactions until Congress allowed that section to expire in 1984.  *Id.* at 6; *see also* 15 U.S.C. § 1666f(a)(2) (1983).  Today, a total of 11 states and Puerto Rico, representing approximately 40% of the American population, ban the practice.[3]  It is an issue that remains hotly debated in state capitals; a total of 27 states considered surcharging during the 2013-2014 legislative session, with Utah enacting a ban for the first time.  *See* Nat'l Conference of State Legislatures, *Credit or Debit Card Interest, Surcharges and Fees 2013 Legislation*, *available at* http://bit.ly/1wIRa6H. Florida is also not unique in facing a Constitutional challenge to its statute; the same counsel representing appellants here are advancing similar First Amendment challenges to statutes in Texas, where the District Court dismissed the case (*Rowell et al. v. Pettijohn*, No. 14-cv-190 Dkt. #55 (W.D. Tex. Feb. 4, 2015) (Order Granting Mot.

---

[3] *See* California (Cal. Civ. Code § 1748.1(a) (2014)); Colorado (Colo. Rev. Stat. § 5-2-212 (2013)); Connecticut (Conn. Gen. Stat. § 42-133ff (2013)); Kansas (Kan. Stat. Ann. § 16a-2-403 (2013)); Massachusetts (Mass. Gen. Laws ch. 140D, § 28A(a)(1)-(2) (2013)); Maine (Me. Rev. Stat. 9-A, § 8-509 (2013)); New York (N.Y. Gen. Bus. Law § 518); Oklahoma (Okla. Stat. tit. 14A, § 2-211 (2013)); Puerto Rico (P.R. Code Ann. tit. 10, §11); Texas (Tex. Fin. Code Ann. § 339.001 (2013)); and Utah (Utah Code § 13-38-302) (2014).

to Dismiss)), New York, where the state's appeal has been fully briefed and awaits argument in the Second Circuit (*Expressions Hair Design v. Schneiderman*, No. 13-4533, 13-4537 (2d. Cir.)), and in California, where cross-motions for summary judgment are pending (*Italian Colors Resturant et al. v. Harris*, 14-cv-00604 (E.D. Cal.)).

In banning surcharging but allowing cash discounts, the Legislature has mandated pricing be standardized so that "[t]he 'regular' or advertised price would be the amount in which persons electing to use credit cards would pay." House Staff Analysis, Supp. Appendix at 6. Put another way, as the Western District of Texas found when it confronted that state's nearly identical statute, banning surcharging "effectively sets the maximum price for credit-card purchases as the posted price." *Rowell*, No. 14-cv-00190, Dkt. No. 55, at 7 (W.D. Tex.). This gives consumers the ability to accurately comparison shop online or through circulars before they ever enter a store, because "the only possible difference is that the ultimate price of an item may be less, should a merchant determine to offer a cash discount. In no event, however, will the price for an item be more than the posted price." *Id*.

This furthers Florida's efforts to protect consumers. As the District Court noted, the "prohibited practice of initially communicating only the lower price—the cash price—entails at least a small measure of bait and switch." A-143 (D. Ct.

Op. at 3). This is especially true for consumers that are attempting to comparison shop online or through merchant advertising. The Senate Report accompanying a 1981 renewal of the nearly identical federal surcharging ban noted the risk consumers would "be lured into an establishment on the basis of the 'low, rockbottom price' only to find at the cash register that the price will be higher if a credit card is used," a practice which could "deceive or mislead the consumer." S. Rep. 97-23, at 4 (1981), *reprinted in* 1981 U.S.C.C.A.N. 74, 77. As the District Court correctly found, "[r]equiring prices to be listed in the same way, thus allowing consumers to make quicker and more accurate comparisons, is a legitimate legislative purpose." A-144 (D. Ct. Op. at 4).

While of course consumers should exercise due diligence when they shop, it is easy to imagine someone missing a posted sign announcing that a surcharge will be imposed, and arriving at the checkout counter surprised. In that circumstance, the consumer could be "caught off-guard and trapped at the checkout counter when trying to complete their purchase." Rosenfeld, *supra*, at 6. If the store clerk does not mention the surcharge specifically, the consumer might never realize this avoidable charge even occurred. The statute avoids this possibility, because the price only has the possibility of going *down* at the register with a merchant cash discount, rather than up with a surcharge. As the District Court found, "ensuring

that the customer knows the facts before initially deciding to make the purchase is a legitimate legislative goal." A-143 (D. Ct. Op. at 3).

Moreover, basic laws of competition say that the merchants that elect to surcharge are likely to be the ones with whom consumers most need to do business. As merchants confessed in the antitrust case that, when it settled, removed surcharge bans from network agreements, many "merchants operate in industries that are so competitive that surcharging is highly unlikely." Merchant Appellants' Joint Brief 55, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.,* No. 12-4671 Dkt. #102 (2d. Cir. June 16, 2014). "Merchants with market power, by contrast, could institute surcharges, but would be unlikely to channel all of the savings to their customers." Steven Semeraro, *The Antitrust Economics (and Law) of Surcharging Credit Card Transactions*, 14 Stan. J.L. Bus. & Fin. 343, 365 (2009). Moreover, for certain types of transactions, it is almost essential that a consumer pay with a credit card. For example, using a debit card to rent a car or check into a hotel is not realistic because of the large transaction holds placed on the account, which may exceed available funds. In situations where consumers "must use a credit card for a particular transaction," surcharging would allow merchants to "exact greater profits from those consumers . . . effectively leveraging the card system market power for their own benefit." *Id.* This is a decidedly anti-consumer result.

Given the very real consumer issues at play, should the Florida Statute infringe on merchants' free speech, it would call into question numerous laws that regulate how financial institutions communicate to their customers.  The Truth in Lending Act restricts how a lender can describe its interest rates, while the Fair Debt Collection Practices Act controls how a creditor can present its claim for repayment.   A whole host of statutes impose similar restrictions on the relationships between businesses and their customers; many plainly implicate communications, unlike the statute here.  *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978) (antitrust laws may prohibit price fixing even though such laws necessarily "abridge[] the freedom of businessmen to talk to one another about prices.").  These restrictions do not pose a First Amendment concern because state has "broad authority to regulate economic conduct" pursuant to the police power, including "the prices to be charged for [] products."  *Nebbia v. New York*, 291 U.S. 502, 537 (1934).  A price is not protected speech.  *See Nat'l Ass'n of Tobacco Outlets v. City of Providence*, 731 F.3d 71, 77 (1st Cir. 2013).

### III.   Allowing Surcharging is Unlikely to Produce Lower Prices or Other Benefits for Consumers, as Confirmed by Recent Experience in the United States and Australia

While accomplishing nothing to further free expression, overturning the District Court's decision would likely give merchants an unjustified windfall at the expense of Florida consumers.  With no requirement that merchants pass any

revenue from surcharging along to consumers, reversing the District Court would likely give merchants a new unearned profit center.

No one can blame merchants for trying to increase their profit. One of the primary arguments advanced for striking down Florida's surcharging ban, however, is that it will result in lower retail prices. *See* Br. *Amici* Merchants 1 (with surcharging, "retail prices would go down"); Br. *Amici* Consumers 19 (surcharging would result in "lower retail prices"). Yet, lawyers representing a class of merchants told the Second Circuit in another litigation that merchants look forward to "increased revenues from the surcharges," and confessed that lower posted retail prices are no guarantee—they "*may*" come "[i]n the long run." Br. for Plaintiffs-Appellees 62, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.,* No. 12-4671 Dkt. #157 (2d. Cir. Oct. 15, 2014).

Indeed, the Durbin Amendment shows that consumers may never see the benefit of giving merchants the right to surcharge. Large merchants have seen significant cost reductions since debit interchange was capped as part of Dodd-Frank; annual bank revenues from interchange fees dropped by between $6.6 billion and $8 billion. Zywicki, *supra*, at 5. Yet, "to date there is no evidence that those cost savings have been passed-through to consumers . . . while consumers have seen large and immediate increases in the cost of bank accounts, to date there is no evidence of reduced prices at the pump or checkout." *Id*.; *see also* Part I(b),

27

*supra*.  Economists estimate "that as a result of the Durbin Amendment, there will be a transfer of $1 billion to $3 billion annually from low-income households to large retailers and their shareholders."  *Id*. at 1.

This result is unfortunately consistent with other countries that have allowed surcharges, where merchants have boosted their profits at the expense of consumers.  In June 2003, the Reserve Bank of Australia allowed surcharging for the first time.  Just nine years later, in the face of anti-consumer market conditions, Australian regulators scaled back these reforms.  Reserve Bank of Australia, *A Variation to the Surcharging Standards: Final Reforms and Regulation Impact Statement* 1-3 (June 2012), *available at* http://bit.ly/1EeyO56.  Australia initially allowed merchants to impose any surcharge, expecting market conditions to impose a natural check on merchants.  *Id*. at 2.  Instead, merchants imposed surcharges "well in excess of acceptance costs."  *Id*. at 4.  The average credit-card surcharge in Australia rose to "around twice [the amount] of the merchant fee."  Marc Rysman & Julian Wright, *The Economics of Payment Cards* 13 (Nov. 29, 2012), *available at* http://bit.ly/1vYuKEw.  Costs were highest for industries where consumers are likely to need to pay with a card, such as airlines, telecommunications, utilities, taxis and gasoline.  New South Wales Office of Fair Trading, *Choice Report: Credit Card Surcharging in Australia*, 4, 14 *available at* http://bit.ly/1ACjSYt.  The 2012 revisions to the surcharging rules force merchants

to tie surcharges to the cost of acceptance, as is true under current card network rules in the United States.  However, two years after the changes, a 2014 study found that consumers flying Qantas from Sydney to Melbourne *still* pay an astounding *523% more* than the average surcharge—an obvious windfall for the airline.  Consumers Federation of Australia, *Airlines Still Demand Mark Ups of Over 500% on Credit Card Surcharges* (Jan. 9, 2014), *available at* http://bit.ly/1Eis08a.

Moreover, far from convincing consumers to use cash, surcharges are allowing merchants to reap the benefits of credit and pocket the difference.  A recent survey showed 64% of consumers report paying a surcharge when presented with one.  New South Wales Office of Fair Trading, *supra*, at 4, 14.  "[T]his may reflect customers' lack of another option at point of sale, particularly for sectors where credit card payments are the norm.  At other times, inadequate fee disclosure by merchants means consumers aren't aware of the fee until it's too late." *Id*.  A survey in 2013 found that close to half of Australians who reported paying a credit card surcharge say they were not offered or made aware of an alternative, surcharge-free payment method.  Consumers Federation of Australia, *supra*.

Meanwhile, consumers did not see the benefits in the form of lower prices.  The Reserve Bank of Australia found that on an inflation adjusted basis, retail prices remained essentially flat.  *See* New South Wales Office of Fair Trading,

*supra*, at 7 (noting that "[w]ith underlying inflation running at around 2.5% . . . a 0.2% reduction" in retail prices "is not observable").  Consumer groups say that Australian merchants have received "an annual $700 million windfall" from credit-card surcharges.  John Dagge, *Excess Fees on Cards to Go*, Sunday Mail (Brisbane), July 8, 2012.  In short, with surcharging, the risks of sellers extracting more than necessary to cover their card acceptance costs are high, in order to achieve consumer benefits that are uncertain at best.  This comes at the expense of the strong consumer protection concerns the Florida Legislature addressed through its surcharging ban.

## **CONCLUSION**

The Florida Statute is a lawful exercise in the Legislature's legitimate interest in consumer protection, and it should be upheld.

March 5, 2015                            Respectfully submitted,

/s/  Richard R. Cook
RICHARD R. COOK
CREDIT UNION NATIONAL ASSOCIATION
601 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 508-6734
rcook@cuna.coop

31

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rules 29(d) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I certify that this brief contains no more than 7,000 words.  Based on the word count of the word processing system used to prepare this Brief, the word count, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), is <u>6,984</u>.

I also certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced font that includes serifs using Microsoft Word 2010 in 14 point Times New Roman font.

/s/  Richard R. Cook

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2015, 7 copies of the brief were dispatched for delivery to the Clerk's Office of the United States Court of Appeals for the Eleventh Circuit by third-party commercial carrier for overnight delivery at the following address:

John Ley, Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

On this same date, a copy of the brief was served on all counsel of record by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

/s/  Richard R. Cook