No. 14-14426

# In the United States Court of Appeals for the Eleventh Circuit

_____

DANA'S RAILROAD SUPPLY; DANA JACKSON; TM JEWELRY LLC;
TIFFANY BALLARD; TALLAHASSEE DISCOUNT FURNITURE; DUANA PALMER;
COOK'S SPORTLAND; and ERIC COOK,
*Plaintiffs-Appellants,*

v.

PAMELA JO BONDI,
in her official capacity as Attorney General of the State of Florida,
*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Northern District of Florida

_____

## PLAINTIFFS-APPELLANTS' REPLY BRIEF
_____

Gary B. Friedman
Rebecca Quinn
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

Deepak Gupta
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptabeck.com*

David Frank
FRIEDMAN, FRANK & ABRAHAMSEN
524 E. College Avenue
Tallahassee, FL 32301
(850) 224-4357

*Attorneys for Plaintiffs-Appellants Dana's Railroad Supply, et al.*

# **TABLE OF CONTENTS**

Table of authorities ................................................................................ ii

Reply brief .......................................................................................... 1

    I.   Florida's no-surcharge law makes liability turn on "semantics, not economics," and thus regulates speech, not conduct. .............................. 1

        A.   The law does not regulate *any* conduct. ...................................... 1

        B.   The Attorney General cannot save the law from scrutiny by comparing it to different laws that do not make liability turn on the label a merchant uses to describe lawful conduct. .... 8

    II.   Because Florida's no-surcharge law restricts speech, it is subject to heightened scrutiny, which it cannot withstand. .................................... 17

        A.   Dual pricing is legal conduct. ...................................... 17

        B.   The state's consumer-protection interest is wholly unsubstantiated, and at odds with the statute's history. ............. 19

        C.   The state fails to show that the statute is no more extensive than necessary to directly advance an interest in consumer protection. .............................................................................. 21

Conclusion .......................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ........................................................................... 24

*Bankshot Billiards, Inc. v. City of Ocala,*
    634 F.3d 1340 (11th Cir. 2011).......................................................... 25

*BellSouth v. Farris,*
    542 F.3d 499 (6th Cir. 2008).......................................................*passim*

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,*
    447 U.S. 557 (1980) ............................................................... 9, 10, 20, 21

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) ........................................................................... 23

*Expressions Hair Design v. Schneiderman,*
    975 F. Supp. 2d 430 (S.D.N.Y. 2013) ..........................................*passim*

*FEC v. Massachusetts Citizens for Life, Inc.,*
    479 U.S. 238 (1986) ............................................................................. 5

*Ford Motor Co. v. Texas Department of Transportation,*
    264 F.3d 493 (5th Cir. 2001).................................................... 9, 10, 18

*Glickman v. Wileman Brothers & Elliott, Inc.,*
    521 U.S. 457 (1997) .................................................................... 10, 11

*Gould. v. The Florida Bar,*
    259 F. App'x 208 (11th Cir. 2007) .................................................... 18

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation,*
    986 F. Supp. 2d 207, 2013 WL 6510737 (E.D.N.Y. 2013) .......... 20, 27

*In re R.M.J.,*
    455 U.S. 191 (1982) .................................................................... 18, 22

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007) ........................................................................... 15

*Mason v. Florida Bar*,
208 F.3d 952 (11th Cir. 2000) .................................................................. 20, 21

*McCullen v. Coakley*,
— U.S. —, 134 S. Ct. 2518 (2014) ........................................................ 6

*Motor Vehicle Manufacturers Association of the United States v. Abrams*,
684 F. Supp. 804 (S.D.N.Y. 1988) ........................................................ 18

*National Association of Tobacco Outlets, Inc. v. City of New York*,
27 F. Supp. 3d 415 (S.D.N.Y. 2014) ..................................................... 13

*National Association of Tobacco Outlets, Inc. v. City of Providence*,
731 F.3d 71 (1st Cir. 2013) ..................................................................... 12

*People v. Fulvio*,
517 N.Y.S.2d 1008 (N.Y. Crim. Ct. 1987) .............................. 4, 26, 27

*Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*,
413 U.S. 376 (1973) ................................................................................ 18

*Sorrell v. IMS Health Inc.*,
131 S. Ct. 2653 (2011) ...................................................................... 5, 21

*This That And The Other Gift And Tobacco, Inc. v. Cobb County, Ga.*,
439 F.3d 1275 (11th Cir. 2006) ............................................................. 21

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) ................................................................................ 11

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ................................................................................ 4

## Legislative Materials

*Cash Discount Act, 1981: Hearings on S. 414 Before the Senate Banking Comm.*,
97th Cong., 1st Sess. 98 (Feb. 18, 1981) ............................................. 7

Fla. Stat. § 215.322(5) .............................................................................. 23

Fla. Stat. § 501.0117(1) ................................................................ 1, 2, 3, 9

Fla. Stat. § 501.201 .................................................................................. 22

Minn. Stat. § 325G.051(1)(a) .................................................................. 22

**Books and Articles**

Jedediah Purdy, *The Roberts Court v. America*, Democracy, Winter 2012 .................. 16

Tim Wu, *The Right to Evade Regulation*, The New Republic, June 3, 2013 .............. 16

# REPLY BRIEF

## I. Florida's no-surcharge law makes liability turn on "semantics, not economics," and thus regulates speech, not conduct.

### A. The law does not regulate *any* conduct.

The Attorney General stakes her defense of Florida's no-surcharge law almost entirely on her argument (at 2) that it is a "straightforward, unambiguous economic regulation" that does not regulate speech—the very opposite of the district court's recognition that the law turns on "semantics, not economics" (a recognition that the Attorney General never once mentions). A-142. The Attorney General bases this argument on her repeated claim that the law prevents merchants from charging consumers "any additional amount . . . at the time of a sale" for using a credit card. Fla. Stat. § 501.0117(1); *see, e.g.*, AG Br. 12.

But the no-surcharge law does not prohibit that conduct, nor does it "govern what prices merchants may charge." AG Br. 10. To the contrary, as the district court correctly observed, the law expressly "allows a merchant to exact a higher price" (set at whatever amount the merchant wishes) "from a customer who pays with a credit card than from a customer who pays with cash"—but only if the difference between the two prices is framed as a "discount" rather than a "surcharge." A-141. Liability, in other words, turns on speech, not conduct.

To see why, consider the question we posed to the Attorney General in our opening brief (at 52): A merchant wants to charge two different prices for a product

1

depending on how the customer pays: $100 for cash, $102 for credit. How is the merchant supposed to comply with the no-surcharge law? Despite being directly asked this question (in a case raising a vagueness challenge, no less), the Attorney General refuses to give a direct answer.

That's because any answer would reveal that the law regulates speech. Here's one: The merchant may say that the product costs $102 (for example, by listing that amount on the label) and put up a sign offering a $2 "discount" to anyone who pays with cash. But the merchant may not say that the product costs $100 (by listing that amount on the label) and put up a sign informing customers that there is a $2 surcharge for paying with a credit card. In both circumstances—the lawful and the criminal—the merchant imposes the same "additional amount" on customers for using a credit card ($102 as opposed to $100). Fla. Stat. § 501.0117(1). And in both circumstances that amount is truthfully and prominently communicated to customers ahead of time. The only difference is *how* it is communicated—that is, which of the two prices the merchant chooses to frame as the "regular" price on the label, and which the merchant chooses to convey through a separate sign. Put another way, the law does not regulate the setting of prices by merchants, but kicks in only *after* they have been set, by demanding one way of framing them over another.

The Attorney General in fact concedes as much. She admits (at 5) that "[u]nder the law, a retailer may, for example, price a loaf of bread at $1.00 and

charge customers 95 cents if they pay in cash; but the retailer may not use a 95-cent label on the shelf and charge credit card users a dollar at the register," even if the retailer prominently discloses the additional amount beforehand. But here, too, the only difference is the merchant's speech—what it puts on the "label"—not the charge it imposes at the register. *See also* A-143 ("Under § 510.0117, the merchant must *list the price* as $100, and the merchant can simultaneously note the 5% discount for cash. The merchant cannot *list the price* as $95, with a $5 surcharge for paying with a credit card." (emphasis added)). A non-complying merchant can bring itself into compliance simply by changing the way that it frames or communicates its prices to customers, without changing the prices themselves. As the district court explained, that is indeed "a matter of semantics, not economics." A-142.

The court was not alone in that insight. District Judge Jed S. Rakoff concluded that New York's identical law "plainly regulates speech" because it "draws the line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities." *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430, 444 (S.D.N.Y. 2013). And another court, in the earliest reported prosecution under a no-surcharge law, likewise understood that "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior, depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *People v. Fulvio*, 517 N.Y.S.2d

1008, 1010, 1014 (N.Y. Crim. Ct. 1987). Although these courts disagreed as to the constitutional consequences of this recognition, they all understood that the law turns on semantics—and semantics only.

The Attorney General's position is squarely at odds with this shared understanding. Yet she never acknowledges this fact: She never mentions the district court's recognition, never grapples with *Expressions*, and never cites *Fulvio*. Instead, she asks this Court to shield the law from scrutiny (which it cannot withstand) because it "does not prohibit anyone from expressing any view about the cost of credit or any other subject" in conversations with customers, but covers only the "label" that merchants use to convey their prices. AG Br. 5, 10.

That is no defense to a First Amendment challenge. Even assuming that Florida's law were so limited (and how is a merchant to know, when New York's law isn't?), the problem for the Attorney General is that the First Amendment protects more than just conversations. The way in which a merchant chooses to communicate price information to consumers—on labels, signs, advertisements, and the like—*is itself speech*. And it's not just any speech, but speech at the heart of the commercial-speech doctrine. *See Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976) (holding that speech conveying "price information" to consumers is "protected by the First Amendment"). As Judge Rakoff put it: "Pricing is a routine subject of economic regulation, but the manner in which price information is

conveyed to buyers is quintessentially expressive, and therefore protected by the First Amendment." *Expressions*, 975 F. Supp. 2d at 445. The Attorney General has no response to this fundamental point, except to quietly concede it in a footnote. *See* AG Br. 20 n.6 ("If a company may legally charge a price, the First Amendment limits how a state may regulate advertising"—and surely any other truthful, non-misleading communication—"*about* that price; whether a state may regulate pricing itself is a different question.").

Nor does the Attorney General have a response to the Supreme Court's holding in *Sorrell v. IMS Health*—that any law that has the "purpose and practical effect" of banning a disfavored way of truthfully describing lawful conduct is a content-based speech restriction that is subject to "heightened scrutiny" and "presumptively invalid," no matter what the law says "on its face." 131 S. Ct. 2653, 2663-64, 2667 (2011); *see also FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255 (1986) ("The fact that [a] statute's practical effect may be to discourage protected speech is sufficient to characterize [it] as an infringement on First Amendment activities."). Indeed, the very case the Attorney General relies on to try to overcome *Sorrell* (at 30–32) itself held a law "subject to First Amendment scrutiny" because it

5

had the practical effect of restricting speech, "even though the Act says nothing about speech on its face." *McCullen v. Coakley*, — U.S. —, 134 S. Ct. 2518, 2529 (2014).[1]

The Attorney General suggests (at 6) that the no-surcharge law's practical effect is only to ensure that a merchant does not "deceive or mislead" consumers by "lur[ing]" them in with a false message, but the law obviously sweeps far broader than disclosure. Indeed, as explained in Part II.C, the sole "practical effect" of the no-surcharge law is to ban *truthful, non-misleading* surcharges. That is the work it does in the real world, as the experience of merchants who were targeted for violating an identical law illustrates. *See, e.g.* A-105–08 ("[The Assistant Attorney General] gave me a script of what I could tell customers when talking to them over the phone.").

And what of the law's purpose? Our opening brief (at 12–15) traced the history of no-surcharge laws and demonstrated that everyone understood they are aimed at speech. Those opposed to the laws, like the Reagan Administration and all major consumer-advocacy groups, recognized that the difference between surcharges and discounts "is merely one of semantics, and not of substance." *Cash Discount Act, 1981: Hearings on S. 414 Before the Senate Banking Comm.*, 97th Cong., 1st Sess. 98 (Feb. 18,

---

[1] Citing *Coakley*, the Attorney General argues (at 30–32) that "if the Surcharge Statute were a speech regulation, it would be a content-neutral regulation." That argument is mystifying. *Coakley* involved a time, place, or manner restriction—a buffer zone outside abortion clinics. *See* 134 S. Ct. at 2531. The Court held that the law was not content-based because whether people "violate the Act depends not on what they say, but simply on where they say it." *Id.* (citation omitted).

1981). But "the semantic differences are significant," one advocate explained, because "the term 'surcharge' makes credit card customers particularly aware that they are paying an extra charge," whereas "the discount system suggests that consumers are getting a bargain, and downplays the truth." *Id.* Those in favor of the laws (the credit-card companies and big banks) understood this as well, and supported them for that very reason. One banking lobbyist testified that a surcharge "makes a negative statement about the card to the consumer" and complained that "the card issuer's ability to create a favorable image for its product will be directly burdened by that negative image." *Id.* at 32, 37. Another put it more succinctly: Surcharges, he said, "talk against the credit industry." *Id.* at 60.

The Attorney General attempts to dismiss this history (at 30–31) as just standard industry lobbying, and because it was not the "express purpose" of Florida's specific law. But that misses the point: The constitutional problem with the no-surcharge law isn't that it helps credit-card companies; it's that it does so by imposing their preferred *speech code*, which all sides understood was its primary purpose.

Ignoring that purpose, the Attorney General seizes on what she claims (at 35–36) is the law's real justification: consumer protection. She describes this interest by resort to various possibilities—"[t]he possibility that consumers would be subject to a bait-and-switch tactic and would be lured by a 'low, rock- bottom price' only to be charged an inflated price at the register"; the possibility of "consumer confusion,

hampering buyers' ability to comparison shop"; and the possibility that merchants will use surcharges "in a misleading way." We will say more about this justification in Part II, but for now it is enough to note that each is about *speech*, not conduct. As Judge Sutton has explained, something "cannot simultaneously be non-communicative" and "yet pose the risk of *communicating* a misleading message." *BellSouth v. Farris*, 542 F.3d 499, 510 (6th Cir. 2008). So even though the parties may dispute the law's true purpose—whether the law is an industry speech code, as everyone understood at the time, or just seeks to prevent false and deceptive advertising, as the Attorney General posits in this litigation—there is no dispute that the purpose is to regulate speech of some kind. And thus there should be no dispute that the law must satisfy First Amendment scrutiny.

### B. The Attorney General cannot save the law from scrutiny by comparing it to different laws that do not make liability turn on the label a merchant uses to describe lawful conduct.

Because the law cannot survive scrutiny, the Attorney General spends most of her brief resisting it. But rather than confront the purpose or practical effect of the no-surcharge law, she relies on cases and hypotheticals about entirely different laws—none of which makes liability turn on labeling or otherwise has the purpose or practical effect of regulating semantics.

Take the minimum-wage law. *See* AG Br. 19. That law regulates conduct because it prohibits employers from paying employees less money. The no-surcharge

law, by contrast, does not regulate what anyone pays for credit. It permits a merchant to charge two different prices for a product depending on how the consumer pays, such that the consumer must pay an "additional amount" for using credit as compared to cash. Fla. Stat. § 510.0117(1). But the law requires the prices to be framed in the state's preferred way, with the higher one listed as the "regular" price and the lower one listed as the "discount" price. That is nothing like the minimum-wage law.

Now take *Ford Motor Co. v. Texas Department of Transportation*, a case that appears throughout the Attorney General's brief. 264 F.3d 493 (5th Cir. 2001). That case involved a Texas law prohibiting automobile manufacturers from selling cars directly to consumers. *Id.* at 498. Texas enforced the law against Ford, which was advertising and selling cars directly to consumers in the state. *Id.* The Fifth Circuit held that this did not violate the First Amendment because (a) selling a car is commercial activity (*i.e.* conduct) that a state may regulate without being subject to heightened scrutiny, and (b) advertising an illegal commercial activity (*i.e.*, prohibited conduct) is not protected by the First Amendment even though it "constitutes commercial speech." *Id.* at 505–07; *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."). The court noted, however, that if Texas "prohibited advertising the sale of motor vehicles by licensed

dealers, a commercial activity lawful in Texas, the regulation would invoke the protections of the First Amendment and be subjected to the intermediate scrutiny outlined in [*Central*] *Hudson*." *Ford Motor*, 264 F.3d at 506.

If anything, Florida's law is more like the hypothetical regulation that would be subjected to scrutiny than the actual law the court upheld. True, dual pricing is a commercial activity. And true, Florida can regulate dual pricing if it wants to (by capping the price difference, say, or banning the practice altogether). If the state did so, the law would regulate conduct, and any speech advertising conduct made illegal by the law would be unprotected. That is what the Fifth Circuit held.

But that is not what the no-surcharge law does. As the Attorney General tacitly concedes (at 5), the only thing this law regulates is how dual pricing is *"label[ed]."* And just as plaintiffs cannot "bootstrap themselves into the heightened scrutiny of the First Amendment" by challenging a prohibition on conduct because it also prohibits advertising that conduct, *Ford Motor*, 264 F.3d at 506, nor can a state evade First Amendment scrutiny by claiming that a law prohibits conduct because the conduct is made illegal based solely on how it is characterized.

Next up is *Glickman v. Wileman Bros. & Elliott, Inc.*, which is even further afield. 521 U.S. 457 (1997). The Court in that case considered whether a compelled subsidy for generic advertising of tree fruits violated the First Amendment. The law involved "no restraint on the freedom of any producer to communicate any message to any

audience" and did not require producers "themselves to speak," but instead "merely required [them] to make contributions for advertising" a "message with which [they did not] disagree." *Id.* at 469–71. The Court upheld the requirement over a compelled-speech challenge. The Court did so, however, not because the law didn't involve speech, but because any speech imposition was incidental to a "broader collective enterprise in which th[e] freedom to act independently [wa]s already constrained by the regulatory scheme." *Id.* at 461, 469. As the Court later explained: The *Glickman* decision "proceeded upon the premise that the producers were bound together" by a statute that "replaced competition with a regime of cooperation," which "Congress [found] to be necessary to maintain a stable market." *United States v. United Foods, Inc.*, 533 U.S. 405, 412–15 (2001). Thus, "the imposition upon their First Amendment right" was "the logical concomitant of a valid scheme of economic regulation." *Id.*

That is a world away from the no-surcharge law. Far from being ancillary to some larger economic scheme (much less one exempted from the antitrust laws and deemed necessary to maintain a stable market), this law regulates one thing and one thing only: how merchants may communicate their prices to customers. *See United Foods*, 533 U.S. at 411–12 (distinguishing *Glickman* and holding law unconstitutional because the speech imposition was "the principal object of the regulatory scheme").

11

This brings us to the tobacco cases. *See* AG Br. 20–21, 27. The first case upheld the constitutionality of Providence's tobacco-discount law, which prohibits "reducing prices on tobacco products by means of coupons and certain multi-pack discounts." *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71, 74 (1st Cir. 2013). The Attorney General claimed below that this case conflicts with our position here because a tobacco "retailer who wanted to communicate the message that it was giving customers a bargain could lawfully sell three packs of cigarettes for $2.00 each, but could not sell two for $3.00 and say that the third would be free." Dist Ct. Dkt. 24, at 7. We responded that the law regulates economic conduct because, as anyone with a passing knowledge of economics knows, "selling cigarette packs for $2.00 each plainly is not the same conduct as selling them for $3.00 each and offering a buy-two-get-one-free discount." Dist. Ct. Dkt. 28, at 4.

Oddly, the Attorney General now says (at 27) that "[t]his gives the game away." But how is selling a product for $2 the same conduct as selling it for $3 and offering a buy-two-get-one-free discount? What if a consumer buys one product? Or three? Or five? (And so on.) The merchant will charge the consumer a *different price* depending on which pricing system it has, which is unquestionably conduct. The no-surcharge law, by contrast, regulates no prices but only the way in which pricing information is truthfully communicated to consumers.

12

The second case involves New York City's tobacco-discount law, which is similar to Providence's but also prohibits one-day sales. *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of New York*, 27 F. Supp. 3d 415 (S.D.N.Y. 2014). The Attorney General argues (at 21) that this case rejects our position because "merchants could engage in the economically identical transaction of lowering the listed price, so the law arguable penalized only calling the lower price a 'sale price.'" But neither the court nor the city interpreted the law in that way. And it is doubtful that New York City would allow a merchant to circumvent the law by lowering its cigarette prices for a single day, regardless of whether the merchant characterized that conduct as a sale. But if it did so—if the law permitted merchants to reduce all cigarette prices for a single day, just so long as merchants didn't advertise this to consumers or call it a "sale"—then yes, the law would make liability turn on speech, and yes, it should be subjected to scrutiny.

The same thing goes for the alcohol laws. The Attorney General points out (at 28) that Indiana "prohibit[s] bars from offering 'happy hours,'" and speculates that the state would allow a bar to "engage in the 'economically identical' conduct of reducing its prices" for one hour every day (say, from 5pm to 6pm). Again, it is doubtful that such a law could be so easily circumvented. The conduct that the law seeks to prohibit is lowering alcohol prices for a short period of time after work, however it is communicated. But if we indulge the Attorney General's fanciful

13

hypothetical, and Indiana were to interpret its law to permit this conduct so long as the bar does not characterize its lower prices as "happy hour" prices but as new, one-hour-long "regular prices"—the way that Florida permits merchants to charge more for credit so long as they do not characterize the additional amount as a "surcharge"—then Indiana's law would regulate speech and would have to satisfy scrutiny to survive. The key question is whether liability turns on labeling: If so, scrutiny applies. If not, not.

The Attorney General also notes (at 28) that Massachusetts "prohibit[s] bars from offering customers free drinks while allowing them to include drinks as part of a meal package." But that is clearly not the same conduct. In the latter scenario, a customer has to *spend money* to receive a drink (by buying a drink or a meal that includes a drink). In the former, a customer may receive a drink *for free*. Under Florida's no-surcharge, however, the customer spends the same amount of money for the same thing in every scenario; the only difference is the merchant's speech.

Then there are usury laws, which the Attorney General says (at 28) "have long restricted the rates lenders may charge, though in some cases a lender might simply increase other charges." It is unclear exactly what the Attorney General means by "other charges." If she is imagining flat fees, then of course those fees are not the same as a higher interest rate. Charging a 25% rate and a few $100 fees is not the same conduct as charging a 30% rate. A state could outlaw those fees or permit them,

14

and it would not implicate the First Amendment. But if the Attorney General is instead hypothesizing an extra fee that is calculated as a percentage of the loan amount (for example, a 25% interest rate and a 5% "extra fee"), then the state would probably see that fee for what it is—an attempt to circumvent the usury laws—and prohibit it as such.

Finally, the Attorney General invokes an obsolete distinction of antitrust doctrine (at 29) that prohibited "vertical price fixing" but "allow[ed] manufacturers to engage in the economically identical practice of announcing 'suggested prices' and refusing to deal with non-complying retailers." But the whole reason the Supreme Court overturned that distinction is because it made "little economic sense" and might impose "potential criminal liability" on a manufacturer who was "unaware of the subtle intricacies of the law"—based solely on how the manufacturer chose to "*discuss its pricing policy* with its distributors." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 902–03 (2007) (emphasis added). Although *Leegin* did not expressly confront the First Amendment, the Court's decision was obviously animated by its concerns about imposing criminal liability based solely on how a merchant truthfully "discuss[ed] its pricing policy." *Id.*

In the end, although the Attorney General conjures up fanciful examples of how merchants might attempt to circumvent laws regulating conduct by engaging in that conduct and simply calling it something else, the no-surcharge law is different,

perhaps even *sui generis*. By expressly permitting cash discounts and banning credit surcharges, the law *invites* circumvention of itself depending on how the conduct is communicated, and thus makes liability turn only on labels. It is hard to think of another law that does that.[2]

And so this constitutional challenge—supported by leading consumer national organizations as amici curiae—casts doubt on *none* of the consumer-protection laws relied on by the Attorney General. Nor does it implicate the current debate over attempts to use the First Amendment as a corporate and political deregulatory tool. *See, e.g.*, Wu, *The Right to Evade Regulation*, The New Republic, June 3, 2013; Purdy, *The Roberts Court v. America*, Democracy, Winter 2012.

States have broad authority to regulate the prices charged to consumers, and when they do so they do not have "satisfy the strictest level of First Amendment scrutiny." AG Br. 19. We don't contend otherwise. All we contend is that the choice of how best to frame a dual-pricing system—without changing the amounts charged—*is* expressive. "Pricing is a routine subject of economic regulation," as

---

[2] A better example would be this one: Imagine a law that said "merchants may not sell meat that is less than 80% lean, but may sell meat that is more than 20% fat." And suppose that the law were enacted because consumers respond differently to a label saying "25% fat" than one saying "75% lean." That law would either cancel itself out, or it would regulate the way fat content is labeled. But it would not regulate conduct. As absurd as this hypothetical law may sound, it better captures the true "*Alice in Wonderland*" nature of the no-surcharge law than anything the Attorney General can come up with.

16

Judge Rakoff explained, "but the manner in which price information is conveyed to buyers is quintessentially expressive, and therefore protected by the First Amendment." JA 41. Because Florida's no-surcharge law, in both its purpose and practical effect, falls on the speech side of the line, it must satisfy heightened scrutiny.

## II. Because Florida's no-surcharge law restricts speech, it is subject to heightened scrutiny, which it cannot withstand.

### A. Dual pricing is legal conduct.

In a last-ditch effort to avoid First Amendment scrutiny, the Attorney General (at 32-34) offers a profoundly circular argument—that the speech at issue is entirely unprotected because it is "speech about illegal conduct." AG Br. 33. But that argument "simply chases [the Attorney General's] tail. The lawfulness of the activity does not turn on the existence of the speech ban itself; otherwise, all commercial speech bans would all be constitutional." *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008). No court has held otherwise, and for good reason. Under a contrary rule, the commercial-speech doctrine would cease to exist.

The relevant question instead is whether the underlying conduct—dual pricing for cash versus credit—is legal. It is. As the district court acknowledged, "Florida law *allows* a merchant to exact a higher price from a customer who pays with a credit card" (so long as the consumer is not *told* that the price is higher for using a credit card). A-141 (emphasis added). "[T]he difference between a cash discount and a credit-card surcharge makes no difference in the price a customer

17

must pay when using either cash or a card." A-142. So speech that frames that price difference to emphasize that consumers are paying more for credit rather than less for cash "does not advance an illegal transaction," *id.*, and is not "inherently misleading." *In re R.M.J.*, 455 U.S. 191, 203 (1982).

The examples on which the state relies—advertising of *otherwise illegal* gender discrimination and *otherwise illegal* in-state business by out-of-state lawyers and car dealers—are self-evidently different. *See Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376 (1973); *Gould. v. The Fla. Bar*, 259 F. App'x 208, 210 (11th Cir. 2007) (unpublished); *Ford Motor*, 264 F.3d at 505−06. Those cases all involved merchants who wanted to advertise conduct, entirely separate from the regulated speech itself, that was illegal anyway. They did not involve situations, like this one, in which liability turns solely on the way the same transaction is labeled or characterized to the consumer. Here, because it is "entirely lawful" to charge a consumer more for using a credit card, the speech in which the plaintiffs seek to engage "relates to lawful activity." *Motor Vehicle Mfrs. Ass'n of the U.S. v. Abrams*, 684 F. Supp. 804, 806 (S.D.N.Y. 1988). Because "[t]he regulated speech pertains solely to dual pricing, which all parties agree is lawful in itself," the state cannot evade scrutiny. *Expressions*, 975 F. Supp. 2d at 446.

18

**B.    The state's consumer-protection interest is wholly unsubstantiated, and at odds with the statute's history.**

When it comes time to actually defend the no-surcharge law, the Attorney General abandons two of the three rationales identified by the district court (promoting "happier customers" and ensuring a single price scale). And she devotes just four half-hearted pages to the task (at 35-38), mainly seeking to water down the test rather than satisfy it. The principal justification she puts forward—preventing consumer deception through bait-and-switch advertising—only highlights the fact that the law is aimed at speech, not conduct. Again, what the law regulates "cannot simultaneously be non-communicative" and yet "pose the risk of communicating a misleading message." *BellSouth*, 542 F.3d at 510. The Attorney General cannot have it both ways, and she never tries to reconcile the contradiction. Nor, as we explain below, does she come close to meeting her burden to show that the law directly advances a legitimate interest and is no more extensive than necessary in doing so.

Given the genesis of the surcharge ban—which was (and is) opposed by national consumer groups and championed by the credit-card industry because the surcharge label conveys a "negative statement about the card to the consumer"— the state's purported concerns about consumer deception and confusion ring hollow. *See* Br. of Amici Consumer Action, National Association for Consumer Advocates, National Consumers League, U.S. Public Interest Research Group, and Florida Public Interest Research Group at 16-20 (debunking the state's consumer-protection

19

justifications). The state cannot avoid the fact that Florida's law was, as Judge Rakoff put it, "enacted in the name of consumer protection at the behest of the credit-card industry over the objection of consumer advocates." *Expressions*, 975 F. Supp. 2d at 449. Indeed, the judge presiding over the massive national antitrust litigation concerning Visa and MasterCard's swipe-fee policies (a judge who therefore has unmatched familiarity with the real-world effect of no-surcharge rules) pronounced the no-surcharge statutes "anti-consumer" and "irrational." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 2013 WL 6510737, *19-*20 (E.D.N.Y. 2013).

Despite all this, the state offers nothing to substantiate its purported consumer-protection interest in enacting the statute. Although *Central Hudson*'s second prong requires the state to show, with evidence, "that its fear of consumer confusion is real," *BellSouth*, 542 F.3d at 509, the state claims that it may rely on nothing more than "common sense." But "common sense" can't explain the need for a complete ban on all speech framing the price difference as a "surcharge," no matter how prominently disclosed to the consumer ahead of time. And, in any event, "common sense" isn't enough. "While empirical data supporting the existence of an identifiable harm is not a sine qua non for a finding of constitutionality, the Supreme Court has not accepted 'common sense' alone to prove the existence of a concrete, non-speculative harm." *Mason v. Fla. Bar*, 208 F.3d 952, 957 (11th Cir. 2000).

**C.    The state fails to show that the statute is no more extensive than necessary to directly advance an interest in consumer protection.**

Finally, the Attorney General barely even attempts the showing necessary to survive the third and fourth prongs of *Central Hudson*: that the statute is "narrowly tailored"—that it is "no more extensive" than necessary to "directly advance" consumer protection. *Central Hudson*, 447 U.S. at 566. Nor could it. Ready alternatives exist that would be both *less restrictive* of speech and *more effective* in addressing the state's purported aims.

*Central Hudson*'s third prong imposes a heavy burden. It "requires a state's restrictions on speech to target an identifiable harm and mandates that the state's restrictions on speech mitigate against such harm in a direct and effective manner." *Mason*, 208 F.3d at 956. And the fourth prong is even more demanding. It requires the state to justify its restriction on speech in light of the alternatives. At the very least, under Supreme Court and Eleventh Circuit precedent, the state must explain "why remedies other than content-based rules would be inadequate." *Sorrell*, 131 S. Ct. at 2669; *see This That & The Other Gift & Tobacco, Inc. v. Cobb Cnty., Ga.*, 439 F.3d 1275, 1280 (11th Cir. 2006) (directing summary judgment for plaintiffs where a Georgia statute was "more extensive than necessary" under *Central Hudson* because "[l]ess onerous restrictions adequately would serve Georgia's interest").

These inquiries yield a firm command: "States may not place an absolute prohibition" on information that is merely "potentially misleading … if the information also may be presented in a way that is not deceptive." *R.M.J.*, 455 U.S. at 203. But what exactly is deceptive about a merchant who prominently and conspicuously discloses a 3% credit-card surcharge at every step, so the consumer knows exactly how much she will pay and fully registers the impact of swipe fees on the purchase price? The state never says.

On the other hand, if the state were serious about preventing consumers from being "lured by a 'low, rock-bottom price' only to be charged an inflated price at the register'" (AG Br. 35), why not simply enforce its existing false-advertising law? *See BellSouth*, 542 F.3d at 508; *Expressions*, 975 F. Supp. 2d at 447; Fla. Stat. § 501.201 *et seq.* Or, if that's not enough, why wouldn't the problem be wholly alleviated through a special false-advertising law for dual pricing, specifically outlawing this precise type of deceptive advertising the state identifies? Or why not specifically allow merchants to highlight the extra cost of credit by labeling it a "surcharge" and then insist on prominent disclosure before the point of sale—as Minnesota does, *see* Minn. Stat. § 325G.051(1)(a), and as the national consumer advocacy groups and the Federal Reserve Board both urged in the 1980s? The Attorney General never even attempts to explain why these "numerous and less burdensome alternatives to the restriction

on commercial speech" would not be adequate. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993).

Similarly, the recent national class-action settlement agreements with Visa, MasterCard, and American Express require merchants to "provide clear disclosure to the merchant's customers at the point of store entry" and additional "clear disclosure … at the point of interaction or sale with the customer." Settlement ¶ 42(c), *available at* https://www.paymentcardsettlement.com. Yet Attorney General Bondi sent cease-and-desist letters to all the plaintiffs, *after* the settlement's disclosure provisions had been announced. A-66, 70, 75, 80. Indeed, her office went further, informing merchants that "[r]egardless of the terms of that settlement," the no-surcharge law broadly prohibits use of the surcharge label. *Id.*

Finally, if the state were serious about ensuring that merchants won't try to "generate extra profits" beyond the cost of swipe fees (AG Br. 36), then why not regulate the level of permissible difference between the cash and credit prices? The law permits a merchant to charge, for instance, $100 for a product with cash payment and $200 with credit payment—but only if the difference is characterized as a "cash discount." It would be easy enough to require that the price difference between cash and credit may not exceed the actual swipe fees. Indeed, Florida knows how to draft such a statute because it limits the price difference for charges made by local government units. *See* Fla. Stat. § 215.322(5) (permitting government units to

23

charge "an amount sufficient to pay the service fee charged by the final institution, vending service company, or credit card company for such services"). Such a restriction would not restrict any speech at all, and would be far more effective in preventing windfall profits. Where, as here, "[i]t is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal," the state "cannot satisfy the requirement that its restriction on speech be no more extensive than necessary." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996). The existence of all these alternatives—and the state's complete failure to even address them—is fatal to its defense of the no-surcharge law.[3]

## III.  Florida's no-surcharge law is unconstitutionally vague.

The Attorney General also argues that the no-surcharge law is not unconstitutionally vague. Before making that argument, however, she faults the plaintiffs—each of whom received a letter from her office notifying them that they "may be in violation" of a criminal law, A-66, 70, 75, 80—for not waiting to be prosecuted before seeking clarity about what the law means. *See* AG Br. 40–42. Her

---

[3] The Attorney General (at 39-49) characterizes this case as a "facial challenge" and argues that "even if the Court were to determine that the Statute fails First Amendment scrutiny," the plaintiffs should obtain no relief for that reason. But this is an as-applied challenge, based on specific facts about the speech in which the plaintiffs seek to engage (*see* A-62–76), and they seek relief only as to them—not as to others.

24

main authority for that eye-popping assertion is *Bankshot Billiards, Inc. v. City of Ocala*, in which this Court expressed concern about litigants "comb[ing] the statute books for poorly drafted laws and su[ing] to enjoin their enforcement." 634 F.3d 1340, 1349 (11th Cir. 2011). The merchant in that case "did not allege facts about [its] business and then describe how [it] was unable to understand the [law] as applied to its business model," nor did it allege that it was "chilled from engaging in constitutionally protected activity." *Id.* at 1345, 1350. But the plaintiffs here have specifically alleged that they have been chilled from engaging in constitutionally protected speech. *See* Opening Br. 20–26, 51–55. And when that is so, this Court allows for pre-enforcement review to "provide[] law-abiding citizens with a middle road between facing prosecution and refraining from otherwise constitutional conduct." *Bankshot Billiards*, 634 F.3d at 1350.

As for the merits, the Attorney General claims (at 43) that the no-surcharge law isn't vague because "this Court need only look to the Statute itself, which defines the conduct that is prohibited." And that conduct, in her view, is the act of charging an "additional amount" for credit. AG Br. 43 n.14. Of course, the law *doesn't* prohibit that activity. As discussed above, it prohibits only how the activity is characterized. And the statutory text, rather than clarify, *creates* confusion. Although the definition of surcharge is not by itself unclear, the law introduces vagueness by expressly

25

permitting cash discounts even though they too require the credit-card customer to pay an "additional amount" as compared to the cash customer.[4]

The Attorney General admits that the law doesn't prohibit charging less for cash—a $2 cash "discount" is okay, a mathematically equivalent $2 credit-card "surcharge" is verboten. So what's the difference? What is a merchant supposed to do if it wants to charge 2% more for credit? And if customers ask about this, what is the merchant supposed to tell them? The Attorney General does not say.

Instead, she dismisses these concerns as "hypothetical." AG Br. 44. But they are concerns that any merchant who employs or would like to employ a dual-pricing system must face. Customers will ask questions about it, and merchants need to know how to respond. For example, what if TM Jewelry resumes dual pricing and takes pains to frame the difference as a cash discount, but then a customer calls and asks for its prices, the way that someone from the New York Attorney General's office called dozens of merchants several years back and asked for their prices? *See, e.g.*, A-107. What is TM Jewelry supposed to say? Or what if someone in the store asks TM Jewelry if it charges more for credit, as a customer did to the merchant in *Fulvio*? Again, what is TM Jewelry supposed to say?

---

[4] Another way of thinking about it is this: What makes Florida's law any different from a law saying that "a merchant may charge consumers more for using a credit card, but only if the merchant frames the additional amount as a cash discount rather than a credit surcharge"?

The Attorney General seeks to downplay these concerns—and thus distance itself from New York—by asserting (at 43–44) that the plaintiffs "are simply wrong that a merchant may violate the law solely by telling a customer that it charges 'more' for credit." But the very fact that Florida purports to interpret its no-surcharge law more narrowly than New York does—to cover labeling, signs, and advertising, but not conversations—only underscores its vagueness. The statutory text does not reveal this nuance, and merchants should not be expected to read the Attorney General's brief in this case to learn what the law means. The Attorney General provides no compelling reason why this Court should regard Florida's statute as any different from New York's, nor provide any assurance for Florida merchants that the state's law will not be interpreted similarly in the future.

Nor does she grapple with any of the cases that have addressed the meaning of state no-surcharge laws and universally grasped their incoherence. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 2013 WL 6510737, at *19–*20 (E.D.N.Y. 2013) ("No-surcharge laws are not only anti-consumer, they are arguably irrational."); *Expressions*, 975 F. Supp. 2d at 435 ("*Alice in Wonderland* has nothing on [New York's no-surcharge law]."); *Fulvio*, 517 N.Y.S.2d at 1012 (holding that the no-surcharge law, by prohibiting credit surcharges but permitting cash discounts, is "so vague, uncertain and arbitrary of enforcement as to be fatally defective"). It is possible, of course, that all of these judges simply failed to

27

grasp the essential clarity of the no-surcharge statute. But the Attorney General doesn't say why that is. The more likely explanation—by far—is that these laws (Florida's included) are hopelessly, unconstitutionally vague.

## CONCLUSION

The district court's judgment should be reversed in its entirety.

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

Gary B. Friedman
Rebecca Quinn
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

David Frank
FRIEDMAN, FRANK & ABRAHAMSEN
524 E. College Avenue
Tallahassee, FL 32301
(850) 224-4357

March 12, 2015

*Counsel for Plaintiffs-Appellants Dana's Railroad Supply, et al.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that my word processing program, Microsoft Word, counted 6,975 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

*/s/ Deepak Gupta*

March 12, 2015                    Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2015, I electronically filed the foregoing Reply Brief for Plaintiffs-Appellants with the Clerk of the Court of the U.S. Court of Appeals for the Eleventh Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta